FILED
2009 Feb-06  AM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED

02 FEB -8  PM 12: 4 :

U.S. DISTRICT COURT
N.D OF ALABAMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-75-S-666-S** |
| | ) | |
| **JEFFERSON COUNTY, et al.,** | ) | |
| **Defendants.** | ) | ENTERED |
| ─────────────────────── | ) | |
| **JOHN W. MARTIN, et al.,** | ) | FEB – 8 2002 |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-74-S-17-S** |
| | ) | |
| **CITY OF BIRMINGHAM, et al.,** | ) | |
| **Defendants.** | ) | |
| ─────────────────────── | ) | |
| **ENSLEY BRANCH OF THE N.A.A.C.P., et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-74-S-12-S** |
| | ) | |
| **GEORGE SEIBELS, et al.,** | ) | |
| **Defendants.** | ) | |



### MEMORANDUM OPINION

These actions are before the court on the motion of the Jefferson County Personnel Board seeking permission to use the register resulting from administration of the revised selection procedure for the Police/Deputy Sheriff Sergeants' promotional classification (doc. no. 841). The parties have represented to the court that they do not object to interim use of this register, *provided* the Personnel Board is required to develop a third, revised selection procedure for the sergeants' classification that complies with both the requirements of the consent decree and the *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. Part 1607.[1] Accordingly, this aspect of

---

[1] The *Uniform Guidelines on Employee Selection Procedures* (1978) represent a joint statement of the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department

the Board's motion — allowing interim use of the register — is due to be granted, as is the Board's motion to file the police/deputy sheriff sergeants' register under seal (doc. no. 845).

For the reasons set forth below, however, the court will not adopt the Personnel Board's proposed schedule for development of a third, revised selection procedure for the sergeants' promotional classification.

## I. FACTUAL BACKGROUND

The lawfulness of the employee selection procedures used by the Personnel Board and the City of Birmingham has been at issue for more than a quarter century. As Judge Carnes recently observed, these cases are "already older than the average college student."[2] The entire history of the litigation need not be repeated for present purposes; even so, the history of selection procedures for the police/deputy sheriff sergeants' promotional classification is highly relevant to the following discussion.

The public safety positions have been at the heart of these controversies since the outset. Nonetheless, the lawfulness of the sergeants' selection procedure remains unresolved. In its most recent, albeit now seven-year-old opinion on remand, the Eleventh Circuit observed that "[a]n end to racial discrimination demands the development of valid, non-discriminatory selection procedures to replace race-conscious selection procedures. We hesitate to label this essential object 'long-term,' because it should be pursued with a sense of urgency." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1571 (11th Cir. 1994). Despite the passage of more than seven years, the Personnel Board seems no closer to attaining that goal with respect to the sergeants' promotional classification.

---

of Justice as to the characteristics of acceptable selection procedures. *See* 43 Federal Register 38, 290-38, 315 (Aug. 25, 1978) (*Adoption of Four Agencies of Uniform Guidelines on Employee Selection Procedures*).

[2]*Birmingham Fire Fighters Association 117 v. Jefferson County*, No. 01-14262 (11th Cir. Jan. 7, 2002).

Indeed, the words written by the Eleventh Circuit in 1994 still apply today:

> [T]he single most important race-neutral alternative contained in the decrees was the requirement that the Board develop and put in place non-discriminatory selection procedures — a requirement that the Board has not satisfied. The Board was quite properly ordered to implement selection procedures that *either* had no disparate impact on blacks and women *or* that, despite having disparate impact, were "job related" as that term is used in Title VII. Moreover, if the Board chose the second approach, adopting procedures that were job-related despite having some disparate impact, then the Board was required to search for selection procedures that were equally job-related but with less adverse impact. These decree provisions roughly parallel the requirements of Title VII, which mandates that an employer use either a selection procedure with no adverse impact or a job-related selection procedure that has no more adverse impact than other, equally job-related selection procedures. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

*Ensley Branch*, 31 F.3d at 1571 (emphasis in original).

Following the Eleventh Circuit's remand to this court, the Personnel Board was bound, by

the terms of the December 19, 1995 order modifying the Board's 1981 consent decree, to

> develop and implement selection procedures for hiring and promotion meeting the requirements of paragraph 12 of this Order[3] and to provide the parties information

---

[3]Paragraph 12 of the 1995 Order Modifying the 1981 Jefferson County Personnel Board Consent Decree provides:

> 12. It shall be the Personnel Board's responsibility to establish that each selection procedure required or used by the Personnel Board, including each standard (including minimum qualifications used to determine which applicants are qualified or eligible to apply for a job or submit to a selection device), procedure, test, or other device, shall either: (1) have no adverse impact on the basis of race or sex, as defined by the *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607 *et seq.* (1994), (hereinafter "the *Uniform Guidelines*"); or (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the *Uniform Guidelines*[,] and other applicable Federal law.² If a selection procedure or combination of selection procedures is used by the Personnel Board to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use. In accordance with the *Uniform Guidelines*, where there exists adverse impact in a selection procedure, as part of its consideration of the job relatedness and validity of any selection procedure, the Personnel Board shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact. Whenever the Personnel Board, a jurisdiction served by the Personnel Board, or any party identifies a race [and gender]-neutral selection procedure that has less adverse impact than a selection procedure required by the Personnel Board and that alternative procedure is also agreed by

concerning its use and proposed use of these selection procedures, including the information described in paragraph 30 of this Order,[4] pursuant to the following timetable: (a) for promotional police service job classifications in the police departments and County Sheriff's Office and promotional fire service job classifications in the fire departments, within 12 months of the entry of this Order [*i.e.*, by December 19, 1996] ....[5]

This was not accomplished.

Indeed, it was not until the early part of 1999 that the Personnel Board even began to develop

a selection procedure for the sergeants' promotional classification. The Personnel Board selected

a consultant, SHL-Landy Jacobs, Inc., to devise the selection procedure. Landy-Jacobs began the

_____

the parties to be job related for the job classification in question and consistent with business necessity and in accordance with applicable law, such alternative selection procedure shall be used by the Personnel Board, absent good cause shown.

Footnote 2 to paragraph 12 states: "For all purposes relevant to this Order, adverse impact shall be defined as it is in the *Uniform Guidelines*."

[4]Paragraph 30 of the 1995 Order Modifying the 1981 Jefferson County Personnel Board Consent Decree provides:

> 30. The Personnel Board shall make [available to counsel for all parties] all data concerning the development of any selection procedures used or proposed to be used by the Personnel Board, including but not limited to, the adverse impact of the selection procedure when used by the Personnel Board, or if applicable, by other users, the effect of the selection procedure on the composition of eligibility registers for the job classifications at issue, the effect of the use of the selection procedure on the composition of certification lists for the job classifications at issue, job analyses, expert reports and validation studies.... This information shall be provided to all parties by the Personnel Board on the dates set out in paragraph 19 of this Order [N.B.: see below]. This information shall be provided in machine-readable form to the extent it exists in that form.

> Further, within fourteen (14) days of its receipt of a written request from any party, the Personnel Board shall provide the requesting party with copies of any additional information concerning the adverse impact or job relatedness of the job classification at issue in the possession or control of the Personnel Board but not provided by the Personnel Board pursuant to the dates set out in paragraph 19 of this Order [N.B.: see below]. However, if an examination is in progress for the job classification for which additional information is requested, the Personnel Board may defer providing information about the current examination process for fourteen (14) days after the examination process is completed.

*Nota bene*: The dates set out in paragraph 19 of the 1995 Order Modifying the 1981 Jefferson County Personnel Board Consent Decree have been superceded by the dates specified in paragraphs 18 and 19 of the orders entered by this court on December 18, 2000 (doc. no. 708), and May 24, 2001 (doc. no. 758).

[5]Order Modifying the 1981 Jefferson County Personnel Board Consent Decree entered on December 19, 1995, ¶ 19, at 6.

process by conducting a "job analysis."[6]  The purpose of the job analysis was to develop a comprehensive description of the content of the sergeants' classification[7] by interviewing and surveying incumbent sergeants, who are referred to as "subject matter experts," to determine the

---

[6]The *Uniform Guidelines* require a job analysis for those selection procedures, such as the one at issue here, that are to be justified on the basis of content validity:

> There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) and/or important work behavior(s) constituting most of the job.

29 C.F.R. § 1607.14(C)(2).

[7]Professors Gatewood and Feild have observed that

> a selection measure has content validity when it can be shown that its content (items, questions, etc.) representatively samples the content of the job for which the measure will be used. "Content of the job" is composed of those job behaviors that are necessary for effective job performance. The behaviors that compose the content of the job to be assessed are referred to as the *job content domain*. *For a measure to possess content validity, it must be representative of the job content domain.* This requirement is true for both predictors and criteria. But, in addition to job behaviors, selection measures (in particular, predictors such as paper-and-pencil tests) should also be representative of the KSAs [knowledges, skills, and abilities] necessary for performing these behaviors. If we want to infer the extent to which a job applicant possesses a skill or knowledge that is necessary to perform a job at the present time (present job competence), then a content validity strategy is appropriate.

Robert D. Gatewood & Hubert S. Feild, *Human Resource Selection* 173 (5th ed. 2001) (emphasis in original). *See also Uniform Guidelines*, 29 C.F.R. § 1607.14(C)(1), pertaining to the appropriateness of content validity studies, and providing that:

> Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledge, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

> A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledge, skills, or abilities which an employee will be expected to learn on the job.

duties typically performed by the occupants of such positions.[8] The subject matter experts were also consulted about the knowledges, skills, and abilities ("KSAs") necessary for effective job performance.  Based on the information gathered from the subject matter experts, a list of critical tasks and KSAs was generated for the sergeants' classification. The subject matter experts rated the identified items using a five-point scale to indicate the manner of use,[9] and a four-point scale to indicate the relative importance of each.[10]   The use ratings ranged from (A) to (E), where (A) indicates that the incumbent always consults a reference, (C) indicates that the information must be recalled from memory 50% of the time and may be referenced 50% of the time, and (E) the information must always be recalled from memory.  The relative importance ratings ranged from (A) "not very important" to (D) "critical."

With this information in hand, the selection procedure was developed.  The selection procedure had three components: a written multiple-choice technical knowledge test, consisting of 103 questions[11] divided between closed-book and open-book portions; a written in-basket exercise, consisting of 34 questions[12] in a multiple-choice format; and, an oral board simulation.  For the

---

[8]Professors Gatewood and Feild observed, as have many others, that the design of a selection procedure to be validated on the basis of a content validity study

requires the use of expert judgment.  Usually, these judgments are obtained from job incumbents and supervisors serving as *subject matter experts.*  Subject matter experts are individuals who can provide accurate judgments about the tasks performed on the job, the KSAs necessary for performing these tasks, and any other information useful for developing selection measure content.  *Because of their importance, it is essential that these judges be carefully selected and trained in how to serve as a judge.*

Robert D. Gatewood & Hubert S. Feild, *Human Resource Selection* 175 (5th ed. 2001) (emphasis supplied).

[9] SHL Landy Jacobs, Inc., Validation Report:   The Personnel Board of Jefferson County Promotion Examinations for Police/Sheriff's Sergeant, Lieutenant, and Captain (Aug. 2000), at 23.

[10]*Id.*

[11]Two questions were omitted following candidate appeals.  *Id.* at 54.

[12]One question was omitted following candidate appeals.  *Id.* at 56.

sergeants' classification, a multiple-hurdle approach was used — *i.e.*, only those candidates who

scored higher than the "cut-score" established by the Personnel Board for the technical knowledge

and in-basket components were eligible to advance to the oral board component of the selection

procedure.[13] This court described the administration and scoring of the original selection procedure

in an order entered on May 1, 2001, as follows:

> The Personnel Board administered the technical knowledge examination on
> December 13, 1999, and the "in-basket" exercise on December 16, 1999. A total of
> 392 candidates sat for the first two components of the selection procedure. Each
> candidate's scores on the first two components were weighted to arrive at a
> composite score. In determining the composite score that would be deemed the
> passing point for the first two components of the selection procedure, the Personnel
> Board considered, among other matters, the estimated number of promotions that
> would occur within a particular jurisdiction over the life of each register and the
> adverse impact at different passing points. The Personnel Board found that an
> appropriate number of persons would be available on each jurisdictional register if
> the composite passing point for the first two components (which the parties generally
> have referred to as a "cut score") was set at 47.26, but the Board ultimately decided
> to lower the cut score to 41.00 in order to reduce adverse impact. In other words,
> only those candidates who achieved a weighted composite score on the two written
> examinations of 41.00 or higher were allowed to advance to the final, oral component
> of the selection procedure. A total of 317 candidates out of the 392 persons who sat
> for the written examinations (81%) achieved such a score.

---

[13]*Id.* at 64. Landy Jacobs's justification for this approach was as follows:

> With respect to the use of a cut-score at interim test phases, an attempt was made to allow
> candidates to participate in both test phases, if administratively practical and logical. However, if
> there were many more candidates than ultimately would be placed onto the final eligible register, that
> [sic] candidates toward the bottom of the list would have no chance of appearing on the final register,
> and the number of candidates at Phase I made participation of all candidates in the Phase II Oral Board
> prohibitive, a Phase I cut was established. Otherwise, all candidates were permitted to participate in
> all test phases and a cut was established on the final register. A Phase I cut was implemented only for
> the sergeant's examination.

*Id.* Compare the foregoing with 29 C.F.R. § 1607.5(H), pertaining to "cutoff scores," and providing:

> Where cutoff scores are used, they should normally be set so as to be reasonable and
> consistent with normal expectations of acceptable proficiency within the work force. Where applicants
> are ranked on the basis of properly validated selection procedures and those applicants scoring below
> a higher cutoff score than appropriate in light of such expectations have little or no chance of being
> selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact
> should be considered.

The Personnel Board began notifying the 317 candidates eligible to proceed to the final component of the selection procedure on February 9, 2000, and scheduled the oral boards for the weeks of February 21-25 and March 27-31, 2000. Each candidate's score on the oral board component was combined with her or his scores on the two written components to form a final composite score. Candidates whose final composite score was greater than or equal to 41.00 were placed on the appropriate jurisdictional register of persons eligible to be considered for promotion to the rank of sergeant within some governmental law enforcement department serviced by the Board. The Personnel Board did not disclose the results of the oral boards to the parties (or its proposed overall scoring of all three components of the selection procedure) until June 15, 2000.

The Personnel Board's scoring methodology resulted in registers demonstrating adverse impact against black candidates. The United States and the Martin Plaintiffs/Bryant Interveners accordingly objected to the use of such registers within the City of Birmingham.[14]

The United States proposed an alternate use of the results of the first administration of the original selection procedure, to attempt to reduce the adverse impact against black candidates. The original results became known as "use 1," and the alternate use proposed by the United States became known as "use 2." The Wilks class objected to "use 2," because applicants had already been advised by the Personnel Board of their scores, and "use 2" would have resulted in changes in the rank order of candidates. The parties were unable to resolve the dispute, and the United States filed a motion asking the court to approve an interim use of the registers of persons eligible for promotion to the rank of sergeant within the Jefferson County Sheriff's Department, the City of Birmingham Police Department, and the police departments of the other, minor municipalities serviced by the Personnel Board[15] — but only as such candidates were scored (and their rank order on the resulting

---

[14]Order on the United States' Motion to Approve an Interim Use of Existing Police/Deputy Sheriff Sergeant Registers of Eligibles, entered on May 1, 2001 (doc. no. 749), at 3-4 (footnotes omitted). One of the omitted footnotes provided: "Since the inception of this litigation, now more than 26 years ago, the parties and courts have consistently referred to American citizens with African ancestors as 'blacks.' For that reason only, this court continues the practice." *Id.* at 4 n.9.

[15]These municipalities include Bessemer, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Irondale, Leeds, Midfield, Mountain Brook, Pleasant Grove, Tarrant, Trussville, Vestavia Hills, and Warrior, Alabama.

registers established) pursuant to procedures agreed to by the Personnel Board, the Martin plaintiffs and Bryant intervenors ("Martin/Bryant parties"), and the United States.

Following consideration of the motion, the arguments of the parties, and the advice of the Special Master, this court determined that

> "Use 2" methodology *does* significantly reduce adverse impact on the register of those persons eligible for promotion to the rank of sergeant within the City of Birmingham Police Department. Even so, it does not eliminate adverse impact. Moreover, the ameliorating effects of "use 2" are achieved at the expense of working significant changes in the scores and (especially) rank order of candidates on the City's register of eligibles. Further, while the total number of white candidates certified under "use 1" and "use 2" may not change, individual candidates who would have been certified under "use 1" may not be under "use 2." This court therefore agrees with the Wilks class that such an approach would have the effect of "changing the rules," is inherently unfair, and may undermine confidence in the selection procedures for key public safety positions.[16]

This court accordingly directed the Personnel Board to re-administer all three components of the selection procedure to all candidates for promotion to the rank of sergeant in the City of Birmingham Police Department, in accordance with the schedule and instructions set forth in the order. Moreover, this court provided the Personnel Board with the option of utilizing the existing registers as defined in "use 1" outside the City of Birmingham or, if the Personnel Board chose, it could re-administer all three components of the revised sergeants' selection procedure to *all* candidates for promotion to the rank of sergeant, regardless of governmental jurisdiction serviced by the Board.[17] The Personnel Board chose the latter course.[18]

In accordance with the court's schedule, the Personnel Board and its consultant (SHL-Landy

---

[16]Order on the United States' Motion to Approve an Interim Use of Existing Police/Deputy Sheriff Sergeant Registers of Eligibles, entered on May 1, 2001 (doc. no. 749), at 10 (footnote omitted).

[17]*Id.* at 7-8.

[18]Transcript of Proceedings, May 31-June 1, 2002 (doc. no. 768), at 18-19.

Jacobs) began work on revising the selection procedure.  One of the first deadlines imposed by the court called for the parties to submit their objections to the existing selection procedure, and to specify the questions they believed should be revised or eliminated.  The Martin/Bryant parties responded as follows:

> we object to the use of the specific items that we have identified.[19]  We have objected to over 54% of the items from the written components of this device: 49% of the technical knowledge items and 72% of the in-basket items.  We also propose revisions to approximately 23% items [sic].  The remaining items (that were not objected to on standard testing principles or subject to modification) cannot purport to measure the same number of ability areas as the original test purported to measure. The reliability of the remaining items has been perforce reduced.[20]

The United States also had many objections to the existing selection procedure, including:

(1) the multiple-choice test format did not reflect the sergeant job; (2) there was inadequate support

for a portion of the technical knowledge examination to be given in a closed-book, rather than an

open-book, format; (3) there was inadequate evidence linking the test content with the sergeant job;

(4) there was inadequate evidence that the knowledges, skills, and abilities that the written test

purported to measure were required on "day one" of the job, rather than learned on the job; (5) the

multiple-choice format of the in-basket test was not useful for measuring job content;[21] and (6) the

---

[19]The Martin/Bryant parties objected to individual questions on the written technical knowledge and in-basket components of the selection procedure on one or more of the following grounds: (1) a statistical analysis of whether groups of individuals with the same overall test score have the same probability of answering an item correctly; (2) a statistical analysis demonstrating the extent to which high-scoring candidates have a high probability of answering an item correctly and low-scoring candidates have a low probability of answering a question correctly; (3) there were multiple correct alternative answers to the question; (4) the item-total correlation (i.e., the extent to which ability is related to responses to a particular item) was negative or low (less than .10); (5) there were severe violations of professional item-writing guidelines; (6) only a small number of candidates answered correctly; and (7) a single "distractor" (alternative response) was chosen more often by candidates than the "correct" answer. May 18, 2001 letter from Farah S. Brelvi, counsel for the Martin/Bryant parties, to opposing counsel and the Special Master.

[20]Id.

[21]The United States offered the following example of how it considered the format to be flawed:

> One example is the question concerning the appropriate response to a request from an officer to take leave.  In the context of the job, the sergeant would have an opportunity to discuss this request with the requesting officer, determine the circumstances, and consider other alternatives, such as explaining

-10-

technical knowledge component emphasized memorization or knowledge of terminology drawn from texts on Constitutional law and principles of police supervision, rather than application of those principles.[22]

To amplify its objections, the United States submitted the report of Harold W. Goldstein, Ph.D., dated May 9, 2001. With respect to the Personnel Board's determination that some test items were appropriate for the closed-book portion, while others were more appropriate for the open-book portion of the written technical knowledge component, Dr. Goldstein observed:

> SHL LJ [Landy Jacobs] justifies the distinction based on SME [subject matter expert] judgments regarding the manner by which a Sergeant uses the type of knowledge tapped by a test item. For example, if a Technical Knowledge Test question taps knowledge that a Sergeant must be able to recall from memory, then the item is placed on the closed-book part of the test. On the other hand, if a question taps knowledge that a Sergeant would be able to look up in a source (*e.g.*, a manual or guide), then the item is placed on the open-book part of the test. SMEs made judgments on a scale about the knowledge being tapped in terms of the level of recall required. The 5 point scale ranged from "(1) I am always able to refer to the source; I never need to recall the information from memory" to "(5) I am never able to refer to the source; I must recall the information from memory all of the time." Based on this SME data, questions were divided into the closed-book and open-book format.
>
> An issue that emerges is the dividing point for being on the closed-book or open-book format. SHL LJ set the cutoff at 2.45. That is, all items rated at 2.45 or above are assigned to the closed-book format. No reasonable rationale is provided for this cutoff. This approximate midpoint on the scale is labeled as information that a Sergeant "50% of the time is able to refer to the source (*e.g.*, manual); and 50% of the time must recall the information from memory." If Sergeants on the job can 50% of the time look up the information in a manual or guide, why would this need to be tested in a closed-book format? *In fact, one could argue that since the test is choosing Sergeants for when they first get on the job, then this is something that they*

---

to the officer why he or she cannot take leave that day, or asking the officer to attempt to find another officer who will agree to switch days off. This is not the type of circumstance that is suited to a multiple-choice response. Even if the correct response is chosen, the response tells us little or nothing about the candidate.

United States' Report on Written Test Components of Police Sergeant, at 5-6.

[22]*See id.* at 4-7.

> *can look up at first and eventually commit to memory over time.* We can not directly assert this because *SHL LJ did not collect data on what knowledge is necessary when you first get on the job.*[23]

Dr. Goldstein also observed that

> the cutoff set for the Sergeant test is 2.45 as compared to 2.50 for the Lieutenant and Captain exam. However, according to SHL LJ, this was not done for any job-relevant reason. They note in the Validation Report that this was set so that the number of test items on the open-book test would not exceed 60 questions (Validation Report, p. 26). Thus, in part, some items were shifted to the closed-book test only because there were too many items in the open-book test. *This rationale certainly does not seem job relevant, which was the purported original basis for these decisions.*[24]

Dr. Goldstein concluded as follows:

> [T]he review of the Jefferson County case reveals numerous shortcomings with regard to the development and implementation of the selection system for Police/Sheriff Sergeant position. The following critical problems emerged from the review that focused on the written test components:
>
> ● The job analysis over emphasizes [sic] rote technical knowledge and under-emphasizes critical abilities of the job. When abilities are focused on, they tend to be of a more cognitive nature. Subsequently, the written tests do not capture the full range of critical abilities.
>
> ● The test design relies too heavily on a standardized written multiple-choice methodology. This approach tends to measure irrelevant competencies such as reading comprehension and the ability to choose between multiple options.
>
> ● Formal content validity data was not reported on these tests, and potentially was not conducted.[25]

Based on these criticisms of the existing selection procedure, the United States recommended

that the technical knowledge component be made entirely open book, and that many of the questions

---

[23]Expert Report of Dr. Harold W. Goldstein, at 6 (emphasis supplied).

[24]*Id.* at 7 (emphasis supplied).

[25]*Id.* at 13.

-12-

be eliminated.[26]  The United States also suggested that additional questions be developed to test knowledges identified as important, but not covered by the existing items (*e.g.*, treatment and supervision of prisoners, medical care for prisoners, and non-discrimination principles). The United States further recommended that the in-basket component of the selection procedure be eliminated altogether.[27]

The Wilks class did not submit objections to the existing procedure.

The Personnel Board submitted its response to the parties' objections on June 7, 2001. In sum, the Board was not receptive to the parties' objections, finding the Martin/Bryant parties' and the United States' suggestions that they scrap the existing procedure and start from scratch unavailing. For example, the Personnel Board complained that,

> [i]n effect, DOJ is advocating a complete and wholesale overhaul of the testing procedures.   Such a major undertaking would necessitate a lengthy and time consuming process that would include a new job analysis rather than confirmation of existing data; a new test plan rather than a revision to the current one; and the development and validation of new procedures rather than modifications to the existing procedures. SHL USA Inc. and the Board cannot engage in such an effort and still be able to meet the timeline imposed by the Court. Even so, the Board and SHL USA Inc. will consider the objections raised by DOJ while revising the written test procedures.[28]

The Personnel Board also submitted the response of SHL-Landy Jacobs's Janet Echemendia, Ph.D., to the objections raised by the parties. While Dr. Echemendia stated that she agreed in principle with the Martin/Bryant parties' objections, with respect to their overall comments she asserted:

---

[26]The United States recommended eliminating questions 1-14 from the closed book portion, questions 15-35 from the closed book portion, questions 36-60 of the closed book portion, and items that were linked to knowledges rated less than 3.0 on the rating scale for importance (items 1, 2, 5, 7, 8, 9, 10, 11, 13, 14, 16, 17, 18, 20, 21, 23, 24, 27, 28, 29, 30-34, 36-37, and 41 of the closed book portion).  United States' Report on Written Test Components of Police Sergeant, at 9-10.

[27]*Id.* at 10-11.

[28]June 7, 2001 letter from Charlie D. Waldrep, counsel for the Personnel Board, to the court, opposing counsel, and the Special Master, at 4.

-13-

Based on the information presented above in response to the objections, the percentages of items identified in the objections provide an overestimate of those requiring attention. Furthermore, with modifications, *we expect to be able to retain virtually the same number of items on the test, so statements regarding coverage of "abilities" (actually knowledge and abilities) and reduction of reliability are erroneous.* In fact, we expect that reliability will improve as a result of the modifications that will be made. We believe the needs of the Board in meeting staffing needs and conforming to the court order will be best served by incorporating modifications to improve the existing test rather than creating a completely new test at this point in time.[29]

With respect to the United States' objections relating to the technical knowledge component, and manner of assigning items to the closed-book versus open-book portion of the technical knowledge test, Dr. Echemendia explained:

We stand by the criterion used to identify material to be covered on the examinations and to distinguish closed-book from open-book materials. To be retained on the examination, a knowledge source subsection had to be used by 50% of respondents and to receive an importance value at or close to 2.50 on a scale of 1 to 4 where:

1 = not very important
2 = helpful but not necessary
3 = important
4 = critical

We used 2.5 as a cutoff because it allowed us to identify knowledge that ranges between approaching importance to critical. Looking at it another way, hypothetically, a knowledge with a rating of 2.5 may have had half of the respondents indicating that it was important and the remaining half indicating that it was helpful but not necessary. The use of 2.5 therefore provides a conservative criterion for ensuring coverage of important information and is consistent with the logic of the 50% "use" criterion.[30]

Dr. Echemendia addressed the contention of the United States that the multiple-choice format of the in-basket component was inappropriate, asserting:

The multiple-choice format of the In-Basket test is a reasonable approach designed

---

[29]*Id.*, attachment 1, at 5-6 (emphasis supplied).
[30]*Id.* at 7-8.

to allow for the use of an In-Basket style test, involving the application of abilities to job-related situations, with a candidate pool consisting of 400 individuals. A traditional In-Basket format, which requires at least one hour each for evaluation by multiple raters, would be impractical with 400 candidates, particularly given a compressed time line.

Nevertheless, we do acknowledge that the In-Basket is performing statistically more similar to the technical knowledge test than the Oral Board test in terms of subgroup differences.[31]

Dr. Echemendia proposed adjusting the weights of the components to compensate for this problem.[32]

Following the parties' analysis of the existing selection procedure and the Personnel Board's updated job analysis, the revised test blueprint was delivered to the parties on June 7, 2001. The test blueprint contained this statement about the cut-score:

A cut-score will not be applied to the final composite score. Rather, cut-scores will be applied to each test component to ensure that candidates placed onto the eligibility list meet the minimal qualifications on each component of the examination. The cut-scores will be set at a t-score of 40, with t-scores for each test component being computed based on those candidates who complete all three test components.[33]

The Martin/Bryant parties and the United States objected to the test blueprint, observing that it included a multiple-hurdle cut-score approach, rather than the final cut-score approach the Personnel Board had previously agreed to use, and that the court had ordered.[34] The United States further opined that: the in-basket component was unnecessary and should be eliminated;[35] the

---

[31]*Id.* at 10.

[32]*Id.*

[33]*Id.*, attachment 2. A "*T*-Score" — usually typed with an uppercase T — "indicates deviation from a mean. The mean is scored 50, and one standard deviation is scored 10. Thus, a *T*-score of 70 is 2 standard deviations above the mean; 40 is one standard deviation below." W. Paul Vogt, *Dictionary of Statistics & Methodology* 295 (2d ed. 1999).

[34]June 29, 2001 letter from Farah S. Brelvi, counsel for the Martin/Bryant parties, to the court, Special Master, and opposing counsel; United States' Objection to Personnel Board's Revised Test Blueprint for Police and Sheriff's Sergeant Examination, at 3-4.

[35]The United States maintained that the multiple-choice format of the in-basket component caused it to exhibit "the degree of adverse impact that is typical of a cognitive test, whereas the oral board is exhibiting the lesser degree of adverse impact that one would expect of a test that measures other abilities, including abilities related to oral expression and inter-personal abilities." United States' Objection to Personnel Board's Revised Test Blueprint for Police and

-15-

multiple-choice technical knowledge test should be open book; the written technical knowledge and oral board components should be weighted 40% and 60%, respectively, based on the job analysis information collected; and, the selection procedure should be scored using a compensatory model, with a cut-score for each candidate's final composite score. The United States asserted that the Personnel Board's test plan failed to take into account the parties' objections.[36]

The Personnel Board delivered the written test components of the sergeant examination to the parties on July 6, 2001. The United States and the Martin/Bryant parties reiterated their objections to the written components, and opined — correctly, as it turns out — that the "revised" test was likely to produce the same levels of adverse impact as the original examination.[37] The Martin/Bryant parties aptly observed that "SHL's response to the United States' expert comments, contained in Charlie Waldrep's June 7, 2001 letter to Judge Smith, Counsel, and Dr. Veres, suggests that SHL has taken more interest in defending its traditional assessment practices than in proactively seeking to reduce the amount of adverse impact in the Police Sergeant assessment process as required by the decree and the *Uniform Guidelines*."[38] The United States pointed out that, even though the Personnel Board had agreed with the Martin/Bryant parties that some test items needed to be eliminated, it did not appear that the Personnel Board had, in fact, eliminated those items. Further, despite the request of the United States for the updated subject matter expert data upon which Landy Jacobs apparently had relied to revise the selection procedure, it had not been supplied

Sheriff's Sergeant Examination, at 5-6.

[36]*Id.* at 4.

[37]July 20, 2001 letter from Rowan D. Wilson and Farah S. Brelvi, counsel for the Martin/Bryant parties, to the court, Special Master, and opposing counsel; United States' Objections to Personnel Board's Revised Written Test Components for Police/Sheriff's Sergeant. The United States also submitted the expert report of Dr. Harold Goldstein, dated July 16, 2001, in support of its objections to the written test components.

[38]July 20, 2001 letter from Rowan D. Wilson and Farah S. Brelvi, counsel for the Martin/Bryant parties, to the court, Special Master, and opposing counsel, at 1.

-16-

in time for the United States to evaluate the information.

The significant problems identified by the United States and the Martin/Bryant parties made it difficult, if not impossible, for meaningful changes to be made to the written components before their scheduled administration on August 9, 2001. The issue was discussed during the status conference conducted on July 26, 2001. In light of the objections made by the Martin/Bryant parties and the United States, and the information contained in the Personnel Board's monthly status report submitted on July 18, 2001, this court commented:

> This may be an unfair characterization or summarization, but this is my concern: On reading the written objections of the Government and the Martin-Bryant parties, it appears that the Police Deputy Sheriff Sergeant's examination that's being devised by SHL-Landy Jacobs is virtually identical to the one that has already been administered and condemned by this Court, and ... the only significant change is that they [*i.e.*, SHL-Landy Jacobs] have ignored my order to apply the cut score at the end, and proposed to impose a cut score to each of the three components.
>
> Now, I would think — I have covered this ground in other status conferences, so I am not going to go into it at length. But it would seem to me that the ideal way to proceed, is that when these proposals are put on the table by the Board or the City, and there are responses from the opposing parties' subject matter experts that are critical of certain questions or aspects of the proposed selection procedure, that there be discussion among those subject matter experts, as well as participation of counsel, and that those which have merit be adopted ....[39]

Based on the parties' concern about the limited time available to revise the written components, all of the remaining deadlines — including the deadline for administration of the written components — were extended.[40] The Personnel Board notified the court, Special Master, and opposing counsel on July 31, 2001 that it would not apply a cut-score to each individual

---

[39]Transcript of Proceedings, July 26, 2001 (doc. no. 792), at 12-13.

[40]*See* the Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure, entered on July 27, 2001 (doc. no. 790). The deadline for the administration of the written components was extended from August 9, 2001 until September 27, 2001.

component, but would instead set a cut-score for the final composite scores.[41]  Additionally, the

parties' experts participated in a conference call on August 15, 2001, in an effort to resolve some of

the disputed issues.[42]

On July 19, 2001, the Personnel Board delivered the oral board component[43] to the parties.

The Martin/Bryant parties objected to the following aspects of the oral boards:  there was a lack of

standardization in the subordinate conference exercise; the rating scales were vague and ambiguous;

and, the time constraints were unnecessary.  The Martin/Bryant parties recommended the following

changes:  consensus ratings should be used to ensure that rater bias was reduced; a detailed

behaviorally-anchored checklist should be used to compile the ratings; the rating panels should be

demographically diverse; the raters for the subordinate conference exercise should not be role

players; the exercise should be standardized by using a videotape to which the candidates would be

asked to respond; the candidates' preparation time should be increased; the candidates' preparation

time should immediately precede each exercise; and, each candidate's performance should be

videotaped.[44]

The United States also objected to the oral board components.  While the United States

disagreed with the Martin/Bryant parties recommendation that the candidates respond to a videotape

for the subordinate conference exercise,[45] the United States agreed that the preparation time should

---

[41]July 31, 2001 letter from V. Michelle Obradovic, counsel for the Personnel Board to the court, Special Master, and opposing counsel.

[42]The parties' experts were unable to discuss the objections to the oral board component, because that portion of the selection procedure was administered on August 12, 2001, despite the extension of the deadline for its administration to October 18, 2001.  *See* Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure, entered on July 27, 2001 (doc. no. 790), at 2.

[43]The oral board component of the examination consisted of a "subordinate conference" exercise and an "incident supervision" exercise.

[44]August 2, 2001 letter from Rowan D. Wilson, counsel for the Martin/Bryant parties to the court.

[45]*See supra* note 43.

be split, each candidate's performance should be videotaped, the assessment panels should be diverse by race and sex, and the rating scales should be revised. Moreover, the United States observed that the Personnel Board's proposed oral board component did not provide adequate safeguards for inter-rater reliability. The United States suggested that consensus ratings be considered and emphasized that the role players should be adequately trained, but need not be assessors. Based on the objections of the Martin/Bryant parties and the United States, the Personnel Board modified the rating scales,[46] but it does not appear that any of the other recommendations were adopted.

The next issue to surface was the weight to be given to each component of the selection procedure, relative to each candidate's total score. After much discussion, the Personnel Board proposed to assign the technical knowledge component 30% of the overall score, the written in-basket component 15%, and the oral board component 55% of each candidate's total score.[47]

Following the removal of the defective items, the test as administered consisted of 24 open-book and 23 closed-book questions on the written technical knowledge component,[48] 25 multiple choice questions on the in-basket component,[49] and an incident supervision exercise and a subordinate conference exercise comprising the oral board component.

The revised selection procedure resulted in adverse impact on the basis of race.

---

[46]*See* August 10, 2001 letter from V. Michelle Obradovic, counsel for the Personnel Board, to opposing counsel.

[47]The Personnel Board had previously advised the court, the Special Master, and opposing counsel that the weights would be 35% for the technical knowledge component, 20% for the in-basket component, and 45% for the oral board component. September 17, 2001 letter from V. Michelle Obradovic, counsel for the Personnel Board to the court, Special Master, and opposing counsel, attaching memorandum from Dr. Janet Echemendia to Michael Blair, Industrial/Organizational Psychologist for the Jefferson County Personnel Board. However, the validation report submitted in support of the revised selection procedure indicated the weights set forth *supra*. SHL USA, Inc., Validation Report: Personnel Board of Jefferson County Merit System, 2001 Police/Sheriff's Sergeant Selection Promotion Examination (Nov. 2001), at 39.

[48]The original technical knowledge test consisted of 103 questions.

[49]Only 19 items were scored. *See* SHL USA, Inc., Validation Report: Personnel Board of Jefferson County Merit System, 2001 Police/Sheriff's Sergeant Promotion Examination (Nov. 2001), at 51. The original in-basket component consisted of 34 questions.

The Personnel Board submitted its validation report to the parties on November 19, 2001.

After reviewing the test results and the validation report, the United States and the Martin/Bryant parties each filed an objection to the use of the selection procedure,[50] asserting that the Personnel Board had failed to demonstrate that the selection procedure complied with paragraph 12 of the 1995 Order Modifying the 1981 Jefferson County Personnel Board Consent Decree.[51] The United States first observed that, even though the Personnel Board had agreed not to score questions which fewer than half of the incumbent sergeant subject matter experts were unable to answer correctly, there were seven such questions remaining in the written technical knowledge portion of the examination.[52]   Additionally, with respect to the oral board component, the United States contended, as it had throughout the revision process, that:  (1) the rating system was inadequate; (2) consensus ratings should have been used; (3) the exercises should have been videotaped; and (4) the Personnel Board should adopt measures to minimize the effect of rater error or bias.[53]   The United States emphasized that,

> [a]lthough the Court's order of July 27, 2001 postponed the date for the administration of the Sergeant examination [until October 18, 2001,[54]] the Board decided to go forward with the administration of its oral board component in August. Indeed, the Board began administering its oral board component on August 12, 2001,

[50]United States' Objection to Personnel Board's Proposed Use of the 2001 Police/Sheriff's Sergeant Examination (doc. no. 825); Motion of Martin Plaintiffs and Bryant Intervenors to Reject the Personnel Board's Proposed 2001 Police/Sheriff Sergeant Selection Procedures (doc. no. 826).  The Wilks class filed a notice stating that it had no objection to the selection procedure (doc. no. 824).

[51]See supra note 3 for the text of paragraph 12 of the 1995 Order Modifying the 1981 Jefferson County Personnel Board Consent Decree.

[52]Additionally, there were five such questions on the written in-basket component.

[53]To this end, the United States recommended that the Personnel Board rotate the panel members, monitor the panels during the exercises, provide better training, adopt criteria for participation as a rater, avoid racial and gender stratification in the panel composition, and, recruit well-qualified and diverse raters.  United States' Memorandum in Support of Objection to Personnel Board's Proposed Use of the 2001 Police/Sheriff's Sergeant Examination, at 8.

[54]This date was specified in the court's order for the administration of the oral board component of the selection procedure.  See the Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure, entered on July 27, 2001 (doc. no. 790).

before the parties' August 15 meeting to discuss the objections.  At the August 15
meeting the Board advised the parties that it would not incorporate the parties' oral
board suggestions and objections into the 2001 administration of the oral board but
would consider incorporating them into future administrations.  Our review of the
2001 validation report for Police/Sheriff's Sergeant and review of the Sergeant
examination results has reinforced the United States' view that revisions to the oral
board format are necessary.

> *As administered in August 2001, the oral board had greater adverse impact
> than the 1999 administration.*[55]

The Martin/Bryant parties also identified several flaws in the selection procedure:  although

six areas of knowledge were identified by the subject matter experts as necessary to perform the job

of  sergeant  and  were  weighted  according  to  their  importance,  constitutional  law  was

disproportionately tested; the multiple-choice format of the written technical knowledge and in-

basket components was known to produce adverse impact; the racially-skewed results of the oral

board component were attributable to the Personnel Board's segregation of the rating panels by race

— *i.e.*, panels made up of two white members and one black member for one exercise, and panels

made up of two black members and one white member for the other; the Personnel Board scored

seven questions that fewer than fifty percent of the incumbent sergeants answered correctly; and, the

Personnel Board made no meaningful effort to determine why the selection device had adverse

impact or to reduce it.  The Martin/Bryant parties also asserted that

> [t]he parties repeatedly urged the Board to develop additional test questions in order
> to replace any items that the Board might later agree to omit.  The Board refused,
> claiming that its written questions would withstand professional scrutiny.  In fact, the
> Board is now attempting to validate a selection procedure that includes 66 written
> questions (at least ten of which the Board must omit, as noted above) but that began
> with 127 written questions.  The Board dropped approximately half of its original
> items because they failed to meet various professional standards, but refused to
> develop supplemental questions to maintain the adequacy and representativeness of

---

[55]United States' Memorandum in Support of Objection to Personnel Board's Proposed Use of the 2001
Police/Sheriff's Sergeant Examination, at 4-5 (emphasis supplied).

the written questions. If the Board had administered a device with 127 written questions, it is possible that the adverse impact would have been reduced. The Board's refusal to develop supplemental questions is one more indication of its apparent choice to defend a flawed test rather than create a better one.[56]

Faced with these objections to the selection procedure, the Personnel Board initiated negotiations with the United States. The Personnel Board agreed to remove five items from the written technical knowledge component, and to credit two answers as correct for an additional item. The Personnel Board also agreed that, for future administrations of the oral board component, the behaviorally-anchored rating scales used for assessing the candidates' performance would be improved, a consensus approach would be used to rate the candidates, and each candidate's performance would be videotaped. Additionally, the Personnel Board agreed to review recent research on the effectiveness of panel rotation, more closely monitor and review rater panels during the exercises, implement a ten to twelve hour training session for raters, including mock candidate interviews, implement criteria for the selection of raters, and, create diverse, representative rater panels. Based on the Personnel Board's concessions, the United States withdrew its objection.[57]

In connection with the scheduled hearing to resolve the sergeants' selection procedure dispute, the Martin/Bryant parties submitted the expert report of Kathleen Lundquist, Ph.D.[58] In summary, Dr. Lundquist concluded that the Personnel Board's allegedly revised selection procedure was "virtually unchanged in structure" from the original selection procedure. She observed that

> [l]ittle or no apparent effort was made to implement changes that would have reduced
> the substantial adverse impact of the examination. Moreover, even agreed-upon
> methodological steps to improve item content (such as eliminating items with low

---

[56]Brief of Martin Plaintiffs and Bryant Intervenors in Support of Their Motion to Reject the Personnel Board of Jefferson County's Proposed 2001 Police/Sheriff Selection Procedures, at 32.

[57]United States' Reply to Personnel Board of Jefferson County's Response to United States' Objection to Proposed Use of the 2001 Police/Sheriff's Sergeant Examination (doc. no. 832).

[58]Doc. no. 833.

point biserial correlations and assigning knowledge items based on their manner of use ratings) were inconsistently applied by SHL. Moreover, the content validity of the current version of the test is significantly challenged by the dramatic differences between a KSA's importance as shown in the job analysis and its representation on the test (*e.g.,* Constitutional Law items should have been 21% of the test based on their importance as shown in the job analyses, but were actually 45% of the scored test items).

Additionally, I have significant concerns about the execution of the oral board, including the race differences in oral board panels, the need for more thorough assessor training and the need for improved standardization of the rating process.[59]

It was Dr. Lundquist's opinion that, because of the serious flaws existing in the revised selection procedure, and the extent of the resulting adverse impact, the promotional process should be redesigned yet again.[60] She identified several flaws in the construction of the multiple-choice technical knowledge and in-basket components, including the Personnel Board's failure to: conduct an appropriate psychometric review of the items prior to finalizing the items to be scored; assign items to the open and closed-book portions of the knowledge test consistent with the "manner of use" ratings collected from incumbent subject matter experts (*i.e.,* whether the incumbent was required to recall the information from memory or whether reference material, such as a manual, could be consulted); remove items that at least half of the incumbent sergeants serving as subject matter experts could not answer correctly; assess the KSAs measured by the various assessments within the promotional process in a manner reflecting their relative importance based on the job analysis, and develop examinations that were acceptably reliable. Dr. Lundquist also observed that, although the written technical knowledge examination consisted of 47 questions when it was administered, five items were deleted pursuant to the Personnel Board's agreement with the United

---

[59]*Id.* at 31-32.
[60]*Id.* at 32.

States, and her review suggested an additional eighteen items should be deleted.[61]

The court's Special Master, John G. Veres, III, Ph.D., also prepared a report analyzing the selection procedure.[62]   Dr. Veres concluded that the selection procedure did not meet the requirements of the *Uniform Guidelines*. He observed that the most troubling flaws evident in the written technical knowledge component were that it failed to assess proportionately the knowledges, skills, and abilities identified by the incumbent sergeant subject matter experts as critical to the performance of the job, and that the Personnel Board's consultant failed to develop a sufficiently large pool of test items.[63] He stated: "[v]irtually all of the problems [with the technical knowledge component] could have been reduced or eliminated if an adequate pool of test items had been developed by SHL."[64]

Dr. Veres made the following assessment of the in-basket component of the selection procedure:

> The "setting and manner of the administration" of the multiple-choice format chosen "less resemble the work situation" than traditional in-basket scoring methods. An additional concern is the approximately .70 standard deviation (sd) difference in mean scores by race on the In-Basket Examination (See *Validation Report*, p. 57). The observed difference is substantially larger than the approximately .35 sd differences by race reported in the professional literature for in-basket exercises (see Goldstein, Yusko, Braverman, Smith, & Chung, 1998).  While I cannot definitively conclude that the increase in average racial difference was caused by the multiple-choice format, the combination of reduced evidence of content validity and increased racial differences is troubling.  Moreover, the availability of more demonstrably valid scoring methods likely to produce smaller racial differences and less adverse impact creates a substantive problem in complying with the *Uniform Guidelines* (See Questions 50, 51, and 52 of *Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection*

---

[61]*Id.* at 18-19.
[62]Doc. no. 847.
[63]*Id.* at 4.
[64]*Id.*

*Procedures* [EEOC *et al.*, 1979]).[65]

Dr. Veres agreed with Dr. Lundquist's recommendations for improving the oral board component, and echoed her concern with the ambiguous rating scales used to evaluate candidates. He stated:

> For over a decade, test developers have known that the degree of structure in an oral interview is an important factor in enhancing interview validity (Wiesner & Cronshaw, 1988). Wiesner and Cronshaw found that "structured interviews produced mean validity coefficients twice as high as unstructured interviews" (p. 275). More recently, Huffcutt and Arthur (1994) conducted a meta-analysis of over a hundred validity coefficients in entry-level jobs and found that structured

---

[65]*Id.* at 5. The "questions and answers" to the *Uniform Guidelines* referenced by Dr. Veres are set forth below:

**50. Q.** In what circumstances do the Guidelines call for the use of an alternative selection procedure or an alternative method of using the procedure?

**A.** The alternative selection procedure (or method of use) should be used when it has less adverse impact and when the evidence shows that its validity is substantially the same or greater for the same job in similar circumstances. Thus, if under the original selection procedure the selection rate for black applicants was only one-half (50 percent) that of the selection rate for white applicants, whereas under the alternative selection procedure the selection rate for blacks is two-thirds (67 percent) that of white applicants, the new alternative selection procedure should be used when the evidence shows substantially the same or greater validity for the alternative than for the original procedure.

**51. Q.** What are the factors to be considered in determining whether the validity for one procedure is substantially the same as or greater than that of another procedure?

**A.** ...For content validity, the strength of validity evidence would depend upon the proportion of critical and/or important job behaviors measured, and the extent to which the selection procedure resembles actual work samples or work behaviors. Where selection procedures have been validated by different strategies, or by construct validity, the determination should be made on a case-by-case basis.

**52. Q.** The Guidelines require consideration of alternative procedures and alternative methods of use, in light of the evidence of validity and utility and the degree of adverse impact of that procedure. How can a user know that any selection procedure with an adverse impact is lawful?

**A.** The Uniform Guidelines (Section 5G) expressly permit the use of a procedure in a manner supported by the evidence of validity and utility, even if another method of use has a lesser adverse impact. With respect to consideration of alternative selection procedures, if the user made a reasonable effort to become aware of alternative selection procedures, has considered them and investigated those which appear suitable as a part of the validity study, and has shown validity for a procedure, the user has complied with the Uniform Guidelines. The burden is then on the person challenging the procedure to show that there is another procedure with better or substantially equal validity which will accomplish the same legitimate business purposes with less adverse impact.

*Uniform Employee Selection Guidelines Interpretation and Clarification*, 44 Fed. Reg. 11,996 (Mar. 2, 1979).

interviews "can reach levels of validity that are comparable to mental ability tests" (p. 184). One would predict that enhancing interview structure by increasing the specificity of scoring guidelines would improve validity.

Other studies have shown that structured interviews reduce racial differences in mean interview scores. Huffcutt and Roth (1998) found "high-structure interviews have lower group differences on average than low-structure interviews" (p. 179). Their "estimates for the interview indicate about one quarter of a standard deviation difference on average for both Black and Hispanic applicants" (p. 185), similar to those cited in Dr. Lundquist's report and markedly smaller than the observed difference in the incident supervision component of the SHL oral board. As in the In-Basket Examination, the availability of more demonstrably valid scoring methods likely to produce smaller racial differences is a real problem in complying with the *Uniform Guidelines*.[66]

Following the submission of Dr. Veres' report,[67] the Personnel Board reached an agreement with the Martin/Bryant parties.[68] This agreement called for the Personnel Board to develop yet a third sergeants' selection procedure, and for certain changes to be made to the scoring of the results of the revised selection procedure. Significantly, the Personnel Board agreed to incorporate the following changes to the oral board component in future administrations of the selection procedure: develop new behaviorally-anchored rating scales and a detailed checklist using the input of incumbent sergeant subject matter experts; use a consensus rating process; videotape each candidate's performance; and take steps to reduce or eliminate rater bias.[69] The Wilks class did not

---

[66]*Id.* at 7.

[67]Although the United States informed the court that it did not intend to present expert testimony at the scheduled hearing on the validity of the selection procedure, the January 14, 2002 report of Dr. Goldstein was submitted. Dr. Goldstein also concluded that the selection procedure was seriously flawed, and agreed with the observations of Dr. Lundquist and Dr. Veres. He identified three main problems with the selection procedure: the multiple-choice format of the written technical knowledge and in-basket components was inappropriate for the job; the content of the remaining items on the test was not representative of the job; and, additional steps, such as videotaping the candidates, revising the rating scales, and properly training the raters, were not taken by the Personnel Board despite the parties' recommendations. Expert Report of Dr. Harold W. Goldstein (doc. no. 846), at 5-6.

[68]By letter dated January 11, 2002, Rowan D. Wilson, counsel for the Martin/Bryant parties, informed the court that their objection to the use of the selection procedure would not be withdrawn; however, if the court entered an order approving the agreed-upon use of the results of the selection procedure, they would "dispense with the validation hearing."

[69]January 8, 2002 letter from V. Michelle Obradovic, counsel for the Personnel Board, to the court, Special

-26-

agree with the scoring changes, but did not object to the overall result.

During the status conference conducted on January 16, 2002, the Personnel Board filed a motion to allow the use of the sergeants' register (doc. no. 841). Attached to the motion was a proposed order with a vague schedule for the Personnel Board to develop yet another selection procedure for the sergeant classification.

Notwithstanding the Personnel Board's expressed "willingness and desire" to develop a lawful selection procedure, this court's confidence in the competence of the Board's Executive Director, Industrial/Organizational Psychologist, and subordinate employees has evaporated.

Rather than continuing to entrust this task, and those remaining under the court's jurisdiction, to the Personnel Board which, for the past three years has arrogantly rebuffed the cogent, common-sense recommendations of noted experts in the field of employee selection procedure development, the court has determined that the imposition of a receivership is necessary, in order to bring these long-suffering cases to a lawful conclusion in accordance with binding authorities.

## II. DISCUSSION

District courts have the power to take broad remedial action to secure compliance with orders, including the power to appoint a receiver. *See, e.g., Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) ("A district court's power to fashion and effectuate desegregation decrees is broad and flexible, and the remedies may be 'administratively awkward, inconvenient, and even bizarre.'") (quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 401 U.S. 1, 15-16, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971)), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 150 L.Ed.2d 755 (1977); *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C.1997) ("Pursuant to its equity

Master, and opposing counsel.

jurisdiction, a federal court has power to take broad remedial action to effectuate compliance with its orders. This equitable power includes the power to appoint a receiver.") (citing *Morgan,* 540 F.2d at 533; *Bracco v. Lackner,* 462 F.Supp. 436, 455 (N.D.Cal.1978); *Petitpren v. Taylor School District,* 104 Mich. App. 283, 304 N.W.2d 553, 557 (1981) (observing that a trial court "may appoint a receiver in the absence of a statute pursuant to its inherent equitable authority")); *see also District of Columbia v. Jerry M.,* 738 A.2d 1206, 1213 (D.C. Ct. App. 1999) ("The court has the power, pursuant to its equity jurisdiction, to take broad remedial action to secure compliance with its orders, including the power to appoint a receiver."); *Wayne County Jail Inmates v. Lucas,* 391 Mich. 359, 366, 216 N.W.2d 910, 913 (Mich. 1974) (en banc) ("The appointment of a person to carry out functions the court deems necessary to provide full and complete relief is not a novelty in American jurisprudence.") (footnote omitted).[70]

"[I]t is abundantly clear that a court may appoint a receiver to force public officials to comply with court orders." *Dixon,* 967 F. Supp. at 550 (citing *Morgan,* 540 F.2d at 534-35 (holding that the district court's supplementation of local decision making with a receiver was justified given the local authority's failure to comply with the court's desegregation orders); *The Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation,* 424 Mass. 430,

---

[70]The omitted footnote provides:

> *See,* for example, *Silver v. Ladd,* 74 U.S. 219, 19 L.Ed. 138 (1868) (commissioner to convey title); *Grand Rapids Trust Co. v. Carpenter,* 229 Mich. 491, 201 N.W. 448 (1924) (receiver for a corporation); *Jefferson County ex rel. Grauman v. Jefferson Fiscal Court,* 301 Ky. 405, 192 S.W.2d 185 (1946) (commissioners to advise regarding change in boundaries of voting precincts); *O'Neil v. United Association of Journeymen Plumbers,* 348 Pa. 531, 36 A.2d 325 (1944) (master to supervise election of union officers); *Bartlett v. Gates,* 118 F. 66 (CA 8, 1902) (master to supervise election of corporate officials); *United States v. Manning,* 215 F.Supp. 272 (W.D.La.1963) (referees to protect voting rights).

*Wayne County Jail Inmates v. Lucas,* 391 Mich. 359, 366 n.2, 216 N.W.2d 910, 913 n.2 (Mich. 1974) (en banc).

677 N.E.2d 127, 148 (1997) ("Public officials who fail to abide by legal standards are not immune to these remedies.... A court with equity jurisdiction has the discretion to appoint a receiver to take over the main functions of public officials.") (citations omitted)).

Receivers have been appointed "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons." *Dixon*, 967 F.Supp. at 550.

> The mechanisms at work in the creation of ... a receivership of a public institution, are fairly clear. The political process has failed to produce an institution conforming to law and those subjected to the illegality, who are usually politically powerless (*cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938)), turn to the courts for the vindication of their rights. Injunctive remedies are called for, but the judge lacks expertness in the particular field, and lacks time even when he chances to have the knowledge. Hence the appointment of adjunct officers who supply expert knowledge and sometimes implicitly encourage acceptance by the parties and the general public of the results of the judicial intervention.

*Perez v. Boston Housing Authority*, 379 Mass. 703, 735 n.29, 400 N.E.2d 1231, 1250 n.29 (1980).

Despite the tenor of the foregoing authorities, the appointment of a receiver to act in the place of "elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances." *Morgan*, 540 F.2d at 535. "Essentially it is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary." *District of Columbia v. Jerry M.*, 738 A.2d at 1213 (citing *LaShawn A., by Moore v. Kelly*, 144 F.3d 847, 854 (D.C. Cir. 1998)).

> The establishment of a receivership is an intrusive remedy which should only be resorted to in extreme cases. *The appropriateness of a particular remedy is one of reasonableness under the circumstances.* Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate.

*Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.Va. 1990) (emphasis supplied) (citing, *e.g., Morgan,*

540 F.2d at 533; *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979); *United States v. City*

*of Detroit*, 476 F. Supp. 512, 520 (E.D. Mich. 1979)).

Yet, circumstances sometimes compel the imposition of a receivership upon public entities,

as the District of Columbia District Court concluded on the basis of conditions that mirror those

confronted by this court:

> The remedial phase of this case has been marked by repeated cycles of
> noncompliance and sluggish progress, frustration and requests for court intervention,
> promises to improve, and further noncompliance after a flurry of attempts to make
> short-term changes. This pattern has convinced the Court that the defendants either
> cannot or will not make the fundamental changes necessary to improve the plight of
> abused and neglected children.

*LaShawn A. v. Kelly*, 887 F. Supp. 297, 299 (D. D.C. 1995).

As the First Circuit explained in upholding the imposition of a temporary receivership and

the transfer of school district staff in a desegregation case:

> The more usual remedies of contempt proceedings and further injunctions were
> plainly not very promising, as they invited further confrontation and delay; and when
> the usual remedies are inadequate, a court of equity is justified, particularly in aid of
> an outstanding injunction, in turning to less common ones, such as a receivership, to
> get the job done.

*Morgan*, 540 F.2d at 533 (1st Cir. 1976) (citing *Milltown Lumber Co. v. Town of Milltown*, 150 Ga.

55, 102 S.E. 435 (1920); *Columbian Athletic Club v. State*, 143 Ind. 98, 40 N.E. 914 (1895); Note,

*Monitors: A New Equitable Remedy?*, 70 Yale L.J. 103, 107-13 (1960)), *cert. denied*, 429 U.S. 1042,

97 S.Ct. 743, 50 L.Ed.2d 755 (1977).

Courts in the District of Columbia, where most of the reported receiverships have been

imposed on public institutions, have identified the following factors when considering whether a

-30-

receivership is warranted:

> In determining whether other remedies are inadequate and receivership remains the only viable option to effectuate compliance with the laws and orders of the court, the court should consider a number of factors. These include: (1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and, (6) "whether a receiver can provide a quick and efficient remedy."

*District of Columbia v. Jerry M.*, 738 A.2d at 1213 (quoting *Dixon*, 967 F.Supp. at 550-51 (in turn citing *Judge Rotenberg Educational Center*, 677 N.E.2d at 148-49, and *Morgan*, 540 F.2d at 533 ("Remedial devices should be effective and relief prompt.")).

Moreover, the most weighty consideration "is whether any other remedy is likely to be successful." *Dixon*, 967 F. Supp. at 550 (citing *Shaw v. Allen*, 771 F. Supp. at 762 ("When more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."); *Newman*, 466 F. Supp. at 635 ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction."); *Bracco*, 462 F.Supp. at 456 (noting that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren*, 304 N.W.2d at 557 (finding a receiver appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence")).

While these authorities are not binding on this court, they provide thoughtful and studied guidance to ensure that this draconian approach not be undertaken lightly and without due

-31-

deliberation. Prior to deciding on this course of action, the court has considered these controversies as a whole, and, of most relevance, the events of the past year. During the relatively short time since these cases were reassigned to the undersigned judge, the Personnel Board has missed court-imposed deadlines (deadlines, it should be noted, which the Board proposed and to which it consented),[71] has been subject to criminal[72] and civil contempt proceedings,[73] and has otherwise been chastised by this court and the parties for serious dereliction of its professional and constitutional duties. The court has, therefore, become convinced that there are no remaining alternatives, and, that a receivership is warranted.

Further contempt proceedings are sure to result in additional "confrontation and delay." If time was of the essence in developing lawful race- and gender-neutral selection procedures for key public safety positions more than twenty years ago, it is even more so now. Indeed, despite the mandate of the consent decree entered in 1995 to develop a lawful sergeants' selection procedure within 12 months, the Personnel Board delayed *four years* before even *beginning* the process. Two more years have passed, and, because of the Personnel Board's intransigence, poor judgment, and obvious lack of professional competence, the parties and this court are back at square one.[74]

Moreover, the court is not convinced that the Personnel Board has the leadership to "turn the

---

[71]*See* Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause, entered on June 1, 2001 (doc. no. 763), at 5-6 (the Personnel Board had already missed five court-imposed deadlines before filing its motion to modify the court's December 18, 2000 order, and, had the court not granted its motion, would have failed to comply with seven additional deadlines). Indeed, the Personnel Board only complied with the court's deadlines for about three months. *Id.* at 3. In its motion to modify the deadlines established by the court's December 18, 2000 order, the Personnel Board sought to extend the deadlines for 39 of the 57 job classifications. *Id.* at 4.

[72]*Id.*

[73]Order Directing the Jefferson County Personnel Board to Show Cause (doc. no. 764).

[74]The Personnel Board's proposed schedule to develop a new selection procedure is sorely lacking in specificity. It contains only the following dates:  begin "the development process" by April 1, 2002; complete "the development stage" of the selection procedure; pilot test the selection procedure by February 1, 2003; deliver results of the pilot test to the parties by March 1, 2003; and, resolve objections to the selection procedure by June 1, 2003. *See* Motion of the Jefferson County Personnel Board to Allow Use of Police/Sheriff's Sergeant Register (doc. no. 841).

-32-

tide within a reasonable time period." While the Personnel Board has added more staff, ostensibly to facilitate compliance with the terms of the consent decree, its past performance leaves the court with grave doubts as to whether these minimal organizational changes will make a difference.

Especially in light of the events of the past year, this court is concerned about the good faith of the Personnel Board to accomplish its constitutionally-mandated goals of developing lawful, race- and gender-neutral employee selection procedures. When discussing "good faith" as a defense to a motion for imposition of civil contempt sanctions in *LaShawn A. v. Kelly*, the court said, in words that are relevant here:

> [D]efendant's [sic] good faith is arguable at best. The remedial history outlined above demonstrates that the defendants have repeatedly attempted last-minute adjustments or compromises in an attempt to avoid sanctions. Because this pattern has persistently recurred since 1991, the Court must question whether the defendants truly intend to cooperate in the remedial efforts. Additionally, the defendants' recent actions cast an extremely bad light on their alleged good intentions.

*LaShawn A.*, 887 F. Supp. at 313-14 (D.D.C. 1995).

Time and again, this court has observed the Personnel Board's "last-minute adjustments or compromises in an attempt to avoid sanctions." Most telling of this pattern of behavior are the agreements the Personnel Board reached with the United States and the Martin/Bryant parties to incorporate those parties' well-founded recommendations to improve the oral board component *for future administrations* of the selection procedure.[75] If the Personnel Board had delayed the administration of that component, as it had the court's explicit permission to do,[76] and taken the

---

[75]This amounts to at least a tacit admission that the selection procedure was flawed. *See* Expert Report of Dr. Kathleen K. Lundquist (doc. no. 833), at 26 ("In fact, the Board has already agreed to incorporate many of the [parties' oral board] recommendations into their future promotional processes conceding the problems with the current promotional process.")

[76]*See* Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure entered on July 27, 2001 (doc. no. 790).

opportunity to work with the parties' experts, as it did for the technical knowledge component, it is

conceivable that the selection procedure may have been acceptable.  Additionally, the Personnel

Board ignored the parties' and the Special Master's advice to develop a larger pool of items for the

written components.  Leaving aside the psychometric and other technical objections to the selection

procedure, it seems clear that the technical knowledge test (for which only 38 items could ultimately

be scored, out of an original 103 items) and the written in-basket test (for which only 19 items could

be scored, out of an original 34 items) are of little value in evaluating candidates for promotion to

sergeant.  Further, it is obvious that the Personnel Board is wasting resources.  As this court has

stated:

> It appears that "money is no object" to the Board, as the staggering costs of this
> litigation — including, but not limited to, more than two decades of attorneys' fees,
> salaries for additional personnel to facilitate compliance with the consent decrees,
> and fees of outside consultants hired to assist in the development of non-
> discriminatory selection procedures — have not stimulated the Board to abandon its
> slothful pace.[77]

The Personnel Board also has had the additional resources of the parties' experts at their disposal

to assist in revising and bringing the sergeants' selection procedure into compliance with the law,

but has squandered those resources as well.

While the court has not been called upon to determine the validity of the sergeants' selection

procedure, the detailed factual history of this device, including the experts' comments, was recounted

*supra* to illustrate the Personnel Board's obvious lack of competence and utter failure to fulfill its

professional responsibilities.  The Personnel Board's actions and exercise of poor judgment in

devising and revising the selection procedure give the court no assurance that the selection

---

[77]Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause (doc. no. 763), at
7.

procedures for the remaining classifications, and any revision that may be necessary thereto,[78] will pass muster. The Personnel Board's actions through the long and winding course of this litigation amplify the court's concern.

### III. CONCLUSION

For all of the foregoing reasons, the court concludes that the appointment of a receiver is not just warranted by the circumstances, but that it is necessary to ensure that the Personnel Board finally complies with the terms of its consent decree. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the __8th__ day of February, 2002.

United States District Judge

---

[78]To date, the parties have filed objections to the selection procedures for the Clerical Stores job family, the Public Safety Dispatcher II, Public Works Coordinator, Street Paving Supervisor, and Shop Helper classifications, and, most significantly, for the General Clerical job family. The General Clerical job family has by far the largest number of applicants (766 qualified applicants for the Administrative Assistant I classification, 343 for the Administrative Assistant II classification, 268 for the Administrative Assistant III classification, 123 for the Administrative Assistant IV classification, 171 for the Administrative Coordinator classification, 23 for the Legal Secretary classification, 54 for the Senior Court Clerk classification, and 19 for the Principal Court Clerk classification). *See* Personnel Board of Jefferson County, Research and Validation Team, 2001 General Clerical Job Family Series Validity Report (undated), at 24.