FILED

2006 Mar-31  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED

02 JUL -8  AM 8: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-75-S-666-S** |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA,** *et al.,* | ) | |
| **Defendants.** | ) | **ENTERED** |
| | ) | |
| **JOHN W. MARTIN,** *et al.,* | ) | **JUL 8 – 2002** |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-74-S-17-S** |
| | ) | |
| **CITY OF BIRMINGHAM, ALABAMA,** *et al.,* | ) | |
| **Defendants.** | ) | |
| | ) | |
| **ENSLEY BRANCH OF THE N.A.A.C.P.,** *et al.,* | ) | |
| *et al.,* | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Civil Action No. CV-74-S-12-S** |
| | ) | |
| **GEORGE SEIBELS,** *et al.,* | ) | |
| **Defendants** | ) | |

**MEMORANDUM OPINION**

This case is before the court on the show cause order entered in response to the motion

jointly filed by the Martin plaintiffs, Bryant intervenors ("the Martin/Bryant parties"), and Wilks

class, asking the court to hold defendant Jefferson County Personnel Board in civil contempt.[1]  In

pertinent part, that order provided:

---

[1] *See* Plaintiffs' and Intervenors' Joint Motion to Hold Defendant Personnel Board of Jefferson County in Civil Contempt, filed April 4, 2002 (doc. no. 884).  The class of "Bryant intervenors" consists of all present and future black and female employees and applicants for employment with the City of Birmingham.  This court allowed the Bryant class to intervene "in an effort to gather all interested parties in a single proceeding."  *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1560 (11th Cir. 1994) ("*Ensley II*").  The "Wilks class" consists of all present and future male, non-black employees and applicants for employment with the City of Birmingham.  *See id.* at 1560.  Consistent with the Supreme Court's decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), *aff'g In re Birmingham Reverse Discrimination Employment Litig.,* 833 F.2d 1492 (11th Cir. 1988), this court allowed the Wilks class — which was not a party to the 1981 consent decrees — to intervene in the consolidated actions referenced in the style of this case, originally for the purpose of collaterally attacking the City's and Personnel Board's consent decrees and the affirmative action programs adopted under them, and later "for the limited purpose of participating in any litigation regarding potential modification of the consent decrees."  *Ensley II,* 31 F.3d at 1560.

934

It is further ORDERED that the Jefferson County Personnel Board show cause, if any there be, in writing, on or before Friday, April 19, 2002, why: (1) it should not be held in civil contempt for failing to comply with (a) this court's December 19, 1995 order, modifying the Personnel Board's 1981 consent decree, and (b) this court's December 18, 2000 order, extending the Personnel Board's 1981 consent decree and 1995 modification order; and (2) if the Jefferson County Personnel Board ultimately is adjudged to be in civil contempt, why a receiver should not be appointed to assume control of all functions of the Personnel Board, and/or why the court should not grant such other equitable relief as may be necessary to purge the Personnel Board of its contempt, and, secure the Board's compliance with all requirements of its consent decree, modifications thereto, and other orders of this court. The Personnel Board's submission shall contain any evidentiary materials upon which the Board intends to rely in connection with this order to show cause, including materials relating to the appropriate scope of any receivership, or powers of any receiver, in the event the Jefferson County Personnel Board ultimately is adjudged to be in civil contempt and is placed in receivership as a sanction therefor.

Any party who wishes to contest the written response or evidentiary showing of the Jefferson County Personnel Board shall file its response no later than Friday, May 3, 2002. Any such response shall contain the evidentiary materials upon which that party intends to rely in connection with this order to show cause, including materials relating to the appropriate scope of any receivership or powers of any receiver, in the event the Jefferson County Personnel Board ultimately is adjudged to be in civil contempt and is placed in receivership as a sanction therefor.

Upon receipt and review of all submissions in response to this order, the court shall determine the date and time for an evidentiary hearing, oral arguments, and other submissions, as may be necessary.[2]

On motion of defendant Jefferson County, Alabama, requesting time for additional discovery,[3] the deadline for the parties' responses to the Personnel Board's submission was extended to May 20, 2002. During the status conference conducted on May 23, 2002, all parties waived an evidentiary hearing on the motion to hold the Personnel Board in civil contempt, and submitted the issue to the court for decision on the basis of briefs and evidentiary materials.[4]

---

[2]Order to Show Cause entered April 5, 2002 (doc. no. 886), at 1-2.

[3]*See* doc. no. 894.

[4]*See* Transcript of Hearing, May 23, 2002 (doc. no. 921), at 8-9.

## I. SUMMARY OF APPLICABLE LEGAL STANDARDS

Within the Eleventh Circuit, civil contempt sanctions are the primary means of compelling

a party's compliance with the provisions of consent decrees.

> [C]onsent decrees, like all injunctions, are to be enforced through the district court's
> civil contempt power — exercised after (1) the plaintiff moves the court to order the
> defendant to show cause why he should not be held in contempt for refusing to obey
> the decree's mandate, (2) the court grants the motion, and (3) the defendant fails to
> present a lawful excuse for his alleged disobedience. . . .

*Reynolds v. Roberts*, 207 F.3d 1288, 1297 (11th Cir. 2000) (*"Reynolds II"*); *see also*, *e.g.*, *Reynolds*

*v. Roberts*, 251 F.3d 1350, 1358 (11th Cir. 2001) (*"Reynolds III"*) ("[W]e reiterate what we stated

in *Thomason* and *Reynolds II* — there are proper procedures to be followed for the enforcement and

litigation of issues related to consent decrees."); *Florida Association for Retarded Citizens, Inc. v.*

*Bush*, 246 F.3d 1296, 1298 (11th Cir. 2001) (per curiam) (same); *Thomason v. Russell Corp.*, 132

F.3d 632, 634 n.4 (11th Cir. 1998) (observing that "the proper method of enforcing a consent decree

is *not* a 'motion to enforce' or similar plea for the court to 'do something' about a violation of the

decree," but a motion asking "the court to issue an order to show cause why [the defendant] should

not be held in contempt and sanctioned for failing to abide by the Decree's mandate") (emphasis in

original); *Wyatt v. Rogers*, 92 F.3d 1074, 1078 n.8 (11th Cir. 1996) ("Precedent dictates that a

plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order

move the court to issue an order requiring the defendant to show cause why he should not be held

in contempt and sanctioned for his noncompliance."); *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th

Cir. 1990) ("Every civil contempt proceeding is brought to enforce a court order that requires the

defendant to act in some manner."); *Newman v. Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982)

("The plaintiffs, if they think [a defendant] is failing to take the action required by the consent

decree and wish the court to intervene, have available a traditional equitable remedy. They can initiate contempt proceedings by moving the court to issue an order to show cause why the [defendant] should not be held in civil contempt.").

## A.    Prima Facie Case for Civil Contempt

To prevail on a motion for civil contempt, a plaintiff must demonstrate by clear and convincing evidence that a defendant violated a prior court order that was valid and lawful, clear, definite and unambiguous, and that the alleged violator had the ability to comply with the order. *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). "Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor 'to produce evidence explaining his noncompliance. . . .'" *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)).

## B.    Affirmative Defenses to Motion for Civil Contempt

The contemnor must show "either that he did not violate the court order or that he was excused from complying." *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990). "[I]n this circuit, a party subject to a court's order demonstrates inability to comply only by showing that he has made 'in good faith all reasonable efforts to comply.'" *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988) (quoting *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)).

## C.    Imposition of Receivership as Remedy for Civil Contempt

"Pursuant to its equity jurisdiction, a federal court has power to take broad remedial action to effectuate compliance with its orders. This equitable power includes the power to appoint a receiver." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) (citing *Morgan v. McDonough,* 540 F.2d 527, 533 (1st Cir. 1976); *Bracco v. Lackner*, 462 F. Supp. 436, 455 (N.D. Cal. 1978); *Petitpren*

4

*v. Taylor School District*, 304 N.W.2d 553, 557 (Mich. Ct. App. 1981)).

"The appointment of a person to carry out functions the court deems necessary to provide full and complete relief is not a novelty in American jurisprudence." *Wayne County Jail Inmates v. Lucas*, 216 N.W.2d 910, 913 (Mich. 1974) (en banc) (footnoted citations omitted) ("*Wayne I*"); *see also, e.g., Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 556 & n.2 (Mich. Ct. App. 1989) ("*Wayne II*") (same); *Morgan*, 540 F.2d at 533 ("A district court's power to fashion and effectuate desegregation decrees is broad and flexible, and the remedies may be 'administratively awkward, inconvenient, and even bizarre.'") (quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15-16, 28, 91 S.Ct. 1267, 1276, 1282, 28 L.Ed.2d 554 (1971)); *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999) ("The court has the power, pursuant to its equity jurisdiction, to take broad remedial action to secure compliance with its orders, including the power to appoint a receiver."); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 677 N.E.2d 127, 148 (Mass. 1997) ("Public officials who fail to abide by legal standards are not immune to these remedies. . . . A court with equity jurisdiction has the discretion to appoint a receiver to take over the main functions of public officials.") (citations omitted)).

Receivers have been appointed "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons." *Dixon*, 967 F. Supp. at 550.

> The mechanisms at work in the creation of . . . a receivership of a public institution, are fairly clear. The political process has failed to produce an institution conforming to law and those subjected to the illegality, who are usually politically powerless (*cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938)), turn to the courts for the vindication of their rights. Injunctive remedies are called for, but the judge lacks expertness in the particular

5

field, and lacks time even when he chances to have the knowledge. Hence the appointment of adjunct officers who supply expert knowledge and sometimes implicitly encourage acceptance by the parties and the general public of the results of the judicial intervention.

*Perez v. Boston Housing Authority*, 400 N.E.2d 1231, 1250 n.29 (Mass. 1980).

## 1.    Factors to consider

The appointment of a receiver to act in the place of "elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances." *Morgan*, 540 F.2d at 535. "Essentially it is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary." *Jerry M.*, 738 A.2d at 1213 (citing *LaShawn A.*, *by Moore v. Kelly*, 144 F.3d 847, 854 (D.C. Cir. 1998)).

An important consideration is "whether any other remedy is likely to be successful." *Dixon*, 967 F. Supp. at 550 (citing *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate.")); *Newman*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction."); *Bracco*, 462 F. Supp. at 456 (noting that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren*, 304 N.W.2d at 557 (finding a receiver appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence")).

Courts in the District of Columbia, where most of the reported receiverships have been

imposed on public institutions, have identified six, non-exhaustive factors to consider when determining whether other remedies are inadequate, and, the imposition of a receivership remains the only viable option for securing compliance with court orders. These include:

(1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and, (6) "whether a receiver can provide a quick and efficient remedy."

*Jerry M.*, 738 A.2d at 1213 (quoting *Dixon*, 967 F. Supp. at 550-51 (citing, in turn, *Judge Rotenberg Educational Center*, 677 N.E.2d at 148-49, and *Morgan*, 540 F.2d at 533 ("Remedial devices should be effective and relief prompt.")).

The court will review the procedural and evidentiary record to determine, first, whether the Personnel Board should be held in civil contempt and, if so, whether application of the factors enumerated above leads to the conclusion that the appointment of a receiver is warranted. In order to facilitate the comprehensive factual review necessary to an examination of these issues, the court will draw upon prior court opinions and the uncontested factual statements contained in the parties' briefs.[5]

## II. FACTUAL BACKGROUND

### A.    The Jefferson County Personnel Board

The Jefferson County Personnel Board ("Personnel Board" or "Board") was created by an Alabama statute originally enacted in 1935, and reenacted in 1945. *See* Act No. 248, 1945 Acts of

---

[5]*See* Personnel Board of Jefferson County's Response to Show Cause Order (doc. no. 890); United States' Reply to Personnel Board of Jefferson County's Response to Order to Show Cause Why it Should Not be Held in Civil Contempt (doc. no. 914); Wilks Class' Response to Court's Order Dated April 5, 2002 (doc. no. 915); Jefferson County's Memorandum Brief (doc. no. 916); Martin Plaintiffs' and Bryant Intervenors' Memorandum in Support of Their Order to Show Cause (doc. no. 918).

Alabama, at 376-400; Act No. 284, 1935 Acts of Alabama, at 691-713; *see also* 1940 Code of Alabama, Appendix § 645 *et seq*. (Recomp. 1958).[6]

Although the Personnel Board shares responsibility for hiring and promoting local government employees with the twenty-two governmental entities served by the Board,[7] it nevertheless is the principal civil service agency for public employees, because it is charged by Alabama law with the function of administering written tests and other job selection procedures that produce "registers" and "certificates" of persons considered eligible for employment or promotion[8] to classified positions[9] with those governmental employers, including defendants Jefferson County and the City of Birmingham, Alabama.

The screening, testing, certification, and other functions of the Personnel Board's staff are supervised by the Personnel Director,[10] who is appointed by, and serves at the pleasure of, a three-

---

[6]Both the original 1935 Act and 1945 re-enactment are so-called "general acts of local application," meaning that the legislation applied only to Alabama counties and municipalities that satisfy population requirements specified in the statute. As a result of the population figures of 200,000 residents specified in the 1935 Act, and 400,000 residents in the 1945 Act, the law has applied since its inception only to Jefferson County, the largest county in Alabama. *See* Act No. 248, 1945 Acts of Alabama § 2, at 377. Various sections of the enabling legislation have been amended many times during the intervening years.

[7]The governmental entities served by the Personnel Board include: the Jefferson County Commission; the Jefferson County Department of Health; the Jefferson County Emergency Management Agency; the Jefferson County Storm Water and Sewer Administration; the Jefferson County Personnel Board as an entity; and the cities of Birmingham, Bessemer, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Irondale, Leeds, Midfield, Mountain Brook, Pleasant Grove, Tarrant, Trussville, Vestavia Hills, and Warrior.

[8]Successful applicants for employment or promotion are placed by the Personnel Board on "registers of eligibles." Once a register for a particular job classification has been established, a governmental entity served by the Board may request a "certificate of eligibles" when vacancies occur. The certificate contains the names of the highest ranked candidates on the register who have indicated a desire to work for that particular employer. The number of persons appearing on the certificate is a function of the number of vacancies to be filled. State law provides that the number of candidates to be certified to the selecting authority is equal to the number of vacancies to be filled plus nine. Ala. Code § 36-26-17 (1975). Thus, if there is one vacancy, ten candidates are certified (the so-called "Rule of Ten").

[9]The Board's enabling legislation excludes such positions as elected officials, certain appointed officials and professionals, and "common laborers" from the classified service. *See* Acts No. 677 and 782, 1977 Acts of Alabama.

[10]At some undetermined point, the occupant of this position began to be called "Executive Director" by the members of the three person Personnel Board, but the correct, statutory title remains either "Personnel Director" or "Director of Personnel." *See* § 1 of Act No. 680 and § 4 of Act No. 684, 1977 Acts of Alabama (both amending § 12 of Act No. 248, 1945 Acts of Alabama, defining the "Duties of personnel director").

8

person Personnel Board,[11] the members of which are appointed for six-year terms by a Citizens Supervisory Commission.[12]

## B.  Procedural History 1974-1999

The history of this case — an amalgam of three consolidated and two intervening class actions — is long. As Judge Carnes recently observed, the "case already [is] older than the average college student"; January 4, 2003 will mark its 29th "birthday, if such a thing were cause for celebration." *Birmingham Fire Fighters Association 117 v. Jefferson County*, 280 F.3d 1289, 1295, 1290 (11th Cir. 2002).

Over the life of this protracted litigation, various orders of this court have been addressed on appeal eight times: once by the former Fifth Circuit,[13] six times by the present Eleventh Circuit,[14] and once by the Supreme Court.[15]  There is not space, therefore, to tell the whole story. A great deal

---

[11]The present chairman of the Board is James B. Johnson, who has served as a member of the Board since 1973, and as chairman since 1986.  Temple W. Tutwiler III served as an associate member of the Board from November of 1995, until his resignation on April 23, 2002.  (Bill Myers, who formerly served as Chief of Police for the City of Birmingham, and, as a member of the Birmingham City Council from 1981 through 1993, was selected by the Citizens Supervisory Commission to replace Tutwiler on May 29, 2002.)  Robin L. Burrell served as an associate member of the Board from May 1997, until her resignation on June 3, 2002.

[12] Since the legislation creating the Jefferson County Personnel Board was originally enacted in 1935, the section providing for the method of selecting members of the "Citizens Supervisory Commission" was amended by nine Acts of the Alabama Legislature passed from 1939 through 1977.  However, the current method of selecting those persons who may serve as members of the Citizens Supervisory Commission was established by a final judgment entered by this court in *Woods v. Florence*, No. CV82-PT-2272-S (N.D. Ala. Apr. 29, 1985) (Propst, J.); *see also id.* (N.D. Ala. Jan. 31, 1985) (findings of fact and conclusions of law holding that portions of Section 5, Act. No. 248, 1945 Acts of Alabama, as subsequently amended, "have been amended and maintained with the intent to discriminate and continue to have an adverse impact on plaintiffs and other black citizens" in violation of the Fourteenth Amendment to the United States Constitution).

[13]*Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I*").

[14]*Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002); *Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*"); *In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994); *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1984).

[15]*Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), *aff'g In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987).

9

of it, in any event, already has been ably recounted by Judge Carnes in the extraordinary opinion he authored for the Eleventh Circuit in *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*").

There remains, nevertheless, a compelling need to recapitulate a large chunk of the prior history, and not just for the purpose of providing context for the benefit of those readers who are unfamiliar with it, but primarily because — as the evidence and events discussed in Sections II.E, II.G, and IV.C of this opinion will demonstrate — there still are officials who either have not heard, or fully appreciated, the ringing mandate of the Eleventh Circuit, directing this court to order the City of Birmingham and Jefferson County Personnel Board to develop lawful selection procedures for public employees "forthwith, not at the casual pace the Board has passed off as progress" for more than a quarter-century. *Ensley II*, 31 F.3d at 1578.

## 1.    **January 4, 1974, through August 25, 1994**

The original action was filed more than twenty-eight years ago, on January 4, 1974, by the Ensley Branch of the National Association for the Advancement of Colored People and several named plaintiffs, who sued for themselves and on behalf of a class of similarly situated persons. The defendants to that action were: George Seibels, then Mayor of Birmingham, Alabama; the City of Birmingham; the individual members of the Jefferson County Personnel Board; and the Board's Personnel Director. The complaint alleged that these defendants had engaged in discriminatory hiring practices against African Americans in violation of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, 1983, 2000e *et seq*.[16]

The initial action was followed in short order by another raising the same constitutional and

---

[16]One fact underscoring the extraordinary longevity of these controversies is that the present Chief Judge of this court, the Hon. U.W. Clemon, and his law partner, the Hon. Oscar Adams (later Associate Justice of the Supreme Court of Alabama, but now deceased), were the original attorneys of record for plaintiffs in that class action.

10

statutory allegations, filed on January 7, 1974, by John W. Martin and other named plaintiffs (the "Martin class") against the City of Birmingham, Jefferson County, and the Personnel Board.

On May 27, 1975, the United States brought suit against the Personnel Board and the various municipalities serviced by the Board, alleging a pattern or practice of discriminatory employment practices against African Americans and females in violation of Title VII, the Fourteenth Amendment, and 42 U.S.C. § 1981.[17]  Yet a fourth action was filed on February 20, 1976, by Lucy Walker, who challenged the employment practices of the Jefferson County nursing home under Title VII and 42 U.S.C. § 1981, but her claims eventually were resolved.

All of the foregoing actions were consolidated for purposes of discovery and trial by Judge Sam C. Pointer, Jr., and trials were conducted in 1976 and 1979. *See Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 814-15 (5th Cir. 1980) ("*Ensley I*").

### a.    The 1976 trial and 1977 district court opinion

The 1976 trial addressed "the merits of the limited issue of whether the two tests used by the Personnel Board to screen and rank applicants for positions as *police officers* and *firefighters* [were] discriminatory and violative of the constitutional or statutory rights of blacks. All other issues under the complaints were reserved until a later date." *Id*. at 815 (emphasis supplied).

Ultimately, Judge Pointer concluded that the Board's selection, administration, and use of the contested tests were not motivated by a design or intent to discriminate on the basis of race, but that "both tests had a significant adverse impact on black applicants, a phenomenon defined as a passing rate 'less than four-fifths ... of the rate for [whites],'" *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1554 (11th Cir. 1994) ("*Ensley II*") (quoting *Ensley Branch, N.A.A.C.P. v. Seibels*,

---

[17]The United States also alleged violations of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. § 3766(c), and the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1242.

11

13 Empl. Prac. Dec. (CCH) ¶ 11,504, at 6796-97 (N.D. Ala. 1977)),[18] and that neither test was sufficiently "job-related" to satisfy Title VII. *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) ("Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.'") (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)).

As a remedy for the Board's use of these illegal tests, Judge Pointer "ordered race-conscious relief '[p]ending adoption of some selection procedure which either has no adverse effect upon black applicants or is sufficiently job-related.'" *Ensley II*, 31 F.3d at 1555 (quoting *Ensley Branch*, 13 Empl. Prac. Dec. (CCH) ¶ 11,504, at 6808).

An appeal and cross-appeal ensued, which resulted in an affirmance of the district court's holding that the police officer and firefighter tests violated Title VII, but also in a remand to the district court for additional factual findings as to whether the Personnel Board was justified in using

---

[18]The *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. Part 1607, provide the following definition of adverse impact:

*Adverse impact and the "four-fifths rule."* A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms. . . . Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group. Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact. . . .

29 C.F.R. § 1607.4(D).

12

the results of the tests pending the completion of validation reports.[19]  *See Ensley I*, 616 F.2d at 822-

25.

### b.    The 1979 trial and 1981 consent decrees

The Eleventh Circuit summarized the 1979 trial and consent decrees subsequently adopted

by this court in *Ensley II*, saying:

> While the first appeal was pending, the district court conducted a second trial.
> That trial involved challenges to other Board practices, including:  written tests for
> eighteen more positions; various rules affecting promotional opportunities; the
> imposition of height, weight, and educational requirements for certain jobs; and the
> restriction of some job announcements and certifications to persons of a particular
> sex.  *United States v. Jefferson County*, 28 Fair Empl.Prac.Cas. (BNA) 1834, 1835,
> 1981 WL 27018 (N.D.Ala.1981), *aff'd*, 720 F.2d 1511 (11th Cir. 1983).  The Board
> defended on the grounds that these practices either had no adverse impact upon
> blacks or women, or were sufficiently job-related to be effective predictors of future
> job performance.  *Id*.  As in the first trial, the City did not participate.  In fact, the
> original plaintiffs' claims against the City never reached trial.
>
> While the first proceeding was on remand and the second was at trial, the
> parties entered settlement talks that eventually suspended both proceedings.  Once
> again, we resort to our summary of the facts from a prior decision:
>
> > After we ruled on the district court's decision concerning the written [police
> > officer and firefighter] tests, [*Ensley I*, 616 F.2d at 812], the plaintiffs, in all
> > three cases, entered into extensive negotiations with the Board and the City

---

[19]The former Fifth Circuit explained the concept of "validating" selection procedures in *Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I*"), as follows:

"Validation" is the process of determining whether a selection device is sufficiently job-related to comply with the requirements of Title VII.  *See* Uniform Guidelines on Employee Selection Procedure (hereinafter referred to as Uniform Guidelines), 43 Fed.Reg. 38290, 38291 (August 25, 1978).  There are three basic methods of validation: "'criterion' validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); 'construct' validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and 'content' validity (demonstrated by tests whose content closely approximate tasks to be performed on the job by the applicant)."  *Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 n.13 (1976); *see* Uniform Guidelines, § 5, 43 Fed.Reg. at 38298.

*Id.* at 816 n.11.

13

> which culminated in two proposed consent decrees, one with the Board and one with the City. The former disposed of all of the plaintiffs' claims against the Board; the latter disposed of all the plaintiffs' claims against the City.

*United States v. Jefferson County*, 720 F.2d 1511, 1514-15 (11th Cir. 1983) (footnotes omitted). *Thus, before the district court ruled on the remand of the first case or rendered a decision in the second case, the parties submitted proposed consent decrees that settled all claims against the City and the Board, including allegations of gender discrimination raised by the United States.* Although these decrees provided retrospective relief such as back pay for some individuals, *their keystone was an extensive regime of affirmative action for blacks and women.*

> *At the heart of the Board decree was a requirement*, subject to the availability of qualified applicants, *that the Board annually certify blacks and women either according to racial and gender quotas set forth in the decree or in proportion to their representation in the applicant pool, whichever was higher.* The decree's minimum certification rates ranged from ten to fifty percent, depending on the position involved and whether the goal applied to blacks or women. The Board agreed to continue to certify according to these annual "goals" until satisfaction of the long-term "goal"; *i.e.*, until the proportion of blacks and women employed by the City in any given job classification "approximate[d] the respective percentages [of blacks and women] in the civilian labor force of Jefferson County." These provisions did not govern appointment of blacks to entry-level police and firefighter positions, with respect to which the Board decree simply adopted the remedies established by the district court's 1977 order on that subject. Nor did the decree state that the development of lawful selection procedures would terminate race- and gender-conscious certification requirements, which could potentially have continued forever.

> The Board decree established several other significant obligations. First, the Board committed itself "periodically" to review its hiring and promotion procedures to ensure that the procedures either had no adverse impact or were sufficiently job-related to pass muster under Title VII. Second, so long as the Board's procedures — whether job related or not — had a disparate impact on blacks or women, the Board agreed to "mak[e] a good faith effort to determine whether there [were] any alternative [testing procedures] . . . which [would] reduce any adverse impact." Third, the decree prohibited the Board's prior practice of restricting job announcements on the basis of gender. Fourth, the decree mandated continued aggressive recruitment of blacks and women.

*Ensley II*, 31 F.3d at 1556-57 (footnote omitted) (emphasis added).

14

###### c.    The reverse discrimination cases

This court's approval of consent decrees for the City of Birmingham and Personnel Board "brought forth a collection of cases that has come to be known as the 'Birmingham Reverse Discrimination Employment Litigation.' In these cases, a number of male, non-black City employees collaterally attacked the decrees and the affirmative action programs adopted under them." *Id*. at 1558. That litigation eventually spawned another trial, efforts by various parties to modify various provisions of the 1981 consent decrees, and additional appeals. *See id*. at 1558-63; *see also, e.g.*, *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983).

##### 2.    Significant changes in Constitutional law and *Ensley II*

When this court approved the Board's consent decree in 1981, the Supreme Court had just begun to address the constitutionality of affirmative action programs as a means of remediating historical or contemporary discriminatory selection practices by public entities. *See Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). "Since then, the Court . . . repeatedly revisited this issue, substantially changing affirmative action jurisprudence. Most significantly, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498-508, 109 S.Ct. 706, 724-30, 102 L.Ed.2d 854 (1989), *established that voluntary, race-conscious, local-government affirmative action programs are subject to strict scrutiny*." *Ensley II*, 31 F.3d at 1564 (emphasis added).

It now is clear that, when defending a voluntary affirmative action plan, a public employer

15

must show, among other things, that it has "a 'strong basis in evidence for its conclusion that remedial action was necessary.'" *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant v. Jackson Board of Education*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986) (plurality opinion)). On this issue, the *Ensley II* Court held that, "[a]t the time the City and the Board accepted the [1981] consent decrees, they already had [and Judge Pointer had found] a 'strong basis in evidence' for concluding that race-based relief was needed in the *police* and *fire* departments," and "[f]urther findings with respect to those departments are unnecessary." 31 F.3d at 1566, 1567 (emphasis supplied).

By the time the Eleventh Circuit addressed the 1981 consent decrees in *Ensley II*, however, the parties had not fully litigated, nor had this court decided, whether there was sufficient evidence of past or present discrimination to justify continued use of race-conscious remedies in the other departments covered by the decrees. The Eleventh Circuit therefore remanded the case to this court for the purpose of determining

whether the public employers here have a strong basis in evidence for their conclusion that past or present discrimination in departments other than the police and fire departments warrants race-based relief.

The City and Board may defend their programs by showing enough evidence of discrimination to create a strong basis for the conclusion that past or present discrimination warrants race-based remedies in departments in addition to the police and fire departments. It is not necessary (but would of course be sufficient) for the City and Board to show that, when they approved the decrees, they already had strong evidence of such discrimination. This case concerns only the prospective validity of the decrees, and prospective validity can be established just as well with new evidence as with old. If the City and Board can . . . show strong evidence of the need for affirmative action in a department, then future affirmative action in that department is justified. *Cf. Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993) (holding that consideration of evidence developed after adoption of an affirmative action plan is "especially appropriate" where the relief sought is "prospective only"); *Concrete Works, Inc. v. City of Denver*, 823 F. Supp. 821, 837 (D.Colo. 1993) ("[I]t would make little sense to strike down the [affirmative action

16

plan] solely because the evidence of discrimination before the City Council was insufficient without the post-enactment evidence only to watch the City Council reconvene immediately, incorporate the new evidence into a new ordinance, and arrive at a constitutionally adequate factual predicate.").

On remand, the district court should give the City and the Board a chance to make the requisite showing. . . . If . . . the City and Board fail to present strong evidence justifying race-based relief in a department, the district court must forthwith terminate the race-based affirmative action provisions as to that department.

*Id.* at 1567-68 (footnotes omitted).

The *Ensley II* Court also held that, even if the City and Personnel Board presented sufficient

evidence of discrimination to create a "strong basis" for the conclusion that past or present

discrimination warranted race-based remedies in departments other than the police and fire

departments, the affirmative action regimens erected by court orders must be "narrowly tailored"

to the compelling governmental interest of ending racial discrimination.

> *Croson's* second requirement is that the affirmative action provided be narrowly tailored to the discrimination to be remedied. This requirement, like the "compelling interest" requirement, applies to the present case through the interaction of *Rufo* and *Croson*. *Rufo* commands district courts to modify consent decrees to avoid "perpetuat[ing] a constitutional violation." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391, 112 S.Ct. 748, 763, 116 L.Ed.2d 867 (1992). For its part, *Croson* establishes the controlling constitutional standard that cannot be violated. Taken together, these decisions mandate that the present decrees' affirmative action provisions be "narrowly tailored" to serve the compelling government interest of ending racial discrimination. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507, 109 S.Ct. 706, 728 (1989). *The district court failed to make the modifications necessary to tailor the decrees narrowly to that interest.*

*Ensley II*, 31 F.3d at 1568-69 (emphasis added).

The *Ensley II* Court ultimately held that the "long-term" and "annual goals" contained in the

1981 consent decrees failed the second *Croson* requirement,[20] and that "the district court must re-

---

[20]The Eleventh Circuit held that the "long-term" racial goals contained in the 1981 consent decrees were "fundamentally flawed," because

they are designed to create parity between the racial composition of the labor pool and the race of the

write the decrees to make them narrowly tailored to the compelling interest they are intended to

serve." *Id.* at 1570.

> On remand, the district court must re-write the decrees to reflect that their *true* long-term purpose is to remedy past and present discrimination, not to achieve work-force parity. The goal of eliminating discrimination may justify some interim use of affirmative action, but affirmative action selection provisions are themselves a form of discrimination that cannot continue forever.   An end to racial discrimination demands the development of valid, non-discriminatory selection procedures to replace race-conscious selection procedures. We hesitate to label this essential object "long-term," because it should be pursued with a sense of urgency.

> While "strict scrutiny does not require exhaustion of every possible ... alternative," it does require "serious, good faith consideration of race-neutral alternatives," either prior to or in conjunction with implementation of an affirmative action plan. *Coral Constr. Co. v. King County*, 941 F.2d 910, 923 (9th Cir. 1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992); *see also Cone Corp. v. Hillsborough County*, 908 F.2d 908, 917 (11th Cir.) (upholding a minority set-aside program that implemented race-neutral alternatives in conjunction with, rather than prior to, racial preferences), *cert. denied*, 498 U.S. 983, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). "[R]ace-neutral means are to be favored." *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1557 (11th Cir. 1994). *Unfortunately, race-neutral alternatives have not been pursued diligently enough in this case.*

>    . . .

> [T]he *single most important race-neutral alternative contained in the decrees was the requirement that the Board develop and put in place non-discriminatory selection procedures* — a requirement that the Board has not satisfied. *The Board was quite properly ordered to implement selection procedures that* either *had no disparate impact on blacks and women* or that*, despite having disparate impact, were*

---

employees in each job position.   The Constitution does not guarantee racial parity in public employment; instead, it forbids racial discrimination. . . .

     By striving for racial parity rather than an end to racial discrimination, these decrees actually promote racial discrimination in contravention of the Constitution.  Some might argue that an end to discrimination requires parity between the racial composition of the labor pool and the racial composition in each job position. The Supreme Court, however, has rejected that contention, because it "rests upon the completely unrealistic assumption that minorities will choose a particular profession in lockstep proportion to their representation in the local workforce." *Croson*, 488 U.S. at 507, 109 S.Ct. at 729 (internal quotation marks omitted).

*Ensley II*, 31 F.3d at 1570. The "annual goals" contained in both decrees also were condemned because they lacked "flexibility" and had "been applied as rigid quotas." *Id*. at 1576.

18

*"job related" as that term is used in Title VII.* Moreover, if the Board chose the second approach, adopting procedures that were job-related despite having some disparate impact, then the Board was required to search for selection procedures that were equally job-related but with less adverse impact. *These decree provisions roughly parallel the requirements of Title VII, which mandates that an employer use either a selection procedure with no adverse impact or a job-related selection procedure that has no more adverse impact than other, equally job-related selection procedures. See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). *Although the decree ordered the Board to comply with Title VII by developing valid tests, it provided no deadlines or formal review mechanism to ensure that the Board actually did so. That omission turned out to be a serious flaw.*

. . .

In 1991, the Board administered thirty-five different tests, none of which had been validated. Thirteen years after the consent decrees took effect, the Board is still unable or unwilling to demonstrate the legality of a single exam. For its part, the City has never tried to validate the selection procedures it uses to choose from among qualified candidates; nor does the City decree presently require that it do so. *Thirteen years of experience teach that the decrees as written are simply too weak to make the City and the Board develop non-discriminatory selection procedures.* The district court should remedy this defect. *The provisions requiring valid selection procedures must be given teeth and extended to cover the City, too.*

Under its present decree, the Board may indefinitely administer racially discriminatory tests and then attempt to cure the resulting injury to blacks with race-conscious affirmative action. Federal courts should not tolerate such institutionalized discrimination. Use of racial hiring quotas to mask the effects of discriminatory selection procedures places grievous burdens on blacks as well as whites. . . . Whatever they measure, tests that are not job-related do not predict future job performance, yet they may nevertheless convince some persons that those who score lower are less qualified. As Justice Brennan once explained, "even in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs." *United Jewish Orgs. v. Carey*, 430 U.S. 144, 173, 97 S.Ct. 996, 1014, 51 L.Ed.2d 229 (1977) (Brennan, J., concurring in part). Blacks who do not make top marks on the flawed exams, but who nevertheless are appointed through affirmative action, may discover that their colleagues mistakenly consider them less able. *Croson*, 488 U.S. at 493, 109 S.Ct. at 722 (plurality opinion) ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."); *Hayes v. North State Law Enforcement Ass'n*, 10 F.3d

207, 212 (4th Cir. 1993) ("'While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome.'" (quoting *Maryland Troopers Ass'n v. Evans*, 993 F.2d 1072, 1076 (4th Cir. 1993))). For these reasons, it is not surprising that *the class of black employees argued in the district court that a reasonable timetable for adoption of valid tests should be imposed*. The failure of the consent decrees to force the City and the Board to develop race-neutral selection procedures that are fair to blacks and whites has caused both to suffer the effects of discrimination.

By permitting the continued use of discriminatory tests, the decrees compound the very evil they were designed to eliminate. The Constitution will not allow such a discriminatory construct. One color of discrimination has been painted over another in an effort to mask the peeling remnants of prejudice past, leaving a new and equally offensive discoloration rather than a clean canvas. The time has long passed for the Board and the City to strip away the past and adopt fresh, race-neutral selection procedures. And court-approved racial preferences must end as soon as possible.

*The district court declined to set deadlines for the development of valid selection procedures*. The court agreed that "use of such testing procedures would be desirable," but nevertheless summarily decided "that specific requirements for development and review [of lawful tests], particularly if accompanied by a judicially-imposed timetable, would be unrealistic, unworkable, and unwise." *That decision was an abuse of discretion*.

*While it may be difficult to develop valid selection procedures, that task is far from impossible*. Other public employment cases prove that it can be done. . . .

Moreover, the conclusion that job selection procedures cannot be brought into compliance with Title VII necessarily implies that Congress set up a legal requirement that is impossible to meet. We are loath to impute such a gross error to our nation's elected representatives. Had Congress shared the district court's belief that validation of selection procedures was "unrealistic, unworkable, and unwise," then Congress "would not have made a specific exception to Title VII for the proper use of professionally designed tests." *Guardians Ass'n v. Civil Serv. Comm'n*, 630 F.2d 79, 89 (2d Cir. 1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). *Valid tests may prove administratively burdensome to design and validate, but minimizing inconvenience is not a constitutional value. It certainly does not outweigh the importance of ending racial discrimination. See, e.g., Hayes v. North State Law Enforcement Ass'n*, 10 F.3d 207, 216 (4th Cir. 1993). As Judge Frank M. Johnson, Jr., has explained, "[t]he Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present." Jack Bass, *Taming the Storm*

398 (1993) (quoting written statement made by Judge Johnson during confirmation proceedings regarding his appointment to the Court of Appeals). *If the process of approving selection procedures places undue strain on the district court's resources, it may appoint a special master to assist with the task.*

. . .

*Valid selection procedures are both possible in practice and constitutionally necessary. Therefore, on remand, the district court should set prompt deadlines for the City and the Board to develop and implement valid job-selection procedures.*

*Id.* at 1570-75 (footnotes and some citations omitted) (emphasis added).

In sum, the *Ensley II* Court clearly commanded that this court's *ultimate* objective should be that of aggressively compelling the Personnel Board and City of Birmingham to develop "valid, non-discriminatory selection procedures" in accordance with specific, "prompt deadlines" and "formal review mechanism[s]" to "ensure" that the Board and City "actually did" "develop and implement valid job-selection procedures." The Court explicitly refused to describe that objective as "long term," "because it should be pursued with a sense of urgency."

The *Ensley II* Court nevertheless observed that, en route to the ultimate objective of developing and implementing valid, non-discriminatory job selection procedures, "some use of racial preferences" might be justified on an interim, short-term basis. This issue was discussed in the context of the "annual goals" specified in the 1981 consent decrees.

Until valid job-selection procedures are in place, some use of racial preferences is necessary to counteract the ongoing effects of racially discriminatory testing. Were such race-conscious decisionmaking not allowed prior to the implementation of race-neutral selection devices, the City and the Board would find themselves in the impossible position of trying to comply with Title VII on the basis of discrimination-tainted procedures. The Wilks class implicitly conceded as much at the modification hearing, and argues on appeal only that "supplemental" affirmative action should be disallowed in the absence of "a firm schedule for adoption of lawful tests." We have already decided that adoption of such a schedule is necessary. Therefore, pending prompt implementation of valid selection procedures, the Board may continue to make race-conscious certifications to the City

21

and the City may continue to take race into account when hiring and promoting. We will discuss later the character of race-conscious decisionmaking that is permitted.

In addition, even after valid selection procedures are in place, affirmative action may be needed to cure past discrimination by the City and the Board. However, we refuse simply to assume that the effects of past discrimination in public employment have endured or will endure indefinitely. For the past thirteen years, the decrees have mandated that the City and Board affirmatively hire blacks as a remedy for past wrongs. This court-approved remedy has apparently had substantial impact.

On remand, the district court must determine from evidence whether the effects of past City and Board discrimination persist. As long as significant specified effects linger, affirmative action may be justified despite the implementation of valid selection procedures.     Public employers cannot escape their constitutional responsibilities merely by adopting facially-neutral policies that institutionalize the effects of prior discrimination and thus perpetuate de facto discrimination. *See United States v. Fordice*, 505 U.S. 717, 727-29, 112 S.Ct. 2727, 2735-36, 120 L.Ed.2d 575 (1992) (school desegregation case). Here, however, it is not at all clear that broad affirmative action is still needed to cure past discrimination by the City and the Board. After thirteen years of racial preferences — and even longer with respect to firefighters and police officers — the district court should consider the retrospective, remedial purpose of affirmative action satisfied except where it finds that past discrimination continues to taint a particular position. Absent such findings, and once valid selection procedures have been adopted, affirmative action will no longer be legitimate; the goals of rectifying past and present discrimination will have been achieved.

*Ensley II*, 31 F.3d at 1575-76.

In any event, the *Ensley II* Court stressed that, "in their present form," the annual goals specified in the 1981 consent decrees were "unconstitutionally unrefined," and that

[o]n remand, the district court must re-write the decrees to make clear that the annual goals cannot last indefinitely. *Once a valid selection procedure is in place for a particular position*, neither the City nor the Board may continue to certify, hire, or promote according to a race-conscious "goal" absent proof of ongoing racial discrimination, or of the lingering effects of past racial discrimination, with respect to that position. Under no circumstances may the City hire or promote, or the Board certify, candidates who are demonstrably less qualified than other candidates, based upon the results of valid, job-related selection procedures, unless the district court finds that such appointments are necessary to cure employment discrimination by the City or Board.

22

In addition, the district court must re-write the decrees to relate the annual goals to the proportion of blacks in the relevant, objectively-qualified labor pool, calculated with reasonably available data. The district court may set an annual affirmative action goal that is greater than the proportion of blacks in the qualified labor pool if the district court finds that unlawful employment discrimination by the City or Board has reduced the proportion of blacks either in the qualified pool or in the position itself. In such circumstances, the district court may set a flexible goal that does not unduly burden the interests of innocent third parties and that is reasonably related to the pool of qualified blacks. *See, e.g., Cone Corp. v. Hillsborough County*, 908 F.2d 908, 916-17 (11th Cir. 1990) (approving a flexible affirmative action goal set at approximately twice the proportion of minorities in the qualified pool); *Howard v. McLucas*, 871 F.2d 1000, 1008 (11th Cir.) (approving a flexible, 50% affirmative action goal in order "expeditious[ly]" to remedy the identified effects of unlawful discrimination), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *cf. In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d 1525, 1542-43 (11th Cir. 1994) (suggesting that affirmative action goals must be flexible and "tied in some reasonable manner" to the proportion of blacks in the qualified pool). Appropriately designed, such increased goals may hasten the end to judicial oversight by expeditiously remedying past discrimination.

The Constitution tolerates race-based remedies only when they are necessary either to remedy past discrimination or to correct present discrimination *until valid selection procedures are in place*. Affirmative action is at most a temporary treatment; a cure for discrimination requires more fundamental and more even-handed reform. We cannot allow stop-gap remedies to turn into permanent palliatives. *Therefore, the district court is directed to order the City and the Board to develop race-neutral selection procedures forthwith, not at the casual pace the Board has passed off as progress for thirteen years*. The Board's decree is not a security blanket to be clung to, but a badge of shame, a monument to the Board's past and present failure to treat all candidates in a fair and non-discriminatory manner. Federal judicial oversight should provide public employers no refuge from their responsibilities. We are confident that, on remand, the district court will modify and enforce the decrees in a way that will bring that truth home.

*Id*. at 1577-78 (emphasis added).[21]

---

[21]*See also Ensley II*, 31 F.3d at 1582:

On remand, the district court should modify the decree to impose a set of prompt deadlines on the City and the Board for the development of gender-neutral selection procedures. As these procedures are developed and put into place, the City and Board must stop employing any affirmative "goals" or quotas for female appointments unless further affirmative action is needed to eradicate lingering effects of discrimination against women. However, because gender goals need be only "substantially related" (rather than "narrowly tailored") to their goal, *compare, e.g., Kahn v. Shevin*, 416 U.S. 351, 356 n.10, 94 S.Ct. 1734, 1737 n.10, 40 L.Ed.2d 189 (1974) (rejecting Justice Brennan's

The concluding paragraphs of the *Ensley II* opinion summarize the Court's various holdings

and directions to this court:

> On remand, the district court should determine whether the City and the Board have
> a strong evidentiary basis for their conclusion that race-based remedies are necessary
> to cure public employment discrimination in departments other than the police and
> fire departments.  If not, the race-based affirmative action provisions that apply to
> those other departments are unconstitutional and must be terminated.  With respect
> to the police and fire departments, and all other departments for which race-based
> remedies are found to be justified, the district court must re-write the decrees'
> affirmative action provisions to make them narrowly tailored.  *The court is therefore*
> *directed to establish a schedule of reasonably prompt deadlines for the City and the*
> *Board to develop and implement race-neutral selection procedures.* In addition, the
> district court should restrict the decrees' use of race-based preferences to
> circumstances in which race-based relief is necessary either to remedy the lingering
> effects of public employment discrimination against blacks, or until the City and the
> Board have implemented valid selection procedures.
>
> The decrees' gender-based preferences must be re-written to make them
> substantially related to the objective of ending discrimination against women.  *To*
> *that end, we direct the district court to establish a schedule of reasonably prompt*
> *deadlines for the City and the Board to develop and implement gender-neutral*
> *selection procedures.*  Unless needed to remedy lingering discrimination against
> women, gender preferences should be phased out as gender-neutral selection
> procedures are implemented.

*Ensley II*, 31 F.3d at 1583-84 (emphasis added).[22]

---

dissenting opinion that a Florida property-tax exemption for widows that was intended to reduce the
economic disparity between men and women should have been crafted as narrowly as possible to
achieve that goal) *with Croson*, 488 U.S. at 507, 109 S.Ct. at 729 (requiring narrow tailoring), the
decrees need not tie gender goals to the proportion of qualified female applicants.

[22]*See also id.* at 1552, where the *Ensley II* Court previewed its ultimate holdings:

> More specifically, we hold that the district court should: determine whether the City and the
> Board have a strong basis in evidence for their conclusion that race-based affirmative action is
> necessary in departments other than the police and fire departments, and if not, terminate the
> race-based goals with respect to those other departments; *order the City and Board to implement valid*
> *job-selection procedures forthwith*; prohibit appointments based on race or gender after *valid*
> *procedures are in place*, unless the district court specifically finds that further affirmative action is
> necessary to remedy the lingering effects of discrimination; revise the decrees' annual appointment
> goals for blacks to make them flexible and reasonably related to the pool of qualified black applicants;
> and award appropriate attorneys' fees to the Wilks class.  [Emphasis supplied.]

### 3.    The 1995 modification order and the Board's noncompliance 1995-99

Following remand, this court modified the Personnel Board's 1981 Consent Decree by means of an order entered on December 19, 1995 ("1995 Modification Order"), which vacated all provisions of the decree pertaining to "annual goals" and affirmative action plans.[23] Since then, the Board has not utilized race- or gender-conscious selection procedures.

The "long term objective" with regard to the 854 job classifications for which the Board administered selection procedures was stated as follows:

> The long term objective of the parties through the Decrees and this Order is to ensure that any and all alleged unlawful barriers to employment, assignment, and promotion that have existed for blacks and women are removed, that any present effects of alleged past employment discrimination by the Personnel Board are fully remedied, and that equal employment opportunities are available to all persons, regardless of race or sex, as required by Title VII of the Civil Rights Act of 1964, as amended.[24]

The 1995 Modification Order also stated that "[i]t shall be the Personnel Board's duty to use its best efforts to develop and implement lawful non-discriminatory selection procedures for hiring and promotion within the next four years."[25] In hindsight, that language hardly appears sufficiently forceful to drive home the major premise of the *Ensley II* decision — *i.e.*, that the Personnel Board must be compelled to develop and implement valid, race- and gender-neutral selection procedures "forthwith, not at the casual pace the Board has passed off as progress for thirteen years" — or to justify the Court's stated "confiden[ce] that, on remand, the district court will modify and enforce the decrees in a way that will bring that truth home." 31 F.3d at 1577, 1578.

Notwithstanding, paragraph 11 of the 1995 Modification Order did require the Personnel

---

[23]*See* 1995 Modification Order ¶ 9 (vacating among other provisions of the 1981 Consent Decree paragraphs 23-28 (annual goals) and 34-35 (affirmative action plans)).

[24]*Id.* ¶ 7.

[25]*Id.* ¶ 8.

Board to "develop and implement *lawful selection procedures* for hiring and promotion in the classified service according to the timetables set out in this Order."[26] The referenced "timetables," which will be discussed in more detail below, were the subject of extensive negotiations among the parties and conferences with the court prior to entry of the 1995 Modification Order. The Board neither objected that the timetables specified were unreasonable, nor appealed the order.

Paragraph 12 of the 1995 Modification Order essentially defined for purposes of this case the concept of "lawful selection procedures":

> It shall be the Personnel Board's responsibility to establish that each selection procedure required or used by the Personnel Board, including each standard (including minimum qualifications used to determine which applicants are qualified or eligible to apply for a job or submit to a selection device), procedure, test or other device, shall either (1) have no adverse impact on the basis of race or sex, as defined by the *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607 *et seq*. (1994), (hereinafter "the *Uniform Guidelines*"); or (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, the *Uniform Guidelines* and other applicable Federal law.[27] If a selection procedure or combination of selection procedures is used by the Personnel Board to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use. In accordance with the *Uniform Guidelines*, where there exists adverse impact in a selection procedure, as part of its consideration of the job relatedness and validity of any selection procedure, the Personnel Board shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have

---

[26]*Id.* ¶ 11 (emphasis supplied). In full text, paragraph 11 reads as follows:

> The Personnel Board shall develop and implement lawful selection procedures for hiring and promotion in the classified service according to the timetables set out in this Order. Pursuant to State law, the Personnel Board is not obligated to rank candidates it certifies to jurisdictions for hiring or promotion consideration. The Personnel Board shall list applicants on certifications to the jurisdictions it serves in random order.

[27]The *Uniform Guidelines on Employee Selection Procedures*, which paragraph 12 adopts as the litmus test for determining whether a contested selection procedure is lawful, represent a joint statement of the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice as to the characteristics of acceptable selection procedures. *See Adoption of Four Agencies of Uniform Guidelines on Employee Selection Procedures*, 43 Fed. Reg. 38,290-38,315 (Aug. 25, 1978); *see also Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 816 n.11 (5th Cir. 1980).

26

less adverse impact. Whenever the Personnel Board, a jurisdiction served by the Personnel Board, or any party identifies a race-neutral selection procedure that has less adverse impact than a selection procedure required by the Personnel Board and that alternative procedure is also agreed by the parties to be job related for the job classification in question and consistent with business necessity and in accordance with applicable law, such alternative selection procedure shall be used by the Personnel Board, absent good cause shown.[28]

### a.    Timetables for public safety positions

Paragraph 19 of the 1995 Modification Order required the Board to "develop and implement selection procedures for hiring and promotion meeting the requirements of paragraph 12" for all entry-level public safety (police and fire) job classifications within twelve months of the entry of the 1995 Modification Order, and all promotional public safety jobs within eighteen months of the entry of the Modification Order.[29]

The Board, however, took *five years*, instead of twelve months, to develop lawful selection procedures for entry-level public safety jobs.[30] Moreover, now nearly *eight years* after *Ensley II*, the Board still has not done so for the "Police/Deputy Sheriff Sergeant" promotional or "Public Safety Dispatcher" classifications.

### b.    Timetables for non-public safety job classifications

Paragraphs 13 through 19 of the 1995 Modification Order imposed a process and timetables

---

[28]1995 Modification Order ¶ 12, at 3-4 (footnote omitted). The omitted footnote states:

> "Selection procedure" as used in this Order is defined as any measure, combination of measures, or procedure used as a basis for any employment decision, including the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, education and work experience requirements through informal or casual interviews and unscored application forms. *See* Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.16(Q). The term "selection procedure" is used herein to describe the screening, testing and certification procedures of the Personnel Board. The Personnel Board does not make final employment selection decisions for the jurisdictions it serves.

[29]The full text of paragraph 19 of the 1995 Modification Order is set forth *infra*, at note 40.

[30]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 2 (deposition of Gregory James), at 131-32; Exhibit 3 (deposition of Michael Blair), at 26; Exhibit 1 (deposition of James Johnson), at 54-55.

27

for winnowing the job classifications that remained at issue as of December 19, 1995, and separating acceptable selection procedures from those that any party contended were unlawful.

Paragraph 13 exempted from the requirements of the consent decree all jobs in the Jefferson County Department of Health, as well as any other job classifications which the plaintiffs collectively agreed, within sixty days of the entry of the Modification Order, to exempt from further scrutiny.[31]

Paragraph 14 required the Personnel Board to provide the parties with "a list of all job classifications remaining after the exclusion of jobs exempted by paragraph 13," *and*, detailed information from which adverse impact, applicant flow, and certification results could be determined for those classifications.[32] The Board was ordered to produce that information within one hundred

---

[31]Paragraph 13 of the 1995 Modification Order provides:

Job classifications that exist in the Department of Health shall be exempt from the requirements of paragraph 14 and the remainder of this Order. Within 60 days of the date of this Order the United States, the Martin/Bryant Plaintiffs and the Wilks Intervenors shall provide the Personnel Board with a list of the job classifications which they agree to exempt from the requirements of paragraph 14 and the remainder of this Order. Those job classifications that the United States, the Martin/Bryant Plaintiffs and the Wilks Intervenors each have agreed, in writing, to exempt from the requirements of paragraph 14 and the remainder of this Order shall be exempt. Further, at any time, the parties may agree that there shall be no temporary certification goals for any particular job classification and that the Personnel Board shall not be required to provide any additional evidence that the selection procedures for that job classification meet the requirements of paragraph 12 of this Order.

[32]Paragraph 14 of the 1995 Modification Order provides:

Within one hundred (100) days of the entry of this Order the Personnel Board shall submit to the parties a list of all job classifications remaining after the exclusion of jobs exempted by paragraph 13. Simultaneously and in conjunction with that submission, the Personnel Board shall provide the parties with applicant testing, ranking and selection information for each non-exempt job classification for January 1, 1990 through the date of the submission, including for each job classification:

(a) the job announcement or other document containing a detailed description of all selection procedures used by the Personnel Board, and the time period during which each was used, including any changes in use since January 1, 1990;

(b) the source or author of each selection procedure used by the Personnel Board;

(c) for each administration of a selection procedure, by job classification, a list of all

days of the entry of the 1995 Modification Order. That 100-day deadline was critically important

for two reasons: first, the paragraph 14 data was essential to the identification of apparently

unlawful selection procedures addressed in the succeeding paragraphs; and, second, all remaining

deadlines also were keyed to December 19, 1995, the date on which the Modification Order had

been entered. The Board nevertheless missed that deadline by well over a year.[33] To make matters

worse, the information belatedly provided was of minimal use to the parties, because it was either

> applicants, identified by name, social security identification number, race, sex, jurisdiction(s)
> for which he or she is being considered, an indication of whether each applicant met the
> minimum standards to participate in the selection procedure, and, if not, the particular
> minimum standard which caused the applicant to be deemed ineligible, any selection
> procedure or part thereof that the individual failed, the individual score(s), seniority points,
> final score and final ranking of each applicant;
>
> (d) the individuals certified by the Personnel Board, by job classification and jurisdiction,
> identified by name, social security identification number, race, sex, certification number and
> approximate certification date(s).
>
> (e) the individuals hired by each jurisdiction served by the Personnel Board from each
> eligible list, by name, social security number, race and sex;
>
> (f) a summary of the certification method used for each job classification since January 1,
> 1990, including any supplemental certification, and the approximate dates of any changes
> in the certification method.

The Personnel Board shall also provide a copy of the information described in subsections (d) and (e)
of this paragraph to the City of Birmingham for all certifications to the City of Birmingham since
January 1, 1990, for the purpose of assisting the City in meeting its obligation under its Decree. To
the extent they exist in machine-readable form, the Personnel Board shall provide the data described
in (c), (d) and (e) above in machine-readable form on one or more diskettes. A copy of the data from
the Personnel Board's applicant record is sufficient to comply with the requirement to provide the data
listed in (c), (d) and (e) above, to the extent that the data is contained in that record. A hard copy of
this data shall be provided by the Personnel Board where machine readable data is not maintained by
the Personnel Board or upon written request of a party. If additional data on the impact of any other
selection procedure administered by or for the Personnel Board since 1981 exist, the Personnel Board
shall so indicate to the parties and shall also provide such data to any party upon written request. The
parties to this Order agree to limit such requests to those job classifications where a party has a good
faith desire to obtain additional information to evaluate the adverse impact of the Personnel Board's
selection procedures.

[33]*See* Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 36 (April 8, 1996 cover letter from L. Morgan
Battle, counsel for Personnel Board, to opposing counsel); Exhibit 37 (July 8, 1996 letter from M. Kaplan, counsel for
Martin/Bryant parties, to L. Morgan Battle, counsel for Personnel Board); Exhibit 38 (October 8, 1996 letter from M.
Kaplan, counsel for Martin/Bryant parties, to L. Morgan Battle, counsel for Personnel Board); Exhibit 40 (December
2, 1996 letter from M. Kaplan, counsel for Martin/Bryant parties, to L. Morgan Battle, counsel for Personnel Board);
Exhibit 41 (February 26, 1997 letter from M. Kaplan, counsel for Martin/Bryant parties, to L. Morgan Battle, counsel
for Personnel Board); Exhibit 42 (May 5, 1997 letter from W. Ahmed to A. Franklin).

incomplete or indecipherable.[34] It was not until the Summer of 1997 that the Board finally produced

a complete set of the data required by paragraph 14 — more than fourteen months after the

production date specified.

Paragraph 15 was pivotal to winnowing the remaining job classifications. Unfortunately,

it was less than artfully worded:

Within ninety (90) days of [the] parties' receipt of the Personnel Board's submission pursuant to paragraph 14 of this Order, including a supplemental submission pursuant to a request for additional information, the United States, the Martin/Bryant Plaintiffs and the Wilks Intervenors shall *each* submit to the Personnel Board a list of up to fifteen job classifications. The Personnel Board shall provide the following information for these fifteen job classifications, and for entry level and promotional sworn police/Sheriff's department and fire service job classifications, to the United States, the Martin/Bryant Plaintiffs and the Wilks Intervenors within two-hundred-eighty (280) days of the entry of this Order:

(a) an analysis of whether the method of certification, if done without regard to the race and sex of the candidates, would have had an adverse impact on the basis of race or sex against blacks or women, analyzing both by the certification rule then in effect and the current certification rule; and

(b) the extent to which *each* selection procedure, or part thereof, that it uses or has used for each such job classification has had an adverse impact on the basis of race or sex against blacks or women from January 1, 1990, to the present, as defined by the *Uniform Guidelines*.

In the event that the United States, the Martin/Bryant Plaintiffs or the Wilks Intervenors wish to obtain information from the Personnel Board required by this paragraph for more than fifteen job classifications each, the parties shall attempt to agree on a schedule for the Personnel Board to provide additional information. The parties agree to limit such requests to those job classifications where a party has a good faith desire to obtain additional information to evaluate the adverse impact of

---

[34]*See* Exhibit 43 (August 2, 1996 letter from M. Kaplan, counsel for the Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 44 (August 15, 1996 letter from M. Kaplan, counsel for the Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 45 (December 12, 1996 letter from S. Clark, counsel for the Wilks class, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 46 (January 23, 1997 letter from S. Clark, counsel for the Wilks class, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 47 (January 15, 1997 letter from B. Thawley, counsel for the United States, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 48 (January 27, 1997 letter from L. Morgan Battle, counsel for the Personnel Board, to opposing counsel).

the Personnel Board's selection procedures. If within sixty (60) days of such a request, the Personnel Board and the requesting party have not agreed on the information to be provided or an appropriate schedule for providing the requested information, any party may submit this matter to the Court for resolution.

Stated differently, paragraph 15 imposed three requirements upon the Personnel Board. First, each plaintiff could submit a list of up to fifteen job classifications within ninety days following the Personnel Board's provision of paragraph 14 information (*i.e.*, a total of 190 days after entry of the Modification Order). Following receipt of those lists, the Board was required to provide the adverse impact analyses specified in paragraph 15 within 280 days of the entry of the Modification Order (*i.e.*, ninety days after the parties submitted their paragraph 15 lists to the Board).

Second, as to any job classifications exceeding fifteen for which any plaintiff had "a good faith desire to obtain additional information to evaluate the adverse impact of the Personnel Board's selection procedures," the parties were instructed to attempt to agree on a schedule for the Board to provide the information.

Finally, *and independently of both of the foregoing requirements*, the Board was ordered to submit within 280 days of the entry of the 1995 Modification Order adverse impact analyses in accordance with paragraph 15 for "entry level and promotional sworn police/Sheriff's department and fire service job classifications."

The Board, however, did not comply with *any* of the foregoing requirements.

In response to the paragraph 15 requests of the United States and Martin/Bryant parties,[35]

---

[35]The United States' paragraph 15 submission, dated October 1, 1996, contained a list of 29 positions divided as follows: (1) 15 job classifications for which the Board was required to provide adverse impact analyses within 280 days of the entry of the 1995 Modification Order (*i.e.*, 90 days after submission of the lists to the Board); and (2) 14 additional job classifications for which the parties were required to agree upon a schedule for the Board to conduct adverse impact analyses. Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 4.

The Martin/Bryant parties' paragraph 15 submission, dated August 7, 1997, contained a list of 83 positions divided as follows: (1) 15 job classifications for which the Board was required to provide adverse impact analyses within 280 days of the entry of the 1995 Modification Order (*i.e.*, 90 days after submission of the lists to the Board); and (2) 68 additional job classifications for which the parties were required to agree upon a schedule for the Board to conduct

the Personnel Board reported only certification ratios — not the adverse impact analyses prescribed

by paragraph 15.[36]  As to those public safety job classifications for which the Board was required

to submit adverse impact analyses within 280 days of the entry of the Modification Order (*i.e.*, no

later than September of 1996), the Board did not do so until November of 1996.

Paragraph 16 required the other parties to file a response within ninety days after receipt of

the Board's paragraph 15 adverse impact information, listing those job classifications which any

party contended had adverse impact on the basis of race or gender, "along with an explanation for

the basis of its contentions."[37]  Both the United States and Martin/Bryant parties submitted such

reports, with one or both contending that adverse impact on the basis of *race* was demonstrated in

the selection procedures for the following classifications:  entry-level police officer and deputy

sheriff classifications; police sergeant; police lieutenant; police captain; firefighter; fire apparatus

operator; fire lieutenant; fire captain; and, fire battalion chief.  The Martin/Bryant parties and the

---

adverse impact analyses. *Id.*, Exhibit 6.  In addition, the Martin/Bryant parties identified another 110 job classifications for which they requested that the Board supplement the paragraph 14 data it previously had submitted, if and when additional selection procedures were administered, because the existing sample sizes were insufficient to determine whether to request an adverse impact analysis. The Martin/Bryant parties also explicitly stated that "for the remainder of the job classifications for which the Board has provided paragraph 14 data, [the Martin/Bryant parties] do not seek to scrutinize further the Board's certification procedures under the Modification." *Id.*  That remainder constituted *305 job classifications*, which were thus excluded from further examination under the Board's 1995 Modification Order.

[36]*Id.*, Exhibit 5 (December 22, 1997 letter from L. Morgan Battle, counsel for the Personnel Board, to the court and opposing counsel); Exhibit 6 (August 7, 1997 letter from M. Kaplan, counsel for the Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 7 (Jefferson County Personnel Board's Report to the court, dated June 22, 1998, and Amendment to the Jefferson County Personnel Board's Report, Exhibit 6).

[37]Paragraph 16 of the 1995 Modification Order provides:

Within ninety (90) days of the parties' receipt of the Personnel Board's submission pursuant to paragraph 15 of this Order, including a supplemental submission pursuant to a request for additional information, each of the other parties shall file a response listing any job classifications in the Personnel Board's submission (or any other job classifications) that it contends have one or more selection procedures that have an adverse impact against blacks and/or women, along with an explanation for the basis of its contentions. If any party contends that the information submitted by the Personnel Board is insufficient to assess whether any selection procedure at issue has adverse impact against blacks and/or women, in its initial response that party shall also list each such selection procedure and state the basis for its contention. A pending request for additional information for a job classification will not affect the party's duty to file a timely response with respect to job classifications for which it has no outstanding request for information.

32

United States also contended that adverse impact was demonstrated on the basis of *gender* in the selection procedures for the following classifications: entry-level police officer and deputy sheriff; police and deputy sheriff's sergeant; and, firefighter.[38]

Paragraph 18 of the Modification Order required the Board either to eliminate the adverse impact, or to validate its selection procedures for any job classification as to which any party claimed the existence of adverse impact on the basis of race or gender.[39] As discussed hereafter, the Board's attempts at validation were woefully inadequate and have been rejected by all other parties.

For each job classification for which the Board conceded that adverse impact was present, paragraphs 18 and 19(c) of the 1995 Modification Order required the Board to develop a lawful selection procedure within 24 to 48 months, and to demonstrate that the new procedure either lacked adverse impact, or was job related in accordance with the *Uniform Guidelines*.[40]

---

[38]*See* Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 8 (United States' Response to Personnel Board's Report Pursuant to Paragraph 15 of Order Modifying Jefferson County Personnel Board Consent Decree, submitted December 20, 1996); Exhibit 9 (Response of Martin/Bryant Parties to Jefferson County Personnel Board's September 25, 1996, Report in Partial Compliance with Paragraph 15 of Modification of Personnel Board Consent Decree, submitted December 27, 1996); Exhibit 10 (Response of Martin/Bryant Parties to Jefferson County Personnel Board's November 5, 1996, Report in Partial Compliance with Paragraph 15 of Modification of Personnel Board Consent Decree, submitted February 5, 1996); Exhibit 11 (United States' Response to Personnel Board's Report for Entry Level Sworn Police/Sheriff's Department and Fire Service Job Classifications Pursuant to Paragraph 15 of Order Modifying Jefferson County Personnel Board Consent Decree, submitted February 13, 1997).

[39]Paragraph 18 of the 1995 Modification Order provides:

For each job classification that the Personnel Board identifies in its report pursuant to paragraph 15 of this Order as having one or more selection procedures that has an adverse impact on the basis of race or sex, or that a party contends in its report pursuant to paragraph 16 of this Order has an adverse impact on the basis of race or sex against blacks and/or women, unless the Court determines the selection procedure(s) in question meets the requirements of paragraph 12 of this Order or the Personnel Board revises its selection procedure to eliminate adverse impact, the Personnel Board shall complete a written job analysis and validation report according to the timetable set out in paragraph 19 of this Order. Using the results of the completed job analyses, the Personnel Board shall revise its selection procedures consistent with implementing selection devices which are job related, consistent with business necessity and which reduce or eliminate adverse impact.

[40]Paragraph 19 of the 1995 Modification Order reads:

The Personnel Board agrees to develop and implement selection procedures for hiring and promotion meeting the requirements of paragraph 12 of this Order and to provide the parties information concerning its use and proposed use of these selection procedures, including the

33

Paragraph 19 of the Modification Order set forth with particularity the timetable that the

Personnel Board was to follow for submission of police and fire department validation reports:

> (a) for promotional police service job classifications in the police departments
> and County Sheriff's Office and promotional fire service job classifications in the
> fire departments, within 12 months of the entry of this Order;

> (b) for the remaining sworn positions in the police departments and Jefferson
> County Sheriff's Office and fire service positions in the fire departments, within 18
> months of the entry of this Order. . . .[41]

Thus, within eighteen months of the entry of the 1995 Modification Order (*i.e.*, by June of 1997),

the Board was required to have submitted validation reports for *all* job classifications within the

police and fire departments. Instead, the Board did not finish submitting its reports until January

of 1998, six months late.[42]

---

information described in paragraph 30 of this Order, pursuant to the following timetable:

> (a) for promotional police service job classifications in the police departments and
> County Sheriff's Office and promotional fire service job classifications in the fire
> departments, within 12 months of the entry of this Order;

> (b) for the remaining sworn positions in the police departments and Jefferson
> County Sheriff's Office and fire service positions in the fire departments, within 18 months
> of the entry of this Order;

> (c) for all remaining job classifications to be scheduled for review and not covered
> by subparagraphs (a) or (b) or exempted by paragraph 13, in accordance with a schedule to
> be submitted by the Personnel Board for the development of selection procedures meeting
> the requirements of paragraph 12 of this Order twelve (12) months from the entry of this
> Order as part of its second semi-annual compliance report. That schedule shall provide that
> the Personnel Board shall develop its selection procedures and provide the information
> described in paragraph 30 of this Order to the parties in six-month intervals from 24 to 48
> months from the date of entry of this Order. In each semi-annual report the Personnel Board
> shall describe the status of its efforts to comply with this schedule and shall report any
> changes to the schedule it proposed for job classifications other than those listed in
> subparagraphs (a) and (b).

The Personnel Board shall not be required to include job classifications on its schedule that were
identified in the Personnel Board's paragraph 15 submission as not having adverse impact on the basis
of race or sex against blacks or women and to which no party contended otherwise in its paragraph
16 submission. Nor shall it include any job classifications that the parties have agreed, in writing,
need not be included or that the Court has determined meets the requirements of paragraph 12.

[41]*Id.*

[42]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 12 (January 22, 1998 letter from L. Morgan Battle,

The Personnel Board submitted its first validation report — for the fire apparatus operator classification — on December 20, 1996. Pursuant to paragraph 20,[43] the Martin/Bryant parties advised the Board that it had failed to make the requisite demonstration: *i.e.*, that the Board's selection procedures for certifying applicants for promotion to fire apparatus operator met the requirements of paragraph 12 of the 1995 Modification Order (namely, that they were job related and consistent with business necessity).[44] For the classifications of fire lieutenant, fire battalion chief, police sergeant, police lieutenant, police captain, and fire captain, the Martin/Bryant parties advised the Board that the validation reports failed to meet the requirements of the 1995 Modification Order and *Uniform Guidelines*.[45] The United States and the Wilks intervenors likewise advised the Board that all of the validation reports were unacceptable.[46]

In summary, from December of 1995 until mid-1998, the Board abjectly failed to comply with the requirements of the 1995 Modification Order, *missing every deadline set by the court* in the face of repeated objections by the other parties. By June of 1998, the Board had not developed

counsel for Personnel Board, to opposing counsel).

[43]Paragraph 20 of the 1995 Modification Order provides:

Within ninety (90) days of receiving the Personnel Board's proposal as to selection procedures for any job classification pursuant to its obligations under paragraphs 18 and 19, including all information described in paragraph 30 of this Order, each party shall advise the Personnel Board that the party contends lacks sufficient evidence to demonstrate that it meets the requirements of paragraph 12 of this Order and shall state with particularity the bases for each such contention that the selection procedure does not meet the requirements of paragraph 12. If, after an additional sixty (60) days, the parties cannot reach agreement on whether a selection procedure proposed by the Personnel Board for any particular job classification meets the requirements of paragraph 12 of this Order, any party may submit that matter to the Court for resolution.

[44]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 13 (March 28, 1997 letter from M. Kaplan, counsel for Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board).

[45]*Id.,* Exhibit 14 (June 25, 1997 letter from M. Kaplan, counsel for the Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 15 (August 14, 1997 letter from M. Kaplan, counsel for the Martin/Bryant parties, to L. Morgan Battle, counsel for the Personnel Board).

[46]*Id.*, Exhibit 16 (April 3, 1997 letter from B. Thawley, counsel for the United States, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 17 (August 20, 1997 letter from R. Fitzpatrick, counsel for the Wilks class, to L. Morgan Battle, counsel for the Personnel Board); Exhibit 18 (May 5, 1998 letter from B. Thawley, counsel for the United States, to L. Morgan Battle, counsel for the Personnel Board).

lawful selection procedures for any of the public safety positions, even though it was obligated to have completed all of them by that time.

Finally, following a hearing conducted on June 30, 1998, concerning the Board's failure to comply with the court's order, then-Chief Judge Sam C. Pointer, Jr., appointed John G. Veres, III, Ph.D., to serve as the court's special master — at the Board's expense. The special master was directed to "assist the parties in the development of a realistic schedule governing the transmission of data among the parties and the completion of job analysis and validation procedures."[47]

During status conferences conducted on November 3 and December 7, 1998, the Board advised the court for the first time that it lacked sufficient in-house expertise to develop and validate public safety jobs, but indicated it was attempting to hire permanent employees and, failing that, would employ outside consultants.[48]

What little progress the Board had made by the end of the twentieth century was almost exclusively due to the parties' agreement to exclude jobs having either very small numbers of incumbents or applicants, or very low turnover rates. More than 600 jobs were excluded from court scrutiny on that pragmatic basis,[49] because no meaningful conclusions could be drawn from such small numbers.[50]

---

[47]Order entered July 20, 1998 (doc. no. 643).

[48]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 22 (November 3, 1998 Transcript of Hearing), at 3-6; Exhibit 23 (December 7, 1998 Transcript of Hearing), at 8-21.

[49]The exemption contained in paragraph 13 for job classifications within the County Department of Health (*see supra* note 31) reduced the number of jobs at issue from 854 to 770. Following negotiations, the parties agreed, pursuant to paragraph 13, to exempt an additional 264 classifications from the requirements of paragraph 14. *See supra* note 32. Following a hearing conducted by Judge Pointer on June 30, 1998, the number of classifications remaining under review was reduced to 120, including all public safety job classifications in the police and fire departments. During June of 1999, the parties agreed that fifty-six non-public safety, and thirteen public safety, classifications would be subject to the requirements of paragraph 14. *See* Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 1 (deposition of James Johnson), deposition exhibit 1, at 31-33 (contained in supplemental filing of exhibits (doc. no. 924)).

[50]The interpretative guidance provided for the *Uniform Guidelines* cautions against rote reliance on the so-called "four-fifths rule" for determining the presence or absence of adverse impact (*see supra* note 17 for text of rule) where there are small numbers of selections. *See, e.g., Uniform Employee Selection Guidelines Interpretation and*

C.      The Board's Noncompliance, 2000 to Present

During April of 2000, following the retirement of Chief Judge Pointer, these controversies were reassigned to the undersigned judicial officer. A series of conferences ensued, and the parties were ordered to submit briefs addressing the Board's outstanding obligations under its 1981 Consent Decree and 1995 Modification Order.

The Board conceded that its existing selection procedures for fifty-eight job classifications (police/deputy sheriff sergeant, firefighter, and fifty-six non-public safety classifications) had adverse impact on the basis of race or sex (or both), and could not be defended as lawful.[51]

---

*Clarification,* Equal Employment Opportunity Commission, 44 Fed. Reg. 11,996, 11,999 (Mar. 2, 1979):

21. **Q**. Is evidence of adverse impact sufficient to warrant a validity study or an enforcement action where the numbers involved are so small that it is more likely than not that the difference could have occurred by chance?

For example:

| Applicants | Not Hired | Hired | Selection Rate/Percent Hired |
|---|---|---|---|
| 80 White | 64 | 16 | 20 |
| 20 Black | 17 | 3 | 15 |

White Selection Rate.................................................... 20%    $[16 \div 80 = 0.20]$
Black Selection Rate.................................................... 15%    $[3 \div 20 = 0.15]$
15 divided by 20 = 75% (which is less than 80%).

**A**. No. If the numbers of persons and the differences in selection rates are so small that it is likely that the difference could have occurred by chance, the Federal agencies will not assume the existence of adverse impact, in the absence of other evidence. In this example, the difference in selection rates is too small, given the small number of black applicants, to constitute adverse impact in the absence of other information (see Section 4D). If only one more black had been hired instead of a white, the selection rate for blacks (20%) would be higher than that for whites (18.7%). Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

On the other hand, if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact, warranting the need for validity evidence.

[51]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 1 (deposition of James Johnson), deposition exhibit 1 (contained in supplemental filing of exhibits (doc. no. 924)).

Even so, the Board confidently assured this court that it could develop new, lawful selection procedures for all fifty-eight classifications in short order. The Board submitted a detailed schedule supporting its proposal, which allocated twelve months for the Board to develop and administer selection procedures meeting the requirements of paragraph 12 of the 1995 Modification Order, and three additional months for party and court review. The Board proposed to extend the 1995 Modification Order until March of 2002. In essence, the Board proposed to complete in twelve months the work it had failed to accomplish during the preceding five years. For that reason, this court viewed the Board's proposal with a jaundiced eye, and perceived it as being, at best, incongruously optimistic.

Accordingly, when extending the Board's 1981 Consent Decree and 1995 Modification Order, this court established a more realistic set of time limits for the Board to complete its remaining tasks. This court's December 18, 2000 order required the Board to develop lawful employee selection procedures in accordance with a detailed schedule, specifying position-by-position, step-by-step, deadlines for each task.[52] Significantly, each deadline specified in the order either had been proposed by, or was more generous than the schedule requested by, the Board.

The Board still failed to meet many deadlines.

Worse, within three months of entering the December 18, 2000 order, the Board moved the court to extend the deadlines for forty-one of the fifty-six non-public safety job classifications. The story of that early failure of the Board to adhere to its compliance schedule was told in this court's June 1, 2001 notice of commencement of criminal contempt proceedings.[53]

---

[52]*See* Order Extending 1981 Consent Decrees and 1995 Modification Orders entered December 18, 2000 (doc. no. 708).

[53]*See* Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause (doc. no. 763).

The Board complied with the court-ordered timetable for about three months or so.  During the March 22, 2001 status conference, however, the Board's attorney requested that the Board be allowed "to revise *some* time lines" pertaining to the "positions [of] Communications, Horticulture, Mechanical and Automotive Technician, and Property Appraisal."  This court's initial reaction to that request was, in hindsight, regrettably benign, but perhaps the court may be excused for its oral response, because it was engendered by the Board's portrayal of its request as affecting only "some" interim deadlines, and not the completion dates for any job classifications.  The court nevertheless directed the Board to put its request in the form of a written motion, "so that we can be very precise.  I would like the motion to state by position ... the dates that you propose to revise for specific steps."

The Board delayed in filing its motion for over one month, until 8:57 o'clock a.m. on April 26, 2001 — just 33 minutes before the beginning of the April status conference.  That pleading reiterated that the court was being asked to revise "*some* of the *interim* project timelines contained in Paragraph 19 of the December 18, 2000 Order...."  In fact, however, the substance of the motion requested extension of interim project deadlines for 39 of the 57 job classifications specified in paragraph 19 of the December 18, 2000 order (*i.e.*, 68%) — a number and percentage which seem somewhat incongruous in juxtaposition to the adjective "some."  Moreover, the motion asked this court to extend the *ending date* for concluding all tasks required to develop and implement non-discriminatory selection procedures for 36 of the 57 job classifications identified in paragraph 19 of the December 18, 2000 order (*i.e.*, 63%).

Sadly, even though this court ultimately granted most of the Board's motion by an order entered on May 24, 2001 (doc. no. 758), that action did not alter what now appears to be a deeply ingrained, nonchalant attitude toward court-ordered schedules.  Upon reviewing the Board's most recent monthly status report, this court learned that the Board has failed to comply with yet another mandated milestone.  In section IV of that report, entitled "Efforts Made to Comply with Timetables Ordered by the Court Order," the Board made the following statement:

> All deadlines were met with the exception of the completion of the job analysis for the classification of Clinical Counselor within the Social Services job group.  As addressed in the monthly update report for this project, access to Clinical Counselor job incumbents has been difficult due to heavy work loads and staff shortages at the Western Mental Health Center.  To accommodate client needs, the Board has modified the job analysis procedures and anticipates that the data collection phase will be complete by June 1, 2001.  This delay will not impact the delivery of the test plan by June 15, 2001, as called for in the timeline.

The December 18, 2000 order mandated that the job analysis for the "Clinical Counselor" job classification be completed by May 11, [not June 15,] 2001 (*see* doc. no. 708 ¶ 19, at 23).

Significantly, the Board's April 26, 2001 motion to modify certain portions of the deadlines specified in paragraph 19 of the December 18, 2000 order (doc. no. 748) did not request that any of the interim deadlines for the Social Services Job Family, which includes the Clinical Counselor job classification, be extended.

It also is significant to observe that, prior to the date upon which the Board filed its motion to modify this court's December 18, 2000 order (*i.e.*, April 26, 2001), it already had failed to meet the March 23rd, April 16th, and April 23rd deadlines for the four job classifications included in the Accounting Job Family, and, the April 13th and April 20th deadlines for the six classifications within the Public Works – General Job Family: classifications and job families, it must be remembered, that were *not* included in the oral motion voiced by the Board during the March status conference.

Moreover, had this court not entered an order on May 24, 2001, granting portions of the Board's motion to modify, the Board would have failed to comply with seven (7) additional deadlines specified in the December 18, 2000 order — six of which the Board acknowledged in its current monthly report:

> If the Court denies the motion put forth by the Personnel Board, the following deadlines will not have been met: [1] April 27th, Automotive Technician; [2] April 27th, Public Works Engineering [Job Family – two job classifications]; [3] May 4th, Horticulture [Job Family – two job classifications]; [4] May 18th, Communications [Job Family – two classifications]; [5] May 25th, Automotive Technician; May 31st, Accounting [sic]; and [6] May 31st, Clerical Stores [Job Family – two classifications].

The Board failed to list (7) the April 27 deadline for completing an analysis of the knowledge, skills, and abilities required for, and duties of the "Guard" job classification.

Ultimately, the most striking aspect of the Board's failure to meet deadlines imposed by paragraph 19 of the December 18, 2000 order may be these facts: the Board was intimately involved in the determination of those milestones by which the pace of its progress would be measured, and consented to the imposition of each.

It thus appears the Personnel Board is habituated to the "casual pace" condemned by the Eleventh Circuit almost seven years ago. A further illustration of the Board's lethargy is contained in its most recent monthly status report, wherein

the Board only now, some twenty years after the fact, asks for "clarification" of language contained in its 1981 *consent* decree.

Therefore, to comply with the mandate of the Eleventh Circuit, "to bring [the] truth home" to the Board, this court is left with no choice but that of putting "teeth" into its orders through the initiation of criminal contempt proceedings, to compel the Board to discharge duties which it has neglected for more than two decades. This court considered civil contempt proceedings, but determined that a civil remedy would be inappropriate and ineffective.

In particular, it must be noted that monetary sanctions, in the form of a fine, would be impotent as a motivational tool. It appears that "money is no object" to the Board, as the staggering costs of this litigation — including, but not limited to, more than two decades of attorneys' fees, salaries for additional personnel to facilitate compliance with the consent decrees, and fees of outside consultants hired to assist in the development of non-discriminatory selection procedures — have not stimulated the Board to abandon its slothful pace. Accordingly, the court is forced to consider the imposition of more punitive sanctions, should any Board member, official, employee, or other person responsible for compliance with mandated deadlines be found guilty of criminal contempt.

As provided in Federal Rule of Criminal Procedure 42(b), an attorney is hereby appointed by the court to prosecute this contempt proceeding. Because the United States is a party to these actions, a private attorney will be appointed: namely, Charles A. Powell, III, of the Birmingham, Alabama firm Johnston, Barton, Proctor & Powell. By virtue of this appointment, Mr. Powell — together with any lawyers and non-legal personnel in his firm who may assist him — shall have and possess the same authority as a public prosecutor to investigate, develop evidence, enter into plea bargains, and perform all other prosecutorial functions within the parameters of the Constitution and Federal Rules of Criminal Procedure. Additionally, Mr. Powell may call upon and use the advice and services of the Special Masters who have provided assistance to this court in the statistical evaluation of the parties' evidentiary submissions, Dr. John G. Veres, III, and Dr. Chester I. Palmer. The fees and expenses reasonably incurred by Mr. Powell in the performance of his prosecutorial duties pursuant to this order — together with those of any lawyers and non-legal personnel in his firm (and Special Masters) who may assist him — shall be billed at the firm's (or Master's) normal and customary rate to the Jefferson County Personnel Board, and paid by the Board within seven days of presentment.

In conclusion, it is ORDERED that the Jefferson County Personnel Board, including all individual members thereof (James C. [sic] Johnson, Temple W. Tutwiler III, and Robin Burrell), its Executive Director (Ben Payton), and its Industrial/Organizational Psychologist (Michael Blair), be, and they hereby are,

directed to appear before this court in Courtroom 4A of the Hugo L. Black United States Courthouse in Birmingham, Alabama, on July 26, 2001, at 9:30 o'clock a.m., to show cause, if any there be, why they should not be held in criminal contempt for knowingly and willfully failing to comply with the December 18, 2000 order extending the parties' 1981 consent decrees and 1995 modification orders, specifically, by failing to meet the following court-ordered deadlines: the March 23, April 16, and April 23 deadlines for the Accounting Job Family (prior to the filing of the motion for modification); the April 13 and April 20 deadlines for the Public Works — General Job Family (prior to the filing of the motion for modification); the April 27 deadline for the Guard job classification (before the motion for modification was granted); the April 27 deadline for the Automotive Technician job classification (before the motion for modification was granted); the April 27 deadline for the Public Works — Engineering Job Family (before the motion for modification was granted); the May 4 deadline for the Horticulture Job Family (before the motion for modification was granted); the May 11 deadline for the Social Services Job Family, Clinical Counselor job classification (for which no request for extension was included in the motion for modification); and the May 18 deadline for the Communications Job Family (before the motion for modification was granted).

Finally, in view of the fact that, in accordance with Rule 42(b) of the *Federal Rules of Criminal Procedure*, the substance of this order was read in open court, in the present of all persons to whom it is directed — with the sole exception of Ms. Robin L. Burrell, Associate Member of the Jefferson County Personnel Board — and further in view of the fact that copies of this order as entered on this date were personally delivered by the clerk of court to all persons to whom it is directed — with the sole exception of Ms. Robin L. Burrell, Associate Member of the Jefferson County Personnel Board — it remains only for this court to ORDER that the United States Marshal forthwith serve a copy of this order upon Ms. Burrell at 300 North 21st Street in Birmingham, Alabama 35203, or at such other place as she may be found, and make due return to this court.[54]

Following a thorough investigation, the Special Prosecutor determined that the evidence was

not sufficient to support the prosecution of criminal contempt charges against the individual

defendants, and recommended the dismissal of defendants Johnson, Tutwiler, Burrell, Payton, and

Blair.[55]  Ultimately, the Special Prosecutor also recommended dismissal of the criminal contempt

---

[54]Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause (doc no. 763), at 3-7 (footnotes omitted).

[55]*See* Motion to Dismiss filed Aug. 15, 2001 (doc. no. 19) in *In re: Criminal Contempt Proceedings Against the Jefferson County Personnel Board, James B. Johnson, Temple W. Tutwiler, Robin L. Burrell, Michael Blair, and Ben Payton*, No. CR-01-S-234-S (N.D. Ala.).

proceedings against the Board itself:

> Having been advised that the Personnel Board would rely on "advice of counsel" as a defense to the charge of criminal contempt, the Special Prosecutor interviewed the Personnel Board's attorneys. Based on those interviews and his initial investigation, the Special Prosecutor has now determined that the evidence is insufficient to support the prosecution of criminal contempt charges against the Personnel Board. While the Special Prosecutor is still of the opinion that the Personnel Board, through its attorneys, should have done a better job of communicating with the Court regarding the deadlines that had been or would be missed, he has nonetheless concluded that the actions of the Personnel Board do not rise to the level of criminal contempt and he declines to prosecute the Personnel Board.[56]

This court obviously misfired in thus attempting to impress upon the Board its intention to obey the Eleventh Circuit's mandate — to compel the development and implementation of lawful, non-discriminatory selection procedures "forthwith, not at the casual pace the Board has passed off as progress for [almost twenty] years"[57] — because, following the dismissal of criminal contempt proceedings, the Board failed miserably in the administration of a selection procedure for the police and deputy sheriff's sergeant promotional classification.

### 1.    Police and deputy sheriff's sergeant selection procedure

The lawfulness of those procedures used to select persons to fill public safety positions in police and fire departments has been at the heart of these controversies since the first case was filed in 1974. Yet, the Board still has no valid procedure in place for the police and deputy sheriff's sergeant promotional classification ("sergeant") — and this despite the unambiguous language of the 1995 Modification Order requiring the Board "to develop and implement selection procedures for hiring and promotion meeting the requirements of paragraph 12 . . . for promotional police service job classifications in the police departments and County Sheriff's Office . . . within

---

[56]*Id.*, Motion to Dismiss filed Oct. 24, 2001 (doc. no. 28), at 2.

[57]*Ensley II*, 31 F.3d at 1577.

12 months of [December 19, 1995]."[58]

The Board first undertook to revamp its selection procedure for the sergeant classification during 1990, prior to both the *Ensley II* decision and 1995 Modification Order. The Board hired an outside consultant, Dr. Lawrence O'Leary, who — together with John Seaman, the head of the Board's Research and Validation Division, and other Board staff — developed a new selection procedure consisting of: a series of written examinations, including a multiple-choice job knowledge component, a written document review component, a situational judgment component,[59] and an occupational suitability battery specifically designed for sergeants, which was purchased from an outside vendor; and a behavioral interview, using assessment center methodology,[60] which consisted of two performance exercises.[61] The situational judgment component was selected because it "measured police problem solving skills," had been "validated nationally on a law enforcement population," and consistently produced minimal or no adverse impact.[62] The inclusion of the situational judgment and document review components was "an effort not only to broaden the

---

[58] 1995 Modification Order ¶ 19(a); *see also supra* note 40 for full text of paragraph 19.

[59] The 1990 Validation Report described the "situational judgment" component developed by Personnel Decisions, Inc., as follows: "The test is a nationally validated and secure test which measures problem solving by verbally placing the candidate in law enforcement situations and asking the candidate which of three alternatives would be the best for a Sergeant to take and which would be the worst." Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 24 (deposition of John Seaman), deposition exhibit 5, at 43.

[60] The definition of an "assessment center" developed by the Task Force on Assessment Center Standards is as follows:

An *assessment center* consists of a standardized evaluation of behavior on multiple inputs. Multiple trained observers and techniques are used. Judgments about behavior are made, in part, from specially developed assessment simulations. These judgments are pooled by the assessors at an evaluation meeting during which assessment data are reported and discussed and the assessors agree on the evaluation of the dimension and any overall evaluation that is made.

Robert D. Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION 648 (5th ed. 2001) (quoting Task Force on Assessment Center Guidelines, "Guidelines and Ethical Considerations for Assessment Center Operations," 18 PUBLIC PERSONNEL MANAGEMENT 457-70 (1989)).

[61] Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 24 (deposition of John Seaman), deposition exhibit 5, at 3.

[62] *Id.* at 42.

44

base of job competencies measured, but also to reduce the possibility of the occurrence of adverse impact."[63] The 1990 sergeant selection procedure, however, had adverse impact on a pass-fail basis, because of the multiple-choice job-knowledge component. The Board did not attempt to defend the 1990 procedure as lawful.

During 1993, the Board administered a new sergeant selection procedure based on the 1990 version, but without the assistance of an outside consultant. The 1993 administration omitted, without explanation, the situational judgment component.[64] The adverse impact from the multiple-choice component decreased, as did the adverse impact from the procedure overall, measured on a pass-fail basis. Again, the Board did not attempt to defend the procedure as lawful.

During 1995, the Board again administered a sergeant selection procedure based on the 1990 and 1993 versions.[65] Adverse impact for the selection procedure overall, measured on a pass-fail basis, continued to decline. As before, however, the Board did not attempt to defend the selection procedure as valid.

Although the Board had prepared validation reports for each administration of these sergeant selection procedures, the Board did not deliver the reports to the parties until 1997. Shortly thereafter, the Board advised the court and parties that it intended to develop from scratch a new sergeant selection procedure. The Board did not explain why it was abandoning its existing procedures, or why it had stopped using a consultant (Dr. Lawrence O'Leary) and a test element (the situational judgment component) that had helped to enhance the validity and reduce the adverse impact of the selection procedure.

---

[63]*Id.* at 43.

[64]*Id.* at deposition exhibit 6, at 34, 37-39.

[65]*Id.* at deposition exhibit 7.

45

The Board in 1999 employed the consulting firm SHL-Landy Jacobs, Inc. ("SHL") to devise

a completely new selection procedure.[66] SHL began the process by conducting a "job analysis."[67]

The purpose of the job analysis was to develop a comprehensive description of the duties typically

performed by sergeants (the "content of the job")[68] by interviewing and surveying incumbent

---

[66]The United States forewarned the Board that the work of SHL had not passed judicial scrutiny in another proceeding. By letter dated March 11, 1999, commenting on the proposals for the development of selection procedures submitted to the Board, Barbara E. Thawley, counsel for the United States, stated:

> I am also enclosing a copy of a July 31, 1998 decision and order in *United States v. City of Buffalo*, Civil Action No. 74-CV-195C (W.D.N.Y.), concerning a selection procedure developed by Landy, Jacobs & Associates for the entry level firefighter position in Buffalo, New York. The selection procedure recommended was a written multiple choice examination and a seven-part physical ability test. Judge Curtin found that this selection procedure had a severe adverse impact on blacks and Hispanics when used to rank candidates by total score on the eligible list. While black and Hispanic applicants were one-third of the applicant pool, they were only 8% of the candidates in Bands A and B and only 1% of the candidates in Band A.
>
> The City of Jackson, Mississippi, is a party to a consent decree with the United States concerning the City's employment practices. It is currently using promotional procedures developed by Semko and Associates for police and fire department positions. The City recently submitted information to the United States indicating that its district fire chief promotion procedure, using an assessment center developed by Semko and Associates, did not have an adverse impact on black candidates.

Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 1 (deposition of James Johnson), deposition exhibit 8, at 2 (contained in supplemental filing of exhibits (doc. no. 924)). Chairman Johnson testified that although the Board interviewed prospective consultants, he never saw the United States' letter, and if he had seen it, "that would have caused [him] great concern." Jefferson County's Evidentiary Submission in Response to the Personnel Board's Response to the Court's Show Cause Order (doc. no. 917), Exhibit E (deposition of James Johnson), at 124.

[67]The *Uniform Guidelines* require a job analysis for those selection procedures, such as the one at issue here, that are to be justified on the basis of "content validity" (a concept that is elaborated in the footnote immediately following this one):

> There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) and/or important work behavior(s) constituting most of the job.

29 C.F.R. § 1607.14(C)(2).

[68]Professors Gatewood and Feild have observed that

> a selection measure has content validity when it can be shown that its content (items, questions, etc.) representatively samples the content of the job for which the measure will be used. "Content of the job" is composed of those job behaviors that are necessary for effective job performance. The

46

sergeants (referred to as "subject matter experts," or "SMEs") to determine the duties typically performed by sergeants.[69] The subject matter experts also were consulted about the knowledges, skills, and abilities ("KSAs") necessary for effective job performance. Based on the information thus gathered, a list of critical tasks and KSAs was generated for the sergeant classification. The subject matter experts rated the identified items using a five-point scale to indicate the manner of

behaviors that compose the content of the job to be assessed are referred to as the *job content domain. For a measure to possess content validity, it must be representative of the job content domain.* This requirement is true for both predictors and criteria. But, in addition to job behaviors, selection measures (in particular, predictors such as paper-and-pencil tests) should also be representative of the KSAs [knowledges, skills, and abilities] necessary for performing these behaviors. If we want to infer the extent to which a job applicant possesses a skill or knowledge that is necessary to perform a job at the present time (present job competence), then a content validity strategy is appropriate.

Robert D. Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION 173 (5th ed. 2001) (emphasis in original); *see also Uniform Guidelines*, 29 C.F.R. § 1607.14(C)(1), pertaining to the appropriateness of content validity studies, and providing that:

Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledge, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledge, skills, or abilities which an employee will be expected to learn on the job.

[69]Professors Gatewood and Feild observed, as have many others, that the design of a selection procedure to be validated on the basis of a content validity study

requires the use of expert judgment. Usually, these judgments are obtained from job incumbents and supervisors serving as *subject matter experts*. Subject matter experts are individuals who can provide accurate judgments about the tasks performed on the job, the KSAs necessary for performing these tasks, and any other information useful for developing selection measure content. *Because of their importance, it is essential that these judges be carefully selected and trained in how to serve as a judge.*

Gatewood & Feild, *supra* note 68, at 175 (emphasis supplied).

47

use,[70] and a four-point scale to indicate the relative importance of each.[71] The "manner of use" ratings ranged from A to E, with A indicating that the incumbent always consults a reference, C indicating that the information must be recalled from memory 50% of the time and may be referenced 50% of the time, and E indicating that the information must always be recalled from memory. The relative importance ratings ranged from A ("not very important") to D ("critical").

With this data in hand, the selection procedure was developed. The final version had three components: a written multiple-choice technical knowledge test, consisting of 103 questions[72] administered in closed-book and open-book formats; a written in-basket exercise, consisting of thirty-four questions[73] in a multiple-choice format; and, an oral board simulation.

When constructing the new sergeant selection procedure, SHL apparently abandoned components documented to be more valid, and to result in reduced adverse impact. For example, even though Dr. Janet Echemendia, the SHL industrial/organizational (I/O) psychologist in charge of the project,[74] contemporaneously moderated a Society of Industrial and Organizational Psychologists panel touting the use of "assessment centers" as a way to improve validity while reducing adverse impact,[75] the sergeant selection procedure that she designed for the Board lacked such a component. While O'Leary's assessment center methodology had ameliorated adverse impact by videotaping performance exercises, and having each candidate's performance assessed

---

[70]SHL-Landy Jacobs, Inc., Validation Report: The Personnel Board of Jefferson County Promotion Examinations for Police/Sheriff's Sergeant, Lieutenant, and Captain (Aug. 2000), at 23.

[71]*Id.*

[72]Two questions were omitted following candidate appeals. *Id.* at 54.

[73]One question was omitted following candidate appeals. *Id.* at 56.

[74]For one description of some of the activities of so-called "industrial/organizational psychologists," see Susan E. Jackson & Randall S. Schuler, *Human Resource Planning*, in Gerald R. Ferris & M. Ronald Buckley, HUMAN RESOURCES MANAGEMENT: PERSPECTIVES, CONTEXT, FUNCTIONS, AND OUTCOMES 156, 157-60, 162-64, 166-69, 173-76 (3d ed. 1996).

[75]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibits 80 & 81; *see also supra* note 60 for definition of "assessment center."

48

by a consensus of professional raters,[76] SHL abandoned videotaping[77] and used police employees from other jurisdictions as raters.[78] Moreover, SHL's response to the Board's Request for Proposal ("RFP") specifically acknowledged that "roughly 10-20% of the job [ ] is not directly represented in the job analysis, nor measured directly in the suggested test components. This area of the job relates to issues such as motivation, discipline and corporate citizenship-type behaviors and dispositions."[79] Despite SHL's statement in the RFP, namely that "[l]eadership style and general work motivation are important aspects of managerial jobs," and its suggestion of "the use of a work styles inventory, the Occupational Personality Questionnaire" to "assess [ ] such characteristics" and "to further reduce adverse impact in the process,"[80] the procedure actually implemented included no such personality component.

Moreover, SHL and the Board adopted a multiple-hurdle approach for the actual administration of the selection procedure — *i.e.*, only those candidates who received a weighted composite "cut-score" of 41.00 for the technical knowledge and in-basket components were allowed to advance to the oral boards.[81] This court described the administration and scoring of the original

[76]*Id.*, Exhibit 24 (deposition of John Seaman), at deposition exhibit 7, at 38-39.

[77]*Id.*, Exhibit 27, at 25.

[78]*Id.*, Exhibit 28 (deposition of Wayne Bolander), at deposition exhibit 3, at 45.

[79]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 25, at 30.

[80]*Id.* at 31.

[81]*See* SHL-Landy Jacobs, Inc., Validation Report: The Personnel Board of Jefferson County Promotion Examinations for Police/Sheriff's Sergeant, Lieutenant, and Captain (Aug. 2000), at 64. SHL justified this approach as follows:

> With respect to the use of a cut-score at interim test phases, an attempt was made to allow candidates to participate in both test phases, if administratively practical and logical. However, if there were many more candidates than ultimately would be placed onto the final eligible register, that [sic] candidates toward the bottom of the list would have no chance of appearing on the final register, and the number of candidates at Phase I made participation of all candidates in the Phase II Oral Board prohibitive, a Phase I cut was established. Otherwise, all candidates were permitted to participate in all test phases and a cut was established on the final register. A Phase I cut was implemented only for the sergeant's examination.

49

selection procedure in an order entered on May 1, 2001:

> The Personnel Board administered the technical knowledge examination on December 13, 1999, and the "in-basket" exercise on December 16, 1999. A total of 392 candidates sat for the first two components of the selection procedure. Each candidate's scores on the first two components were weighted to arrive at a composite score. In determining the composite score that would be deemed the passing point for the first two components of the selection procedure, the Personnel Board considered, among other matters, the estimated number of promotions that would occur within a particular jurisdiction over the life of each register and the adverse impact at different passing points. The Personnel Board found that an appropriate number of persons would be available on each jurisdictional register if the composite passing point for the first two components (which the parties generally have referred to as a "cut score") was set at 47.26, but the Board ultimately decided to lower the cut score to 41.00 in order to reduce adverse impact. In other words, only those candidates who achieved a weighted composite score on the two written examinations of 41.00 or higher were allowed to advance to the final, oral component of the selection procedure. A total of 317 candidates out of the 392 persons who sat for the written examinations (81%) achieved such a score.

> The Personnel Board began notifying the 317 candidates eligible to proceed to the final component of the selection procedure on February 9, 2000, and scheduled the oral boards for the weeks of February 21-25 and March 27-31, 2000. Each candidate's score on the oral board component was combined with her or his scores on the two written components to form a final composite score. Candidates whose final composite score was greater than or equal to 41.00 were placed on the appropriate jurisdictional register of persons eligible to be considered for promotion to the rank of sergeant within some governmental law enforcement department serviced by the Board. The Personnel Board did not disclose the results of the oral boards to the parties (or its proposed overall scoring of all three components of the selection procedure) until June 15, 2000.

> The Personnel Board's scoring methodology resulted in registers demonstrating adverse impact against black candidates. The United States and the Martin Plaintiffs/Bryant Interveners accordingly objected to the use of such registers

*Id.* Compare the foregoing with 29 C.F.R. § 1607.5(H), which pertains to "cutoff scores," and provides:

> Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact should be considered.

within the City of Birmingham.[82]

The Board's scoring methodology for the sergeant selection procedure resulted in significant adverse impact on the basis of race. Not surprisingly, therefore, both the United States and the Martin/Bryant parties objected to the Board's use of the resulting register of eligible candidates. Moreover, because the Board had not allowed all candidates to sit for the oral board component of the selection procedure, the adverse impact could not be eliminated or reduced simply by reviewing and altering the Board's scoring methodology. The Board did not attempt to demonstrate that its selection procedure was job related under the standards of the *Uniform Guidelines.*

Accordingly, this court ordered the Board to revise the selection procedure for the sergeant promotional classification, and to administer *all* components of the revised procedure to *all* candidates for promotion to the rank of sergeant within the City of Birmingham's Police Department in accordance with a schedule and instructions set forth in the order.[83] Further, the court ordered the parties to submit their objections to the existing selection procedure, and to specify any questions they believed should be revised or eliminated, prior to the development and administration of the revised procedure. Despite this court's direction, the Board and SHL largely ignored the parties' objections, and made only minor changes to the original sergeant selection procedure. This prompted the court to express its concern that

the Police Deputy Sheriff Sergeant's examination that's being devised by SHL-Landy Jacobs is virtually identical to the one that has already been administered and condemned by this Court, and . . . the only significant change is that [SHL-Landy Jacobs] ha[s] ignored my order to apply the cut score at the end, and proposed to

---

[82]Order on the United States' Motion to Approve an Interim Use of Existing Police/Deputy Sheriff Sergeant Registers of Eligibles entered May 1, 2001 (doc. no. 749), at 3-4 (footnotes omitted). One of the omitted footnotes provided: "Since the inception of this litigation, now more than 26 years ago, the parties and courts have consistently referred to American citizens with African ancestors as 'blacks.' For that reason only, this court continues the practice." *Id.* at 4 n.9.

[83]Doc. no. 749.

51

impose a cut score to each of the three components.[84]

After reviewing the "revised" written components during July of 2001, both the United States and the Martin/Bryant parties reiterated their objections, and opined that the revised test instruments likely would produce the same levels of adverse impact as the originals. The Martin/Bryant parties noted that "SHL's response to the United States' expert comments . . . suggests that SHL has taken more interest in defending its traditional assessment practices than in proactively seeking to reduce the amount of adverse impact in the Police Sergeant assessment process as required by the decree and the Uniform Guidelines."[85] Furthermore, even though the Board had *agreed* with the Martin/Bryant parties that some items should be eliminated, the Board, in fact, *did not eliminate* those items.

As a result of such significant problems with the "revised" procedure, the court extended all of the remaining deadlines to allow the Board yet another opportunity to re-evaluate and revise the written test components of the sergeant selection procedure before another administration was attempted.[86]

The Board delivered the oral component of the selection procedure to the parties during July of 2001. The United States and the Martin/Bryant parties submitted substantial objections and many recommendations for revision.[87] In response, the Board modified only the rating scales, and refused to adopt any of the parties' other recommendations. Moreover, despite the fact that this court extended the deadline for administration of the oral component of the sergeant selection procedure

---

[84]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 29 (transcript of status conference conducted on July 26, 2001), at 12-13.

[85]*Id.*, Exhibit 30.

[86]Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure entered July 27, 2001 (doc. no. 790).

[87]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibits 31 & 32.

until October 18, 2001, in order to allow the Board an opportunity to revise its procedure in response to the parties' substantive objections,[88] the Board — in a demonstration of either stupidity or arrogance — instead chose to administer a virtually unchanged oral examination on *August 12, 2001*.

The administration of the second, "revised" sergeant selection procedure resulted in adverse impact on the basis of race. After reviewing the test results and the Board's November 19, 2001 validation report, the United States and the Martin/Bryant parties objected to the use of the resulting register of eligibles. The Martin/Bryant parties also submitted an expert report demonstrating that the sergeant selection procedure was not lawful.[89] The United States correctly pointed out that "[a]s administered in August 2001, the oral board had greater adverse impact than the 1999 administration."[90]

Despite the undisputed fact that the 2001 sergeant selection procedure resulted in significant adverse impact on the basis of race, the Board failed to conduct any meaningful analysis of ways in which it might have reduced adverse impact,[91] as required by both the *Uniform Guidelines* and paragraph 12 of the 1995 Modification Order.[92] In fact, the Board's validation report for the procedure — the product of the Board's significant eleven-year investment in staff resources,

---

[88] Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure entered July 27, 2001 (doc. no. 790).

[89] Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 27.

[90] *Id.,* Exhibit 32, at 5.

[91] Jefferson County's Evidentiary Submission in Response to Personnel Board's Response to the Court's Show Cause Order (doc. no. 917), Exhibit E (deposition of James B. Johnson), at 141-48.

[92] *See* 45A AM. JUR. 2d *Job Discrimination* § 356 (1993) (citing *Uniform Guidelines,* 29 C.F.R. § 1607.3(B)) ("[W]hen adverse impact results from a procedure and a validity study is called for, the Guidelines state that an investigation of suitable alternative procedures and methods of use should be included as part of the validity study."); 1995 Modification Order ¶ 12 ("In accordance with the *Uniform Guidelines*, where there exists adverse impact in a selection procedure, as part of its consideration of the job relatedness and validity of any selection procedure, the Personnel Board shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact.").

consultant fees, and legal fees — devoted only one and a half (out of more than 1,000) pages to "Considering Alternative Measures."[93]

Additionally, the parties contended that the Board committed numerous errors in the development and administration of the 2001 sergeant selection procedure, including errors in judgment, violations of professional standards, and violations of its own decision-making rules. The following examples illustrate those contentions.

First, despite identifying and assigning relative weights to six areas of knowledge deemed important to the performance of the sergeant position, the Board devoted nearly half of the forty-seven written examination questions to constitutional law — not the most important knowledge — and included only three questions testing the area of knowledge rated by the subject matter experts as the most important: effective police supervision.

Second, the written examination, the in-basket exercise, and the incident supervision exercise are components whose structures are known to produce adverse impact. Therefore, using three such components, aggregating their scores, and assigning a relatively large weight to that sum, compounded the resulting adverse impact.

Third, the Board segregated the oral board assessors by race, and created predominantly white panels for one exercise and predominantly black panels for another, producing racially skewed results.

Fourth, although the Board stated that it would use only questions that more than half of the incumbent sergeants could answer correctly, more than half of the incumbents failed seven of the Board's forty-seven technical knowledge questions.

---

[93]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 28 (deposition of Wayne Bolander), at deposition exhibit 3, at 65-66.

54

Fifth, despite the fact that the Board polled incumbent sergeants to determine which questions would be appropriate for the closed-book *versus* open-book portions of the written tests, the Board, without explanation, included seven questions on the closed-book examination that the incumbent sergeants rated as appropriate only for an open-book examination.[94]

Pursuant to this court's order setting a hearing on the validity of the sergeant selection procedure,[95] the special master prepared a report analyzing the 2001 procedure and concluded it did not comply with the *Uniform Guidelines*. Following submission of the special master's report, the Board reached an agreement with the Martin/Bryant parties to develop yet another selection procedure, and for certain changes to be made to the scoring of the results of the revised procedure.[96] Significantly, the Board agreed in future administrations of the oral board examination to develop new, behaviorally-anchored rating scales, and a detailed checklist using the input of incumbent sergeant subject matter experts; to use a consensus rating process; to videotape each candidate's performance; and, to take steps to reduce or eliminate rater bias.[97]

During the status conference conducted on January 16, 2002, the Personnel Board filed a motion to allow it to use the register of eligibles resulting from the 2001 administration of the sergeant selection procedure.[98] Attached to the motion was a proposed order with a vague schedule for the Board to develop yet another selection procedure for the sergeant classification with the same

---

[94]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibits 27, 33 & 34.

[95]*See* Order entered November 30, 2001 (doc. no. 821).

[96]By letter dated January 11, 2002, Rowan D. Wilson, counsel for the Martin/Bryant parties, informed the court that their objection to the use of the selection procedure would not be withdrawn; however, if the court entered an order approving the agreed-upon use of the results of the selection procedure, they would "dispense with the validation hearing."

[97]January 8, 2002 letter from V. Michelle Obradovic, counsel for the Personnel Board, to the court, special master, and opposing counsel.

[98]Doc. no. 841.

three components as the SHL procedure. Moreover, the schedule called for development of the new procedure over a three-month period, with interstitial review periods by the parties, and requiring review and objections within one week of receipt of data.

Thus, more than five years after the deadline established in the 1995 Modification Order, and more than twelve years after Dr. O'Leary's first effort, the Board still has not developed and implemented lawful procedures for the selection of persons eligible to be promoted to the rank of sergeant within those police departments served by the Board, or within the Jefferson County Sheriff's Department.

## D.     The Board's Repeated Failures to Provide Required Data and Information to the Parties

In addition to the Board's failure to produce the data required by paragraph 14 of the 1995 Modification Order until the Summer of 1997 — a delay that, as discussed in Section II.B.3.b. above, was more than fourteen months after the production date ordered[99] — the Board repeatedly has dragged its feet in responding to the parties' requests for information to which they unquestionably were entitled.  The Martin/Bryant parties offer recent examples of the Board's recalcitrance.

On February 11, 2002, and again on February 16, 2002, the Martin/Bryant parties requested that the Board specify the race and gender of those "23 qualified candidates [that] did not sit for the [Heavy Equipment Operator and Construction Equipment Operator] written examination and [the] additional 12 candidates who took the written test but did not appear for the performance test."[100] Despite the fact that paragraph 30 of the 1995 Modification Order required production of such

---

[99]See text at notes 31-33 *supra.*

[100]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 28 (deposition of Wayne Bolander), at deposition exhibit 4.

information,[101] the Board initially refused to provide it, thereby frustrating the Martin/Bryant parties' ability to review those job classifications.

In response to the Martin/Bryant parties' February 11th request, the Board stated that "this information is reported in Appendices T and U of the validation report."[102] On February 16th, the Martin/Bryant parties again requested race and gender data for those applicants, explaining that "Appendices T and U" in fact did not provide the requested information. The Board, acting through Dr. Wayne Bolander — the Board's contract Industrial/Organizational Psychologist who assumed responsibility for the Consent Decree Team following Michael Blair's reassignment[103] — nevertheless persisted in refusing to provide the requested information, stating that "[t]here is no [adverse impact] on this test, therefore a response to this data request is not necessary."[104]  Even when Dr. Bolander was confronted with the unambiguous language of paragraph 30 of the 1995 Modification Order, and grudgingly provided the requested information, he "still [held] that there

[101]Paragraph 30 of the 1995 Modification Order provides:

> The Personnel Board shall make all data concerning the development of any selection procedures used or proposed to be used by the Personnel Board, including but not limited to, the adverse impact of the selection procedure when used by the Personnel Board, or if applicable, by other users, the effect of the selection procedure on the composition of eligibility registers for the job classifications at issue, the effect of the use of the selection procedure on the composition of certification lists for the job classifications at issue, job analyses, expert reports and validation studies, available to counsel for the parties. This information shall be provided to all parties by the Personnel Board on the dates set out in paragraph 19 of this Order. This information shall be provided in machine-readable form to the extent it exists in that form.

> Further, within fourteen (14) days of its receipt of a written request from any party, the Personnel Board shall provide the requesting party with copies of any additional information concerning the adverse impact or job relatedness of the job classification at issue in the possession or control of the Personnel Board but not provided by the Personnel Board pursuant to the dates set out in paragraph 19 of this Order. However, if an examination is in progress for the job classification for which additional information is requested, the Personnel Board may defer providing information about the current examination process for fourteen (14) days after the examination process is completed.

[102]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 28 (deposition of Wayne Bolander), at deposition exhibit 5.

[103]*See infra* notes 117-119 and accompanying text.

[104]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 57.

57

is no need to provide this information to the parties," maintaining that "it really isn't something the

parties are entitled to under the consent decree."[105]

## E.     The Individual Board Members' Benighted Attitude

Perhaps the most disturbing revelation exposed by the parties' evidentiary submissions is the

abject ignorance of the requirements of the 1981 Consent Decree, 1995 Modification Order, and

other court orders manifested by the three persons who control the Personnel Board as an entity.

It appears that the Board members have shirked their responsibilities under the consent decree and

modification orders largely because they have no idea what those obligations are.

James Johnson, who has been a member of the Personnel Board since 1973, and currently

serves as its Chairman,[106] testified that he was not familiar with either the 1981 Consent Decree or

the 1995 Modification Order.[107] Johnson also stated that he had never read the Eleventh Circuit's

*Ensley II* decision, he did not meet with Board staff to discuss the decision, and the Board did not

develop a strategic plan, or hire new staff, in response to the decision.[108] The following exchange

occurred when Johnson was questioned by counsel for the Martin/Bryant parties about specific

directives contained in the opinion:

Q.     [T]he Eleventh Circuit states, therefore, the District Court is directed to order
the City and the board to develop race-neutral selection procedures forthwith,
not at the casual pace the board has passed off as progress for thirteen years.
Do you recall that statement?

A.     No.

. . .

---

[105]*Id.*

[106]*Id.*, Exhibit 1 (deposition of James Johnson), at 34.

[107]*Id*. at 36-37, 47, 50; *see also id.* at 35 (Johnson did not "know for sure" whether the consent decree required
the Board to develop and implement nondiscriminatory selection procedures, but he "imagine[d] it was.").

[108]*Id.* at 40-41.

Q.     What did you understand the Eleventh Circuit was telling the board through
       this statement?

A.     That it needs to develop some race-neutral procedures that it has not done in
       the past. That's what I understand that to say. That's the first time I have
       seen it.

Q.     Did the board do anything to comply with the order?

A.     That, I don't know.

Q.     How about the next sentence? The board's decree is not a security blanket
       to be clung to, but a badge of shame, a monument to the board's past and
       present failure to treat all candidates in a fair and nondiscriminatory manner.
       Do you recall that statement?

A.     No, I sure don't.

Q.     Again, let me ask you the same question. What do you believe the Eleventh
       Circuit was trying to convey to the board at the time?

A.     The same thing, that we need to start giving some attention to these matters.
       I would have been terribly upset had I read that.

Q.     And did the board do anything about this once this came out?

A.     Once again, I really don't know.

Q.     Okay.

A.     I would hope that they did, but I don't know.[109]

Temple Tutwiler became a Board member in December of 1995,[110] but did not read either

the 1981 Consent Decree or 1995 Modification Order.[111] He also was not familiar with the

requirements imposed upon the Board by the Eleventh Circuit in *Ensley II*.[112] Tutwiler candidly

admitted that he had not satisfactorily performed his duties as a member of the Board: "We

---

[109]*Id.* at 44-46.

[110]Tutwiler resigned from the Personnel Board on April 23, 2002.

[111]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 58 (deposition of Temple Tutwiler III), at 23.

[112]*See id.* at 25-29.

59

wouldn't be here if I had."[113]

The third Board member, Robin Burrell,[114] who is a practicing attorney, stated that she believes she read *Ensley II* more than once. When asked "[d]o you recall what that opinion said," however, she answered "No."[115]

Such evidence unmistakably demonstrates that the Board members failed to apprehend their legal obligations, or take any steps — much less meaningful steps — to ensure compliance.

## F.     The Board's Frustration of Efforts to Enforce its Consent Decree

The Board repeatedly has failed to disclose its noncompliance to the court and the parties until the deadline for compliance has passed. Faced with the Board's noncompliance, either this court or the parties have had to confront the Board, thereby frustrating the efforts of the court and parties to effectuate compliance with the consent decree, wasting the court's and the parties' time and resources, and unnecessarily delaying the development and implementation of lawful selection procedures.

In *Ensley II*, the Eleventh Circuit saw through the Board's attempts to obfuscate its slothful efforts to comply with the 1981 Consent Decree, and directed this court to issue an order with "teeth," to force the Board to develop and implement lawful, race- and gender-neutral selection procedures. 31 F.3d at 1572.

Nevertheless, from December of 1995 until mid-1998, the Board failed to comply with the 1995 Modification Order, missing every court-imposed deadline, despite the parties' objections. At some point, the Board certainly must have realized that it could not meet each of those deadlines,

---

[113]*Id.*, Exhibit 58, at 111.

[114]Burrell resigned from the Personnel Board on June 3, 2002.

[115]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 59 (deposition of Robin Burrell), at 139.

but chose not to disclose its inability to do so until the deadlines had passed. By June of 1998, the Board had not developed lawful selection procedures for *even one* public safety position, let alone *all*, as it was required to have done.

Following entry of the February 8, 2002 Order and Memorandum Opinion, stating that "this court's confidence in the competence of the Board's Executive Director, Industrial/Organizational Psychologist [Michael Blair], and subordinate employees ha[d] evaporated,"[116] the Board represented in its February 13, 2002 monthly status report that "Michael Blair was reassigned to the Five Year Survey Project effective immediately," and that Dr. Wayne Bolander had agreed to head the Consent Decree Team on an interim basis.[117] Despite the Board's representation that Blair had been relieved of his responsibilities and authority over the Board's consent decree efforts, however, Chairman James Johnson testified that, in fact, Blair "[was] still available to Dr. Bolander as a resource person, and he's expected to spend some five or six hours a day as a resource person for another five or eight weeks, months."[118] Ella Chandler, the manager of the Classification and Compensation Division, to whom Blair reported, similarly testified that, in the first three months following his reassignment, Blair continued to have consent decree compliance responsibilities and, in fact, spent less than fifty percent of his time on Classification and Compensation duties.[119] Additionally, following the Board's representations that it had retained Pittman McLenagan Group, L.C., to review the selection procedures and validation reports for those job classifications remaining at issue under the decree, and that the work of that contract consultant would be performed without

---

[116]Memorandum Opinion (doc. no. 851), entered February 8, 2002, at 27.

[117]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 62, at 2.

[118]Jefferson County's Evidentiary Submission in Response to Personnel Board's Response to the Court's Show Cause Order (doc. no. 917), Exhibit E (deposition of James Johnson), at 209.

[119]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 63 (deposition of Ella Chandler), at 89-92.

61

any contact or communication with Board staff or Board members, Blair initiated an "unauthorized communication" with Dr. Martha Hennen, a Pittman McLenagan Group employee, in an attempt to discourage the firm from performing work for the Board.[120] The Board initially failed to inform the parties or the court of the identity of the Board employee who contacted Dr. Hennen, but eventually identified Blair.[121] At the request of the Board's counsel, Dr. Hennen provided a written narrative of her conversation with Blair, although that narrative still has not been provided to the parties or the court.[122]

## G. The Board's Leadership Vacuum

Given these facts, the court concludes that neither the Personnel Board's staff, nor the individual Board members, have competently discharged their duties. The individual Board members lacked knowledge about their responsibilities under the 1981 Consent Decree or 1995 Modification Order. Such ignorance is shocking, when one considers the Board members were deposed in connection with the present proceedings almost one year after they had been subjected to criminal contempt proceedings.[123] The Board's staff has been chronically deficient in size, qualifications, organization, training, and ability. Moreover, poor interpersonal relations among staff constitute a further impediment to progress.

### 1. The Board does not understand its legal obligations

In addition to the individual Board members' ignorance of court orders, they also lacked basic knowledge of employee selection procedures, the requirements of Title VII or the *Uniform Guidelines*, and never undertook any real effort to educate themselves about those subjects. For

[120]*Id.*, Exhibit 64.

[121]*Id.*, Exhibit 67.

[122]*Id.*, Exhibit 64.

[123]See text beginning at note 53 *supra.*

62

example, Burrell was "not sure that I truly understand what adverse impact is,"[124] and when asked

whether the elimination of adverse impact was more important than job-relatedness, answered: "I

think you are out of the area of my expertise. That would be something that our staff would handle

and our attorneys would handle. . . . I'm a divorce lawyer."[125] Temple Tutwiler expressed his

understanding of a "nondiscriminatory selection device" as "[a] test that could be passed for a

position by any human being."[126] Board Chairman James Johnson rationalized: "we are not

technicians, you know, we are just in the sense common labor, I mean citizens, you know, we have

no expertise in these matters, you know."[127]

Thus, Board members not only have deferred, but — due to their failure to acquire even the

most basic knowledge of federal requirements — have been forced to defer to Board staff and

counsel as to all facets of compliance with this court's decrees. Temple Tutwiler put it succinctly:

Q.   What was the Board doing to respond to the 11th Circuit's orders in
     December 1995?

A.   Relying on counsel and staff to take the appropriate measures and respond
     accordingly.[128]

Instead of assuming responsibility for the Board's compliance, the individual Board members,

because they lacked relevant knowledge, skills, and abilities, simply acted as rubber stamps:

Q.   During the course of the consent decree litigation, has the board, to your
     knowledge, ever had a recommendation or a request from the director that the
     board has not followed relative to the consent decree?

---

[124]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 59 (deposition of Robin Burrell), at 50.

[125]*Id.* at 48.

[126]*Id.*, Exhibit 58 (deposition of Temple Tutwiler), at 52-53.

[127]*Id.*, Exhibit 1 (deposition of James Johnson), at 72.

[128]*Id.*, Exhibit 58 (deposition of Temple Tutwiler), at 25; *see also id.*, Exhibit 1 (deposition of James Johnson), at 57 ("We relied on our counsel and our director to take care of" all consent decree compliance issues), 72 ("We depend greatly, almost solely on our attorneys and the director to advise us.").

A.      Not that I can remember.

Q.      Okay. Do you recall —

A.      I would venture to say no period.[129]

Burrell testified that the Board members have "uniformly approved," and "never denied," requests for additional staff — even to the point of "immediately approv[ing]" the hiring of "more industrial/organizational psychologists, again, without knowing what they were."[130]

Based on this record, it is clear that the three person Board lacks the leadership to discharge its duties under the consent decrees and, ultimately, the United States Constitution.

## 2.     The Board staff lacks sufficient competence to discharge the Board's obligations

Board Chairman Johnson testified that, throughout Ben Payton's tenure as Personnel Director, Payton "constantly" told the individual Board members "that everything was fine, no problems at all. That apparently wasn't the case."[131] Following Payton's resignation, the Board members met to appoint an Acting Personnel Director. Johnson and Burrell selected Gregory James, manager of the Board's Employment Administration Division, because they were "totally dissatisfied" with the other division managers.[132]

Dr. Diane Clark, the only former Personnel Director of the Board who is an industrial and organizational psychologist, believes that the Board division managers with whom she is familiar "lack the high level of motivation, and professional skills required to overcome years of delay and dissension and mount a concerted effort to develop non-discriminatory tests, absent substantial and authoritative direction from some external source or sources with substantial experience in test

---

[129]*Id.*, Exhibit 1 (deposition of James Johnson), at 315.

[130]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 59 (deposition of Robin Burrell), at 108.

[131]*Id.*, Exhibit 1 (deposition of James Johnson), at 299.

[132]*Id.* at 251.

64

development and validation, and organizational management."[133]

*Indeed*, the Board's heavy reliance on various outside consultants during recent years is a tacit admission that the Board lacks the in-house competence to develop lawful selection procedures.

Even those employees hired specifically by the Board to assist with its efforts to comply with the 1995 Modification Order lacked experience in the development of selection procedures for a public employer, and with selection procedures challenged in litigation.[134]

The Board's ineffective, "hit or miss," efforts to develop selection procedures for the job classifications remaining under court scrutiny clearly demonstrates the lack of internal staff competence. In an attempt to comply with this court's May 24, 2001 order, the Board or its retained consultants created selection procedures and provided validation reports for fifty-six classifications. The Board's staff failed to recognize (or admit) that any of the newly developed procedures had problems of any sort. When, finally, the Board retained a competent outside consulting firm to conduct a review of the selection procedures developed for thirty-three of the fifty-six classifications, the firm identified at least fifteen needing total redevelopment, with the remainder requiring varying degrees of revision. For each of those procedures, a Board staff member was responsible for supervision of the consultant's efforts,[135] yet no Board staff member ever identified, or advised the parties or this court, that any selection procedure actually was inadequate.

Somewhat belatedly, the Board members realized that Payton and Blair were not properly discharging their responsibilities under the consent decree and subsequent court orders, and were

---

[133]*Id.*, Exhibit 70, at ¶¶ 17-19.

[134]*Id.*, Exhibit 71 (deposition of James Osburn), at 72-73.

[135]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 73.

65

committing the Board's resources to defending what the Board had done, rather than attempting to comply with those decrees and orders.[136]

That "defensiveness" is not surprising, given the organizational structure of the Board. The Board created a "Defense/Litigation Team" headed by Dr. Bolander and supervised by Blair.[137] Likewise, Dr. Bolander's contract specified that he was responsible for "[c]oordinating selection system *defense activities* with Personnel Board staff and counsel."[138] Tutwiler recognized that same "defensiveness," but believed its root source was that "the staff considers their work product a good work product . . . [and] whenever their works were offered, they were — every minor detail was challenged by someone in one of the other parties."[139] Notwithstanding, the Board has never been willing to demonstrate the validity of any selection procedure it developed. The combination of staff misperception of abilities, coupled with a structure that isolates and polarizes staff members, has created an organization whose mission is to defend, rather than correct.

### 3. The Board's structure inhibits development of staff competence

As a separate matter, by segregating its consent decree efforts from the development of non-consent decree selection procedures, the Board has created a situation in which the institutionalization of competence in the development of lawful selection procedures — whether by contact with outside consultants, the parties, experts, or the special master — remains cabined within the consent decree team. The only remaining trained psychologist on the Board's staff is Dr. John Seaman, but he is *not* trained as an industrial and organizational psychologist. Dr. Seaman heads

---

[136] Robin Burrell described that defensiveness at length, and in a decidedly pejorative manner, during her deposition. *See* Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 59 (deposition of Robin Burrell), at 128-33. Yet, she did nothing about it.

[137]*Id.*, Exhibit 60 (deposition of Wayne Bolander), at deposition exhibit 6.

[138]*Id.* at 4, at Attachment 1 (emphasis supplied).

[139]*Id.*, Exhibit 58, at 49.

66

the Board's Research and Validation Division, which is responsible for the selection procedures for all non-decree job classifications, including those released from the consent decree, but he has had nothing to do with compliance efforts since November of 2000.[140]

The Board's organizational structure thus has virtually guaranteed that the tremendous efforts expended in the development of lawful selection procedures for the job classifications still subject to court scrutiny will neither be transferred to the remainder of the Board's operations, nor likely survive the conclusion of this litigation. So much waste is abhorrent.

Finally, the record makes clear that the Board's staff presently suffers from a lack of internal leadership. The transcripts of depositions conducted by the parties during May of 2002 reveal a long-standing, "poisoned" work environment, in which the staff members regard one another with varying degrees of suspicion and distrust, and appear to be more focused on such issues than in accomplishing their day-to-day duties and responsibilities.[141] While the divisions among staff do not appear to be solely based on race, there are some staff members who believe that management decisions are motivated by such considerations.[142]

## III. DISCUSSION

### A. Civil Contempt

As the foregoing discussion should make clear, the Board repeatedly has failed to comply with court orders. Despite its own significant input into the terms of the 1981 Consent Decree, the

---

[140]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 24 (deposition of John Seaman), at 26-40.

[141]*See, e.g.,* Supplemental Filing of Exhibits (doc. no. 920), Exhibit 74 (deposition of Clare Haynes), at 41-51; Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 75 (deposition of Gregory James), at 111-13; *id.*, Exhibit 76 (deposition of Cathy Hulsey), at 52-58.

[142]See, e.g., Jefferson County's Evidentiary Submission in Response to the Personnel Board's Response to the Court's Show Cause Order, Exhibit E (deposition of James Johnson), at 178-85; Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 63 (deposition of Ella Chandler), at 53-58; Supplemental Filing of Exhibits (doc. no. 920), Exhibit 74 (deposition of Clare Haynes), at 45, 121; Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 77 (deposition of Gregory James), at 141-42.

1995 Modification Order, and the December 18, 2000 order extending both, the Board still failed to meet court-ordered deadlines. As the plaintiffs and intervenors amply have demonstrated, during more than two decades of federal judicial oversight, the Board *never* has been in compliance with the court's orders. Following the 1981 Consent Decree, the Board did nothing to ensure that its selection procedures were lawful. Following the 1995 Modification Order, the Board missed every deadline established. Indeed, when the 1995 Modification Order was extended, this court observed that "[i]t is undisputed that efforts to develop and implement lawful selection procedures for many job classifications either have not been initiated or are incomplete."[143]   The Board's continuing noncompliance with the court's orders since the decree was extended has been well documented.[144] Even today, almost seven years after entry of the 1995 Modification Order, a substantial amount of work remains to be completed. One or more parties recently objected to the selection devices for thirty-three, non-public safety, job classifications. In response, the Board retained an outside consulting firm (Pittman McLenagan Group, L.C.) to evaluate the parties' objections, and that consultant has concluded that the selection procedures for at least fifteen of the thirty-three classifications should be junked, and that the remainder require minimal to substantial revision.[145]

The court finds, therefore, that the Martin/Bryant parties and Wilks class have demonstrated by clear and convincing evidence a prima facie case of civil contempt. *See, e.g., McGregor v.*

---

[143]Order Extending 1981 Consent Decrees and 1995 Modification Orders entered December 18, 2000 (doc. no. 708), at 3.

[144]*See, e.g.,* Memorandum Opinion and Order to Show Cause entered April 5, 2002 (doc. no. 886); Memorandum Opinion and Order entered February 8, 2002 (doc. no. 852); Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause (doc. no. 763); Order Modifying Certain Portions of this Court's December 18, 2000 Order Extending the 1981 Consent Decrees & 1995 Modification Orders and, *sua sponte*, Certain Portions of the 1995 Personnel Board Modification Order entered May 24, 2001 (doc. no. 758); Order on the United States' Motion to Approve an Interim Use of Existing Police/Deputy Sheriff Sergeant Registers of Eligibles entered May 1, 2001 (doc. no. 749).

[145]*See* Personnel Board of Jefferson County's Monthly Status Report for May 2002 (doc. no. 913), at 3.

68

*Chierico*, 206 F.2d 1378, 1383 (11th Cir. 1998) (requiring such a showing for a finding of civil contempt).

The burden thus shifts to the Board to show either that it has not violated the court's orders, or that it should be excused for noncompliance. *See, e.g., Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990). A defendant may be excused from complying only where it has made in good faith *all* reasonable efforts to comply. *See, e.g., United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).

The Board does not deny that it violated the court orders; rather, the Board argues that it made "good faith attempts to perform [its] professional and constitutional duties."[146] The Board professes that its "'willingness and desire' to develop lawful selection procedures has ripened into a realization that competent leadership, reorganization of the entity, and significant investment in developing and maintaining technical competence among the staff are requisites for completing the Personnel Board's obligations under the Consent Decree."[147] The Board points to "the thousands of pages of technical materials created by" the Board as evidence of its efforts to comply with the decrees.[148]

This court is not convinced that the Board made all reasonable efforts to comply with the decrees. The record establishes that the Board was unwilling to comply with the consent decree and subsequent modification orders, failed to devote sufficient resources to its compliance efforts, failed to coordinate consent decree related activities, failed to hire and train sufficient, qualified staff or otherwise provide sufficient resources, and inadequately supervised its consent decree related

[146]Personnel Board of Jefferson County's Response to Show Cause Order (doc. no. 890), at 5.
[147]*Id.* at 4.
[148]*Id.* at 4-5.

69

projects. The Board did not designate any staff to oversee compliance efforts until June of 1999, and did not formulate a plan to comply with the decrees until November of 2000. The Board did not adequately monitor the work of the consultants it hired to develop the remaining selection procedures. Apart from hiring one Industrial/Organizational Psychologist during 1999 (Michael Blair), the Board took no other steps to ensure that its staff possessed the technical competence necessary to bring the Board into compliance with the requirements of federal law.[149] Throughout, the individual members of the Personnel Board remained blissfully ignorant of the Board's obligations.

Accordingly, despite the Board's protestations that it "tried its best," the court finds that the Board did not make all reasonable efforts to comply with the decree, and that it did not act with reasonable diligence to seek relief from the decree when compliance became difficult.[150] *See United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984) (efforts that may be characterized as "substantial," "diligent," or "in good faith" do not satisfy requirement that defendant make *all* reasonable efforts to comply). Accordingly, the court finds that the Board should be held in civil contempt for violating the 1981 Consent Decree, the 1995 Modification Order, the December 18, 2000 order extending the decree and modification order, and other orders of this court.

**B.    Remedy**

The Martin/Bryant parties and Wilks class ask this court to impose a receivership on the Board as a remedy for the court's finding of civil contempt.

---

[149]The Board belatedly attempted to bolster its in-house competence by hiring Dr. Wayne Bolander on a contract basis on September 25, 2001, and by provisionally appointing Dr. James Osburn on November 26, 2001. Both resigned during April of 2002.

[150]*See* Personnel Board of Jefferson County's Motion to Modify Paragraph 19 of the December 18, 2000 Order Extending 1981 Consent Decrees and 1995 Modification Order (doc. no. 748); Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure entered July 27, 2001 (doc. no. 790).

"A federal remedial power may be exercised 'only on the basis of a constitutional violation'

and, '[a]s with any equity case, the nature of the violation determines the scope of the remedy.'"

*Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (quoting

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 92 S.Ct. 1267, 1276, 28

L.Ed.2d 554 (1971)). "Remedial judicial authority does not put judges automatically in the shoes

of [local] authorities whose powers are plenary. Judicial authority enters only when local authority

defaults." *Swann*, 402 U.S. at 16, 92 S.Ct. at 1276.

> Normally, . . . separation of powers principles dictate that duly elected public
> officials be permitted to operate within their respective spheres without interference
> from another branch of government. And, certainly, principles embodying
> federalism further prohibit the federal judiciary's interference in state or local
> government. But where the actions or omissions of elected public officials, whether
> representatives of federal, state, or local government, impermissibly infringe on the
> constitutionally protected rights of individuals, . . . federal courts as interpreters and,
> most importantly, protectors of the United States Constitution must act to stop such
> infringement.

*Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W. Va. 1990).[151]

As noted in Section I.C.1 of this opinion, courts that have confronted the task of determining

whether other remedies are inadequate, and the imposition of a receivership remains the only viable

option for securing compliance with court orders, have focused on the following factors: whether

---

[151]These principles are no less applicable here, where the Board has agreed to the entry of a consent decree, and has not, strictly speaking, admitted liability for constitutional violations. *See* 1981 Consent Decree, at 2 ("The Personnel Board denies that it has engaged in any pattern or practice of discrimination on the basis of race or sex in carrying out its employee selection functions."). However, the Board also acknowledged the court's findings that the tests used to select entry level police officers, deputy sheriffs, and firefighters abridged Title VII. *Id.* As the Second Circuit has observed:

> The respect due the federal judgment is not lessened because the judgment was entered by consent.
> The plaintiffs' suit alleged a denial of their constitutional rights. When the defendants chose to
> consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiffs'
> claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or
> state court order.

*Badgeley v. Santacroce*, 800 F.2d 33, 38 (2d Cir. 1986).

there were repeated failures to comply with the court's orders; whether further efforts to secure compliance would only lead to confrontation and delay; whether leadership is available which can turn the tide within a reasonable time period; whether there was bad faith; whether resources are being wasted; and, whether a receiver can provide a quick and efficient remedy. *See District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999). Accordingly, the court examines those factors in the context of this case.

As set forth in detail above, there is no question that the Board repeatedly has failed to comply with the court's orders since the consent decree was entered in 1981. The Board has continually earned the criticism of the parties, this court, and the Eleventh Circuit for its failure to accomplish the goals established by the 1981 Consent Decree, the 1995 Modification Order, and subsequent orders of this court.

This court has become convinced that further efforts to secure compliance would lead only to more confrontation, frustration, and delay. This court already has done all it can to ensure compliance. For example, the special master appointed by Judge Pointer in July of 1998 has been, at best, only moderately successful in spurring the Personnel Board to fulfill its responsibilities under the consent decree: he *was* successful in assisting the parties' efforts to narrow the scope of those job classifications subject to additional litigation to four police, five fire, and fifty-seven non-public safety positions; but, despite this court's December 18, 2000 Order, imposing a more generous schedule than the one proposed by the Board for the completion of its remaining tasks, the special master's efforts to encourage the Board's adherence to that schedule, and to facilitate the development of lawful selection procedures met with markedly less success. The special master reported that his efforts have been frustrated by defensiveness on the part of the Board's staff. He

72

cites as one example an occasion on which counsel for the United States articulated an objection to one of the Board's selection procedures but, rather than address the substance of the objection, the Board's Industrial/Organizational Psychologist, Michael Blair, asserted that the objection was untimely, frustrating the parties' efforts to resolve the issue. The special master has further reported that the parties' pre-monthly status conference meetings — designed, in part, to resolve issues of testing methodology — were characterized by evasiveness and defensiveness on the part of the Board's staff. Board member Robin Burrell witnessed the phenomenon from a different perspective, but reached the same conclusion:

[T]here appeared to be a tendency to defend our actions and spend a lot of time and energy defending our action when there have been recommendations made by either Dr. Veres, by the parties, by the court, when my personal opinion was that the time could be better spent trying to solve the problem instead of defending what we had done.[152]

Further, monetary sanctions, in the form of a fine, would be impotent as a motivational tool, because of the vast sums of money that already have been expended in this case, to no avail. More importantly, the cost of monetary sanctions ultimately would be borne by the taxpaying citizens of those governmental entities served by the Board, and thus would not have the "teeth" necessary to spur compliance.

The most compelling basis for this court's conclusion that other sanctions are inadequate, however, is the fact that even the threat of criminal contempt sanctions against the individual Board members did not inspire those individuals to ascertain their constitutional obligations.[153] Quite frankly, the court finds this total abdication of responsibility to be shocking, and agrees with the blunt assessment of the Martin/Bryant parties: "The Board members have done nothing because

[152]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 59 (Deposition of Robin Burrell), at 128-29.

[153]See Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause (doc. no. 763).

they have not bothered to find out what the Courts have ordered them to do."[154]

The Board lacks the leadership to turn the tide toward compliance within a reasonable period of time. The Board's former Personnel Director, Ben Payton, is on administrative leave pending retirement. Those employees who had training and experience in the development of selection procedures have either resigned or been terminated.[155] Board members Tutwiler and Burrell have resigned their appointments.[156] As a result of this leadership vacuum, the Board's staff is not functioning productively. There does not appear to be anyone currently employed by the Board who can successfully lead that organization to fulfill its professional and constitutional obligations.

Especially in light of the events of the past year, this court also is concerned about the good faith of the Board to accomplish its constitutionally mandated goals of developing lawful, race- and gender-neutral employee selection procedures. When discussing "good faith" as a defense to a motion for imposition of civil contempt sanctions in *LaShawn A. v. Kelly*, the District Court for the District of Columbia wrote:

> [D]efendant's [sic] good faith is arguable at best. The remedial history outlined above demonstrates that the defendants have repeatedly attempted last-minute adjustments or compromises in an attempt to avoid sanctions. Because this pattern has persistently recurred since 1991, the Court must question whether the defendants truly intend to cooperate in the remedial efforts. Additionally, the defendants' recent actions cast an extremely bad light on their alleged good intentions.

*LaShawn A. v. Kelly*, 887 F. Supp. 297, 313-14 (D.D.C. 1995), *aff'd and remanded*, 990 F.2d 1319 (D.C. Cir. 1993). Time and again, this court has observed similar "last-minute adjustments or

---

[154]Martin Plaintiffs' and Bryant Intervenors' Memorandum in Support of their Order to Show Cause (doc. no. 918), at 39.

[155]Dr. Wayne Bolander resigned effective April 2, 2002. Personnel Board of Jefferson County's Monthly Status Report for April 2002 (doc. no. 887), at 2. Dr. James Osburn resigned effective April 30, 2002. *Id.* Michael Blair's employment was terminated effective May 10, 2002. Personnel Board of Jefferson County's Monthly Status Report for May 2002 (doc. no. 913), at 2.

[156]Tutwiler resigned April 23, 2002, and Burrell resigned June 3, 2002.

compromises in an attempt to avoid sanctions." A recent example telling of this pattern of behavior is the Board's agreement to incorporate the United States' and the Martin/Bryant parties' well-founded recommendations to improve the oral board component of the selection procedure in *future administrations* of the police and deputy sheriff's sergeant selection procedure. If the Board had delayed the administration of that component, as it had the court's *explicit* permission to do,[157] and taken the opportunity to work with the parties' experts, as it did for the technical knowledge component of that selection procedure, it is conceivable that the selection procedure might have been acceptable.

In conclusion, the court finds that the extraordinary step of imposing a receivership on the Board is the only means of providing a quick and efficient remedy. While the terms "quick" and "efficient" are foreign in the context of this litigation, due to its tortured history, the court is persuaded that, with the proper receiver in place, the Board's obligations under the consent decree, at long last, will be fulfilled. Moreover, appointing a receiver appears to the court the most expedient way of ending federal judicial oversight of the Board, and returning it to local authority in full compliance with its constitutional mandate.

## C.     Scope of the Receivership

Having determined that a receivership should be imposed on the Board, the court must determine its scope.

The Board presently employs approximately fifty individuals in the following four divisions: Employment and Administration; Classification and Compensation; Employee Relations; and, Research and Validation (including the so-called "Consent Decree Team"). Each of the Board's

---

[157]*See* Order Extending Some of the Deadlines for the Police/Deputy Sheriff Sergeant Selection Procedure entered July 27, 2001 (doc. no. 790).

75

divisions performs functions that are not, strictly speaking, directly related to its consent decree obligations. Those functions, however, are part of the so-called "human resource management" cycle, which consists of: designing the job; classifying/evaluating; recruiting; staffing; training; appraising performance; and, managing performance. Each phase of the management cycle is interdependent, and strongly relies on job analysis data. As the classifying/evaluating phase identifies critical job requirements and determines pay in relation to other jobs in an organization, it relies on the same job analysis data that allows valid minimum qualifications and selection procedures to be designed in the staffing phase, relevant curricula to be developed in the training phase, and performance standards to be identified in the appraising phase.

In order for an organization to function smoothly, each phase must be in harmony with other phases. Minimum qualifications set markedly higher than required to meet performance standards can unfairly limit applicants' access to employment. Set too low, minimum qualifications can increase stress on the recruiting function, as it may be difficult to identify appropriate recruiting sources. Training programs that do not teach employees to meet performance standards can lead to disciplinary action and reduced employee morale.[158] With those human resource principles in mind, the court will consider the role of each division, and its interrelatedness with the Board's obligations under the consent decree.

The Research and Validation Division is responsible for the recruitment, screening, and selection procedure development and administration functions of the Board. This division performs functions that are central to compliance with the consent decree and, unquestionably, should be placed under the authority of the Receiver.

[158]*See generally* S.E. Bemis, A.H. Belenky, & D.A. Soder, JOB ANALYSIS: AN EFFECTIVE MANAGEMENT TOOL (1983).

76

The Employment and Administration Division is responsible for maintaining the registers of eligible candidates that result from the administration of each selection procedure. This division also is responsible for issuing certificates of eligible candidates to requesting jurisdictions. Those registers and certificates are instrumental to assessment of whether a particular selection procedure has adverse impact. Paragraph 30 of the 1995 Modification Order requires the Board to

> make all data concerning the development of any selection procedures used or proposed to be used by the Personnel Board, including but not limited to, the adverse impact of the selection procedure when used by the Personnel Board, or if applicable, by other users, *the effect of the selection procedure on the composition of eligibility registers for the job classifications at issue, the effect of the use of the selection on the composition of certification lists for the job classifications at issue*, job analyses, expert reports and validation studies, available to counsel for the parties. [Emphasis supplied.]

The functions of the Employment and Administration Division thus are integrally related to the Board's compliance with its consent decree, and should be placed under the authority of the Receiver.

The Classification and Compensation Division is responsible for developing and maintaining classification and pay plans for the jurisdictions served by the Board. Pursuant to state law, the Board must conduct a survey every five years to ensure that the classification and pay plans are consistent with the job duties for each classification.[159] During the survey, a job analysis is conducted for each classification, and minimum qualifications are verified. Because the job analysis and minimum qualifications are used to develop selection procedures for numerous classifications, the functions performed by the Classification and Compensation Division are inextricably related to the Board's obligations under its consent decree. Accordingly, that division should properly be

---

[159]*See* Act No. 680, 1977 Acts of Alabama, § 1, at 1179-80, and Act No. 684, 1977 Acts of Alabama, § 4, at 1191 (both amending Act No. 248, 1945 Acts of Alabama, § 12).

77

placed under the authority of the Receiver.

The Employee Relations Division also performs functions directly related to consent decree

compliance — namely, recruitment. Paragraphs 29,[160] 30,[161] and 31[162] of the 1981 Consent Decree,

and paragraph 10[163] of the 1995 Modification Order, provide recruitment requirements that the

---

[160]Paragraph 29 of the 1981 Consent Decree provides:

The Personnel Board shall continue to operate a comprehensive recruitment program designed to meet the needs of the service and specific requirements set out in this Consent Decree. To meet these purposes, the Personnel Board, in addition to its own resources, shall have access to and utilize what other resources may be deemed appropriate and available from each and every jurisdiction and department thereof comprising the merit system subject to the Civil Service Act and terms of this Decree.

[161]Paragraph 30 of the 1981 Consent Decree provides:

The Personnel Board will continue to engage in affirmative recruitment activities which are consistent with its obligation to take all reasonable steps to reach the goals set forth in this Decree, and will insure that the Personnel Board's policy of affirmative recruitment and non-discrimination in hiring is emphasized to blacks and women. Wherever feasible, the Board shall utilize newspaper, radio and other media of mass circulation in an effort to attract qualified applicants. The Board shall maintain regular contact with area high schools, technical and vocational schools, the Alabama Department of Employment Security and minority and women's organizations such as the Urban League and the NAACP. The Board shall continue to notify such schools and organizations of anticipated job vacancies in the classified service and shall send to them examination announcements sufficiently in advance of any scheduled examination to provide such schools and organizations a reasonable opportunity to refer qualified minority and female applicants. Such announcements shall continue to specify that the Personnel Board is an equal opportunity employer.

[162]Paragraph 31 of the 1981 Consent Decree provides:

The Personnel Board shall continue to insure that promotional examination announcements and announcements of training opportunities are issued and posted in conspicuous places within each jurisdiction and department reasonably in advance of any scheduled promotional examination or training opportunities in order to provide incumbents with a fair opportunity to apply for promotion or training and to adequately prepare for the promotional examination or training. In this regard, the Personnel Board shall insure that all persons eligible for training programs and promotional examinations have equal access to all books, articles, pamphlets, and other materials which are used for preparation for such examinations or training, and that these materials are made available to such persons reasonably in advance of any scheduled promotional examinations or training.

[163]Paragraph 10 of the 1995 Modification Order provides:

This paragraph supplements but does not replace the recruitment requirements of paragraphs 29-31 of the Personnel Board's 1981 Consent Decree. The Personnel Board shall maintain a recruitment program designed to inform interested persons of job opportunities with the Personnel Board and with the jurisdictions served by the Personnel Board. The recruitment program shall include: (1) providing copies of vacancy announcements to the jurisdictions served by the Personnel Board at least two weeks prior to the announcement's closing date; and (2) maintaining contacts with area high schools, technical and vocational schools, colleges, and organizations to inform them of

78

Board must meet. The court concludes that this division also should be placed under the authority of the Receiver.

The Personnel Board, while acknowledging that each of the foregoing divisions performs functions related to the consent decree, nevertheless argues that certain nondiscretionary, administrative and quasi-judicial functions of the Board should not be placed under the Receiver's authority.

## 1.   Nondiscretionary, administrative functions

Essentially, the Board asks this court to cull particular functions from its divisions and to leave them outside of the Receiver's authority, even though the Receiver clearly should have authority over other functions performed by that same division. In view of the interrelatedness of the human resource functions described above, the court finds such an approach unworkable.

The Board's Employment and Administration Division has three sub-units:  payroll; certification; and, general administration.[164]  The payroll unit audits payrolls, ensures they are accurate and timely, maintains personnel records, and prints pay schedules used by jurisdictions served by the Board.[165]  The certification unit processes requests for certificates from the jurisdictions, based on the registers received from the Research and Validation Division, and records

employment opportunities with the Personnel Board and with the jurisdictions served by the Personnel Board. For job classifications open to outside applicants in which blacks or women have been traditionally under-represented, including, but not limited to police officer, deputy sheriff, firefighter, engineering positions, and skilled craft positions, the Personnel Board shall also advertise employment opportunities in a daily newspaper of general circulation in Birmingham, in the *Birmingham Times* or the *Birmingham World*, and in other media, for the purpose of emphasizing to blacks and women the availability of employment opportunities in those job classifications. The Personnel Board shall also place public service announcements on local radio and television media as part of its recruitment efforts for police officer, deputy sheriff and firefighter. Upon request, the Personnel Board will cooperate with recruitment programs implemented by the City of Birmingham or other jurisdictions.

[164]Affidavit of Mary Beth Vrabel (doc. no. 919), Exhibit 75 (deposition of Gregory James), at 52.

[165]*Id.* at 54.

all employment applications filed with the Board.[166] The general administration unit processes requests for transfers, emergency and provisional appointments, evaluates personal services contracts, and processes requests to change part-time positions to full-time.[167] The Classification and Compensation Division conducts job audits, develops job specifications, and handles pay scale issues.[168] The Employee Relations Division processes grievances and disciplinary actions, and manages the employee evaluation process.[169]

Although the particular functions described may not directly implicate particular terms of the consent decree, part of the role of the Receiver is to protect the institutional asset as a whole.[170] Moreover, it would be impossible to separate each division's functions into those controlled by the Receiver, and those outside his control, especially where they are, in many cases, likely to be performed by the same individual. Therefore, the Receiver also will have authority over the Board's nondiscretionary administrative functions.

## 2.    Quasi-judicial functions

The question of whether the Receiver should have authority over the Board's quasi-judicial functions presents a more difficult issue. These functions have three aspects, which require separate discussion.

First, section 22 of Act No. 248 governs the dismissal and suspension of merit system employees. An "appointing authority"[171] may dismiss or demote an employee for just cause

---

[166]*Id.* at 53.

[167]*Id.* at 52.

[168]*Id.* at 49-50.

[169]*Id.* at 51.

[170]*See, e.g.,* Carolyn Hoecker Luedtke, *Innovation or Illegitimacy: Remedial Receivership in* Tinsley v. Kemp *Public Housing Litigation*, 65 Mo. L. Rev. 655, 685 (2000).

[171]Section 1 of the Board's Enabling Act has never been amended, and defines the terms "appointing authority" or "appointing Power" as meaning a

"whenever [the appointing authority] considers the good of the service will be served thereby, for reason stated in writing, served on the affected employee, and a copy furnished to the Director [of the Board], which action shall become a public record."[172] The affected employee has ten days to appeal the action by filing an answer to the charges with the Board. The Board must conduct a public hearing, either before the Board, or before a hearing officer appointed by the Board. If a hearing officer is appointed, that person must take testimony from the employee and the appointing authority, and submit to the Board within five days findings of fact and conclusions of law, and a recommended decision.    The Board then must consider the hearing officer's report and recommendation during its next regular meeting, and may modify, alter, set aside, or affirm. If the Board hears the appeal, it must make findings of fact and law and issue a decision. In either case, the Board certifies its findings to the appointing authority to effectuate the decision.[173] Either party may appeal the Board's decision to the Circuit Court of Jefferson County for review by a three-judge panel. The circuit court reviews questions of law, and whether the Board's decision is supported by substantial evidence.

Second, pursuant to rules and regulations adopted by the Board and approved by the Citizens Supervisory Commission, the three-person Board has a role in employee grievance procedures.[174]

person, officer, board, council, commission or other body including the County Board of Health whose lawful jurisdiction or powers are confined wholly or primarily within the territorial limits of such county and who or which possesses final power to appoint persons to services, jobs, offices or positions, the compensation of which is paid in whole or in part from the public funds of such county or from the public funds of a municipality in such county subject to this Act. . . .

Act No. 248, 1945 Acts of Alabama, at 376-77.

[172]Section 22 of the 1945 re-enactment of the Board's Enabling Act subsequently was amended five times. *See* Act No. 562, 1947 Acts of Alabama; Act No. 670, 1953 Acts of Alabama; Act No. 1600, 1971 Acts of Alabama; Act No. 679, 1977 Acts of Alabama; and Act No. 684, 1977 Acts of Alabama.

[173]Part of the Board's role is to ensure system-wide consistency for disciplinary actions. *See* Personnel Board of Jefferson County's Response to Show Cause Order (doc. no. 890), at 8.

[174]*See* Rule 8.6(b), Rules and Regulations Adopted by the Personnel Board, as approved by the Citizens Supervisory Commission. Rule 8.6(a) defines the term "grievance" as "an alleged wrong ensuing from the commission

81

At "Step I" of the procedure, the employee must submit a grievance to his or her immediate supervisor within seven calendar days of the incident complained of. The supervisor must reply in writing to the aggrieved employee within seven calendar days of his or her receipt of the grievance, or in lieu of replying, may refer the grievance to the department head. If the grievance is not resolved at the supervisory level, it proceeds to "Step II," which requires the grievant to submit the grievance to his or her department head within five calendar days of the immediate supervisor's reply. The department head must reply in writing to the grievant within five calendar days of receipt of the grievance. If the grievance is not resolved by the department head's answer, the grievant may proceed to "Step III," which offers the grievant these options: the grievant may submit his or her grievance within five calendar days of the "Step II" answer to either (1) a hearing officer, or (2) a "grievance committee."[175] If the grievant chooses the first option, the assigned hearing officer must convene a formal hearing within ten calendar days after assignment. Following the hearing, the hearing officer must render written findings of fact and a recommendation to the Board within ten days of the hearing, and the Board must render a decision at its next regular meeting. If the grievant instead chooses to submit the grievance to a grievance committee, the committee must convene a formal hearing within fifteen calendar days, and render written findings of fact and a decision within ten calendar days of the hearing. The decision of the committee may be appealed to the Board within ten calendar days of the decision. Upon appeal, the Board must review the record and render a final decision at the next regular meeting.

---

or omission of an act by management having a significant adverse effect on the employee's career or the terms and conditions of his employment."

[175]A grievance committee is composed of three members: (1) the Citizens Supervisory Commission representative of the county employees, if the grievant is employed by the county, or, otherwise, the Citizens Supervisory Commission representative of the municipal employees; (2) a designee of the appointing authority of the jurisdiction where the grievant is employed; and, (3) a mutually agreed upon person selected by the first two members. Rule 8.6(b), 1995 Rules and Regulations of the Personnel Board, as approved by the Citizens Supervisory Commission.

Third, pursuant to Rule 7.24 of rules and regulations adopted by the Board, and approved by the Citizens Supervisory Commission, the Board hears appeals of denials of applications for "injury leave with pay."[176]

The Martin/Bryant parties assert that the foregoing quasi-judicial functions also should be under the authority of the Receiver. As support for their contention, they observe that the Board's quasi-judicial functions include appeals of disciplinary actions and grievances, which are defined by the Board's rules as "an alleged wrong ensuing from the commission or omission of an act by management having a significant adverse effect on the employee's career or the terms and conditions of his employment."[177] The Martin/Bryant parties emphasize that such appeals or grievances may encompass "questions about the propriety of minimum qualifications or their application, misclassification based on actual job duties, misuse of 'related' lists, irregularities in administration of selection procedures, misuse of provisional appointments and efforts of jurisdictions to evade the results of selection devices."[178] As a result, they argue, the Board's adjudicatory responsibilities "involve the resolution of employees' allegations directly related to the Board's selection devices

---

[176]The Personnel Board typically refers to this category of employee rights as either "injury with pay," or simply "IWP," applications. For clarity, those claims will be referred to hereafter as applications for "injury *leave* with pay," which — according to Rule 7.24, 1995 Rules and Regulations Adopted by the Personnel Board, and Approved by the Citizens Supervisory Commission — are available under the following circumstances:

> Employees who sustain a disabling injury on or about the premises where their services are being performed or where their service requires their presence at the time of the accident and during the hours of service, without fault or gross negligence on their part while performing position duties, or who otherwise develop a disabling condition that arises out of and in the course of their employment, may be granted injury leave with pay. Employees must notify a supervisor or other authorized representative of the employer in writing of an accident, an incident of exposure, or of their belief that their disabling condition arose out of and in the course of their employment, within five (5) calendar days of occurrence or identification of the condition as job related.

[177]Rule 8.6(a), 1995 Rules and Regulations Adopted by the Personnel Board, and Approved by the Citizens Supervisory Commission.

[178]Martin Plaintiffs' and Bryant Intervenors' Memorandum in Support of their Order to Show Cause (doc. no. 918), at 76.

83

and practices."[179] The Martin/Bryant parties conclude, "[g]iven the Board's extensive history of discrimination and its continuing failure to comply with the consent decrees, the Board's ability to determine whether the Board itself is engaging in unfair employment practices — which decisions then will receive deference from the Alabama state courts — raise concerns that meritorious complaints of the misconduct by the Board will be ignored except as relates to the particular grievant."[180]

While the arguments of the Martin/Bryant parties are compelling, they offer no specific evidence that the three-person Board's quasi-judicial functions relating to appeals of disciplinary actions and denials of "injury leave with pay" applications, and the Board members' participation in employee grievance procedures, are so intertwined with the Board's obligations under the consent decree as to warrant placement under the authority of the Receiver. This is particularly so where the number of grievances filed annually, and those which proceed to "Step III," is relatively small, in view of the large number of employees within Jefferson County's merit system as a whole,[181] such that the concerns expressed by the Martin/Bryant parties are minimized. Similarly, there is a relatively small number of appeals of disciplinary actions and denials of "injury leave with pay" applications. The Personnel Board reported in its 2001 Annual Report that it had received fifty-eight new appeals of disciplinary actions and denials of "injury leave with pay" applications, and that there were eighty-nine such appeals pending during the fiscal year. Of those eighty-nine, appeal was

---

[179]*Id.* at 76-77.

[180]*Id.*

[181]At the court's request, the Personnel Board has advised that, for calendar year 2001, fifty-eight grievances were filed, of which only thirteen proceeded to "Step III" of the employee grievance procedure. Telephone call from V. Michelle Obradovic, counsel for the Personnel Board, to the court's law clerk, June 25, 2002. By contrast, there are more than 9,000 classified employees. *See* Personnel Board of Jefferson County's Response to Show Cause Order (doc. no. 890), at 7.

84

withdrawn in four cases, and twenty-three were settled prior to or at hearing.[182]  There were only seven "injury leave with pay" appeals pending during the 2001 fiscal year.[183]

Accordingly, with the exception discussed in the following paragraph, the Board will retain: (a) its limited role in "Step III" of the employee grievance procedure, as set forth in rule 8.6(a) of the 1995 Rules and Regulations adopted by the Board, and approved by Citizens Supervisory Commission; (b) all powers, duties, and obligations set forth in section 22 of Act No. 248 and Rule 6 of the 1995 Rules and Regulations adopted by the Board, and approved by the Citizens Supervisory Commission;[184] and (c) its role in reviewing denials of applications for "injury leave with pay," as specified in Rule 7.24 of the Board's rules and regulations.

The members of the Jefferson County Personnel Board shall *not perform* the foregoing functions with respect to employees of the Personnel Board.  Instead, for the duration of the Receivership imposed by this order, any employee of the Jefferson County Personnel Board holding permanent status, and who is subject to demotion, suspension, discipline, or termination at the instance of the Receiver, shall be entitled to a due process hearing before a magistrate judge of this court randomly drawn, who shall apply the same standards of review as would otherwise be applied by the Personnel Board in such matters, but for the existence of this court's order. *See* 28 U.S.C. §§ 636(b)(3), 1651.  Any employee wishing to avail himself of this procedure shall notify the Receiver in writing, and file a copy with the Clerk of this Court, within ten (10) calendar days after notification of the contested employment action.  Within ten (10) calendar days thereafter, the

---

[182]Personnel Board of Jefferson County's Response to Order to Show Cause (doc. no. 890), Exhibit 6.
[183]*Id.*

[184]The staff of the Personnel Board shall continue to perform the administrative functions specified in section 22 of the Act No. 284 as the responsibility of the Personnel Director — namely, preparation of transcripts and certification of copies of charges and answers.

85

Receiver shall file with the Clerk of this Court a copy of the written notice of the contested employment action and a written statement of the reasons for the action taken with respect to the employee. The Clerk shall draw at random a magistrate judge of the court, who shall conduct a hearing on the matter within ten (10) working days after the Receiver's statement of reasons. The hearing may be continued for not more than thirty (30) days on agreement of the parties or on motion for good cause shown. Upon completion of the hearing, the magistrate judge shall file his written findings of fact and conclusions of law, together with a recommendation for disposition of the appeal. Either party may file objections to the magistrate judge's findings and conclusions within ten (10) calendar days after they are entered, and this court shall thereafter enter such orders as may be appropriate. In like manner, any employee of the Board desiring to appeal a decision by the Receiver disallowing in whole or in part an application for injury leave with pay shall notify the Receiver in writing, and file a copy with the Clerk of this Court, within ten (10) calendar days after notification of the disallowance. Thereafter, the appeal shall be considered by a magistrate judge of this court randomly drawn, who shall apply the same standards of review as would otherwise be applied by the Personnel Board under Rule 7.24 of the 1995 Rules and Regulations Adopted by the Personnel Board, and Approved by the Citizens Supervisory Commission, but for the existence of this court's order.     Either party may file objections to the magistrate judge's report and recommendation within ten (10) calendar days after they are entered, and this court shall thereafter enter such orders as may be appropriate. Finally, with respect to any employee of the Board who files a grievance that proceeds to "Step III" of the employee grievance procedure, his or her right of appeal of the decision rendered by either a hearing officer or a grievance committee shall lie to a magistrate judge of this court, randomly drawn, who shall apply the same standards of review as

86

would otherwise be applied by the Personnel Board under Rule 8.6 of the 1995 Rules and Regulations Adopted by the Personnel Board, and Approved by the Citizens Supervisory Commission, but for the existence of this court's order. The aggrieved employee shall file a notice of appeal with the Clerk of this Court within ten (10) calendar days of the announced decision. Either party may file objections to the magistrate judge's report and recommendation within ten (10) calendar days after they are entered, and this court shall thereafter enter such orders as may be appropriate.

## IV. CONCLUSION

The imposition of a receivership upon all functions of the Personnel Board, save those quasi-judicial functions discussed above, unquestionably amounts to censure of those persons responsible for the Board's deficient compliance efforts. Even so, that action should not be misinterpreted as a condemnation of the Personnel Board as a valuable public institution. Understanding the distinction requires historical perspective.

## A.    The Advent of Civil Service Systems Based on Merit Selection

Although merit systems for public employment can be traced back to ancient China, Prussia, France, and Great Britain, the adoption of some such system at the national level of American government did not occur until late in the nineteenth century. From the election of Andrew Jackson as President in 1824, until the assassination of President James A. Garfield in 1881, a "spoils system" held sway: the victors of each election contest claimed the "spoils of the enemy,"[185] placing

---

[185]The utterance, "to the victor belong the spoils," often is attributed, incorrectly, to Andrew Jackson. The words actually were spoken by William L. Marcy, a United States Senator from the State of New York and supporter of President Jackson, during an 1832 Senate debate:

> It may be, sir, that the politicians of the United States are not so fastidious as some gentlemen are, as to disclosing the principles on which they act. They boldly preach what they practice. When they are contending for victory, they avow their intention of enjoying the fruits of it. If they are defeated, they

87

faithful supporters in government jobs as the reward for political services rendered.[186]

Beginning with the enactment of the Pendleton Civil Service Reform Act in 1883,[187] however, the perversions of the spoils system gradually were displaced at the national level by four core principles: competitive selection based on merit (graded examinations); the absence of arbitrary removals from public employment; the proscription of financial assessments from appointed office holders; and, the concept of a neutral and objective (non-partisan) career civil service.[188]

As with most successful pieces of legislation that work structural reforms in government, there were several intertwined motivations leading to passage of the Pendleton Act. In this instance,

---

expect to retire from office. If they are successful, they claim, as a matter of right, the advantages of success. They see nothing wrong in the rule, that to the victor belong the spoils of the enemy. . . .

Jay Shafritz, Norma Riccucci, David Rosenbloom, and Albert Hyde, PERSONNEL MANAGEMENT IN GOVERNMENT 7 (4th ed. 1992). It is correct, nevertheless, to tag Jackson as the originator of the spoils system in national government. Sir James Bryce, the English de Tocqueville, recorded the following facts:

Washington in his eight years displaced only nine person, and all for cause, John Adams nine in four years, and those not on political grounds. Jefferson in his eight years removed thirty-nine, but many of these were persons whom Adams had unfairly put in just before quitting office; and in the twenty years that followed (1808-28) there were but sixteen removals.

II James Bryce, THE AMERICAN COMMONWEALTH 97 (1888). *But see Elrod v. Burns*, 427 U.S. 347, 378-79, 96 S.Ct. 2673, 2691-92, 49 L.Ed.2d 547 (1976) (Powell, J., dissenting) (arguing that attribution of political patronage to Jackson's Presidency "understates the historical antecedents of the practice, which stretch back to Washington's presidency").

[186]Sir James Bryce described the system as he observed it during his travels in 1883-84:

The essential features of the system are, that a place in the public service is held at the absolute pleasure of the appointing authority; that it is invariably bestowed from party motives on a party man, as a reward for party services (whether of the appointee or of some one who pushes him); that no man expects to hold it any longer than his party holds power; and that he has therefore the strongest personal reasons for fighting in the party ranks. Thus the conception of office among politicians came to be not the ideal one, of its involving a duty to the community, nor the "practical" one, of its being a snug berth in which a man may live if he does not positively neglect his work, but the perverted one, of its being a salary paid in respect of party services, past, present, and future.

*Id.* at 99.

[187]Act of Jan. 16, 1883, 22 Stat. 404.

[188]*See* Paul P. Van Riper, HISTORY OF THE UNITED STATES CIVIL SERVICE 100 (1958).

the motivations can be summed up as moral, economic, and political. Good Government leagues had been pushing merit reform based on the moral premise of "cleaning-up government," and the 1881 assassination of President Garfield by a disappointed office-seeker provided the ultimate example of the "evils" of the spoils system. Businessmen also were becoming disenchanted with the ineptness of government officials, and the extortions produced by the spoils system. Industrial expansion, and the need to institutionalize governmental expertise in such areas as engineering and health care, to name just two, also brought forth an economic push for change. Finally, partisan political calculations produced Republican worries about the upcoming 1884 Presidential and Congressional elections. The Pendleton Act was perceived as a possible way to make more permanent the tenure of Republican appointees within the federal bureaucracy before the electorate spoke at the ballot boxes.[189]

## 1. Civil service reform in Alabama, and the struggle for enactment of Act No. 284

Civil service reform in Alabama began at a much later date, and at the local level. As in the case of the national model discussed above, the motivations for it were complex and intertwined.

The first attempt to institute a career civil service system based upon principles of merit selection and retention in Alabama can be traced to the enabling legislation for the Jefferson County Personnel Board: Act No. 284, enacted during August of 1935. The history of that Act, and the bitter struggle that was waged for its passage, has been recorded in two sources: Glenn Feldman's scholarly account of one of the more contemptible political figures of the past century, Horace C. Wilkinson, entitled *From Demagogue to Dixiecrat: Horace Wilkinson and the Politics of Race* 99-120 (1995) ("*Feldman*"); and, to a lesser extent, the findings of fact and conclusions of law entered

---

[189]*See* Shafritz, Riccucci, Rosenbloom, and Hyde, *supra* note 186, at 3-19.

by Judge Robert B. Propst of this court in the case of *Woods v. Florence*, No. CV82-PT-2272-S

(N.D. Ala. Jan. 31, 1985) ("*Woods*"), a class action brought by the Southern Christian Leadership

Conference and six African-American plaintiffs, challenging the constitutionality of the system for

selecting members of the Citizens Supervisory Commission, "which is empowered to select the three

members of the Personnel Board, to make non-binding recommendations to the Board, and to repeal

any rule established by the Board which it may deem not in the interest of 'sound administration.'"

*Woods*, at 4.

Act No. 284 was sponsored by Jefferson County State Senator James A. Simpson, who also

was a prominent Birmingham attorney and representative of some of the city's vested interests, the

so-called "Big Mules."[190]  Simpson was assisted in drafting his legislation by Ralph H. Moss, a

personnel officer for the federal government's Farm Credit Administration and a pioneer in civil

service law, whose name had been given to Simpson by the National Civil Service League. *Woods*,

---

[190]The label of "Big Mules" was hung on the necks of Birmingham's monied interests by Bibb Graves during his 1926 campaign for the office of Governor. Graves was an extraordinarily able, if incongruous political figure in Alabama history. The "little brown hickory nut of a man" softened the shock of his Yale law degree on dirt-poor agrarian voters with a chew of tobacco, an energetic, captivating personality, and folksy metaphors that captured his position on complex issues. For example, when speaking to groups of small farmers in north and southeastern Alabama, Graves would say that he had seen many wagons heavily laden with hay pulled by little mules, while the big mules, tied to the back, munched away at the load. If elected, Graves vowed, he would "hitch the big mules to the wagon," and make them shoulder a heavier portion of the state's tax burden. *See* Roger K. Newman, HUGO BLACK 102 (1994); Virginia Van der Veer Hamilton, LISTER HILL, STATESMAN FROM THE SOUTH 83 (1987).

Bibb Graves served as Governor of Alabama from 1927-31, and again from 1935-39; he "would have been elected again in 1942 had death not overtaken him during the campaign." V.O. Key, Jr., SOUTHERN POLITICS IN STATE AND NATION 50 (1949) ("Key"); *see also* George E. Sims, THE LITTLE MAN'S BIG FRIEND: JAMES E. FOLSOM IN ALABAMA POLITICS 1946-1958, at 17-18 (1985). In the process, Graves constructed the most powerful political machine in the state's history, not excluding George Wallace. He did so by utilizing the same tools that had been employed so successfully by William March "Boss" Tweed in New York, and later would be used to equal effect by Thomas J. Pendergast in Missouri, Edward "Boss" Crump in Memphis, and Mayor Richard J. Daley in Chicago: that is, "he impressed local politicians over the state as *a practical man who could and would do business with them* to meet the immediate practical problems of governing *with mutually beneficial results*. With the friends produced by favors and the expectation of favors, he bound to himself an essentially personal following." Key, at 51 (emphasis supplied). Graves's membership in the Ku Klux Klan did not hurt, either.

In any event, one of the most important "friends" bound to Governor Graves "by favors and the expectation of favors" was Horace C. Wilkinson, the "Boss" of Birmingham's "Wilkinson Machine," who is discussed in the text following this footnote.

at 12, 18.

As with the Pendleton Act, Simpson's motivations for sponsoring and waging a fierce political fight for passage of his reform legislation were complex, and not simply an interest in "good government," although that was a concern.[191] All reasons for Simpson's actions ultimately centered on one person, however, Birmingham attorney Horace Wilkinson — a man who could be described by his biographer only in the most unflattering terms:

> Horace C. Wilkinson was one of the most influential political figures in Alabama for over forty years. A notorious racist, and a demagogue *par excellence*, his gift was a special combination of crass political opportunism and hardcore white supremacist logic buttressed by convoluted religious justifications. Wilkinson, who lived from 1887 to 1957, seldom held public elective office, *yet he managed to build a vast network of political clients and proteges*. This network allowed Wilkinson to play a leading role in southern Progressivism, the Ku Klux Klan, the "bolt" of 1928 against Catholic presidential nominee Al Smith, the New Deal, the "Dixiecrat" Movement, and 1950s segregation efforts.

> Wilkinson left a lasting but unfortunate imprint on political discourse in the South, one that men like George Wallace and former pupil "Bull" Connor would learn from and later make infamous. Ironically, Wilkinson's political dexterity allowed him to adopt, when it suited him, the role of 1920s progressive reformer and tribune of the voiceless working-classes in Depression-era Birmingham, the hardest-hit city in America. Still, it was Wilkinson's reactionary conservatism and unadulterated racism that were his most resilient trademarks. Although Wilkinson and his remarkable career have been largely neglected by scholars thus far, his biography highlights the importance of the backroom political boss and demagogue in structural-level southern politics, as well as the perennial clash between poor and privileged southern whites, and the fratricidal conflict between northern and southern Democrats within the national party.

*Feldman*, at vii (emphasis added).

---

[191]*Compare Woods*, at 12 ("[T]he court finds that the primary motivation [for Act No. 284] was good government concerns, with some possible consideration of local political factions."), *with Feldman*, at 109 ("Despite the predilection of some scholars to take Simpson at face-value for his commitment to better government and his determination to represent all of Birmingham's people, it is apparent that some people got more equal representation than others. One perceptive student of Birmingham's legal scene observed that the business-sector attorney 'defended corporations with the fervor that most men can find only for individuals in appealing straits.' In fact, Simpson made his bread and butter from the city's corporate sector and his actions as their representative clearly reflected the arrangement.") (footnote omitted).

The Great Depression that followed the stock market crash of 1929 provided pliable human

materials for Wilkinson's use when constructing his "vast network of political clients and proteges."

Birmingham suffered more from the effects of the Depression than any other metropolitan area in

the United States.

The city desperately required relief. A federal report pinpointed Birmingham as the hardest-hit city in Depression America. To make matters worse Birmingham was unprepared for tough economic times. In an overly optimistic move, symptomatic of the prosperous 1920s, the city had dissolved its Welfare Department shortly before the 1929 stock market crash. Up until the Depression, Birmingham's community chest provided for 800 families a year; by Herbert Hoover's last year in office it had to support nearly twelve times that many indigents. By 1932, one quarter of Birmingham's 108,000 workers were unemployed. Most of those fortunate enough to have jobs could only find part-time employment for sub-standard wages. Full-time workers at U.S. Steel made the lordly sum of ten to fifteen cents an hour, usually in the form of script redeemable at over-priced company stores. Not surprisingly, the southern headquarters of the Communist party gravitated to Birmingham in 1930 and published its official newspaper, the *Southern Worker*, there. Radicals such as Joseph Gelders, a native Alabamian who was also a Jewish Communist, appealed to the large, oppressed black and poor-white working population in the city. Economic turmoil revealed itself in a rash of strikes during the decade. Labor unrest reared its head in the coal, steel, and rubber industries. But probably the single-most dramatic example of the decade's confusion and misery was the 1934 United Textile Workers (UTW) strike that started in North Alabama and became America's single greatest industrial conflict, encompassing 400,000 workers throughout the country.

*Id.* at 104 (footnote omitted). In that milieu, in which thousands of unemployed persons were

desperate for jobs, Horace Wilkinson rose to the peak of his political power and influence in

Birmingham. He built the "Wilkinson Machine," as it came to be called, by appeals to "lower

middle-class and working class whites, the same kinds of people who had joined the Klan during

the Twenties." *Id*. at 103. He courted labor unions, Franklin Roosevelt, and FDR's political allies

in Alabama: Governor Bibb Graves and Senator Hugo L. Black. In the bargain, Wilkinson gained

total control over public employment in Birmingham and Jefferson County.

Wilkinson controlled federal and state patronage in Birmingham, and used a Sunday radio show to propagate issues like higher educational spending and increased property taxes. Wilkinson, Graves, and Black — former Ku Klux Klansmen all — used the same grassroots base of artisans, clerks, and shopkeepers who had swelled the ranks of the Klan in the 1920s to bolster the columns of their own faction during the 1930s. Wilkinson's control of patronage in the most populous county in the state made his political support an important prize to be sought by Alabama governors.

*Id*. at 99 (footnote omitted).

Wilkinson's control of public employment brought him into conflict with Birmingham's leadership, which "belonged to the officers of the corporations that controlled Birmingham's economic base: U.S. Steel, the L & N Railroad, the coal mining companies, and the public utilities. Since the home offices of these firms were located outside Alabama, their officers exercised power through the attorneys they retained."[192] Chief among those attorney-spokesmen was James A. Simpson, who "headed a 'Big Mule' faction that espoused both anti-labor and anti-New Deal sentiments." *Feldman*, at 99.

The latter half of the 1930s was dominated in Birmingham by an extremely bitter conflict between Horace Wilkinson and the "Big Mules" that took the form of a fight over the adoption of a civil service system in the city and county. State Senator James Simpson — the darling of "Big Mule" interests — and Horace Wilkinson — posing as the tribune of labor and the masses — acted as the principals in the long and ugly duel.

*Id*. at 109.[193]

Simpson had become "interested in progressive government reform, especially civil service, after he went to the State Senate in 1927 and saw first-hand the effect of the spoils system under Gov. Bibb Graves. Simpson was a fiscal conservative who abhorred waste in government spending — especially during the rigors of the Depression." *Woods*, at 75. Thus, after introducing Act No.

---

[192]George E. Sims, THE LITTLE MAN'S BIG FRIEND: JAMES E. FOLSOM IN ALABAMA POLITICS 1946-1958, at 10 (1985).

[193]*See also Woods*, at 25 ("Simpson and Wilkinson were the main protagonists in the battle over the passage of the civil service law in 1935.").

284 in the 1935 session of the Alabama Legislature,

> Senator Simpson promoted the Civil Service Act as an economy measure and
> as a remedy for spoils, inefficiency, and political tyranny, and as a way to promote
> career service in public employment. Simpson noted that 85% of government cost
> lies in personnel, and the Act would reduce the cost of local government in Jefferson
> County by 29%.

*Id*. at 81. As Professor Feldman observed, however, the legislation also offered an excellent

opportunity to garner political capital at both the local and state levels.

> Jim Simpson pushed the civil service bill hard against Wilkinson and his
> forces. Simpson and the "Big Mules" knew that the heart of Wilkinson's influence
> in Birmingham lay in his brokerage of political patronage. By attacking Wilkinson's
> patronage machine, they could gain control in Birmingham and sever Wilkinson's
> aid to Bibb Graves in Montgomery. To do this, Simpson depicted his opponent as
> "Boss" Wilkinson, the head of a corrupt, graft-riddled, spoils system in the city. . .
> .

*Feldman*, at 110.

Wilkinson countered the threat to his control of patronage by playing the trump card of race.

"A seemingly indissoluble racial prejudice had been linked with poor and working-class whites in

Alabama since at least Reconstruction. Horace Wilkinson knew that, and was prepared to take full

advantage of his constituency's weakness for racial appeals in order to preserve his political

machine." *Id*. at 114. Wilkinson asserted, among other things,

> that the law would "threaten" democracy, place the civil service system in the hands
> of special interests led by Senator Simpson and Victor Hanson, the publisher of the
> *Birmingham News*, and that the law would endanger white supremacy by making it
> possible for blacks to be hired for civil service positions on the basis of equality to
> whites.
>
> On May 7, 1935, the *Alabama Herald* published a front-page editorial titled
> "Negroizing Public Service" which denounced the civil service law:
>
> > Senator Jim Simpson's so-called civil service bill is a plain and
> > palpable attempt to give Victor Hanson control of Jefferson County
> > and to negroize our public service.

* * *

As now drawn, as soon as the Negro Miles Memorial School has a larger number of bona fide resident students than either Howard or Southern College, then the president of the negro school will supplant the President of one of the white institutions on the supervisory commission.

* * *

The civil service law provides the negro with the only vehicle that will take him from the alley and give him a seat at the desk in the city hall or the court house by the side of some white girl. The civil service law will take the senegambian out of the wood pile and open every appointive job in the county to him. It will negroize the public service.

Another local newspaper published an advertisement on May 6, 1935, which provided "IF YOU OPPOSE NEGROIZING HANSONIZING SIMPSONIZING OUR CITY AND COUNTY HEAR HORACE C. WILKINSON tonight, 7:45, Station WSGN, on the DESPICABLE CIVIL SERVICE BILL ...."

*Woods*, at 20-21 (footnotes omitted).[194]

Simpson did not take Wilkinson's racist bait.[195]  Instead, he stayed on message, emphasizing

the economies to be gained through creation of an efficient, career civil service system to displace

"Boss" Wilkinson's corrupt, graft-riddled, spoils system. Simpson ultimately prevailed. On August

---

[194]One of the omitted footnotes recorded Judge Propst's opinions on the following matters:

The *Alabama Herald* was a blatantly racist newspaper of limited publication with a generally restricted circulation. By contrast, the *Birmingham News*, the *Birmingham Post* and the *Birmingham Age-Herald* were, by 1930's southern standards, relatively moderate on racial matters. In any event, the latter three newspapers have not been shown to have overtly appealed to racial prejudices as perhaps did such newspapers as *The Mobile Press Register*. Victor Hanson was the publisher of the *News* and *Age-Herald*. Hanson opposed the Ku Klux Klan, supported the Supreme Court's "Scottsboro" decision, and was generally considered to be a racial moderate.

*Woods*, at 20 n.16. As Glenn Feldman records, the *Alabama Herald* was owned by Horace Wilkinson, and its editorials on such issues as this largely were his work product.

[195]While Simpson's response was totally unsatisfactory when read with contemporary eyes, viewed in the context of the times and Klan hegemony, it was restrained: he simply "expressed regret that the 'Negro question' had been interjected but disavowed any suggestion that the Act would have the effect of providing such equality to blacks," and added "that 'no honest man who is acquainted with the bill' would make such an assertion." *Woods*, at 14, 23.

22, 1935, the Alabama State Senate voted 31 to 0 for final passage of Act No. 284, thus negating the

possibility that Governor Bibb Graves might veto the measure, and the bill became law on August

28, 1935.[196]   As re-enacted during the 1945 legislative session,[197] and with various amendatory

additions over time,[198] the structure that James A. Simpson built continues to serve Jefferson County

and its various communities to this day.

## 2.   The consequences of Act No. 284

Although it would be a distortion of the truth for anyone to argue that State Senator James

A. Simpson was — even in his own time — a racial liberal,[199] or, with total accuracy to the historical

record, to assert that his motivations for fostering civil service reform were entirely altruistic, those

facts should not detract from the enduring significance of his remarkable accomplishment.

Act No. 284 was — and, even today, remains — extraordinarily progressive. "It included

language which prohibited discharge for political, racial or religious reasons." *Woods*, at 12. "The

bill was racially and sexually facially neutral. These neutral provisions remained after the bill was

---

[196]It would be an ending suitable for a dramatic production to say that this vote ended the struggle, but that would not be factual. Wilkinson continued the fight against Simpson's civil service system for many years more: first, in the court system; and, when legal avenues led to another dead end, at the ballot box. It would be the end of the decade before Horace Wilkinson knew firsthand the full meaning of political defeat. Those interested in the rest of the story should consult Glenn Feldman's biography of Wilkinson, *op cit.*

[197]*See* Act No. 248, 1945 Acts of Alabama, at 376-400; *see also* 1940 Code of Alabama, Appendix § 645 *et seq.* (Recomp. 1958).

[198]*See, e.g.,* Act No. 17, 1951 Acts of Alabama; Act No. 332, 1953 Acts of Alabama, at 386-87; Act No. 560, 1959 Acts of Alabama, at 1404-05; Act No. 715, 1965 Acts of Alabama, at 1319-21; Act No. 591, 1967 Acts of Alabama, at 1366-78; Act No. 677, 1977 Acts of Alabama, at 1167-73; Act No. 679, 1977 Acts of Alabama, at 1176-79; Act No. 680, 1977 Acts of Alabama, at 1179-80; Act No. 684, 1977 Acts of Alabama, at 1183-1200; Act No. 782, 1977 Acts of Alabama, at 1347-51; Act No. 630, 1978 Acts of Alabama, at 893; Act No. 819, 1978 Acts of Alabama, at 1194-95; Act No. 80-730, 1980 Acts of Alabama, at 1475-76; Act No. 87-815, 1987 Acts of Alabama, at 1626-30; Act No. 89-739, 1989 Acts of Alabama, at 1467-68; Act No. 89-765, 1989 Acts of Alabama, at 1545-46; Act No. 89-805, 1989 Acts of Alabama, at 1605-06; and, Act No. 94-564, 1994 Acts of Alabama, at 1035-38. *See also* Act No. 284, 1935 Acts of Alabama, at 691-713.

[199]*See, e.g, Woods*, at 25 ("During the 1940's and 1950's period, Senator Simpson repeatedly demonstrated his commitment to the system of segregation and worked to develop strategems to maintain segregation in the face of legal and other attacks.").

attacked." *Id*. at 21 n.17. Moreover,

> [t]he method of selection of members of the Jefferson County Personnel Board is unique in the country. There is evidence, with no substantial contradictory evidence, that no other municipality or county in the country has a civil service system wherein personnel board members are selected by private citizens representing designated private organizations and educational institutions. Most civil service board members are selected by municipal or county officers or other elected officials. The Jefferson County Personnel Board is also unique in that it serves both the county and municipalities within the county. Most civil service boards serve one governmental entity. The court finds no inference of discrimination from any of the immediately aforementioned departures from the norm in and of themselves. The court is satisfied that the initial establishment of the C.S.C. [Citizens Supervisory Commission] was a bona fide effort to remove "politics" from the system. The inclusion of the county and other municipalities in the system was apparently only an effort to address the problem in a uniform and economical fashion. There is no hint that either of these manners of approaching the problem were influenced by racial considerations. . . .

*Id.* at 16-17 (footnote omitted).[200]

More important than all of the foregoing, however, is the fact that Act No. 284 worked a structural change in county and municipal government. The legislation fundamentally altered the manner in which local governmental officials could thereafter approach a particular societal problem: in this instance, the displacement of a raw "spoils system," controlled by one of the most despicable figures in Alabama history, with the concept of merit selection and retention of civil servants. As Judge Propst concluded in *Woods v. Florence*, by devising a "system . . . to remove 'politics,' particularly far removed 'politics,' from the selection process," Simpson's legislation established "a more stable employment structure for public employees in Jefferson County and its municipalities." *Id*. at 98 (footnote omitted). The Jefferson County Personnel Board thus represents a structural antithesis to governmental actions that are hinged to the politics or policies espoused by

---

[200]The omitted footnote reads: "There is also some evidence that the Jefferson County Personnel Board has more control in the selection of department heads than do some civil service boards." *Woods*, at 16 n.10.

97

a particular political figure, which are not enduring, rarely extend beyond the incumbent's term of office, and effect alterations only around the margins of social problems, leaving no lasting imprint.

For such reasons, it is imperative to draw a distinction between those persons who have controlled the course of the Jefferson County Personnel Board during the long pendency of this litigation, and the institution itself. The former are deserving of chastisement; the latter must be saved and, if it is possible to do so, *strengthened* — so that the Board may continue to serve Jefferson County and its various municipalities for at least another sixty-seven years.

### 3.    The intended legacy of this protracted litigation

The Personnel Board obviously must employ valid selection criteria in order to comply with its consent decree, as modified and extended. The Board's ability to create and then administer selection procedures is hamstrung, however, by its lack of infrastructure and the discord among its present management and staff. To perform its functions lawfully and efficiently, the institution must have an organizational structure, systems, and procedures that support its purpose, and employees who both understand and possess the skills necessary to perform their various roles.

Ultimately, the purpose of the Personnel Board is to deliver efficient, professional, and cost-effective service to local governments, their employees, applicants for employment, and the public at large. Central to the work of the Receiver, therefore, will be the task of refocusing the Personnel Board and its employees on the potential and satisfaction of working in an organization that not only fulfills its mission, but does so in an exemplary manner. Otherwise, the task of sustaining "valid selection criteria" will prove impossible, if not meaningless.

Accordingly, the overriding goal of the receivership imposed by this court is that of creating an instructive collaboration among the Receiver and Board employees, with the advice of

98

consultants, so that authority and responsibility are progressively assumed by the Board and its employees during the course of the process, resulting in the legacy of a strong and competent Personnel Board team with a clearly defined mission, and, the systems and skills to support that mission in a manner that meets the requirements of the Constitution and federal law in all respects. The cumulative effect of the protections afforded by a well-run, efficient, and professional merit system are a sense of procedural justice and a resultant sense of job security. The protections foster a neutral and non-partisan career civil service, one based more on job performance than on political affiliation. In short, the same benefits touted in the original struggle for enactment of Act No. 284, but made consistent with contemporary legal requirements.

**B.     The Receiver**

The accomplishment of those goals sketched above will require more skills than just those of devising valid selection procedures. The Receiver and his consultants must be able to gain the confidence of the Board's employees and other stakeholders across the political spectrum. This will require conflict resolution skills, and sensitivity to (and concomitant ability to communicate with) diverse groups with deeply held positions. Any effective resolution of the Personnel Board's difficulties also will depend, at least in part, on establishing communications systems and conflict resolution procedures in a climate in which diversity is respected. Further, the long-standing failure of the Personnel Board to meet its obligations under the 1981 Consent Decree and 1995 Modification Order argues for a Receiver with demonstrated expertise in changing dysfunctional organizational cultures.

For such reasons, this court shall appoint Ronald R. Sims, Ph.D., as Receiver. Dr. Sims is Floyd Dewey Gottwald Senior Professor in the Graduate School of Business at the College of

William and Mary in Williamsburg, Virginia. He teaches, among other subjects, organizational behavior, leadership, change management, human resources management, and business ethics. He has published extensively in the area of organizational behavior, including recent papers on change in public-sector organizations and team-building. He previously served on the executive board of the Academy of Management's Organizational Development and Change Division. Dr. Sims has successfully consulted on organizational development and change for over twenty-one years. None of the fifteen other persons suggested or considered by this court as candidates for Receiver possess Dr. Sims's combination of practical experience in, and systematic research on the means and methods of effecting, organizational change.[201] Moreover, Dr. Sims has proposed a schedule offering the promise of concluding this litigation in fewer than three years, and possibly half that time. Given the extraordinary longevity of this litigation, the opportunity to end it — and to end it well — in so short a period should be grasped. Lastly, Dr. Sims has expressed his commitment to act as a facilitator and transition leader. This court desires a receivership free of political machinations designed to ensure the Receiver's continued employment as Personnel Director. As previously noted, the present lack of infrastructure and observed discord among the Personnel Board's management and staff stem from the failure of those persons who have controlled the course of the Board over the past two and one-half decades. The selection of a Receiver who desires continued employment as Personnel Director opens a path for those forces that have thwarted any impulses for the Board to comply with its 1981 Consent Decree and 1995 Modification Order. Dr. Sims's objective of "working himself out of a job" correctly focuses the receivership on reforming and strengthening the Board's internal organization, with the ultimate goal of ending federal judicial

---

[201]A copy of Dr. Sims's resume will be attached to this opinion.

oversight, and providing the reinstated Board with the means to achieve its original purposes.

## C.    The Duties and Obligations of Jefferson County's Officials

Regrettably, this opinion must end with a cautionary instruction to defendant Jefferson

County, Alabama.

The legislatively mandated manner for paying the expenses necessary for the performance

of the Personnel Board's mission has not been substantively altered since 1935, and currently reads

as follows:

The salaries and all other expenses of the personnel board, the personnel director and all others arising under the provisions hereof, unless otherwise herein provided, shall be paid by warrants drawn by the personnel board and signed by at least two members thereof on the general fund of the county. At the end of the county's fiscal year it shall prorate the total sum which it has expended for the purposes of this Act between itself and the cities and appointing authorities subject to this Act, charging each with such part of the total sum so expended as the total number of employees of such county, city, or appointing authority who were subject to the provisions of this Act on the last day of the county's fiscal year bears to the total number of employees of all appointing authorities subject to the provisions of this Act on such last day of the county's fiscal year. The sum so arrived at by the county as the proper contribution of each shall be certified to the director of personnel and when approved by him in writing, shall become a liability of the respective county, city and appointing authorities and shall be paid immediately to the county. In the event the salaries of a county, city, or an appointing authority are paid in part from different treasuries or different funds, in the same treasury, the liability for this contribution shall accrue against such various treasuries or funds in the same proportion, as the salaries of the employees of the county, city or the appointing authorities are paid therefrom. In the event any contribution levied hereunder shall not be paid within thirty days after approval by the personnel director, the county may bring suit therefor in any court of competent jurisdiction and any judgment so recovered shall be satisfied from any funds in such treasury or funds against which such contribution levy lies.

Act No. 248, 1945 Acts of Alabama § 4, at 380-81; *see also* Act No. 284, 1935 Acts of Alabama §

33, at 711-12. Section 7 of the legislation creating the Board further prescribes that: "It shall be the

duty of all elective officials in authority of either the counties or municipalities affected by this Act

101

to aid in all proper ways in carrying into effect the provisions of this Act and the rules and regulations prescribed from time to time thereunder. . . ."

Notwithstanding those two provisions of state law, this court recently has observed what it perceives as an attempt by Jefferson County to obstruct the Personnel Board's efforts to comply with its Constitutional obligations. The following discussion, therefore, is intended to place defendant Jefferson County — together with all of its elected Commissioners, appointed officials, employees, and attorneys — on clear notice that obstruction will not be countenanced.

Until just recently, Jefferson County evidenced an amazing lack of interest in the Board's progress (or lack thereof) in the development of lawful selection procedures complying with this court's orders. For example, although counsel for all other parties established a practice of meeting on the day prior to each monthly status conference conducted by this court, counsel for Jefferson County attended only four of the fifteen meetings held since January of 2001; and, of those four, he attended only a portion of the parties' meeting on two occasions.[202] Since February of this year, however, when Jefferson County's business relationship with the Board's former Personnel Director and Industrial/Organizational Psychologist was disrupted, the County's interest in these proceedings has been piqued.

During the status conference conducted on June 20, 2002, the Personnel Board charged that Jefferson County had failed to cooperate with the Board's efforts to comply with the consent decree by refusing to pay several invoices presented for payment. The County responded that it was "trying to . . . get hold of . . . a runaway train with consulting fees that are out of control."[203] Stated differently, for the first time during the twenty-seven-year-plus history of this litigation, Jefferson

[202]This information was provided by the court's special master, who has attended all of the meetings.

[203]Transcript of proceedings, June 20, 2002 (doc. no. 930), at 15.

County has attempted to assume financial oversight of the Board's expenses, and asserts a right to question the "reasonableness" of the Board's expenditures.[204] Moreover, the County apparently includes expenses associated with services performed for this court by the special master in its blanket condemnation of "out-of-control" consulting fees.[205]

Jefferson County argues that it is entitled to review invoices submitted to the Board from Pittman McLenagan Group, L.C. — a consulting firm hired to evaluate the validity of selection procedures for the thirty-three job classifications remaining at issue — and to request "back-up" documentation for those invoices.[206] Jefferson County also protests the fact that the Board does not have a written contract with Pittman McLenagan Group. Despite Jefferson County's distinctive lack of involvement in the parties' efforts to move forward on the development of selection procedures complying with federal standards, the County now takes the position that its budget analyst must be satisfied that the consulting fees charged by Pittman McLenagan Group can be justified before the invoices will be paid.[207] The County's position is factually and legally untenable.

As to the facts, this court first observes that the Pittman McLenagan Group was retained following the resignation of Drs. Bolander and Osburn, and the reassignment of Michael Blair. Due to the departure of those persons from the so-called "Consent Decree Team," the Board had saved, as of June 24, 2002, a total of $75,058.07 in expenses relating to consent decree compliance.[208] In contrast, the fees charged by Pittman McLenagan Group through that same date totaled only

---

[204]*See* June 25, 2002 letter from R. Wilson, counsel for the Martin/Bryant parties, to the court ("Through the first 20 years of the Decree's operation, the County did not once seek to review the Board's payment of consultants, much less withhold payment until the County was satisfied.")

[205]*See* Memorandum (doc. no. 931), filed June 24, 2002, at 10.

[206]At issue were Pittman McLenagan's April 2, 2002 invoice for $29,412.50, and its May 2, 2002 invoice for $24,807.50.

[207]Transcript of proceedings, June 20, 2002 (doc. no. 930), at 19.

[208]*See* Cost analysis of salary and fringe benefits, prepared by counsel for the Personnel Board.

103

$54,220.[209]  Additionally, counsel for all plaintiffs have expressed confidence in the work done by Pittman McLenagan Group, both in the development of selection procedures for the gardener and semi-skilled laborer classifications (to which none of the parties objected), and in developing a plan of action to redevelop or revise the selection procedures for the remaining classifications.[210]

As to the law, any fair reading of sections 4 and 7 of Act No. 248 establishes that the Board is not subordinate to the County, and that the County does not possess financial oversight for the Board's expenses. Even assuming *arguendo* the County possessed such authority, to the extent that state law contravenes federal court orders and constitutional objectives, it is displaced by the Supremacy Clause of the United States Constitution. U.S. Const., art. VI, cl. 2; *see also, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel*, 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979) (state law that has the effect of thwarting a federal court order enforcing federal rights "cannot survive the command of the Supremacy Clause of the United States") (citing *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.5 (1958); *Ableman v. Booth*, 21 How. 506, 16 L.Ed. 169 (1858)); *Spain v. Mountanos*, 690 F.2d 742, 746 (9th Cir. 1982) ("[u]nder the Supremacy Clause of the United States Constitution, a court, in enforcing federal law, may order state official to take actions despite contravening state laws," including the payment of fees); *Hook v. Arizona*, 907 F. Supp. 1326, 1336 (D. Ariz. 1995) (directing state official to pay special master's fees despite contravening state statute).

While Jefferson County argues that it merely is attempting to ensure that the Board's expenses are incurred pursuant to a legal obligation, and that they are "reasonable" in amount, this

---

[209]*Id.*

[210]*See* Transcript of proceedings, June 20, 2002 (doc. no. 930), at 40-42.

court questions the County's motives, in light of the timing of this newly-asserted authority.[211] As part of its argument that the Board's consulting costs are "out of control," the County provided a table listing consulting fees incurred by the Board since fiscal year 2000. The total of all fees listed is more than $1,500,000. Yet, there is no evidence establishing that the County previously attempted to exercise fiscal authority over any of those expenses.

Additionally, the inclusion of expenses for Dr. Veres' services as part of the County's illustration of the Board's "disturbing escalation of costs" is seriously misguided. The County is reminded that Dr. Veres was appointed as the court's special master by the order of then-Chief Judge Pointer on July 20, 1998. The order appointing Dr. Veres specifically provided: "[a]lthough the cost of Dr. Veres's services shall be charged to the Personnel Board, Dr. Veres *shall have no contractual relationship to the Personnel Board* and shall be responsible to this Court."[212] Accordingly, any failure of the County to pay the costs of Dr. Veres' services will be viewed as contumacious and dealt with accordingly, *sua sponte*.

In sum, Jefferson County has a clear duty and obligation under both state and federal law to *cooperate fully* with the Personnel Board in achieving its constitutional mandate. Jefferson County cannot interfere with the Receiver and Board's attempts to "forthwith" develop lawful selection devices by interjecting its own review and approval to delay or thwart payment to Board contractors, or to interfere with the Receiver and Board's own assessments of budget levels necessary to secure compliance with the Board's obligations under its Consent Decree and federal law. The County's recent efforts to thwart the Board's progress simply will not be tolerated by this court. In the words

---

[211]The court agrees that the Personnel Board should review invoices for accuracy prior to submitting them for payment.

[212]Order entered July 20, 1998 (doc. no. 643) (emphasis supplied).

105

of Justice Brennan,

> once a federal court has issued a valid order to remedy the effects of a prior, specific
> constitutional violation . . . the Constitution itself imposes an overriding definition
> of the "public good," and a court's valid command to obey constitutional dictates is
> not subject to override by any countervailing preferences of the polity, no matter how
> widely and ardently shared. *Local legislators, for example, may not frustrate valid
> remedial decrees merely because they or their constituents would rather allocate
> public funds for other uses*.

*Spallone v. United States*, 493 U.S. 265, 301, 110 S. Ct. 625, 645, 107 L.Ed.2d 644 (1990) (Brennan,

J., dissenting) (emphasis added) (citing *Monell v. New York City Department of Social Services*, 436

U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Griffin v. Prince Edward County School Board*,

377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964)); *see also Rufo v. Inmates of Suffolk County
Jail*, 502 U.S. 367, 392, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("Financial constraints may not be

used to justify the creation or perpetuation of constitutional violations.").

Lastly, this court has become concerned, based on comments made by counsel for the County

relating to the selection of a receiver, that some may take the view that the Personnel Board has

ceased to be a viable institution, and that the modern trend is for public entities to move toward a

different "human resources" model. Again, the timing of that suggestion is suspicious. Any attempt

to abolish the Board, or radically alter the scope of its functions, after nearly three decades of

litigation only would spawn more suits, appeals, and legal expenses. Should there be any attempt,

legislative or otherwise, to alter the functions or scope of the Personnel Board during the pendency

of the receivership imposed by this court, those actions shall be superceded and stayed until the

litigation is concluded. This court does not desire to enter the thicket of enjoining a branch of state

government, but is prepared to do so if necessary to preserve its jurisdiction.

An appropriate order consistent with this opinion shall be entered contemporaneously

herewith.

DONE this _____8 ᵗʰ_____ day of July, 2002.

_____
United States District Judge