## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-75-S-666-S |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, *et al.*, | ) | |
|     Defendants. | ) | |
| ──────────────────────── | ) | |
| JOHN W. MARTIN, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-74-S-17-S |
| | ) | |
| CITY OF BIRMINGHAM, ALABAMA, *et al.*, | ) | |
|     Defendants. | ) | |
| ──────────────────────── | ) | |
| ENSLEY BRANCH OF THE N.A.A.C.P., *et al.*, | ) | |
|     Plaintiffs, | ) | |
| vs. | ) | Civil Action No. CV-74-S-12-S |
| | ) | |
| GEORGE SEIBELS, *et al.*, | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION

This opinion addresses the joint motion filed by the Martin plaintiffs and Bryant intervenors ("the Martin/Bryant parties") and the Receiver, submitting the Martin/Bryant parties' objections to the Receiver's decision to round candidates' standard scores ("z scores") to the 0.1 digit (*i.e.*, one-tenth of one point) for seventeen job classifications that remain at issue. The Martin/Bryant parties, the Receiver, and the Wilks Class have submitted briefs and expert reports. Oral arguments were heard on February 23, 2005. The matter thus is ripe for decision.

# I. INTRODUCTORY CONCEPTS

Virtually all of the selection procedures for the job classifications that remain at issue under the consent decree of the Personnel Board of Jefferson County, Alabama ("Personnel Board"),[1] involve not just one, but several different test components.  The method for scoring each component may (and usually does) deviate from the "0" to "100" scale commonly understood by most people.  Moreover, the weights assigned to the scores achieved on each component of the selection procedure may vary.  The means for taking all of these variables into account is to use statistical techniques to convert each job applicant's raw scores on each component of the selection procedure to a composite score, which then may be meaningfully compared to the composite scores of the other applicants for the same job-position.

> An individual's score on the test is the sum of the scores earned on the individual items.  The items, then, are the components forming the composite, which is the total test.  Many tests are made up of several subtests, and the individual's score is the total of scores on all the component subtests.  Here the subtests are the components, and the total test the composite.  . . .
>
> There are many situation in which we wish to combine scores on two or more variables into a single composite score.  An individual's

---

[1]Those classifications are Accountant, Senior Accountant, Auditor, Painter, Stores Clerk, Senior Stores Clerk, Administrative Assistant III, Senior Court Clerk, Zoning Inspector, Revenue Examiner, Senior Engineering Aide, Labor Supervisor, Public Works Supervisor, Waste Water Treatment Plant Maintenance Worker, and Water Pollution Control Technician (Barton, Bessemer, and Stormwater).  Water Pollution Control Technician for Barton, for Bessemer, and for Stormwater, are considered to be separate classifications.

2

scores on several tests might be combined in order to obtain a picture of the general level of his or her abilities or traits in a particular area. Sometimes by combining the scores earned by an individual on several applications of the same test, a more accurate or representative measure of the trait is obtained.  In some instances we can obtain a better prediction of scores on one variable from a composite of scores on a series of predictor tests than we can from scores on any one of the predictor tests.

Edwin E. Ghiselli *et al*., *Measurement Theory for the Behavioral Sciences* 154-55 (1981).

A "z score"[2] is the technique most commonly used to create and express a composite score for measuring a particular candidate's relative location within the distribution of scores earned by all other candidates for the same job-position.  It provides a convenient means of stating the distance between a particular candidate's composite score from the mean (average) score in terms of so-called "standard deviation units."  A "standard deviation unit" is a statistical means of expressing the "spread," "variability," or "dispersion" of scores[3] in a particular "distribution."[4]  In

_____

[2]A z score sometimes is referred to as a "standard score," a term that denotes any of several different techniques for measuring a particular candidate's relative standing in a group of job applicants in standard deviation units.  The use of a "standard score" allows raw scores from several different distributions to be compared.  Other techniques for accomplishing this objective include "T scores," "Z scores" (uppercase "Z," as contrasted to the lowercase "z score" discussed in text), and "stanine scores," but this discussion is sufficiently complicated without delving into those concepts.

[3]The term "dispersion" refers to a "statistic showing the amount of *variation or spread in the scores for, or values of, a *variable.  When the dispersion is large, the scores or values are widely scattered; when it is small, they are tightly clustered.  Two commonly used measures of dispersion are the *variance and the *standard deviation."  W. Paul Vogt, *Dictionary of Statistics & Methodology* 86 (2d ed. 1999) (* is used by the author to note other terms defined in the same

z score notation, the mean (average) score is expressed as "0," and standard deviations are expressed in units of "1." Thus, a z score of 1.26 would be slightly more than one and one-quarter standard deviations above the mean (average) score (0.01 above, to be precise), whereas a z score of −1.74 would be slightly less than one and three-quarter standard deviations below the mean (0.01 less, to be precise).[5] Under the procedures adopted by the Receiver, these hypothetical, z score examples would be rounded to the 0.1 digit (i.e., one-tenth of one point), and 1.26 thus would

---

resource).

The term "variability" also refers to the spread or dispersion of scores in a group of scores, but it specifically refers to "the tendency of each score to be unlike the others. More formally, the extent to which scores in a *distribution deviate from a *central tendency of the distribution, such as the *mean. The *standard deviation and the *variance are two of the most commonly used measures of variability." Id. at 302.

"Spread" simply is another term for the "distribution" or "variability" of a group of scores, both of which are discussed below.

[4]The term "distribution," as used in statistical procedures, refers to a ranking of any variable, such as a test score, from the lowest to the highest. The means of depicting a "distribution" that would be familiar to almost all college graduates would be in the form of a graph, on which the horizontal axis represents all possible scores on a test (e.g., from "0" to "100"), and the vertical axis is used to note the number of students who achieved a particular test-score. Given a sufficiently large sample, assuming a so-called "normal distribution" (i.e., a theoretical continuous probability distribution of scores), and using a French curve to connect all of the "dots" recorded on the graph, the resulting shape of the curve would approximate the cross section of a bell: that is, most scores would be clustered around the middle, and those scores below and above the score achieved by most of the students would tail-off symmetrically on either side of the "mean" (average), "median" (the middle score in a set of ranked scores), or "mode" (the most common, or most frequent, score in the set of test scores).

[5]In summary, and stated somewhat differently, a z score is a "mathematical transformation of raw scores taking into account the mean and the standard deviation of the total distribution for the purpose of referencing an individual's score to the total distribution of scores. The distribution of standard scores has a mean of 0 and a standard deviation of 1." Edwin E. Ghiselli et al., Measurement Theory for the Behavioral Sciences 483-84 (1981).

4

become 1.3, while –1.74 would be rounded to –1.7.

## II. PERTINENT TERMS OF THE PERSONNEL BOARD'S MODIFIED CONSENT DECREE

Paragraphs 11 and 12 of the December 19, 1995 Order Modifying the Personnel Board's 1981 Consent Decree ("1995 Modification Order"),[6] extended by the orders entered on December 18, 2000,[7] and December 9, 2004,[8] require the Personnel Board to develop lawful selection procedures. Specifically, those paragraphs provide that:

> 11. The Personnel Board shall develop and implement lawful selection procedures for hiring and promotion in the classified service according to the timetables set out in this Order. Pursuant to State law, the Personnel Board is not obligated to rank candidates it certifies to jurisdictions for hiring or promotion consideration. The Personnel Board shall list applicants on certifications to the jurisdictions it serves in random order.

> 12. It shall be the Personnel Board's responsibility to establish that each selection procedure required or used by the Personnel Board, including each standard (including minimum qualifications used to determine which applicants are qualified or eligible to apply for a job or submit to a selection procedure, test or other device), shall either (1) have no adverse impact on the basis of race or sex, as defined by the *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607 *et seq.* (1994), (hereinafter "the *Uniform Guidelines*");[9] or be job

---

[6]Doc. no. 597.

[7]Doc. no. 708.

[8]Doc. no. 1163.

[9]The *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. Part 1607, which paragraph 12 of the Board's 1995 Modification Order adopts as the litmus test for determining whether a contested selection procedure is lawful, represent a joint statement of the Equal

related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., the *Uniform Guidelines* and other applicable Federal law. If a selection procedure or combination of selection procedures is used by the Personnel Board to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use. In accordance with the *Uniform Guidelines*, where there exists adverse impact in a selection procedure, as part of its consideration of the job relatedness and validity of any selection procedure, the Personnel Board shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact. Whenever the Personnel Board, a jurisdiction served by the Personnel Board, or any party identifies a race-neutral selection procedure that has less adverse impact than a selection procedure required by the Personnel Board and that alternative procedure is also agreed by the parties to be job related for the job classification in question and consistent with business necessity and in accordance with applicable law, such alternative selection procedure shall be used by the Personnel Board, absent good cause shown.[10]

---

Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice as to the characteristics of acceptable selection procedures. *See Adoption of Four Agencies of Uniform Guidelines on Employee Selection Procedures*, 43 Fed. Reg. 38,290-38,315 (Aug. 25, 1978); *see also Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 816 n.11 (5th Cir. 1980).

[10]Doc. no. 597 (Order Modifying the Jefferson County Personnel Board Consent Decree) ¶¶ 11 & 12, at 3-4 (footnotes omitted). The omitted footnote in paragraph 11 reads as follows:

"Selection procedure" as used in this Order is defined as any measure, combination of measures, or procedure used as a basis for any employment decision, including the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, educational and work experience requirements through informal or casual interviews and unscored application forms. See Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.16(Q). The term "selection procedure" is used herein to describe the screening, testing and certification procedures of the Personnel Board.

# III. THE RECEIVER'S POSITION

The Receiver summarized the development and administration of the selection procedures for the classifications at issue in the following manner:

> [T]he Receiver's consultants and internal professional staff followed a rigorous methodology designed to ensure compliance with the content validity standards of the *Uniform Guidelines on Employee Selection Procedures* (1978), 29 C.F.R. Part 1607. . . .
>
> To comply with the Uniform Guidelines' requirement of a rigorous job analysis, 29 C.F.R. § 1607.14(C)(2),[11] the Receiver's consultants and staff identified the knowledges, skills, abilities, and other characteristics ("KSAOs") needed to perform the critical or important tasks associated with the job. Subject-matter experts ["SMEs"] rated the KSAOs on a number of different scales, including the importance of the KSAO and whether the KSAO was needed upon entry to the job. *See* Rating Scales Methodology at 4. For knowledge

---

> The Personnel Board does not make final employment selection decisions for the jurisdictions it serves.

*Id.* at 3 n.1.

[11]The regulation cited in text is a part of the *Uniform Guidelines on Employee Selection Procedures*, and reads as follows:

> **C**. **Technical standards for content validity studies—**
>
> . . . .
>
> (2)    **Job analysis for content validity.**  There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

29 C.F.R. § 1607.14(C)(2).

statements, the SMEs also rated whether the knowledge needed to be memorized, or could be looked up on the job. *Id.* SMEs also rated tasks for importance to the job and how frequently the tasks were performed. *Id.* at 1, 2. These task ratings were used to calculate a "task criticality score" according to the formula

Task Criticality = (2 x Importance) + Frequency

*Id.* at 1. Subject-matter experts also established the appropriate linkages between KSAOs and tasks. *Id.* at 5.

From the lists of surviving KSAOs and tasks that met the criteria for each of the applicable rating scales, the Receiver's consultants and staff worked with SMEs to develop a variety of selection procedures that were designed to measure the relevant domain of competencies. SMEs also made various ratings of the test items, and confirmed their linkage back to the target competencies. *See id.* at 5-7; Structured Interview Methodology at 26.

After the candidates' obtained scores were standardized to a z-distribution, the Receiver calculated a statistic called the "just noticeable difference" ("JND" herein)[12] as a guide to determine the most

---

[12]Paul J. Hanges, Ph. D., explained the concept of "just noticeable difference" in the following manner:

The JND is a concept first described in psychophysics and refers to the minimum difference between two stimuli needed for reliable differentiation between these stimuli. Technically, it is defined as the midway point between completely unreliable differentiation and perfectly reliable differentiation between two stimuli. Completely unreliable differentiation occurs when there is a 50 percent chance that one stimulus will be rated higher than the other. Perfectly reliable differentiation, on the other hand, occurs when one stimulus is always rated higher than the other (e.g., stimulus A is rated higher than stimulus B 100 percent of the time). The JND is located at the midpoint between these two extremes (i.e., a situation in which one stimulus is rated higher than the other 75 percent of the time). Using a cumulative standardized normal distribution, the JND is located at 0.675 z-score units (i.e., 75 percent of the normal distribution is below 0.675). Thus, the JND for a test is obtained by multiplying the test's SED by a $Z_D$ of 0.675.

appropriate   digit to which the candidates' z-scores should be rounded.[13]  The JND is calculated according to the formula:

$$JND = Z_D \text{ x } SED$$

In the foregoing equation, the SED is the Standard Error of the Difference, and $Z_D$ is the standardized distance corresponding to the desired level of statistical confidence.  *See* Expert Report of Paul Hanges at 3.  In all cases before the Court, the Receiver's consultants and analysts used a $Z_D$ value of 0.675, which corresponds to a one-tailed test of 75% confidence.  *Id.* at 3, fn. 2.  Rank-ordered hiring . . . is equivalent to setting $Z_D$ at zero.  *Id.* at 2.  There is no professionally accepted or required value for $Z_D$; instead, it can be set at any point between 0 and 2.0 based on managerial judgment and organizational needs.  *Id.*

After computing the JND, the following decision rules were followed[14]

| JND Range | Decision Rules for Test Score Rounding Policy |
|---|---|
| .5 - 1.49 | Round to the whole number |
| .05 - .49 | Round to 1 decimal |

Doc. no. 1194, Ex. 9 (Expert Report of Paul J. Hanges, Ph. D.), at 3 n.1.  It was Dr. Hanges who proposed importing the JND concept from the field of psychophysics to that of psychometrics.  *Id.* at 3.

[13]The JND was not calculated in connection with the selection procedures for the three Water Pollution Control Technician and the Wastewater Treatment Plant Maintenance Worker classifications.  Instead, in those four cases, the decision to round the z-scores to the 0.1 digit was driven by "professional judgment with the goal of balancing measurement precision and utility."  *See* doc. no. 1194, Ex. 8 (Expert Report of Leaetta M. Hough, Ph. D.), at 1, 2.

[14]In addition to the selection procedures for the classifications mentioned in the immediately preceding footnote, the Revenue Examiner and Zoning Inspector selection procedures are two exceptions to this; the decision rules were established after those procedures were administered but before any of the Accounting, General Clerical, Public Works, Painter, Sign Painter, Maintenance Repair Worker, Public Works Coordinator, Street Paving Supervisor, Senior Engineering Aide, Stores Clerk, and Senior Stores Clerk selection procedures were administered.

| .005 - .049 | Round to 2 decimals |
|-------------|---------------------|

_____ *See* Expert Report of P. Richard Jeanneret at 18.  In each case, these decision rules resulted in the rounding of candidates' z-scores to the 0.1 digit.[15]

Following development and administration of the selection procedures at issue, the Receiver acknowledged that their use likely would result in adverse impact.[16] Accordingly, paragraph 12 of the 1995 Modification Order requires the Personnel Board to demonstrate that the selection procedures are job-related and consistent with business necessity.[17]

## IV. THE MARTIN/BRYANT PARTIES' POSITION

Although the Martin/Bryant parties level various criticisms of the Receiver's rounding decision in their brief, oral argument was limited to the relatively simple assertion that the Receiver's decision to round to tenths of a point, rather than to the JND calculation, is not justified and contravenes the Enabling Act.  More specifically, the Martin/Bryant parties argue that the term "score," as it is employed in the Enabling Act, should be interpreted to "include all scores that the Board's devices cannot distinguish among."[18]  Further, the Martin/Bryant parties contend that,

_____

[15]Doc. no. 1193 (Receiver's Brief in Response to Objections by the Martin-Bryant Parties), at 4-7.

[16]*See* doc. no. 1177 (Affidavit of Mary Beth Vrabel), Exs. 1-13.

[17]See the text accompanying note 10 *supra*.

[18]Doc. no. 1176 (Martin/Bryant Parties' Memorandum in Support of Their Objections to

> [u]nless the Board's rounding decisions are tied to the actual precision of its devices, the Board could render the Legislature's choice of "scores" rather than "candidates" meaningless, because the Board, without any technical basis or justification, could create as many "scores" as it wanted, driven merely by its subjective view of how many certifications were too many.[19]

This, the Martin/Bryant parties argue, could effectively rewrite the so-called "Rule of Ten."  The interpretation of the "Rule of Ten" lies close to the center of the instant controversy.

## A.     The "Rule of Ten" and the State Enabling Act

As originally enacted by the Alabama Legislature in 1935, the applicable provision of the state Enabling Act (which resulted in the creation of the Personnel Board of Jefferson County) read as follows:

> The Director of Personnel . . . shall then certify to the appointing power the names and addresses of the *three persons standing highest on the eligible list* for the class or grade to which the position belongs but in case there are less than three on such eligible lists, he shall certify the whole number of persons thereon and the appointing power shall fill the position by the number of persons thereon and the appointing power shall fill the position by the appointment of one of the persons so certified. . . .   When the appointing officer selects one of the three eligibles certified, the names of the two remaining eligibles shall be returned to the eligible list for certification to the next vacancy which may occur.

1935 Ala. Acts No. 284, § 19 (emphasis supplied).  The foregoing language, which

---

Board's Rounding of Scores), at 12.

[19]*Id.*

11

effectively created a "Rule of Three," was preserved in the 1945 reenactment of the enabling legislation.  *See* 1945 Ala. Acts No. 248, § 18.

This statutory provision was amended in 1994, however, and the pertinent portion now provides that:

> Vacancies in the classified service shall be filled either by transfer, promotion, appointment, reappointment or demotion.  Whenever a vacancy in an existing position is to be filled by appointment, the appointing authority shall submit to the director a statement of the title of the position, and if requested by the director to do so, the duties of the position, and desired qualifications of the person to be appointed, and a request that the director certify to the appointing authority the names of persons eligible for appointment to the position.  *The director shall thereupon certify to the appointing authority the ranking eligibles, correlating to the 10 highest test scores from the appropriate register, and if more than one vacancy is to be filled, the ranking names of the next highest test score for each available vacancy or all the names on the register if there are fewer than 10.*

Act No. 248, 1945 Acts of Alabama, § 18, amended by Act No. 564, 1994 Acts of Alabama (emphasis supplied).

The Receiver and the Martin/Bryant parties agree that the 1994 amendment of the Enabling Act, changing the "Rule of Three" *eligibles* to the "Rule of Ten" "*scores*," was intended to expand the number of candidates certified to an appointing authority.[20]  The Receiver summarized this common ground as follows:

---

[20]As observed by the parties, the Alabama legislature does not preserve the history of its enactments.  The Wilks Class offers the following possible rationale for Section 18's amendment:

Prior to the 1994 amendment, there was no statutory provision regarding how tie

12

[T]he Enabling Act appears to require the certification of the top 10 *ranks* of candidates, and not merely the top 10 ranking *eligibles*. In the original Act, the adjective "three" clearly modified "persons." In the 1994 amendment, the adjective "10" appears to modify "test scores" instead. Given this shift in the statutory language, along with the clear specification of "five different eligibles for each vacancy" for entry-level fire and police positions in the same Act, it would be difficult to sustain, from the perspective of state law, the certification of only the top 10 ranking eligible candidates, or an interpretation of "scores" that would invariably result in only the top 10 "persons" being certified. The Receiver has presumed that the Alabama Legislature appreciated the difference between "scores" and "eligibles," and intended for the member jurisdictions to be permitted to choose from among ten scores' worth of candidates, although the Legislature did not give any indication what it meant by a "score."[21]

## V. THE ISSUE JOINED

---

scores should be broken. When applicants made the same score, various means were employed to break the tie and only one candidate occupied each rank on a register. In the period of time immediately preceding the 1994 amendment the Board used a "random number" to break ties. Accordingly, situations occurred wherein two candidates might have made the exact score on an exam and one of those candidates would be certified for consideration for an open position and the other would not, simply on the basis of drawing a "lucky" number. Through time all interested parties (i.e., candidates, appointing authorities, the Board) came to view such a system as inherently unfair. Therefore, when the Enabling Act was amended in 1994, language was adopted to clarify that candidates with tied scores would be placed into the same rank on the register and certified together when applicable.

Doc. no. 1191 (Response of the Wilks Class to Martin/Bryant Parties' "Objections to Board's Rounding of Scores"), at 16-17.

[21]Doc. no. 1193 (Receiver's Brief in Response to Objections by the Martin-Bryant Parties), at 25-26. Further muddying the waters, though not addressed by any party who submitted a brief on this issue, is the following provision, buried in the incoherently constructed Section 18 of the Enabling Act, as amended in 1994: "If it is impossible to locate any of the persons so certified or should it become known to the director that any person is not willing to accept the position, the appointing authority may request that the additional names be certified until 10 *persons* eligible and available for appointment have been certified." [Emphasis supplied.]

13

Given the foregoing, the Receiver frames the issue presented by the joint motion in the following manner:  "What does the Enabling Act mean when it refers to 'the 10 highest test *scores*'?"[22]

The Martin/Bryant parties contend that the Receiver's definition of a "score" must be consistent, and must be tied to the actual precision of a selection device.  The Martin/Bryant parties criticize the Receiver for calculating JND z score values, and then "ignoring" those calculations by deciding instead to round the resulting z scores to one-tenth of one point.  The Martin/Bryant parties' argument regarding the manner in which the Enabling Act's term "scores" should be interpreted is stated in brief as follows:

> [A]lthough the Board's consultants have created devices that do not have sufficient precision to distinguish candidates' scores to a tenth of a point, the Board has nevertheless decided to treat candidates who are not demonstrably different as if they were different.  By pretending that its selection procedures are more precise than even their own, flawed calculations suggest, the Board has created adverse impact, which it justifies not based on any argument that the devices really are sufficiently precise to distinguish at the tenth of a point, but instead by the administrative concern that, if the Board rounded to the precision of each device, the hiring authorities would have too many applicants to choose from.[23]

The Martin/Bryant parties maintain that the Receiver should, instead, round

---

[22]Doc. no. 1193 (Receiver's Brief in Response to Objections by the Martin-Bryant Parties), at 26.

[23]Doc. no. 1176 (Martin/Bryant Parties' Memorandum in Support of Their Objections to the Board's Rounding of Scores), at 3.

14

applicants' z scores to the appropriate JND value to reflect the actual precision of the devices as determined by the Board.

In response, the Receiver argues that adoption of the Martin/Bryant parties' proposal would render the subject selection devices virtually useless.  Rounding z scores to JND values, rather than to tenths of a point, the Receiver argues, would result in "a large number of 'ties' at each rank, so that, when combined with the Rule of 10, the certificate of eligibles contains an excessive number of candidates with widely varying levels of qualification for the job."[24]  As but one example, the Receiver points out that using the Martin/Bryant parties' proposal, combined with the statutorily mandated "Rule of Ten," the Revenue Examiner selection procedure would result in a certificate of eligibles for the first vacancy containing 123 of 168 candidates (73.2% of the total).[25]  Such a result, the Receiver argues, means that

> the member jurisdictions will be deluged with far more candidates than they should be expected to screen and select from, with absolutely no guidance as to who scored the highest on the Personnel Board's validated[26] selection procedures.  The plaintiffs' attention would then — justifiably — shift away from the procedures used by the Personnel Board to select candidates for certification, and to the procedures used by the member jurisdictions to appoint individuals from among the dozens of randomly-certified candidates.  Indeed, it is ironic that, now

---

[24]Doc. no. 1193 (Receiver's Brief in Response to Objections by the Martin-Bryant Parties), at 8.

[25]*Id.*

[26]Because the Martin/Bryant parties have interposed other objections to the selection procedures at issue herein, this point has yet to be established.

15

that valid selection procedures have been implemented, the plaintiffs are calling for a use of those selection procedures that will virtually eliminate any pretense of merit selection based on their use, and would welcome the return of arbitrary — or worse, race- and gender-tinged — hiring and promotional decisions.[27]

# VI. DISCUSSION

As stated during the status conference conducted on February 23, 2005, this court finds the Receiver's arguments more compelling than the Martin/Bryant parties' proposal. There are several reasons for that conclusion. First, as the Receiver correctly points out, the interpretation of the provisions of the state Enabling Act by the Personnel Board — in whose stead, for these purposes, the Receiver has been placed by the court[28] — is entitled to "substantial deference" under Alabama law. *Personnel Board of Jefferson County v. Bailey*, 475 So. 2d 863, 866 (Ala. Civ. App. 1985); *see also McCullar v. Universal Underwriters Life Insurance Co.*, 687 So. 2d 156, 163 (Ala. 1996) (under Alabama law, the interpretation placed on a statute by the executive or administrative agency charged with its enforcement is given great weight and deference by a reviewing court). The policy reasons for according such

---

[27]Doc. no. 1193 (Receiver's Brief in Response to Objections by the Martin-Bryant Parties), at 41-42.

[28]*See* doc. no. 935 (Order appointing Ronald R. Sims, Ph. D., as Receiver of the Personnel Board) ¶ 2, at 3 ("[I]t is specifically ORDERED that all powers, duties, and responsibilities vested by Act No. 248 in the various members of the Citizens Supervisory Commission or the three members of the Personnel Board . . . be, and the same hereby are, suspended and, in lieu thereof, vested in the Receiver until further order of this court.").

16

deference to the decisions of an administrative agency such as the Personnel Board were summarized by the Alabama Court of Civil Appeals in *Ex parte Personnel Board of Jefferson County, Alabama*, 440 So. 2d 1106 (Ala. Civ. App. 1983), in the following manner:

> Agencies tend to develop a recognized competence or expertise in the specific fields of operation entrusted to them by the legislature, and judicial deference to the administrative agency in the first instance tends to insure uniformity and consistency of decisions in these special areas. Initial review of a matter by an agency can do more than merely assist a court in its consideration; it might alleviate entirely any need to invoke the court's aid. However, if judicial review is ultimately necessary, the special competence of the agency lends great weight to its reasoning and decision. When the legislature delegates a discretionary function to an agency to be exercised in light of the agency's special competency, a court frustrates legislative intent and usurps that discretionary role by stepping in when the agency's choice is not clearly unreasonable or arbitrary.

*Id*. at 1109 (citations omitted).

In addition, the expert opinions submitted by the Receiver, as well those of the Wilks Class and the court's Special Master, support the conclusion that scoring decisions are a matter of professional judgment, bearing in mind such concerns as the precision of the device and its utility, and that the field of industrial and organizational psychology does not prefer one scoring method over another.[29]

---

[29]*See* doc. no. 1194 (Receiver's Notice of Filing of Evidentiary Submission), Ex. 7 (Expert Report of P.R. Jeanneret, Ph. D. & D. Stelly, Ph. D.), at 16; Ex. 8 (Expert Report of Leaetta Hough, Ph. D.), at 2; Ex. 9 (Expert Report of Paul J. Hanges, Ph. D.), at 4; doc. no. 1191 (Response of the Wilks Class to Martin/Bryant Parties' "Objections to Board's Rounding of Scores"), Ex. A (Expert

Finally, the court is not persuaded by the Martin/Bryant parties' argument that permitting the Receiver (and, thereby, the Personnel Board) to round scores in the manner the Receiver and his consultants have determined is appropriate leaves the merit system vulnerable to "gross manipulation," in that the Personnel Board might round applicants' scores in a manner that "could change the Legislature's 'scores' back to 'candidates,' despite the Legislature's clear intent" to expand the number of applicants certified to appointing authorities.[30]   As the Special Master points out in his report, the Receiver has taken a liberal position by deciding to round to tenths, particularly when combined with the "Rule of Ten," because "rounding to hundredths is the most commonly encountered practice."[31]   There is no evidence before the court that the Personnel Board has "manipulated" its scoring decisions in the past, to ensure that only ten candidates are certified to appointing authorities in contravention of the Enabling Act.   Further, the Receiver's present decision to round scores to tenths does not cause such a result.   Whether the Personnel Board would engage in such conduct in the future, when control is returned to local authorities, is mere speculation, which

---

Report of James C. Sharf, Ph. D.), at 4-5; doc. no. 1205 (Report of John G. Veres III, Ph. D., & Christopher S. Winkelspecht on Rounding Procedures Employed by the Personnel Board of Jefferson County and the Martin/Bryant Banding Proposal), at 12.

[30]Doc. no. 1176 (Martin/Bryant Parties' Memorandum in Support of Their Objections to Board's Rounding of Scores), at 13.

[31]Doc. no. 1205 (Report of John G. Veres III, Ph. D., & Christopher S. Winkelspecht on Rounding Procedures Employed by the Personnel Board of Jefferson County and the Martin/Bryant Banding Proposal), at 12.

cannot form the basis for overturning the Receiver's reasoned judgment in this matter.

## VII. CONCLUSION

In sum, the court is convinced that the Receiver has established a consistent, documented manner of establishing scores for particular selection devices, and that this decision is within his discretion, and entitled to substantial deference. Accordingly, for all of the foregoing reasons, the objection of the Martin/Bryant parties is overruled.  A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 18th day of March, 2005.

_____
United States District Judge