FILED
2005 Jul-12  PM 01:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff, | ) ) ) | |
| vs. | ) ) | Civil Action No. CV-75-S-666-S |
| JEFFERSON COUNTY, ALABAMA, *et al.*,<br>　　　　Defendants. | ) ) ) | |
| JOHN W. MARTIN, *et al.*,<br>　　　　Plaintiffs, | ) ) ) | |
| vs. | ) ) | Civil Action No. CV-74-S-17-S |
| CITY OF BIRMINGHAM, ALABAMA, *et al.*,<br>　　　　Defendants. | ) ) ) | |
| ENSLEY BRANCH OF THE N.A.A.C.P., *et al.*,<br>　　　　Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. CV-74-S-12-S |
| GEORGE SEIBELS, *et al.*,<br>　　　　Defendants. | ) ) ) | |

## MEMORANDUM OPINION

This opinion addresses the motion of the City of Birmingham, Alabama

("City"), to terminate its 1981 Consent Decree, as amended by the 1995 Modification

Order, and to dismiss the City as a party to all actions.[1]  The United States, the Martin

---

[1]Doc. no. 1113.  The present motion is but one of many chapters in the lengthy record of these controversies.  This is not the place to recount that history.  Readers interested in doing so can trace its broad outlines in the following list of *published* opinions (listed in chronological, not *Bluebook*, order):  *Ensley Branch of the N.A.A.C.P. v. Seibels*, 14 Fair Empl. Prac. Cas. (BNA) 670, 1977 WL 806 (N.D. Ala. 1977); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I*"); *United States v. Jefferson County*, 28 Fair Empl. Prac. Cas. (BNA) 1834, 1981 WL 27018 (N.D. Ala. 1981); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983); *In re: Birmingham Reverse Discrimination Employment Litigation*, 37 Fair Empl. Prac. Cas. (BNA) 1, 1985 WL 1415 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 39 Fair Empl. Prac. Cas. (BNA) 1431, 1985 WL 56690 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd*

plaintiffs, and the Bryant intervenors ("Martin/Bryant parties") do not oppose the

motion,[2] but the Wilks Class does, at least in part.

## I. WILKS CLASS MOTION

---

*sub nom. Martin v. Wilks*, 490 U.S. 755 (1989); *Bennett v. Arrington*, 806 F. Supp. 926 (N.D. Ala. 1992); *In re: Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*"); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002).

The extraordinary longevity of these controversies is due to many variables, including such things as: an enduring local contempt for, and defiance of, national equal employment opportunity requirements, especially when such obligations are mandated by federal *court orders* (attitudes that mirror, but – in the case of Birmingham – exaggerate historic, regional prejudices against full equality for women and any persons not descended from white, Anglo-Saxon, Scotch, or Irish Protestant ancestors); the burning sands of local politics, which have shifted in consonance with the tides of partisan politics on the national and state levels; transformations in federal statutory and decisional law; and, changes in the demographics of the City's workforce. With regard to the last variable, the City's workforce shortly after the 1981 consent decree consisted of 69% white and 31% African American ("black") employees. Those persons could be further subdivided on the basis of gender into 79.5% male and 20.5% female employees. The gender composition of the City's current workforce has not changed radically since then: *i.e.*, it presently is comprised of 72% male and 28% female employees. The racial composition of the current workforce, on the other hand, is dramatically different: *i.e.*, 66% of the employees are black, and 34% are white; virtually a complete reversal over the course of twenty-two years. *See, e.g.*, doc. no. 1115 (City's Brief in Support of Motion to Terminate Decree) at 26-27.

> A look at the Police and Fire Departments shows an even more dramatic change. In the first quarter of 1982, none of the Police Captains or Lieutenants were African American or female[,] and of the 138 Police Sergeants, 10 were African American and 6 were female. (At that time, 18.7% of the Police Officers were African American and 11.9% were female.) In 2004, of Birmingham's 29 Police Lieutenants, 14 are African American and 4 are female, while 7 of the 11 Police Captains are African American and 4 are female. The Fire Department, which had no African American Fire Battalion Chiefs, Captains[,] or Lieutenants in March 1982, currently has African American officers occupying nearly 50% of each of those positions.

*Id*. at 28 (citations omitted).

[2]*See* doc. nos. 1137, 1139.

The Wilks Class filed a cross-motion seeking the following modifications of the City's 1981 Consent Decree and 1995 Modification Order:[3]

> 1.    Those portions of the 1981 Consent Decree with the City of Birmingham that survived the 1995 modification should be vacated, with the exception of the general injunction of ¶ 1 of that Decree.

> 2.    The City should continue to adhere to the following portions of the 1995 City Modification Order:  ¶¶ 7,[4] 8,[5] 15,[6] 17,[7] 18,[8] 19,[9] 24,[10]

---

[3] *See* doc. no. 1138.

[4] Paragraph 7 of the 1995 Modification Order provides:  "The City shall use its best efforts to develop and implement lawful non-discriminatory hiring and promotion procedures within the next four years.  Applicants certified to the City will be considered without regard to their race or sex."

[5] The text of paragraph 8 (with footnotes omitted) reads as follows:  "It shall be the City's responsibility to ensure that each selection procedure required or used by the City shall either:  (1) have no adverse impact on the basis of race or sex as defined by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq. (1994), (hereinafter "the Uniform Guidelines"); or (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Uniform Guidelines and other applicable Federal law.  If a selection procedure or combination of selection procedures is used by the City to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use.  In accordance with the Uniform Guidelines, as part of its consideration of the job relatedness and validity of any selection procedure, the City shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact.  Whenever the City or any party identifies a race and gender-neutral selection procedure that has less adverse impact than a selection procedure required by the City and that alternative procedure is also agreed by the parties to this Order to be job related for the classification in question and consistent with business necessity in accordance with applicable law, such alternative selection procedure shall be used by the City, absent good cause shown."

[6] Paragraph 15 imposed the following requirements:  "For each job classification that the City or any other party identifies as having one or more selection procedures that have an adverse impact on the basis of race or sex, unless the Court determines the selection procedure(s) in question meets the requirements of paragraph 8 of this Order or the City revises its selection procedure to eliminate adverse impact, the City shall complete a written job analysis according to the timetable set out in its second semi-annual report.  Using the results of the completed job analyses, the City shall revise its selection procedures consistent with implementing selection devices which are job related and

3

26,[11] 31,[12] 32,[13] and 33.[14]  The other paragraphs of that order should be

---

which reduce or eliminate adverse impact."

[7]Paragraph 17 provides that:  "The City shall modify its interview procedures to ensure that a written record is kept of each interview.  Beginning twelve months from the date of the entry of this Order, all standard interview questions and interview report forms shall be approved in writing by the City's Director of Personnel or his or her designee prior to their use.  Prior to receiving any certification list, the department seeking to fill a vacancy must submit to the Personnel Department for review a written detailed description of the position to be filled, the essential applicant qualifications, the proposed interview questions and a proposed rating form.  Upon completion of the interview process, the department will submit to Personnel the appointment recommendations, with a completed applicant interview rating form."

[8]Paragraph 18 provides that:  "The City shall continue to give to certified applicants the opportunity to be interviewed without regard to their race or sex."

[9]Paragraph 19 provides that:  "Within twelve (12) months of the date of entry of this Order the City's Personnel Department shall provide training in employee selection and applicant evaluation for each City employee with authority to interview or to recommend appointments or promotions.  This training shall also be provided to newly hired or promoted officials with authority to interview or appoint applicants.  City officials who have not attended such training may not interview applicants for employment or promotion until they complete the required training."

[10]Paragraph 24 provides that:  "The City shall continue to make its employees available when their participation in a job analysis or validation study is requested by the Personnel Board or by a party."

[11]Paragraph 26 provides:  "Within six (6) months after the entry of this Order, and at six (6) month intervals thereafter, the City shall submit a report to the Court and to the parties (including the Wilks Class which is considered a party in all respects to this modification order) on its efforts to comply with this Order.  Each of the City's semi-annual reports will describe in detail the efforts made by the City to meet its obligations under this Order to use lawful selection procedures.  The semi-annual reports shall specifically address the progress made during the preceding six months, areas of agreement and disagreement among the parties, allegations of non-cooperation, and a compliance timetable for the accomplishment of tasks within the next six months.  Any party may supplement a report within thirty (30) days after it is filed by the City."

[12]Paragraph 31 states:  "The City shall make all data concerning the development, adverse impact, use and job relatedness of each selection procedure used or proposed to be used by the City, including but not limited to, test scores, job analyses, expert reports and validation studies, promptly available to counsel for the parties upon written request.  This data will be provided to the parties to this Order in a machine readable form as well as hard copy to the extent that it exists in that form."

[13]Paragraph 32 provides:  "The City shall retain during the period of this Order all records concerning its implementation.  These records shall be made available to any party for inspection and copying within thirty (30) days upon written request.  The City agrees that it will henceforth maintain applicant and selection procedure data (including an applicant's name, identification

4

vacated.

3.     In order to effectuate the relief required by the remaining portions of the orders, the Court should direct that the City implement the methodology used in developing the job-related structured interview selection procedure for the Police Captain classification in all other classifications as the need to make appointments arises.  Appointments should be made based on the results of structured interview procedures that meet professional standards for job-relatedness.  The City should retain the necessary technical personnel to adequately train City employees in the proper implementation of such procedures.

4.     The remaining portions of the Court's orders should be extended until December 31, 2005.[15]

## II. GOVERNING LEGAL STANDARDS

The standards governing the City's motion to terminate its 1981 Consent

Decree and 1995 Modification Order were summarized in paragraph number 36 of

the modification order, providing, in pertinent part, that when

considering whether the City of Birmingham 1981 Consent Decree and

---

number, race, sex, job classification applied for, date of certification, City administered procedure ratings and score(s), whether the applicant was disqualified and the reasons for disqualification, and whether an applicant was hired or promoted) in machine readable form and provide this data in such form to the parties to this Order within thirty (30) days of their written request."

[14]Paragraph 33 states:  "All material related to the development of tests or other selection procedures, including copies of tests or proposed tests, test keys and test results, shall be marked 'Confidential Test Material Under Seal' by the City prior to being forwarded to counsel for the parties.  This confidential test material shall not be disclosed to anyone other than counsel, their immediate staff, the court and its staff, and expert consultants retained by the parties and their staffs, without the written permission of the City or an Order of this Court.  Such confidential test material shall not be filed with the Court unless it is filed in a sealed envelope marked 'Confidential Testing Material Under Seal.'  Any material that is marked 'Confidential Testing Material Under Seal' shall not be disclosed by the Clerk of the Court to the public without an Order from this Court."

[15]Doc. no. 1138, at 1-2.

this Order should be dissolved, the Court shall take into account whether and to what extent the purposes of this Order have been achieved and whether there is any continuing unlawful employment discrimination or vestiges of prior unlawful discrimination against blacks and/or women prohibited by Federal law.

That language mirrors the principles elaborated by the Eleventh Circuit's opinion in

*United States v. City of Miami*, 2 F.3d 1497 (11th Cir. 1993), where the Court

observed:

> A court faced with a motion to terminate, as opposed to merely to modify, a consent decree must begin by determining the basic purpose of the decree. We find instructive the Supreme Court's recent decisions as to the propriety of the termination of decrees in the school desegregation cases. In *Board of Education of Oklahoma Public Schools v. Dowell*, [498 U.S. 237 (1991)], a case in which the district court had dissolved a desegregation decree, the Supreme Court, as it did in *Rufo* [*v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)], rejected as erroneous the application of the *Swift* "grievous wrong" standard. [*See United States v. Swift & Co.*, 286 U.S. 106, 119 (1932) ("Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.").] Noting that a decree may not be changed "'if the purposes of the litigation as incorporated in the decree . . . have not been fully achieved,'" the Court stated:
>
>> In the present case, a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved. No additional showing of "grievous wrong evoked by new and unforeseen conditions" is required of the school board. [*Dowell*,

298 U.S. at 247.]

The Supreme Court then went on to emphasize the importance of a school board's good faith compliance with a decree requiring desegregation when a court is determining whether the decree should be terminated. Summarizing, the Court said:

> The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable. [*Dowell*, 498 U.S. at 249-50.]

We find that the principles articulated in *Rufo* and *Dowell* are applicable to requests to modify or terminate decrees in employment discrimination class actions, like the one before us. Generally, the remedies in employment discrimination consent decrees are intended to eliminate present and future discrimination in employment and sometimes to redress the imbalance caused by past discrimination. The decrees fall squarely within that class of decrees that "'involve the supervision of changing conduct or conditions and are thus provisional and tentative.'" [*Ruffo*, 502 U.S. at 379 (in turn quoting *Swift*, 286 U.S. at 114-15).] These decrees are *not* intended to maintain employment quotas; their only purpose is to remedy the effects of past discrimination. Since the impact of these decrees reaches beyond the initial beneficiaries of the lawsuit, the decrees may have a significant impact upon third parties, such as non-favored groups. *Accordingly, we hold that the principles applicable to requests to modify or terminate consent decrees in the institutional reform arenas of prisons and schools are also applicable to such requests in employment discrimination class actions.*

*City of Miami*, 2 F.3d at 1505-06 (emphasis supplied) (footnotes omitted). The

Eleventh Circuit went on to instruct the district court on remand: (*i*) to determine

whether the "basic purpose" of the City of Miami's consent decree (*i.e.*, "eliminating

the effects of past discrimination") had been achieved; (*ii*) to "consider whether the City has 'complied in good faith' with the decree"; and (*iii*) to ascertain "whether the vestiges of past discrimination 'have been eliminated to the extent practicable.'" *Id.* at 1508 (quoting *Dowell*, 498 U.S. at 250). The Court opined that "termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent discrimination in the future or to remedy the effects of past discrimination." *Id.* & n.41 (citing *Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 797 F. Supp. 1174, 1181 (S.D.N.Y. 1992) ("To maintain the temporary affirmative action provisions provided for in the Settlement Agreement after they have served their stated purpose would not only be beyond the intent of the parties but would also infringe on the legitimate expectations of non-minority employees.")).

In *Freeman v. Pitts*, 503 U.S. 467 (1992) — a case which, like *Dowell*, addressed a motion to terminate a school desegregation decree — the Supreme Court held that federal courts have the authority to relinquish control and supervision in incremental stages when compliance with the remedial decree has been achieved in some, but not all, areas. *Id*. at 490-91. The Court observed that returning court-supervised public institutions "to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental

8

system," and that "one of the prerequisites to relinquishment of control in whole or in part is that a [public entity] has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution." *Id.* at 490. Factors relevant to withdrawal of court supervision include: (i) "whether there has been full and satisfactory compliance with the decree"; (ii) "whether retention of judicial control is necessary or practicable to achieve compliance" with any outstanding orders; and (iii) whether the public institution has demonstrated "its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *Id.* at 491. Another court within this Circuit observed that, when considering the foregoing factors, a district court "should give particular attention to the governmental entity's 'record of compliance.' A local government is better positioned 'to demonstrate its good-faith commitment' to a constitutional course of action when its policies exhibit a consistent pattern of lawful conduct directed at eliminating earlier violations." *United States v. City of Montgomery*, 948 F. Supp. 1553, 1563 (M.D. Ala. 1996) (quoting *Freeman*, 503 U.S. at 491).

Here, paragraph 5 of the City's 1995 Modification Order sets forth the three, basic purposes of this long-running litigation:

> The long term objective of the parties through the City Decree and

this Order is to ensure [*i*] that any and all unlawful barriers to employment, assignment, and promotion that have existed for blacks and women are removed, [*ii*] that any present effects of past employment discrimination are fully remedied, and [*iii*] that equal employment opportunities with the City are available to all persons, regardless of race or sex, as required by Title VII of the Civil Rights Act of 1964, as amended.[16]

### III. DISCUSSION

The City asserts that it has achieved at least substantial compliance with the terms of the decree, and the parties (with the exception of the Wilks Class's caveats discussed in Part IV of this opinion) do not take issue with that assertion. The following sections describe the uncontested aspects of the City's compliance.

**A.    Compliance With the Decree's Provisions Relating to Review and Revision of Hiring and Promotion Selection Procedures**

Paragraphs 9 through 16 of the 1995 Modification Order established a procedure for the parties to review data pertaining to the City's selection procedures, and to identify job classifications for which further review was warranted. Beginning in February of 1996, the City provided information to the parties pursuant to paragraphs 9 and 10 of the 1995 Modification Order. Based upon that information, the parties identified twenty-nine job classifications for which they requested more detailed information about selections made since 1990, including the City's position as to whether each selection procedure had adverse impact based upon the race or sex

---

[16]Doc. no. 598 (Order Modifying City of Birmingham Consent Decree) ¶ 5, at 2.

10

of applicants.  As required by paragraph 11 of the 1995 Modification Order, the City provided the requested information on September 13, 1996.  After reviewing the additional information, the parties winnowed the number of classifications at issue to fourteen:  *i.e.*, Police Sergeant; Police Captain; Police Officer (entry-level position); Fire Lieutenant; Fire Battalion Chief; Fire Captain; Fire Apparatus Operator; Firefighter (entry-level position); Public Safety Dispatcher II (Fire);[17] Engineering Aide; Gardener; Heavy Equipment Operator; Labor Supervisor;[18] and Zookeeper.[19]

### 1.   Police Sergeant and Lieutenant promotional classifications eliminated from contention

During May of 1998, former Chief Judge Sam C. Pointer, Jr., to whom these controversies then were assigned, conducted an evidentiary hearing on the City's selection procedures and appointments for promotional classifications in the Police Department (*i.e.,* Sergeant, Lieutenant, and Captain).[20]  Following that hearing, Judge

---

[17] The title of this classification originally was "Fire Communications Operator."

[18] The City began phasing out the Labor Supervisor classification during 1992, with the goal of eliminating the classification through attrition.  The City made no Labor Supervisor appointments between August of 1992 and January of 2003.  In January of 2003, however, due to an administrative error, the City's Public Works Department requested and received a certification of eligibles for Labor Supervisor and made three appointments.  The City reports that it presently is working with the Personnel Board to reclassify those employees.

[19] Operation of The Birmingham Zoo was transferred to a non-profit organization on July 1, 2000.  As a result, the Zookeeper classification has been eliminated.

[20] The hearing was on the motion filed by the Wilks Class for injunctive relief to prevent the City from proceeding with promotions in the Police Department.  Judge Pointer entered a temporary

Pointer held that the selection procedures for the Sergeant and Lieutenant[21] promotional classifications *did not have* adverse impact on the basis of either the race or sex of the applicant.  Judge Pointer also found, however, that the procedures employed to select applicants for promotion to the position of Police Captain did have adverse impact on the basis of the applicant's race, and he ordered the City to

> promptly complete a written job analysis for the position of Police Captain and begin the process of revising its selection procedures for this position in a way that is consistent with implementing selection devices which are job-related and which reduce or eliminate adverse impact, as provided by paragraph 15 of the 1995 City Modification Order.[22]

Following entry of this court's December 18, 2000 order, extending all of the 1981 Consent Decrees and 1995 Modification Orders pertaining to any defendant, the City updated the selection data for the eleven classifications still in contention:  *i.e.*, Police Captain; Police Officer; Fire Lieutenant; Fire Battalion Chief; Fire Captain; Fire Apparatus Operator;  Firefighter; Public Safety Dispatcher II (Fire); Engineering Aide; Gardener; and Heavy Equipment Operator.[23]  Each is discussed below.

---

restraining order on May 8, 1998, enjoining the City from "making any permanent promotions within the Police Department to the position of Sergeant, Lieutenant or Captain."  Doc. no. 14.  Judge Pointer vacated the temporary restraining order on May 20, 1998.  Doc. no. 17.

[21]The Police Lieutenant classification was not identified by any of the parties pursuant to paragraph 12 of the 1995 Modification Order as one having adverse impact, but (as discussed in the immediately preceding footnote) the classification was one of the subjects of the hearing on whether promotions within the City's Police Department should be enjoined.

[22]Doc. no. 17 (Order entered on May 20, 1998).

[23]*See supra* notes 18 and 19, explaining the elimination of the "Labor Supervisor" and

### 2.    Police Captain classification eliminated from contention

As discussed above, Judge Pointer directed the City to revise the selection procedure for the Police Captain classification on May 20, 1998, because it resulted in adverse impact based on an applicant's race.[24]  Even so, the City did not begin to revise its procedure until July of 2001, following the present court's entry of an order establishing deadlines for development and completion of selection procedures.[25] The City met all of its court-ordered deadlines, and neither the United States nor Martin/Bryant parties objected to the revised selection procedure.  On December 5, 2001, however, the Wilks Class filed a "Notice of Disagreement Regarding the City's Selection Procedure for Police Captain."[26]

The parties and their experts conferred to discuss the objections of the Wilks Class.  Based on the parties' discussions, the City supplemented its validity report, provided additional data, revised the selection procedure, and reconvened the subject matter experts to refine the rating process.  The Wilks Class nevertheless maintained its objection to the procedure, and the City agreed to develop an "Administrator's Manual" to provide guidance for future administrations of the selection procedure.

---

"Zookeeper" job classifications from contention.

[24]See the text preceding and accompanying note 22 *supra*.

[25]Doc. no. 785.

[26]Doc. no. 822.

13

The City completed the manual on January 19, 2004, and by letter dated February 3, 2004, the Wilks Class advised the City of its view that the City had complied with paragraph 8 of the 1995 Modification Order with respect to the Police Captain classification.

### 3.     Entry-level "Police Officer" classification eliminated from contention

The City conceded that its selection procedures for the entry-level, Police Officer job classification — which consists of two components: a physical-abilities-screening procedure ("PAS") and a post-physical-abilities-screening procedure ("post-PAS") — adversely impacted female applicants, and revised the procedures.

In July of 2001, the City provided the parties a job analysis and validity report for the revised procedures of the PAS component. Following review of the validity report, the United States and Martin/Bryant parties objected. The City could not unilaterally revise requirements for the PAS component, however, because they are mandated by the Alabama Police Officer Standards and Training Commission ("APOSTC"), a state entity which is not a party to any of these actions. Approval of that entity therefore was necessary before modification of the PAS component could be effected. APOSTC's authorization was obtained on March 14, 2002, and the United States and Martin/Bryant parties withdrew their objections.

14

The City also revised the post-PAS component, and provided the parties a job analysis, test plan, the results of an administration of the procedure, and a validity report in accordance with the deadlines set by the court.  None of the parties objected to the revised, post-PAS component.

### 4.     Fire Lieutenant promotional classification eliminated from contention

On March 16, 2001, the City notified the court in accordance with paragraph 11 of the December 18, 2000 order[27] that all parties agreed the selection procedure for Fire Lieutenant had no adverse impact on the basis of either race or gender.[28]

### 5.     Fire Battalion Chief, Fire Captain, Fire Apparatus Operator, Engineering Aide, Gardener, and Heavy Equipment Operator job classifications eliminated from contention

On the same date, however, the City also reported that the parties disagreed as

---

[27]Paragraph 11 provides that:

The City will notify the court, in writing, by **March 16, 2001**, as to whether the parties agree that its selection procedures for each classification listed in paragraph 9 of this order have no adverse impact on the basis of race and sex.  If, in responding, none of the parties contend that any selection procedure for a job classification has an adverse impact on the basis of race and/or sex, the City will be deemed to have met the requirements of paragraph 8 of the City's 1995 Modification Order with regard to that job classification.  Any party may submit any disagreement as to the adverse impact of any selection procedure for these eleven job classifications to the court for resolution, *provided such disagreement is presented to the court, in writing, within **thirty (30) days after March 16, 2001**.*

Doc. no. 708 (Order Extending 1981 Consent Decrees and 1995 Modification Orders) ¶ 11, at 8-9. (emphasis in original) (footnote omitted).

[28]Doc. no. 739, at 2.

15

to whether its selection procedures had adverse impact *on the basis of race* for six job classifications (*i.e.*, Fire Battalion Chief, Fire Captain, Fire Apparatus Operator, Engineering Aide, Gardener, and Heavy Equipment Operator), and *on the basis of sex* for two classifications (*i.e.*, Public Safety Dispatcher II (Fire) and Heavy Equipment Operator).[29] During the April 26, 2001 status conference, the City conceded that the selection procedure for Public Safety Dispatcher II (Fire) had adverse impact on the basis of an applicant's sex, but requested this court to determine whether the remaining selection procedures had adverse impact on the basis of either race or sex.[30]

In summary, the City contended — and the United States and Martin/Bryant parties agreed — that adverse impact had *not* been demonstrated in the selection procedures for the Fire Battalion Chief, Fire Captain, Fire Apparatus Operator, Engineering Aide, Gardener, and Heavy Equipment Operator job classifications. The Wilks Class argued, however, (a) that the City was required to demonstrate that its selection procedures did not have adverse impact based on race or gender, and (b) that there was evidence of adverse impact for each of the positions. Evidence on these issues was received at a hearing conducted on May 31 and June 1, 2001.

Following that hearing, this court concluded that the Wilks Class bore the

---

[29]*Id.* The parties agreed that there was no evidence of adverse impact based on gender for the Fire Apparatus Operator, Fire Captain, Fire Battalion Chief, Engineering Aide, and Gardener classifications, and based on race for the Public Safety Dispatcher II (Fire) classification.

[30]Doc. no. 745, at 1-3.

16

burden of proof on the issue of whether the selection procedures had adverse impact, and that the Wilks Class had not met that burden with respect to the Fire Battalion Chief, Fire Captain, Fire Apparatus Operator, Engineering Aide, Gardener, and Heavy Equipment Operator classifications. Accordingly, the court concluded that the City had complied with paragraph 8 of the 1995 Modification Order with respect to those classifications.[31]

The Wilks Class appealed those rulings, but the Eleventh Circuit declined to exercise jurisdiction, holding that this court's order did not "modify" the injunction embodied in the City's consent decree and modification order. *See Birmingham Firefighters Association 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002).[32]

### 6. Entry-level Firefighter classification eliminated from contention

The City conceded that the job-task-screening component of the entry-level

---

[31]*See supra* note 5.

[32]As will be discussed in more detail *infra*, in Part IV(C) of this opinion, the Eleventh Circuit also made the following comments with respect to the Wilks Class's argument on the City's burden of proof under the language of paragraph 8 of the 1995 Modification Order:

> It is important to stress that we are not holding that the Wilks class's interpretation of paragraph 8 is incorrect. *The district court's interpretation might be reversed if the issue were before us on appeal from a final judgment*, but it is not. What we hold, and all that we hold, is that the district court's interpretation of the key language does not so blatantly misinterpret the decree as to "modify" it and thereby create interlocutory appellate jurisdiction under § 1292(a)(1).

*Birmingham Firefighters Association 117*, 280 F.3d at 1294 (emphasis supplied).

Firefighter selection procedure had adverse impact on female applicants.[33]  Thus, the parties disagreed only with regard to the post-job-task-screening component of the Firefighter selection procedure.[34]  With respect to that component, the City, the United States, and the Martin-Bryant parties all agreed that there was no adverse impact on the basis of race.  The Wilks class, on the other hand, contended that there *was* adverse impact on the basis of both race and sex.  The court considered the post-job-task-screening component of the Firefighter classification at the hearing conducted on May 31 and June 1, 2001.  Following that hearing, the court found that the Wilks Class had not met its burden of proving adverse impact, and that the City had complied with paragraph 8 of the 1995 Modification Order with respect to that classification.

After conceding that the job-task-screening component of the Firefighter selection procedure had adverse impact against female applicants, the City revised the procedure.  During July of 2001, the City provided the parties with a job analysis and validity report for the job-task-screening component.  Following review of the validity report, the United States and Martin/Bryant parties objected to the City's procedure, and negotiations ensued.  As a result, the City agreed to revise the time

---

[33]Doc. no. 760, at 1-3.

[34]The City did not analyze whether the procedure had adverse impact on the basis of sex, because there were so few female applicants.  Doc. no. 760, at 4.

18

requirements for completion of that component, and to provide a physical conditioning and training manual to (as well as to conduct an orientation session for) candidates prior to administration of the selection procedure.   Those revisions satisfied all parties.

### 7.    Public Safety Dispatcher II (Fire) classification eliminated from contention

The City also revised the selection procedure for the Public Safety Dispatcher II (Fire) classification, after conceding that it had adverse impact based on gender. This court established deadlines by order dated July 26, 2001, which the City met with respect to providing the parties a job analysis and test plan.  Because the City initially had no vacancies in the classification, however, the deadlines for *administration* of the revised procedure, delivery of results to the parties, and delivery of a validity report were extended until such time as a vacancy occurred, and the City requested a certificate of eligibles from the Jefferson County Personnel Board.

When a vacancy ultimately occurred, the City administered the revised selection procedure, disclosed the results, and provided a validity report to the parties in accordance with the deadlines.  Neither the United States nor Martin/Bryant parties objected, but the Wilks Class expressed "*concerns*" about documentation of the procedure.  Even so, the Wilks Class did not formally *object* to the revised selection

procedure.

In response to the stated "*concerns*" of the Wilks Class, the City agreed to develop an administrator's manual, the final version of which was  completed on March 4, 2004.  Counsel for the Wilks Class then advised the City that, in their opinion, the requirements of paragraph 8 of the 1995 Modification Order had been satisfied.

**B.     Compliance with Affirmative Action Obligations:  Sections III, XIV, and XV of the 1981 Consent Decree**

The 1981 Consent Decree established a number of affirmative action obligations for the City.  Specifically, the City was required to develop written affirmative action plans for five years,[35] appoint an Affirmative Action Officer,[36] and appoint separate affirmative action committees for the Police, Fire, and Public Works Departments.[37]  The City complied with each of these requirements.

The City submitted each department's affirmative action plan to the parties on September 1, 1981.[38]  The departments updated these plans each year thereafter, and continued the practice of maintaining departmental affirmative action plans beyond

---

[35] 1981 Consent Decree, ¶¶ 11-13.

[36] *Id.* ¶ 31.

[37] *Id.* ¶ 33.  The City has reorganized some of its departments since 1981.  As of July 1, 2002, the Street and Sanitation Department and the Horticulture and Urban Forestry Department were combined to form the Public Works Department.  Affidavit of Ann Thompson, ¶ 7.

[38] Affidavit of Ann Thompson, ¶ 4.

the five-year decree requirement.

Following entry of the 1995 Modification Order, the City instructed the departments to revise their affirmative action plans to reflect the modifications and revised goals mandated by the 1995 Order.[39]  Since then, each department has annually submitted an affirmative action plan consistent with the revised goals of the City Decree.[40]  For example, and consistent with paragraph 12 of the 1981 City Decree, each department posts copies of its affirmative action plans in its main office, as well as within City Hall.[41]  Additionally, pursuant to paragraph 13 of the 1981 City Decree, each department provides a semi-annual evaluation, reporting on the department's progress in achieving the goals of the City Decree.[42]

From the date of the City's 1981 Consent Decree until his retirement on June 30, 2004, Gordon Graham, the City's Personnel Director, also served as the City's Affirmative Action Officer.[43]  In that role, Mr. Graham fulfilled the responsibilities outlined in paragraph 31 of the 1981 decree.[44]  Following Mr. Graham's retirement,

---

[39]Affidavit of Gordon Graham, ¶ 6, Ex. A.

[40]See Affidavit of Ann Thompson, ¶ 5 & Ex. D.

[41]Id. ¶ 5.

[42]See id. Ex. E.

[43]Affidavit of Gordon Graham, ¶ 2.

[44]Paragraph 31 of the 1981 Decree provides as follows:

> The City shall appoint an Affirmative Action Officer who shall have the following responsibilities:

Ann Thompson assumed those duties.

Finally, the City's Police, Fire, and Public Works Departments have separate affirmative action committees, as required by paragraph 32 of the 1981 Consent Decree.[45]   For several years following entry of the 1981 Consent Decree, these committees met on a regular basis and reviewed departmental job assignment and disciplinary policies to ensure that the policies were administered in a nondiscriminatory manner.[46]   The affirmative action committees presently meet on

---

(a)     Advise black and female employees of the terms of this decree;

(b)     Post his or her office hours and location and copies of this Decree in conspicuous places within each department or operational unit of the City;

(c)     Receive and investigate complaints of race and sex discrimination and conciliate such complaints when appropriate, and notwithstanding any other provisions of law, establish a written procedure which shall govern such complaints;

(d)     Maintain a complete record of all actions taken in pursuit of the duties outlined above, including all correspondence directed to or from the City of Birmingham with respect to any complaints or investigations undertaken pursuant to this Consent Decree and any investigatory files; and

(e)     To review, prior to final selection, a department head's written justification for failure to select certified black or female applicants in jobs in which blacks or females are underrepresented.  The Affirmative Action Officer shall submit his or her written comments together with the appointing authority's written justification to the Office of the Mayor, prior to final selection.

[45]Affidavit of Ann Thompson, ¶ 6.
[46]*Id.*

22

an *ad hoc* basis.[47]

## C.   Compliance With Recruitment Requirements

Paragraph 14 of the 1981 Consent Decree, and paragraphs 23 and 24 of the

1995 Modification Order, address the City's recruitment obligations.[48] The City does

---

[47]*Id.*

[48]Paragraph 14 of the 1981 Consent Decree reads:

> The City shall continue to develop and reassess its present affirmative recruitment program designed to inform blacks and women of job opportunities with the City for the purpose of securing sufficient qualified applicants to enable the City to meet the hiring goals set forth herein. The recruitment program shall include maintaining contacts with area high schools, technical and vocational schools, colleges, and organizations which have traditionally expressed an interest in providing minority and female applicants or which indicate such interest in the future, and informing them of employment opportunities with the City. In addition, where appropriate, advertising of employment opportunities shall be placed with or in advertising media primarily directed to black and female audiences for the purpose of emphasizing to blacks and women the availability of employment opportunity with the City. As part of its recruitment program the City shall utilize black and female recruiters for the Police and Fire Departments.

Doc. no. 247 (Consent Decree with the City of Birmingham) ¶ 14, at 10-11.

> Paragraphs 23 and 24 of the 1995 Modification Order provide:

> 23. The City shall continue to develop and reassess its present affirmative recruitment program for the purposes of meeting the objectives of this Order. The City shall request that the Personnel Board engage in additional recruitment if the City believes that additional efforts by the Personnel Board to recruit blacks and women for a particular job classification or group of job classifications would assist the City in obtaining additional qualified black and female applicants and overcoming vestiges of prior discrimination. The City agrees to cooperate with the Personnel Board's recruitment efforts.

> 24. The City shall continue to make its employees available when their participation in a job analysis or validation study is requested by the Personnel Board or by a party.

23

not engage in independent, formal recruitment efforts, however. Instead, it relies upon the Jefferson County Personnel Board to recruit candidates for vacancies occurring in City job classifications. Nevertheless, the City has cooperated with the Personnel Board in its recruitment efforts, including making employees available to the Personnel Board for participation in job analyses and validation studies.[49] The City has participated in "job fairs" and other recruiting events held at local schools, churches, and community centers, to encourage applicants for the Police and Fire Departments.[50] The City also has reported its recruitment efforts as part of its semi-annual reports.[51]

## D.    Compliance with Job Posting Requirements

Paragraphs 15 and 16 of the 1981 Consent Decree define the City's obligations to post announcements of employment or promotional opportunities. Since entry of the 1981 Consent Decree, the City has posted all written job announcements received from the Personnel Board for hiring, promotion, or training opportunities in "conspicuous places" as required by the consent decree.[52] Further, departmental

---

Doc. no. 598 (Order Modifying the City of Birmingham Consent Decree, entered Dec. 19, 1995) ¶¶ 23 & 24, at 7.

[49] Affidavit of Gordon Graham, ¶ 8; Affidavit of Ann Thompson, ¶ 8.

[50] Affidavit of Ann Thompson, ¶ 8.

[51] *Id.*

[52] Affidavit of Gordon Graham, ¶ 9.

24

affirmative action plans contain job posting requirements.  The City provided information about the postings as part of its semi-annual reports.  Currently, applicants or present City employees also may learn of employment opportunities in the City *via* the Personnel Board's telephone job-line, the Personnel Board's internet website, or the City's website (which provides a link to the Personnel Board's site).[53] Additionally, the Personnel Board provides written job announcements to the City, and the City posts the announcements in the applicable department's main office and the City's Personnel Department.[54]

## E.   Compliance with Provisions Relating to Prohibition of Sex, Height, and Weight Restrictions

Paragraph 17 of the 1981 Consent Decree confined the City's use of sex restrictions in job announcements and certifications to those situations in which such restrictions were determined by the City and approved by the United States to constitute a *bona fide* occupational qualification.[55]  Paragraph 18 of the 1981 Consent Decree prohibited minimum height or weight requirements that had an adverse impact

---

[53]*Id.*

[54]*Id.*

[55]Paragraph 17 reads as follows: "The City shall not request that the Personnel Board restrict any job announcements or certifications on the basis of sex except where, pursuant to a proper validation study, gender is determined to constitute a bona fide occupational qualification within the meaning of Section 703(e) of Title VII for the job(s) listed in such announcements or certifications, and such determination is approved in writing by the United States.  If such approval is not granted, the City reserves the right upon proper motion to petition the Court for approval of the determination."  Doc. no. 247 (Consent Decree with the City of Birmingham) ¶ 17, at 11-12.

on the basis of the applicant's race or gender.[56]

Since the entry of the 1981 decree, the City has not requested the Personnel Board to restrict any job announcements on the basis of such criteria, and it has not imposed minimum height or weight requirements for any position.[57]   Departmental affirmative action plans also contain these same prohibitions.[58]

## F.     Compliance With Provisions Relating to Promotional Eligibility and "Promotional Potential Ratings"

Paragraphs 19a through 23 of the 1981 Consent Decree addressed the City's eligibility requirements for promotion to certain jobs,[59] and paragraphs 24 and 25

---

[56]Paragraph 18 provides that:  "The City shall not use or follow any minimum height or weight requirements which have an adverse impact against blacks or women as selection criteria for any classified service position, nor shall it abide by any such requirements if they are instituted and administered by the Personnel Board."  *Id*. ¶ 18, at 12.

[57]*Id.* ¶ 10.

[58]Affidavit of Ann Thompson, ¶ 9, Ex. D.

[59]Paragraphs 19a through 23 state:

>    19a.  The City shall not require police officers to serve more than three years uninterrupted service in rank (or two years uninterrupted service in rank for candidates who have two years of college credits) in order to be eligible to take the promotional examination for police sergeant, nor shall it require police sergeants to serve more than two years uninterrupted service in rank in order to take the promotional examination for police lieutenant.  Employees who have obtained permanent status as police lieutenant shall not be deemed ineligible for promotion to the next higher rank based upon any minimum length of service or time in rank.

>    19b.  The City shall not require firefighters to serve more than two years uninterrupted service in rank in order to be eligible to take the promotional examination for the position of fire lieutenant.  Employees who have obtained permanent status as fire lieutenant or fire captain shall not be deemed ineligible for promotion to the next higher rank based upon any minimum length of service or time in rank.

addressed the City's use of promotional potential ratings.[60]  Each is discussed below.

19c.  For purposes of subparagraphs a and b the term "uninterrupted" service shall include any time spent as a probationary employee.

20.  In order to be eligible to take the promotional examinations for the positions of public works supervisor or construction supervisor, an employee must have permanent status as a truck driver, refuse truck driver, labor supervisor, heavy equipment operator or construction equipment operator.  In order to be eligible to take the promotional examination for the position of sanitation inspector, an employee must have permanent status as a truck driver or semi-skilled laborer.

21.  Any employee who has worked full-time in an unclassified laborer position for twelve consecutive months shall be eligible to apply to take the promotional examinations for the following classifications:  semi-skilled laborer, truck driver, refuse truck driver, equipment service worker, automotive mechanic helper.  As used in this paragraph, the term laborer shall include the classification of building service worker, laborer, and refuse collector.

22.  Any employee who has obtained permanent status as a semi-skilled laborer or truck driver shall be eligible to apply to take the promotional examinations for the following classifications:  truck driver, refuse truck driver, labor supervisor, heavy equipment operator, equipment service worker, automotive mechanic helper.

23.  Any employee who has obtained permanent status as a truck driver, heavy equipment operator, refuse truck driver, or labor supervisor shall be eligible to apply to take the promotional examination for the classification of construction equipment operator.

Doc. no. 247 (Consent Decree with the City of Birmingham) ¶¶ 19a-23, at 12-13.

[60]Paragraphs 24 and 25 read as follows:

24.  The City may continue to use the Personnel Board's current promotional potential rating system in departments where it is shown to have no adverse impact.  The City shall discontinue the use of the Personnel Board's current promotional potential rating system in the following departments in which departments such ratings have been demonstrated to have had an adverse impact on blacks:  Streets and Sanitation [now Public Works], Police, Fire, Parks and Recreation.

25.  The City further agrees to discontinue the use of the Personnel Board's current promotional potential rating system to determine eligibility for promotion in any other department where, based upon any two successive rating cycles (one cycle consisting of 6 months), there is evidence of adverse impact against blacks.  In

27

1.      **Promotional eligibility requirements** —

a.      **Police and Fire Departments**

With respect to eligibility for promotional classifications in the <u>Police</u> Department, the City was not permitted:

(*i*)     to require more than three years of uninterrupted service in the rank of Police Officer (or two years of uninterrupted service in rank for candidates who had two years of college credits) for eligibility to take the Police Sergeant promotional examination;

(*ii*)    to require more than two years of uninterrupted service in the rank of Police Sergeant for eligibility to take the Police Lieutenant promotional examination;

(*iii*)   to deem ineligible for promotion to the next higher rank employees who have obtained permanent status as Police Lieutenant based on any minimum length of service or time in rank.

With respect to eligibility for promotional classifications in the <u>Fire</u> Department, the City was not permitted:

(*iv*)   to require more than three years of uninterrupted service in the rank of Firefighter for eligibility to take the Fire Lieutenant promotional examination;

---

determining adverse impact under this subpart the parties agree to rely upon section 4D of the <u>Uniform</u> <u>Guidelines</u>.

*Id.* ¶¶ 24 & 25, at 13-14.

or

(*v*)     to deem ineligible for promotion to the next higher rank employees who had

obtained permanent status as a Fire Lieutenant or Fire Captain based on any

minimum length of service or time in rank.

The Jefferson County Personnel Board, not the City, determines eligibility to

apply for promotions, and it is the City's opinion that the Personnel Board's current

requirements are consistent with the terms of the City's decree.[61]  Even so, to insure

the City's compliance, the Police and Fire Departments have included provisions

consistent with these requirements in their affirmative action plans since entry of the

1981 Consent Decree.[62]

### b.     Public Works Department

Paragraphs 20 through 23 of the 1981 Consent Decree addressed employee

eligibility for promotional examinations for classifications within the Public Works

Department.[63]  While the Personnel Board establishes eligibility requirements, the

Public Works Department has included provisions consistent with the decree's

requirements in its annual affirmative action plans since entry of the 1981 Consent

---

[61]Affidavit of Gordon Graham, ¶ 11.

[62]Affidavit of Ann Thompson, ¶ 10, Ex. D.

[63]*See supra* note 59.

29

Decree.[64]

### 2.    "Promotional potential ratings"

Paragraphs 24 and 25 of the 1981 Consent Decree restricted the use of so-called "promotional potential ratings" to those departments in which such ratings were shown to have no adverse impact,[65] and the ratings were prohibited in the Streets and Sanitation (now Public Works), Police, Fire, and Parks and Recreation departments.  Since entry of the 1981 Consent Decree, the City has not used promotional potential ratings.[66]

### G.    Compliance With Provisions Governing the Use of Background Investigations and Dismissals from Police and Fire Academies

Paragraphs 26 and 27 of the 1981 Consent Decree relate to the City's use of background investigations,[67] and paragraph 29 established the procedure for

---

[64]*Id.*, ¶ 11, Ex. D.

[65]*See supra* note 60.

[66]Affidavit of Gordon Graham, ¶ 13.

[67]Paragraphs 26 and 27 provide as follows:

26.  Background investigations shall be conducted in such a manner so as not unlawfully to discriminate on the basis of race or sex.  Applicants for employment shall not be disqualified automatically on the basis of an arrest or conviction record, a military discharge that is less than honorable, or a poor credit rating.  In considering the effect of a criminal conviction upon an applicant's qualifications, the City shall consider at least the following factors:  (1) the nature of the position the applicant is seeking; (2) the nature of the crime; (3) the period of time elapsed since the conviction; and (4) the success or failure of rehabilitation efforts.

27.  The City shall establish a written policy concerning background investigations within the Police Department within 90 days after this Decree is

dismissing recruits from the Police and Fire training academies.[68]

During August of 1981, the Birmingham Police Department revised its policy on background investigations to conform with paragraphs 26 and 27, and provided a copy of the revised policy as part of its semi-annual report.

Since entry of the 1981 Consent Decree, the City has used background

---

entered.  As part of that policy, the Police Department shall provide applicants who have been rejected on the basis of the background investigation written notice of the specific reason(s) for their rejection.  An applicant who has received such notice shall be allowed ten (10) days to respond orally or in writing and to provide relevant information concerning the basis for rejection.  The City shall ensure that such oral or written response and relevant information is reviewed by an individual(s) who did not participate in the applicant's initial background investigation, and that this review shall occur before the rejection becomes final.   The Department's background investigation policy shall be reviewed periodically to ensure that it is administered in a non-discriminatory manner, and that any components, aspects or elements of the background investigation process which result in a disproportionate disqualification of blacks or women are either eliminated or shown to be job related in accordance with the requirements of the <u>Uniform Guidelines</u>.  The policy shall also provide that any black or female applicant rejected for a job by reason of an adverse background investigation shall be replaced on the next certification list for such job by an applicant of the same race or gender.

Doc. no. 247 (Consent Decree with the City of Birmingham) ¶¶ 26 & 27, at 14-15.

[68]Paragraph 29 provides:

29.  The City agrees that prior to the dismissal of a black or female from the police or fire training academy, it shall notify any such black or female in writing of the specific reason(s) that person is subject to dismissal from the academy, and he or she shall be given an opportunity to respond orally or in writing within 10 days to responsible training academy officials with respect to any matters which concern their academy performance.  Copies of any correspondence, notes, memoranda or recordings concerning any matters covered by this paragraph shall be retained by the City and shall be available for inspection by attorneys for the plaintiffs upon request.

Doc. no. 247 (Consent Decree with the City of Birmingham) ¶ 29, at 15.

investigations solely to evaluate candidates for entry-level Police Officer and Firefighter positions.[69] During 2002 and 2003, the parties reviewed the City's current background investigation procedures for those classifications. Following the City's revision of the selection procedure for the Police Officer classification, including the background investigation, none of the parties challenged the City's contention that the selection procedure satisfied paragraph 8 of the 1995 Modification Order. With respect to the Firefighter classification, the Wilks Class initially objected to the City's post-job-task-screening component of the selection procedure, which included a limited background check. This court found, however, that the procedure complied with paragraph 8 of the 1995 Modification Order.[70]

Since entry of the decree, the City has provided the notice required by paragraph 29 to candidates before dismissing them from the training academies, and has provided those candidates the opportunity to respond to the proposed dismissal.[71] The City has provided documentation of such dismissals to the parties upon request.[72]

## H.   Compliance With Provisions Relating to Supervisory Instruction and Desegregation of Facilities

Paragraph 28 of the 1981 Consent Decree required the City to inform all of its

---

[69]Affidavit of Gordon Graham, ¶ 14.

[70]Doc. nos. 782 & 783 (Memorandum Opinion and Order entered July 17, 2001).

[71]*Id.* ¶ 15.

[72]*Id.*

32

supervisory personnel that the City prohibited discrimination against, or harassment of, any employee or potential employee on the basis of race or sex, and provided that the City would instruct supervisory personnel in equal employment opportunity and affirmative action requirements.  Further, paragraph 28 provided that supervisory personnel would be evaluated, in part, on their efforts and results in those areas, as well as their cooperation with the City's Affirmative Action Officer.

Upon entry of the 1981 decree, the City instructed all supervisory personnel in accordance with paragraph 28 and, presently, supervisors address equal employment opportunity issues with all new employees.[73]

Since entry of the decree, all City facilities have been fully racially integrated, in accordance with paragraph 30 of the 1981 Consent Decree.[74]

## I.    Compliance With Record Keeping and Reporting Provisions

Paragraphs 49 through 53 of the 1981 Consent Decree,[75] paragraphs 26 through

---

[73]*Id.* ¶ 16; Affidavit of Ann Thompson, ¶ 12 & Ex. F.

[74]Affidavit of Gordon Graham, ¶ 17.  Paragraph 30 provides: "The parties recognize that the City has engaged and is continuing to engage in affirmative efforts to eliminate vestiges of racial segregation in employees' facilities.  The City hereby agrees to take steps to ensure that such facilities will be maintained in a racially integrated fashion in the future."  Doc. no. 247 (Consent Decree with the City of Birmingham) ¶ 30, at 15-16.

[75]Paragraphs 49 through 53 read as follows:

49.  The City shall retain during the period of this Decree necessary records concerning the implementation of this Decree.  These records shall be made available to the plaintiffs for inspection and copying upon written request.

50.  The City's records shall include the following:

(a)  A list of all organizations and schools which are contacted for recruitment purposes showing the date that any notice of job opportunity was mailed to them, the position and number of positions to be filled from that notice, and the date through which applications could be received for the job which was advertised, including a summary or compilation of all other recruitment efforts aimed at minorities and women, together with the date of said efforts and the names and positions of the City's employees who made the contact and the nature of the contact.

(b)  All written applications and related records for all persons seeking employment with the City, including applications for transfer or promotion within or among departments, for a period of at least five (5) years, and shall include on such applications identification of the applicant by race and sex.  Such records shall also contain a statement of the reasons why any applicant was found not to be qualified for the position(s) applied for.

(c)  With respect to any applicant who is certified for hire or promotion and who is not selected for the vacancy for which that applicant is certified, the City shall record in writing the reason(s) for the applicant's not being selected for that vacancy.  Also, the City shall record and maintain any other written records or comments on an applicant for certification in accordance with paragraph 31(e) above.

(d)  All written communications between the City and applicants for employment, transfer and promotion.

(e)  All written communications between the City and employees concerning discipline and discharge, as well as all written reports concerning these matters.

51.  Within ten days after adoption of the City's annual affirmative action plans and reports for each department, the City shall furnish a copy of every plan and report to the plaintiffs.

52.  Within 60 days of the entry of this decree and thereafter semi-annually, the City shall report to the plaintiffs the following information:

(a)  A summary showing the total number of employees by race and sex in each job classification for each department of the City in both the classified and unclassified service.

34

(b)  A list of all probational appointments for permanent full-time positions, by job classification and department, during the reporting period indicating the race and sex of the persons hired or promoted.

53.  Within 60 days of the entry of this Decree and thereafter on an annual basis, the City shall report to the plaintiffs the following information:

(a)  A list of all persons, by job classification, department, race and sex, to whom positions have been offered and whether or not the positions were accepted.

(b)  A list of all promotions to permanent full-time positions in the classified service, by job classification and department, during the reporting period indicating the race, sex, date of initial hire in the classified service and date of the promotion.

(c)  A breakdown of the applicant flow for employment with the City which indicates by race and sex the number of applicants for each department and job classification in the classified and unclassified service, and the number of applicants hired, rejected, and pending for each job classification and department.  Applicant hires shall be separately identified as to Comprehensive Employment Training Act (CETA) positions.

(d)  A summary report of the recruiting activities conducted by the City and the results of those activities.

(e)  A report of the City's implementation of the individual relief provisions of this Decree.  This report shall include a statement of the monetary payments, if any, that have been made to individuals entitled to such relief.  This report shall further identify each individual who has been offered a job with remedial seniority under this Decree, and whether the job offer was accepted or rejected.  For any individual who was disqualified from an offer of employment under Part XVI of this decree, a specific statement of the reasons for disqualification shall be included in this report.

(f)  A list of the sworn personnel terminated from either the Police Department or the Fire Department, identifying each individual by race, sex, date of hire, date of termination, probational or permanent status, and rank. In addition, the report shall explain the reason each individual was terminated.

(g)  Within thirty (30) days of establishment or revision, a copy of the

33 of the 1995 Modification Order,[76] and paragraphs 5 and 6 of the December 18,

---

> written policy concerning background investigations required by paragraph
> 27.

Doc. no. 247 (Consent Decree with the City of Birmingham) ¶¶ 49-53, at 26-29.

[76]Paragraphs 26 through 33 of the City's 1995 Modification Order read as follows:

> 26.  Within six (6) months after the entry of this Order, and at six (6) month
> intervals thereafter, the City shall submit a report to the Court and to the parties
> (including the Wilks Class which is considered a party in all respects to this
> modification order) on its efforts to comply with this Order.  Each of the City's semi-
> annual reports will describe in detail the efforts made by the City to meet its
> obligations under this Order to use lawful selection procedures.  The semi-annual
> reports shall specifically address the progress made during the preceding six months,
> areas of agreement and disagreement among the parties, allegations of non-
> cooperation, and a compliance timetable for the accomplishment of tasks within the
> next six months.  Any party may supplement a report within thirty (30) days after it
> is filed with the City.

> 27.  The City's second semi-annual report, due twelve months after the entry
> of this Order, shall include a proposed schedule for the City to review and, if
> necessary, revise its selection procedures to meet the requirements of paragraph 8
> over the following thirty-six (36) months.   At least thirty (30) days prior to
> submitting that proposed schedule, the City shall provide copies of its proposed
> schedule to the parties and attempt to obtain their agreement to a schedule.

> 28.  The City shall submit to the parties a proposal for revised selection
> procedures it intends to administer for promotional fire service positions in the Fire
> Department and promotional police service positions in the Police Department
> eighteen (18) months from the date of entry of this Order, unless none of the parties
> object to the selection procedures in their paragraph 12 submissions.

> 29.  The City shall submit to the parties a proposal for revised selection
> procedures it intends to administer for firefighter and police officer candidates within
> eighteen (18) months from the date of entry of this Order, unless none of the parties
> object to the selection procedures in their paragraph 12 submissions.

> 30.  For job classifications other than those in which the only selection
> procedure is an interview, in the event that the City identifies a selection procedure
> it uses as having adverse impact, or a party alleges in its paragraph 11 submission
> that such a procedure has adverse impact, the City shall either produce evidence as
> to the job relatedness of its procedures or change its procedures to eliminate adverse

2000 order extending the decree and Modification Order,[77] define the City's record

impact according to the timetable set out in the City's second semi-annual report.

31. The City shall make all data concerning the development, adverse impact, use and job relatedness of each selection procedure used or proposed to be used by the City, including but not limited to, test scores, job analyses, expert reports and validation studies, promptly available to counsel for the parties upon written request. This data will be provided to the parties to this Order in a machine readable form as well as hard copy to the extent that it exists in that form.

32. The City shall retain during the period of this Order all records concerning its implementation. These records shall be made available to any party for inspection and copying within thirty (30) days upon written request. The City agrees that it will henceforth maintain applicant and selection procedure data (including an applicant's name, identification number, race, sex, job classification applied for, date of certification, City administered selection procedure ratings and score(s), whether the applicant was disqualified and the reasons for disqualification, and whether an applicant was hired or promoted) in machine readable form and provide this data in such form to the parties to this Order within thirty (30) days of their written request.

33. All material related to the development of tests or other selection procedures, including copies of tests or proposed tests, test keys and test results, shall be marked "Confidential Test Material Under Seal" by the City prior to being forwarded to counsel for the parties. This confidential test material shall not be disclosed to anyone other than counsel, their immediate staff, the court and its staff, and expert consultants retained by the parties and their staffs, without the written permission of the City or an Order of this Court. Such confidential test material shall not be filed with the Court unless it is filed in a sealed envelope marked "Confidential Testing Material Under Seal." Any material that is marked "Confidential Testing Material Under Seal" shall not be disclosed by the Clerk of the Court to the public without an Order from this Court.

Doc. no. 598 (Order Modifying the City of Birmingham Consent Decree), ¶¶ 26-33, at 7-8.

[77]Paragraphs 5 and 6 of the December 18, 2000 Order Extending the 1981 Consent Decree and 1995 Modification Order provide that:

5. Beginning in January 2001, the Jefferson County Personnel Board and the City of Birmingham shall each submit monthly written reports specifying their compliance with the requirements of this order. *Such reports shall be submitted at least one week prior to the status conferences scheduled by this court.* Unless

keeping and reporting requirements.

Beginning in 1981, the City provided semi-annual reports to the United States and Martin/Bryant parties. Following certification of the Wilks Class, the City provided copies of reports to counsel for that Class. The City also has responded to specific information requests from the parties.[78]

Beginning in January of 2001, the City provided monthly reports describing its progress in achieving compliance to the court. The City further provided all information and reports, and substantially complied with all deadlines specified in paragraphs 8 through 16 of the December 18, 2000 Order, and subsequent orders

---

otherwise scheduled by the court, status conferences will be held at 9:30 a.m. for two hours in Birmingham during the fourth week of each month. If any party believes additional time is needed for any status conference, counsel must request additional time in advance of the conference.

6. Each monthly report shall describe the party's efforts to develop selection procedures meeting the requirements of paragraph 8 of the City of Birmingham modification order and paragraph 12 of the Personnel Board modification order, and, any other efforts to comply with the modification orders. The reports shall describe the progress made and the tasks accomplished since the last report, including an updated project time line, any areas of agreement and disagreement among the parties, any allegations of non-cooperation, and the efforts made to comply with any timetable(s) ordered by this court. *In the event that either the City of Birmingham or the Personnel Board should fail to accomplish one or more tasks required to be accomplished during a particular month according to the compliance timetables established in paragraphs 8 to 16, and, 18 to 19 of this order, the report shall also include an explanation of why the party failed to timely complete the task(s)* and shall include a proposed schedule for compliance. Any party may supplement that report.

Doc. no. 708, at 4-5 (emphasis in original).

[78]Affidavit of Ann Thompson, ¶ 13.

governing selection procedure development.

**J.      Compliance with Individual Relief Provisions**

Paragraphs 33 through 47b of the 1981 Consent Decree provide relief for certain individuals.  Each of the individuals identified as a victim of discrimination was offered the appointment or other relief specified in the decree, and the City reported its compliance to the parties in semi-annual reports.[79]  Additionally, the City paid all of the monetary relief required by paragraphs 34 through 47b of the 1981 Consent Decree.[80]

## IV. DISCUSSION OF CONTESTED ISSUES

**A.      Failure to Validate Selection Procedures**

The Wilks Class first contends that the City's motion to terminate should be denied because it failed to "validate" its selection procedures, ostensibly in derogation of the Eleventh Circuit's decision in *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*").  Regardless of whether the *Ensley II* opinion can be read to impose such a requirement, which is doubtful, paragraph 8 of the 1995 Modification Order does not require the City to validate a selection procedure *unless* the results of test administrations demonstrate adverse impact on the

---

[79]Affidavit of Gordon Graham, ¶ 19.

[80]*Id.*

39

basis of either the race or sex of applicants.[81]  The Wilks Class did not appeal the

1995 Modification Order; and, as the Eleventh Circuit stated when addressing this

same, untimely argument:

> The issue of whether the City should be permitted to use job selection
> procedures that have not been job-validated, if those procedures do not
> have an adverse impact on race or sex, was raised and fought out by the
> parties after our 1994 remand.  That issue was decided by the district
> court, and its decision about the issue is embodied in the key terms of
> the court's December 1995 Modification Order.  The Wilks Class could
> have had the decision of that issue reviewed by appealing the
> modification order then.  It did not.  A party cannot undo its failure to
> timely appeal an earlier order by the simple expedient of asking the
> district court to undo that order years later.  The time limits of Rule 4
> have more steel in them than that.

*Birmingham Fire Fighters Association 117 v. Jefferson County*, 290 F.3d 1250, 1254

(11th Cir. 2002).

## B.    Failure to Develop Job-Related, Standard Oral Interviews

The Wilks Class also argues that the City's motion to terminate its 1981

Consent Decree and 1995 Modification Order should be denied because "the City is

not in compliance with its decree duty to develop and use job-related standard oral

interviews."[82]  The Wilks Class bases this argument on paragraphs 17 and 19 of the

1995 Modification Order, which read as follows:

---

[81]*See supra* note 5 for the text of paragraph 8 of the 1995 order modifying the City 1981
Consent Decree.

[82]Doc. no. 1140 (Wilks Class' Opposition to the City of Birmingham Motion to Terminate
Consent Decree and to be Dismissed as a Party), at 15.

17.    The City shall modify its interview procedures to ensure that a written record is kept of each interview. Beginning twelve months from the date of the entry of this Order, all standard interview questions and interview report forms shall be approved in writing by the City's Director of Personnel or his or her designee prior to their use.  Prior to receiving any certification list, the department seeking to fill a vacancy must submit to the Personnel Department for review a written detailed description of the position to be filled, the essential applicant qualifications, the proposed interview questions and a proposed rating form.  Upon completion of the interview process, the department will submit to Personnel the appointment recommendations, with a completed applicant interview rating form.

. . .

19.    Within twelve (12) months of the date of entry of this Order the City's Personnel Department shall provide training in employee selection and applicant evaluation for each City employee with authority to interview or to recommend appointments or promotions.   This training shall also be provided to newly hired or promoted officials with authority to interview or appoint applicants.  City officials who have not attended such training may not interview applicants for employment or promotion until they complete the required training.

The Wilks Class contends that these provisions were "clearly intended to require that[,] for those classifications using interviews as part of the selection process[,] that [*i*] standard oral interviews be developed that are job related; that [*ii*] a standard rating form be developed; and that [*iii*] City employees be trained to administer and score the standard interviews."[83]

Regardless of whether such requirements would be desirable in this, the best

---

[83]*Id.* (bracketed alterations supplied).

of all possible worlds, the plain language of paragraphs 17 and 19 simply does not impose such conditions. Moreover, upon review of the evidence submitted by the City, the court is satisfied that the City has complied with the decree's requirements.[84]

The Wilks Class additionally argues that the City's motion should be denied because "the City has failed to document and demonstrate that oral interviews have any meaningful role in the selection process."[85] Following review of the City's evidence, however, the court finds that information collected during oral interviews is considered by the relevant decisionmakers when making selections.

## C.     The City's Selection Procedures

As discussed *supra*, in Part III(A)(5) of this opinion, the court found, following an evidentiary hearing conducted on May 31 and June 1, 2001, that no adverse impact resulted from implementation of the City's selection procedures for the job classifications of Fire Battalion Chief, Fire Captain, Fire Apparatus Operator, Engineering Aide, Gardener, and Heavy Equipment Operator, nor for the post-job-task-screening component of the Firefighter selection procedure. The additional selection data contained in the parties' joint stipulation filed with the court on December 3, 2004, and the expert analyses of that data, demonstrate the City's

---

[84]*See* doc. no. 1150 (Brief in Response to Wilks Class' Opposition to the City's Motion to Terminate Consent Decree and to be Dismissed as a Party), at 9-10 (Table summarizing decree obligation and evidence supporting finding of compliance).

[85]*Id.* at 24.

continued compliance with paragraph 8 with respect to those positions. Thus, the

court now reaffirms its prior findings and conclusions that the City has satisfied the

requirements of paragraph 8 with regard to selection procedures for the Fire Battalion

Chief, Fire Captain, Engineering Aide, Gardener, and Heavy Equipment Operator

job-classifications, as well as the post-job-task-screening component of the entry

level Firefighter selection procedure.[86]

Even so, the additional selection data provided by the City and stipulated to by

the other parties[87] pertaining to the Fire Apparatus Operator classification presents a

dilemma. Each of the parties' experts found statistically significant adverse impact

against white candidates for selections from Register 2000002XX5026, covering the

---

[86]The Wilks Class once again contends that the text of paragraph 8 of the City's 1995 Modification Order shifts the burden of production and persuasion, and requires the City to prove that the selection procedures utilized by it do not cause the exclusion of applicants for jobs or promotions because of their race or gender. The court held on July 17, 2001, that consistent with Title VII jurisprudence generally, the Wilks Class, as the challenging party, bears the burden of production and persuasion. *See* doc. no. 782 (Memorandum opinion entered on July 17, 2001), at 8-11. The court is not inclined to reconsider that decision, either in light of the Wilks Class's arguments, or in light of the Eleventh Circuit's statement in *Birmingham Firefighters Association 117 v. Jefferson County,* 280 F.3d at 1294 (11th Cir. 2002), that the Wilks Class's interpretation of paragraph 8 is "plausible." The court remains firmly of the opinion that the Wilks class bears the burden of production and persuasion. Even if the court were inclined to revisit its decision, however, placing the burden on the City would not result in a more favorable result for the Wilks Class. As set forth herein, the Wilks Class has satisfied its burden of showing adverse impact with regard to the Fire Apparatus Operation position — the only position for which the lawfulness of selection procedures remains substantially in dispute.

[87]*See* doc. no. 1161. The Wilks Class's expert found that when certificates were aggregated, there was no statistically significant adverse impact on the basis of race or gender for the remaining classifications for which selection data was stipulated. *See* doc. no. 1172 (expert report of J. Michael Hardin, Ph. D., on behalf of the Wilks Class), at 9.

time period from August 11, 2000 through February 27, 2004 — *i.e.*, the period roughly corresponding to the period following the court's 2001 ruling that the selection procedure complied with the requirements of paragraph 8.[88]  Likewise, the court's Special Master, John G. Veres III, Ph. D., found that aggregating selection data across certificates from that register yielded statistically significant differences in selection rates, with white candidates being underselected.[89]

The selection procedure presently used by the City for the Fire Apparatus Operator classification was revised in October 1998.  Candidates certified by the Personnel Board submit supplemental applications, which are reviewed by the Promotional Review Panel, and are evaluated based on nine rating factors.[90]  The

---

[88]*See* doc. no. 1166 (expert report of Mary Dunn Baker, Ph. D., on behalf of the City of Birmingham), at 6; doc. no. 1172 (expert report of J. Michael Hardin, Ph. D., on behalf of the Wilks Class), at 9; doc. no. 1187 (expert report of Leonard A. Cupingood, Ph. D., on behalf of the United States), at 16; doc. no. 1188 (expert report of Kathleen K. Lundquist, Ph. D., on behalf of the Martin/Bryant parties), at 10.

[89]Doc. no. 1202 (report of the court's Special Master), at 11-12.

[90]The rating factors are (1) education and training, (2) disciplinary action record, (3) safety-personnel injury record, (4) safety-vehicular accident record, (5) complaints (citizen), (6) attendance, (7) fitness check - physical ability, (8) fitness check - physical fitness, and (9) applicant's initiative in preparing for promotion.  The last factor is described as follows:

> The applicant provides relevant information concerning the preparatory steps that [have] been done [sic] to enhance the applicant's ability to perform the duties required of the promotional position.  Providing four (4) or more relevant preparatory steps will result in an "exceeds job requirements" rating.  The provision of 2 to 3 steps will result in a "meets job requirements" rating.  Below 2 will result in a "does not meet job requirements" rating for this rating factor.

City Ex. 19, admitted during evidentiary hearing conducted on May 31 and June 1, 2001.

44

applications do not contain information about the candidates' race; rather, each candidate is assigned a personal identification number.  The Panel prepares a consensus rating form for each candidate, and provides a summary of the ratings to the Fire Chief.  The Fire Chief makes selections based on the ratings, and does not review the names of the candidates until after selections have been made.  If the Fire Chief has a specific objection to a particular candidate, once his or her identity is disclosed, the Chief may veto (or void) his own selection.[91]  The City has never been required to demonstrate that this selection procedure is job related and consistent with business necessity.

Because the City revised its Fire Apparatus Operator during 1998, the experts for the City,[92] the United States,[93] and the Martin/Bryant parties[94] contend that selection data from all certificates from that point in time forward should be analyzed

---

[91]Doc. no. 782, at 15-16.

[92]See doc. no. 1189 (supplemental expert report of Mary Dunn Baker, Ph. D.), at 2 ("[W]hen the FAO analysis considers the selections that were made over the entire time period that the selection process has been in place [the 1997 register (97PSY5026) as well as the 2000 register], the data fail to reveal a pattern of significant over-selection of African-American candidates.").

[93]See doc. no. 1187 (expert report of Leonard A. Cupingood, Ph. D.), at 2 ("Analysis from October 1998 forward provides a more complete assessment of any disparities for the entire period for which the revised selection procedure was used.").

[94]See doc. no. 1188 (expert report of Kathleen K. Lundquist, Ph. D.), at 8 n.3 ("Since the selection process used for the FAO during the 7/30/99 and 5/17/00 certificates was the same as the process used between 8/11/2000 to the present, analyses were conducted on those certificates.") & 10 n.7 ("A cumulative person count aggregate analysis was conducted on the City of Birmingham's FAO applicant pools and selections across certificates beginning with the 7/30/99 certificate through 2/27/04.")

when assessing adverse impact; and, upon performing such analyses, none found

adverse impact.  The Wilks Class's expert analyzed only the stipulated data, and

found statistically significant adverse impact against white candidates when

aggregating certificates.  Dr. John G. Veres, the court's Special Master, expressed the

following opinion:

> [T]he most relevant time period for statistical analyses [for the Fire
> Apparatus Operator classification] is 11 August 2000 through 27
> February 2004.  That period corresponds to data produced under the
> Joint Stipulation . . . and seems consistent with the Court's expressed
> desire to examine the City's selections since the 2001 reports were
> produced for the Court's edification.  Moreover the 11 August 2000
> through 27 February 2004 time frame represents the most recent sample
> of the City's selection decisions.  I believe this most recent sample is the
> most representative sample of the City's selection decisions.  I must
> therefore conclude that the most relevant of the findings reported below
> support a conclusion of adverse impact for the job of Fire Apparatus
> Operator, with White candidates being significantly underselected.[95]

Dr. Veres further stated:

> I believe that the recent time period covered by certificates from
> Register 2000002XX5026 [*i.e.*, August 11, 2000 through February 27,
> 2004] is the most representative of the City's decision making.  The
> stipulated data set comes closest to representing the City's selection
> decisions since the 2001 proceedings, a time when decision makers had
> reason to believe that the Court was no longer closely scrutinizing their
> behavior.  For this reason, I believe the Register 2000002XX5026-based
> certificate-level analysis *to be more predictive of the City's probable
> future behavior in the absence of Court supervision than analyses
> considering earlier certificates*.

---

[95]Doc. no. 1202, at 2.

Moreover, I believe that focusing on the 11 August 2000 through 27 February 2004 time period is in keeping with the *Guidelines'* language in Section 4D:

> Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time . . . may be considered in determining adverse impact.

I do not believe that the numbers associated with the aggregate certificate-level statistical analysis for Fire Apparatus Operator Register 20002XX5026 are "too small to be reliable." Indeed, those numbers allowed a statistical analysis to be performed which possessed sufficient statistical power to uncover a significant difference in selection rates by race.[96]

The court accepts the opinion of the Special Master as to the relevant time period for analysis, and is troubled that the results of analysis show statistically significant adverse impact on the basis of the race of candidates. Moreover, albeit never required to do so in the first instance, the City has not yet demonstrated that its supplemental application, containing nine rating factors, is job related. On that basis, the court cannot conclude that, with respect to the Fire Apparatus Operator selection procedure, the City has satisfied the decree's basic purpose of ensuring that "equal employment opportunities with the City are available to all persons, regardless of race or sex, as required by Title VII of the Civil Rights Act of 1964, as amended."[97]

---

[96]*Id.* at 13-14 (emphasis supplied).

[97]Doc. no. 598 (Order Modifying the City of Birmingham Consent Decree) ¶ 5, at 2.

Accordingly, judicial supervision will be retained for the limited purpose of obtaining the City's compliance with paragraph 8 of the 1995 Modification Order for the Fire Apparatus Operator classification, until such time as the City either shoulders the burdens of production and persuasion necessary to validate (*i.e.*, demonstrate the job-relatedness of) its supplemental application, or revises the selection procedure in a manner that, all parties agree, complies with federal law.

## V. CONCLUSION

In view of all of the foregoing, the court concludes that the City has substantially achieved the basic purposes of paragraph 5 of its 1995 Modification Order through its compliance with the provisions of the 1981 Consent Decree and the 1995 Modification Order detailed above.  The City has shown that it has removed unlawful employment barriers for blacks and women, that it has remedied past employment discrimination, and that it has ensured — with the exception of the Fire Apparatus Operator classification discussed above — that its employment selection procedures do not result in an unjustifiable, discriminatory impact on the basis of race or sex.  Moreover, with the exception discussed above, the court is satisfied that there has been satisfactory compliance with the City's remedial orders, and that the City has demonstrated its "good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial

48

intervention in the first instance." *United States v. City of Montgomery*, 948 F. Supp. 1553, 1563 (M.D. Ala. 1996).

Accordingly, the City's motion to terminate its consent decree and dismiss it as a party to all actions is due to be granted in part and denied in part. The modifications to the City's remedial orders proposed by the Wilks Class in its cross-motion will be denied. Judicial supervision will be retained for the limited purpose of obtaining the City's compliance with paragraph 8 of the 1995 Modification Order for the Fire Apparatus Operator classification. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 12th day of July, 2005.

_____
United States District Judge

49