## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-75-S-666-S |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, *et al.*,<br>        Defendants. | ) | |
| ——————————————— | ) | |
| JOHN W. MARTIN, *et al.*,<br>        Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-74-S-17-S |
| | ) | |
| CITY OF BIRMINGHAM, ALABAMA, *et al.*,<br>        Defendants. | ) | |
| ——————————————— | ) | |
| ENSLEY BRANCH OF THE N.A.A.C.P., *et al.*,<br>*et al.*,<br>        Plaintiffs, | ) | |
| vs. | ) | Civil Action No. CV-74-S-12-S |
| | ) | |
| GEORGE SEIBELS, *et al.*,<br>        Defendants | ) | |

## MEMORANDUM OPINION AND ORDER

This opinion addresses the motion of the City of Birmingham, Alabama ("the

City"), asking the court to terminate the remaining portion of the City's consent

decree, and to dismiss the City as a party to this litigation.[1]

---

[1] *See* doc. no. 1332. The City's "consent decree" actually consists of three documents: *i.e.*, (*i*) the original decree signed by the City, the United States, the Martin class of plaintiffs, and the Ensley Branch of the N.A.A.C.P. in May of 1981, but only conditionally approved by U.S. District Judge Sam C. Pointer, Jr. on June 8, 1981, subject to being withdrawn following notice and a fairness hearing ("1981 Consent Decree"); (*ii*) a modification order dated Dec. 19, 1995, but itself later modified on Apr. 26, 1996 ("1995 Modification Order"); and (*iii*) a modification order entered by the present judicial officer on Dec. 18, 2000 ("2000 Modification Order"). Nevertheless, for ease of reference this court — like the parties — will refer to the 1981 Consent Decree, the 1995 Modification Order, and the 2000 Modification Order collectively, and simply, as "the City's consent decree."

The present motion is but one of many chapters in the long history of these controversies.  The record is voluminous, and spans more than three decades.  This is not the place to recount that sad story.[2]  Nevertheless, some back-tracking is

---

[2] Readers interested in doing so can trace the broad outlines of these controversies in the following list of *published* opinions (listed in chronological, not *Bluebook*, order):  *Ensley Branch of the N.A.A.C.P. v. Seibels*, 14 Fair Empl. Prac. Cas. (BNA) 670, 1977 WL 806 (N.D. Ala. 1977); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I*"); *United States v. Jefferson County*, 28 Fair Empl. Prac. Cas. (BNA) 1834, 1981 WL 27018 (N.D. Ala. 1981); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983); *In re: Birmingham Reverse Discrimination Employment Litigation*, 37 Fair Empl. Prac. Cas. (BNA) 1, 1985 WL 1415 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 39 Fair Empl. Prac. Cas. (BNA) 1431, 1985 WL 56690 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755 (1989); *Bennett v. Arrington*, 806 F. Supp. 926 (N.D. Ala. 1992);  *In re: Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*"); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002).

As this court noted in its July 12, 2005 memorandum opinion, addressing the City's initial motion to terminate its consent decree,

> The extraordinary longevity of these controversies is due to many variables, including such things as:  an enduring local contempt for, and defiance of, national equal employment opportunity requirements, especially when such obligations are mandated by federal *court orders* (attitudes that mirror, but – in the case of Birmingham – exaggerate historic, regional prejudices against full equality for women and any persons not descended from white, Anglo-Saxon, Scotch, or Irish Protestant ancestors); the burning sands of local politics, which have shifted in consonance with the tides of partisan politics on the national and state levels; transformations in federal statutory and decisional law; and, changes in the demographics of the City's workforce.  With regard to the last variable, the City's workforce shortly after the 1981 consent decree consisted of 69% white and 31% African American ("black") employees.  Those persons could be further subdivided on the basis of gender into 79.5% male and 20.5% female employees.  The gender composition of the City's current workforce has not changed radically since then: *i.e.*, it presently is comprised of 72% male and 28% female employees.  The racial composition of the current workforce, on the other hand, is dramatically different: *i.e.*, 66% of the employees are black, and 34% are white; virtually a complete

required in order to place the present motion in its proper perspective.

## I.  RECENT PROCEDURAL HISTORY

The City's initial motion to terminate its consent decree was filed on July 6,

2004.[3]  One year later, on July 12, 2005, and following numerous court proceedings

and an extensive review of evidentiary submissions, this court concluded that the City

had, with the sole exception of one job classification,

> substantially achieved the basic purposes of paragraph 5 of its 1995
> Modification Order[4] through its compliance with the provisions of the

---

> reversal over the course of twenty-two years.  *See, e.g.*, doc. no. 1115 (City's Brief
> in Support of Motion to Terminate Decree) at 26-27.

>> A look at the Police and Fire Departments shows an even more dramatic
>> change.  In the first quarter of 1982, none of the Police Captains or
>> Lieutenants were African American or female[,] and of the 138 Police
>> Sergeants, 10 were African American and 6 were female.  (At that time,
>> 18.7% of the Police Officers were African American and 11.9% were
>> female.)  In 2004, of Birmingham's 29 Police Lieutenants, 14 are African
>> American and 4 are female, while 7 of the 11 Police Captains are African
>> American and 4 are female.  The Fire Department, which had no African
>> American Fire Battalion Chiefs, Captains[,] or Lieutenants in March 1982,
>> currently has African American officers occupying nearly 50% of each of
>> those positions.

> Doc. no. 1227 (July 12, 2005 memorandum opinion), at 2 n.2 (quoting doc. no. 1115 (City's Brief
> in Support of Motion to Terminate Decree), at 28 (citations omitted)) (emphasis in original).

>     [3] *See* doc. no. 1113.

>     [4] Paragraph number 5 of the City's 1995 Modification Order states the long-term objectives
> of the City's consent decree, and it reads as follows:

>> The long term objective of the parties through the City Decree and this Order
>> is to ensure [*i*] that any and all unlawful barriers to employment, assignment, and
>> promotion that have existed for blacks and women are removed, [*ii*] that any present
>> effects of past employment discrimination are fully remedied, and [*iii*] that equal

> 1981 Consent Decree and the 1995 Modification Order detailed above. The City has shown that it has removed unlawful employment barriers for blacks and women, that it has remedied past employment discrimination, and that it has ensured — with the exception of the Fire Apparatus Operator classification discussed above — that its employment selection procedures do not result in an unjustifiable, discriminatory impact on the basis of race or sex. Moreover, with the exception discussed above, the court is satisfied that there has been satisfactory compliance with the City's remedial orders, and that the City has demonstrated its "good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *United States v. City of Montgomery*, 948 F. Supp. 1553, 1563 (M.D. Ala. 1996).

Doc. no. 1227 (memorandum opinion accompanying July 12, 2005 order), at 48-49 (footnote added).

In other words, the City's motion to terminate was granted with respect to all job classifications except one — that of "Fire Apparatus Operator" — and judicial supervision of the City was retained only

> for the limited purpose of obtaining the City's compliance with paragraph 8 of the 1995 Modification Order[5] for the Fire Apparatus

---

employment opportunities with the City are available to all persons, regardless of race or sex, as required by Title VII of the Civil Rights Act of 1964, as amended.

Doc. no. 598 (Order Modifying City of Birmingham Consent Decree) ¶ 5, at 2 (bracketed alterations added).

[5] Paragraph number 8 of the City's 1995 Modification Order reads as follows:

> It shall be the City's responsibility to ensure that each selection procedure required or used by the City shall either:  (1) have no adverse impact on the basis of race or sex as defined by the <u>Uniform Guidelines on Employee Selection Procedures</u>, 29 C.F.R. § 1607 <u>et seq.</u> (1994), (hereinafter "the <u>Uniform Guidelines</u>"); or (2) be job

4

Operator classification, until such time as the City either shoulders the burdens of production and persuasion necessary to validate (*i.e.*, demonstrate the job-relatedness of) its supplemental application, or revises the selection procedure in a manner that, all parties agree, complies with federal law.

Doc. no. 1227 (memorandum opinion accompanying July 12, 2005 order), at 48 (footnote added). *Cf. Freeman v. Pitts*, 503 U.S. 467, 471 (1992) (holding, in the context of a school desegregation class action, that a district court is permitted to withdraw judicial supervision with respect to discrete categories of institutional reform measures when a governmental entity demonstrates compliance with a court-ordered plan). *See also*, *e.g.*, *United States v. City of Miami*, 2 F.3d 1497, 1506 (11th Cir. 1993) (holding that "the principles applicable to requests to modify or terminate

---

related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the <u>Uniform</u> <u>Guidelines</u> and other applicable Federal law.  If a selection procedure or combination of selection procedures is used by the City to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use.  In accordance with the <u>Uniform</u> <u>Guidelines</u>, as part of its consideration of the job relatedness and validity of any selection procedure, the City shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact.  Whenever the City or any party identifies a race and gender-neutral selection procedure that has less adverse impact than a selection procedure required by the City and that alternative procedure is also agreed by the parties to this Order to be job related for the classification in question and consistent with business necessity in accordance with applicable law, such alternative selection procedure shall be used by the City, absent good cause shown.

Doc. no. 598 (Order Modifying City of Birmingham Consent Decree) ¶ 8 (footnotes omitted) (underlines in original).

consent decrees in the institutional reform arenas of prisons and schools are also applicable to such requests in employment discrimination class actions").

In accordance with those rulings, this court subsequently directed the City: (*i*) to revise its selection procedure for the Fire Apparatus Operator classification; (*ii*) await a certification of eligible applicants from the Personnel Board of Jefferson County ("Personnel Board"); (*iii*) administer the revised selection procedure; and (*iv*) deliver the results of the administration of the revised procedure and a validation study to the parties and Special Master for their consideration and objections, if any.[6]

The City complied with the court's deadlines, and delivered the results of its administration of a revised selection procedure and a validity study to the parties on September 20, 2006.  The motion now before this court was filed on February 2, 2007.

Neither the United States nor the Martin plaintiffs and Bryant intervenors ("Martin-Bryant parties") object to the present motion to terminate the remaining aspect of the City's consent decree, and to dismiss the City as a party to any of these controversies.[7]  The Wilks Class opposes the motion, however;  but not on the basis

---

[6] *See* doc. nos. 1263 (scheduling order dated Sept. 26, 2005) and 1285 (scheduling order dated Feb. 21, 2006).

[7] *See* doc. no. 1348 (Response of the United States to the City's Motion to Terminate); doc. no. 1351 (Response of the Martin-Bryant parties to the City's Motion to Terminate).  *See also* doc. no. 1332 (City's Motion to Terminate the Remainder of its Consent Decree), at Exhibits A ("[T]he United States does not object to the City's proposed selection procedures for the FAO position.")

that the City has failed to fulfill the requirements of paragraph 5 of the 1995 Modification Order with regard to the Fire Apparatus Operator job classification.[8] Instead, the Wilks Class argues that "the City has failed to meet its burden under *Freeman* [*supra*] to demonstrate that retention of judicial control is unnecessary and impracticable to achieve compliance, and that it has demonstrated its good faith commitment to the whole of the Court's orders and to the Constitutional provisions at issue in this case."  Doc. no. 1350 ("Wilks Class' Opposition"), at 9.[9]

## II.  DISCUSSION

"A court faced with a motion to terminate . . . a consent decree must begin by determining the basic purpose of the decree."  *City of Miami*, 2 F.3d at 1505.

The first purpose stated in the City's consent decree was the elimination of

---

and B ("The Martin/Bryant parties do not object to the City's use of the Fire Apparatus Operator ('FAO') selection procedure developed by the Yusko Group.").

[8] *See supra* note 4 for the text of paragraph 5.

[9] *But see* doc. no. 1331 (Wilks Class's Response to the City's Validity Report), at 3 ("[T]he Wilks Class will not object to allowing those appointments to move forward and will not make further efforts to improve the quality of the FAO procedure.").  The Wilks Class also reiterates the objections it lodged in response to the City's first motion to terminate its consent decree.  *See* doc. no. 1350, at 9 ("The Wilks Class continues to assert all of its objections to termination of the City Decree.  In our view, the City of Birmingham has not met its burden of demonstrating that its selection procedures are lawful race-neutral devices.  The Court incorrectly placed the burden on the Wilks Class to demonstrate adverse impact to a statistical certainty.  All of the objections set forth in our previous filings objecting to termination of the City Decree or in other respects objecting to the adequacy of the City's compliance efforts are reasserted and not waived . . .  As stated in numerous previous filings, the City of Birmingham has done very little to meet the mandate of *Ensley Branch v. Seibels,* 31 F.3d 1548 (11th Cir. 1994).").  Those issues already have been decided in the court's July 12, 2005 Memorandum Opinion and Order, and the court will not revisit them here.

unlawful barriers to employment, assignment, and promotion for women and persons

with African ancestors.  A second purpose was to redress the consequences of past

discriminatory practices.   These purposes were encapsulated in the following

paragraphs of the 1995 order modifying the City's 1981 consent decree:[10]

> 5.   The long term objective of the parties through the City Decree and this Order is to ensure that any and all unlawful barriers to employment, assignment, and promotion that have existed for blacks and women are removed, that any present effects of past employment discrimination are fully remedied, and that equal employment opportunities with the City are available to all persons, regardless of race or sex, as required by Title VII of the Civil Rights Act of 1964, as amended.

> * * * *

> 7.   The City shall use its best efforts to develop and implement lawful non-discriminatory hiring and promotion procedures within the next four years.  Applicants certified to the City [by the Personnel Board of Jefferson County] will be considered without regard to their race or sex.

> 8.  It shall be the City's responsibility to ensure that each selection procedure required or used by the City shall either:  (1) have no adverse impact on the basis of race or sex as defined by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq. (1994), (hereinafter "the Uniform Guidelines"); or (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Uniform Guidelines and other applicable Federal law.  If a selection procedure or combination of selection

---

[10] *See supra* note 1 for a summary of the linkages between the City's 1981 Consent Decree and its 1995 Modification Order.

procedures is used by the City to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use. In accordance with the <u>Uniform</u> <u>Guidelines</u>, as part of its consideration of the job relatedness and validity of any selection procedure, the City shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact. Whenever the City or any party identifies a race and gender-neutral selection procedure that has less adverse impact than a selection procedure required by the City and that alternative procedure is also agreed by the parties to this Order to be job related for the classification in question and consistent with business necessity in accordance with applicable law, such alternative selection procedure shall be used by the City, absent good cause shown.

Doc. no. 598 (Order Modifying City of Birmingham Consent Decree), at 2-3 (footnotes omitted) (underlining in original).

It must not be overlooked, however, that there is yet a third purpose implicit in the foregoing provisions. That is, when the City agreed that it would "ensure that any and all unlawful barriers to employment, assignment, and promotion that have existed for blacks and women are removed, . . . and that equal employment opportunities with the City are available to all persons, regardless of race or sex," the City implicitly promised that all remedial measures instituted pursuant to the terms of its consent decree, and for the purpose of complying with federal constitutional and statutory requirements, *would carry forward into the future*, *beyond the date of terminating judicial supervision*. In the opinion of this court, given the extraordinary

9

longevity of this litigation, *that* is the *most important* purpose.

Indeed, it is not sufficient for the City to demonstrate only that "the purposes of the litigation as incorporated in the decree . . . have . . . been fully achieved." *Board of Education of Oklahoma Public School v. Dowell*, 498 U.S. 237, 247 (1991) (quoting *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248 (1968)). In addition, this court must find that it is "unlikely that [the City] would return to its former ways" following the termination of judicial supervision. *Id.*; *see also City of Miami*, 2 F.3d at 1505 (same).

Stated differently, this court must be satisfied that the Constitutional and statutory violations that gave rise to the actions filed against the City — now more than thirty-three years ago — "will not be promptly repeated once the decree is lifted." *Wyatt v. Rogers*, 985 F. Supp. 1356, 1384 (M.D. Ala. 1997). In view of the facts discussed below, this court does not possess the level of confidence required to make such a finding at this time.

On some date that is not disclosed in the record, State Senator J. T. "Jabo" Waggoner, Minority Leader of the Alabama Senate, asked the Attorney General of the State of Alabama to answer the following question:

> Does a municipality whose corporate limits were formerly lying wholly within Jefferson County, but whose corporate limits are later extended beyond Jefferson County, cease to be subject to the

10

> jurisdictional authority of the Personnel Board of Jefferson County and
> to the county's civil service system upon such municipality's inter-
> county extension of its corporate limits?

Doc. no. 1350-2 (Ex. A to the Wilks Class' brief in opposition to the City's motion
to terminate), at 1. That question is highly pertinent to the City's motion to terminate
its consent decree because, on some date after that decree was approved, the City's
corporate limits were extended beyond the borders of Jefferson County.

The Attorney General answered Senator Waggoner's question in the negative
on January 30, 2007, saying "[t]he Civil Service System of Jefferson County does not
govern employees of a municipality whose corporate limits extend beyond Jefferson
County." *Id*. at 3. That advisory opinion was based upon the following language
contained in a statute enacted during the 1977 Regular Session of the Alabama
Legislature, and amending section 2 of the enabling act that gave rise to the civil
service system at issue in this litigation:[11]

---

[11] The civil service system for Jefferson County, Alabama was created by an Alabama statute
originally enacted in 1935, but reenacted in 1945. *See* Act No. 248, 1945 Acts of Alabama, at 376-
400; Act No. 284, 1935 Acts of Alabama, at 691-713; *see also* 1940 Code of Alabama, Appendix
§ 645 *et seq*. (Recomp. 1958). Both the original 1935 Act and 1945 re-enactment are so-called
"general acts of local application," meaning that the legislation applied only to Alabama counties
and municipalities that satisfied population requirements specified in the statute. As a result of the
population figures of 200,000 residents specified in the 1935 Act, and 400,000 residents in the 1945
Act, the law has applied since its inception only to Jefferson County, the largest county in Alabama,
and other municipalities and governmental entities that meet the requisite population and corporate
limit criteria specified in the enabling act. *See* Act No. 248, 1945 Acts of Alabama § 2, at 377.
Various sections of the enabling legislation have been amended many times during the intervening
years. In any event, *the linchpin binding all components of the civil service system is the Personnel
Board of Jefferson County*.

11

> **Personnel Board**; **extent of its authority defined**.  In and for each separate county of the State of Alabama which has a population of four hundred thousand or more inhabitants according to the last or any future federal census, there shall be a personnel board for the government and control, by rules and regulations and practices hereinafter set out or authorized, of all employees and appointees holding positions in the classified service of such counties, the municipalities therein having a population of five thousand or more inhabitants, according to the last federal census, *whose corporate limits lie wholly within the county*, the police officers who are employed by any municipality therein having a population of 2500 or more inhabitants, according to the last federal census, whose corporate limits lie wholly within the county, and the County Board of Health, and such personnel board is vested with such powers, authority and jurisdiction . . . .

Act of May 23, 1977, No. 782, § 2, 1977 *Ala. Acts* 1347-48 (1977) (emphasis supplied).

Subsequently, and on yet another date not disclosed in the record, State Senator Waggoner submitted two additional questions to the Attorney General of the State of Alabama.  The first asked:

> Does a municipality (whose corporate limits were formerly lying wholly within Jefferson County, but whose corporate limits are later extended beyond Jefferson County) *automatically* cease to be subject to the jurisdictional authority of the Personnel Board of Jefferson County by operation of law?

Doc. no. 1350-2 (Ex. B to the Wilks Class' brief in opposition to the City's motion to terminate), at 2 (emphasis in original).  In an opinion bearing a "draft" date of February 22, 2007, the Attorney General answered that question affirmatively, saying

that:

> A municipality is automatically released from the authority of the Personnel Board of Jefferson County when it no longer meets the population and corporate limits criteria set forth in the enabling act. If employees of the municipality have rights that have vested under the Jefferson County civil service system, [however,] those rights cannot be extinguished or taken away.

*Id*. at 3. That opinion was based upon construction of the same statutory language previously quoted: *i.e.*, Act No. 782 *supra*.

The second question raised by Senator Waggoner, and also answered in the Attorney General's February 22, 2007 "draft" opinion, asked:

> Does the governing body (City Council) of a municipality whose corporate limits were formerly lying wholly within Jefferson County, but whose corporate limits are later extended beyond Jefferson County, have the authority to enact ordinances or resolutions to cause that municipality to be subject to the jurisdictional authority of the Personnel Board of Jefferson County and to the county's civil service system?

*Id*. at 4. The Attorney General responded affirmatively, saying that other language contained in the same statute (Act No. 782)

> specifically addresses the situation where the corporate limits of a municipality were wholly within the county, but are later extended beyond the county, and the municipality wishes to remain subject to the jurisdictional authority of the county personnel board. 1977 Ala. Acts No. 782, 1350-51 (1977). The act states, in part, as follows:
>
> > ***In the event the governing body of any municipality whose corporate limits lie partly within said county and partly within any other county*** and having a population of

13

five thousand or more inhabitants, according to the last federal census, or any succeeding federal census, ***shall adopt a resolution in favor of such municipality coming under the provisions of this act***, and transmit or cause to be transmitted a certified copy of such resolution to the Personnel Board of such civil service system, then, sixty days after effective date of such resolution, ***the provisions of this Act shall apply to any such municipality*** having the required number of inhabitants and whose corporate boundaries lie partly within said county and partly without said county. ***Any municipality which adopts a resolution and comes under the provisions of this Act***, ***as herein provided***, ***shall thereafter remain under this Act***, and may not repeal or rescind such action either by the adoption of a resolution or otherwise.

1977 Ala. Acts. No. 782, 1350-51 (1977) (emphasis added).

The language of act 782 allows a municipality whose corporate limits lie partly within one county and partly within another county to come under the authority of the Jefferson county civil service system by adopting a resolution and sending a certified copy to the Personnel board. The act makes it clear that once a municipality adopts a resolution and becomes subject to the authority of the Personnel Board, the resolution is final and cannot be rescinded by the municipality at a later date.

*Id*. at 4-5 (all emphasis in original).

The foregoing advisory opinions ceased to be simply interesting in an academic sense when, on February 6, 2007, in an unrelated suit commenced by the present Mayor of the City of Birmingham in the state court system against the elected members of the Birmingham City Council and the Personnel Board of Jefferson

14

County,[12] the Mayor served the following requests for admissions on the Personnel Board:

> 1.  Admit that the Jefferson County Personnel Board ("JCPB") only has authority over cities located wholly within Jefferson County.
>
> 2.  Admit that the JCPB does not have jurisdiction over municipalities not wholly located in Jefferson County.
>
> 3.  Admit that once a municipality ceases to exist wholly in Jefferson County, that municipality ceases to be subject to the jurisdiction of the JCPB.

Doc. no. 1350-5 (Ex. E to the Wilks Class' brief in opposition to the City's motion to terminate), at 1.  These requests for admissions clearly signaled that the City contemplated the prospect of freeing itself from the Personnel Board's jurisdiction following termination of the City's consent decree and its release from federal court supervision.  Consequently, the Martin-Bryant parties propounded discovery addressing the issue.

The Martin-Bryant parties' requests for admissions, and the City's responses thereto, read as follows:

**REQUEST NO. 1**:
Admit that, under the provisions of the Enabling Act, the Personnel Board has jurisdiction over the classified employees of the

---

[12] The issue in this state court action, as best this court understands it, is whether the Mayor of the City Council of Birmingham has the authority to propose and authorize pay raises for certain classes of municipal employees.

City.

**RESPONSE**:

The City can neither admit nor deny Request No. 1.  The Enabling Act provides that the Personnel Board has jurisdiction over "municipalities . . . whose corporate limits lie wholly within the county". [sic]   The City's corporate limits are not wholly within Jefferson County.

When the Personnel Board was established, the City's corporate limits were entirely within Jefferson County.  However, the City later expanded into Shelby County.  The Enabling Act is silent as to whether a municipality that was originally wholly within Jefferson County but which later was not wholly within the county is subject to the Personnel Board's jurisdiction.

Since the City expanded into Shelby County it has not taken the position that it is not subject to the Personnel Board's jurisdiction.  The City paid for and received services from the Personnel Board both before and after it had corporate limits outside of Jefferson County.  *The City has no plans to withdraw from the Personnel Board.*

**REQUEST NO. 2**:

Admit that the City elected to fall within the jurisdiction of the Personnel Board, as provided in the Enabling Act.

**RESPONSE**:

The City can neither admit nor deny Request No. 2.  The Enabling Act provides that "In the event the governing body of any municipality whose corporate limits lie partly within said county and partly within any other county . . . shall adopt a resolution in favor of such municipality coming under the provisions of this Act, and shall transmit or cause to be transmitted a certified copy to the Personnel Board . . . the provisions of this Act shall apply to any such municipality . . . whose corporate boundaries lie partly within said county and party [sic] without said county." If a municipality delivers such a resolution, it may not repeal or rescind that action.  Other than this provision, the Enabling

16

Act is silent regarding a municipality's election to be subject to a Personnel Board.

The City has never passed a resolution or notified the Personnel Board that it was electing to be covered by the Personnel Board's jurisdiction. The City has paid for and received services from the Personnel Board both before and after it had corporate limits outside of Jefferson County. *The City intends to continue paying for and receiving the Personnel Board's services. However, the City has never elected to be covered by the Personnel Board's jurisdiction as provided in the Enabling Act.*

**REQUEST NO. 3**:
Admit that under existing Alabama laws, the City has no legal right to withdraw from the Personnel Board's jurisdiction.

**RESPONSE**:
The City can neither admit nor deny Request No. 3. The Enabling Act is silent on the withdrawal rights of a municipality that was formerly wholly within Jefferson County and subject to the Act but subsequently expanded beyond Jefferson County. *The City is not seeking to withdraw from the Personnel Board.*

Doc. no. 1350 (Ex. I to the Wilks Class' brief in opposition to the City's motion to terminate), at 1-3 (italicized emphasis supplied, boldface emphasis in original).

The City's responses are, at best, equivocal on its intentions following its release from court supervision. *See*, *e.g.*, doc. no. 1350 (Wilks Class' brief in opposition to the City's motion to terminate), at 5 ("The City's responses were less than a steadfast acknowledgment of its continuing role as a subject jurisdiction of the Personnel Board of Jefferson County."); *id*. at 8 ("[A] statement by elected officials

that they 'have no plans' to do something is hardly much to rely upon with any confidence.").

That equivocation raises grave concerns because, since the creation of the Jefferson County civil service system in 1935,[13] the City has "relied so heavily upon the [Personnel] Board's functions in the hiring and promotion of its employees that *any* suggestion that the City believes it can duplicate the role that it has abdicated to the Board for decades is alarming and cannot be taken lightly." *Id*. at 7 (emphasis in original). Stated differently, while the City "has demonstrated that it can comply fully with its decree and the law *while relying on the Personnel Board for applicant screening and certification*," the City — thus far — "has not demonstrated that it can do so *in the absence of the Personnel Board*." Doc. no. 1351 (Martin/Bryant Parties' Response), at 7 (emphasis supplied).

Assuming the Attorney General's interpretation of the statutory language quoted above is correct, if the City had not been subject to the consent decree it now seeks to terminate, the City would have been *automatically* released from the jurisdiction of the Personnel Board when its corporate limits first extended beyond the physical borders of Jefferson County. Further, if the City were not subject to the consent decree, it would need to enact a resolution in order to be returned to the

---

[13] *See supra* note 11.

Personnel Board's jurisdiction. It has enacted no such resolution, and has not stated that it plans to do so. Thus, the possibility of the City's separation from the Personnel Board is disturbingly real, even in light of the City's responses to the Martin-Bryant parties' requests for admissions. Finally, and of primary importance, given the lack of any evidence that the City can comply with the obligations of its consent decree in the absence of assistance from the Personnel Board, this court lacks confidence that the City will be able to comply with the requirements of federal law following the termination of its consent decree. *See Dowell,* 498 U.S. at 247.

Accordingly, the City's motion to terminate the remaining portion of its consent decree and to be dismissed as a party is DENIED, but without prejudice to the City's right to refile the motion after an additional period for discovery has expired, and additional briefing has been submitted. The additional discovery must be completed on or before November 16, 2007, and should address at least the following issues: (1) whether the Birmingham City Council will pass a resolution to remain under the jurisdiction of the Personnel Board; and, if not, (2) what the City's plans will be for establishing a personnel system that can produce hiring and promotional decisions that comply fully with governing law. The scope of discovery shall *not* extend to any of the issues already decided — *i.e.,* the City's past compliance with the consent decree, or the validity of any of its existing job positions.

19

If the City intends to refile its motion to terminate the consent decree, it must do so

on or before December 16, 2007.  The court will establish a revised briefing schedule

once the motion is filed.

DONE this 20th day of August, 2007.

_____
United States District Judge

20