## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) ) ) | |
| vs. | ) ) | Civil Action No. CV-75-S-666-S |
| JEFFERSON COUNTY, ALABAMA, *et al.*,<br>Defendants. | ) ) ) | |
| JOHN W. MARTIN, *et al.*,<br>Plaintiffs, | ) ) ) | |
| vs. | ) ) | Civil Action No. CV-74-S-17-S |
| CITY OF BIRMINGHAM, ALABAMA, *et al.*,<br>Defendants. | ) ) ) | |
| ENSLEY BRANCH OF THE N.A.A.C.P., *et al.*,<br>Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. CV-74-S-12-S |
| GEORGE SEIBELS, *et al.*,<br>Defendants | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

This opinion addresses the motion filed by the Martin-Bryant parties to disqualify the law firm of Fitzpatrick & Brown, LLP, from serving as additional counsel for defendant Jefferson County, Alabama,[1] particularly in connection with the Martin-Bryant parties' motion to hold Jefferson County in civil contempt for failing to comply with the terms of its consent decree.[2] Resolution of the motion requires the court to delve, once again, into the long and tortured history of this institutional

---

[1]Doc. no. 1406.

[2]Doc. no. 1413.

reform litigation.[3]

The original action was filed more than thirty-four years ago, on January 4, 1974, by the Ensley Branch of the National Association for the Advancement of Colored People and several named plaintiffs who sued for themselves and on behalf of a class of similarly situated persons.[4]  The defendants to that action were:  George Seibels, then Mayor of Birmingham, Alabama; the City of Birmingham, a municipal corporation; the individual members of the Personnel Board of Jefferson County, Alabama ("Personnel Board" or "Board"); and the Board's Personnel Director.  The

---

[3]This is not the place, however, to recount that history in full.  Readers interested in doing so can trace its broad outlines in the following list of *published* opinions listed in chronological, not *Bluebook*, order:  *Ensley Branch of the N.A.A.C.P. v. Seibels*, 14 Fair Empl. Prac. Cas. (BNA) 670, 1977 WL 806 (N.D. Ala. 1977); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I* "); *United States v. Jefferson County*, 28 Fair Empl. Prac. Cas. (BNA) 1834, 1981 WL 27018 (N.D. Ala. 1981); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983); *In re: Birmingham Reverse Discrimination Employment Litigation*, 37 Fair Empl. Prac. Cas. (BNA) 1, 1985 WL 1415 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 39 Fair Empl. Prac. Cas. (BNA) 1431, 1985 WL 56690 (N.D. Ala. 1985); *In re: Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755 (1989); *Bennett v. Arrington*, 806 F. Supp. 926 (N.D. Ala. 1992); *In re: Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994); *Ensley Branch of the N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II* "); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002); *Birmingham Firefighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002).

[4]*See*, *e.g.*, *United States v. Jefferson Co.*, 720 F.2d 1511, 1514 n.1 (11th Cir. 1983) ("The Ensley Branch of the NAACP is a membership organization of black citizens of Birmingham, Alabama.  It, along with three black males who had applied for positions with the City of Birmingham, Alabama, and taken tests administered by the Jefferson County, Alabama, Personnel Board, filed a class action complaint against the City, George Seibels, Jr., then Mayor of Birmingham, the Board, the three members of the Board and the director of the Board.").

complaint alleged that those defendants had engaged in discriminatory hiring practices against African Americans ("blacks") in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

That action was followed only three days later by another, raising the same constitutional and statutory allegations, and filed by John W. Martin and other black individuals (the "Martin class") against the City of Birmingham and its Mayor, the Personnel Board and its Director, and, *Jefferson County and its individual Commissioners.*[5]

The following year, on May 27, 1975, the United States brought suit against Jefferson County, the Personnel Board, and the various municipalities and other governmental entities serviced by the Board, alleging, among other things, a pattern or practice of discriminatory employment practices against African Americans and females in violation of the Fourteenth Amendment, Title VII, and 42 U.S.C. § 1981,

---

[5]*See id.* at 1514 n.2 ("John Martin is a black male who applied for a position with the City of Birmingham and was certified by the Jefferson County Personnel Board but rejected by the City. He and six other black applicants for employment with the City, or City employees denied promotion, filed a class action against the defendants named in the suit brought by the Ensley Branch of the NAACP, and three Jefferson County Commissioners who plaintiffs alleged were responsible for Board activities.").

a part of the Civil Rights Act of 1866.[6]

Judge Sam C. Pointer, Jr., consolidated the foregoing cases and, on December 20-22, 1976, conducted a bench trial on the limited issue of whether the entry-level tests used by the Personnel Board to screen and rank applicants for firefighting and police officer positions violated the constitutional or statutory rights of black applicants.[7]  All other issues under the consolidated complaints were reserved until a later date.[8]  Judge Pointer concluded that the tests violated Title VII because both

> had a significant adverse impact on black applicants, a phenomenon
> defined as a passing rate "less than four-fifths  . . . of the rate for

---

[6]The United States also alleged violations of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. § 3766(c), and the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1242.

It should be noted that yet a fourth action was filed on February 20, 1976, by Lucy Walker, who challenged the employment practices of the Jefferson County Nursing Home under Title VII and 42 U.S.C. § 1981, *see*, *e.g.*, *Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 815 (11th Cir. 1980) ("*Ensley I* "), but her claims eventually were resolved by settlement and that case was dismissed.

[7]The City of Birmingham and Jefferson County — the two largest governmental employers serviced by the Personnel Board of Jefferson County, an independent governmental entity — and the Personnel Board of Jefferson County share responsibility for hiring and promoting employees of the City or County.  The Board, pursuant to state law, administers written tests and other job selection procedures that produce a pool of qualified candidates for a particular position (a "register" of persons considered eligible for the particular position).  The Board ranks the passing applicants and, when a vacancy occurs, forwards a list of candidates to the City or County for final selection (a "certificate" of eligibles).  The original complaints alleged, among other things, that the Board used discriminatory tests to determine eligibility for hiring and promotion, and that the City, County, and other governmental employers engaged in still further discrimination when selecting individuals from the Board's already tainted certificates of persons eligible for hire or promotion.  *See*, *e.g.*, *Ensley Branch of the N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1552 (11th Cir. 1994) ("*Ensley II* ").

[8]For example, the United States did not press at this trial its coordinate claim that the tests also were discriminatory against female applicants.

[whites]." *Ensley Branch*, 13 Empl. Prac. Dec. (CCH) ¶ 11,504, at 6796-97 (internal quotation marks omitted). The court ruled that the tests could be used only if, despite their adverse impact, they were sufficiently "job related" to predict effectively test takers' future job performance. *Id*. at 6796 nn.10-11, 6806. After reviewing testing data, the court concluded that the tests failed to meet this standard. *Id*. at 6798-6808.

*Ensley Branch of the N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1554 (11th Cir. 1994)

("*Ensley II* ").[9] Accordingly, on January 10, 1977, Judge Pointer entered a final

judgment on this limited issue,[10] and ordered remedial actions by the Board and City.

Specifically, the Court ordered that blacks be referred for openings on the police and firefighter forces at the rate at which they took the tests when most recently administered. To accomplish this, the Court ordered that the names of a sufficient number of blacks be added to the current police and firefighter eligibility lists so that the lists shall be representative of the racial composition of the test-takers, *i.e.*, 28 and 14 percent black for police and firefighter lists, respectively; that, one-third of future certifications, *i.e.*, referrals from the lists for actual employment, are to be black until, considering all certifications since the relevant 1975 and 1976 dates, the numbers of certifications become representative of the racial composition of the test-takers. Thereafter, blacks are to be certified in accordance with their representation on the lists, *i.e.*, 28 and 14 percent of certifications for policemen and firefighters, respectively, will be black. Similarly, referrals from future lists will be a function of the rate at which blacks take the examinations on which the lists are based, until or unless defendants develop valid tests.

---

[9]For a succinct discussion of Judge Pointer's specific findings on the issue of liability, see Judge Carnes's opinion in *Ensley II*, 31 F.3d at 1554-55.

[10]*See Ensley Branch of the N.A.A.C.P. v. Seibels*, No. CA 74-2-12-S, 1977 WL 806 (N.D. Ala. Jan. 10, 1977).

*Ensley Branch of the N.A.A.C.P. v. Seibels*, 616 F.2d 812, 815 n.6 (5th Cir. 1980) ("*Ensley I* ").

The Personnel Board appealed, and the United States and the Martin class cross-appealed.[11]  While that appeal was pending, Judge Pointer conducted a second bench trial in August of 1979.  "That trial involved challenges to other Board practices, including:  written tests for eighteen more positions; various rules affecting promotional opportunities; the imposition of height, weight, and educational requirements for certain jobs; and the restriction of some job announcements and certifications to persons of a particular sex."  *Ensley II*, 31 F.3d at 1556.  The plaintiffs' independent claims against the City and County were not tried.

While awaiting Judge Pointer's decision on the issues raised in the August 1979 trial, and following the former Fifth Circuit's affirmance of his January 1977 finding of Title VII violations, *see Ensley I*, 616 F.2d at 822,[12] the parties entered into settlement negotiations that resulted in the execution of two proposed consent decrees:  *i.e.*, one between the City of Birmingham and the Ensley Branch plaintiffs,

---

[11]The Personnel Board contended that its test devices did not violate Title VII, while the United States and the Martin plaintiffs contested Judge Pointer's determination as to the date on which Title VII liability commenced.  *See id*. at 815.

[12]While the former Fifth Circuit affirmed Judge Pointer's determination of Title VII liability, it reversed and remanded for additional proceedings on the question of when the City's liability under Title VII commenced.  *See id*. at 822-25.

the Martin class plaintiffs, and the United States ("the City decree"); and another between the Personnel Board and the Ensley Branch plaintiffs, the Martin class plaintiffs, and the United States ("the Board decree"). The proposed consent decrees were signed by counsel for the affected parties on May 19, 1981. Judge Pointer provisionally approved the proposed consent decrees the following month, but reserved final approval until a fairness hearing could be convened, to consider objections that might be filed by interested parties.

The "keystone" of each consent decree tendered to Judge Pointer on May 19, 1981 was "an extensive regime of affirmative action for blacks and women." *Ensley II*, 31 F.3d at 1556. That fact prompted several interested non-parties to appear at the fairness hearing conducted during August of 1981, for the purpose of challenging the proposed City and Board decrees. Chief among the objectors was the Birmingham Firefighters' Association 117 ("BFA"), a labor association representing a majority of City firefighters, most of whom were white males. "The day after the hearing, BFA and two of its members (BFA members) moved . . . to intervene of right *in each of the three cases*, contending that the proposed consent decrees would have a substantial adverse impact upon them. The court denied their motions as untimely, and approved, and entered, both consent decrees." *United States v. Jefferson County*, 720

7

F.2d 1511, 1515 (11th Cir. 1983) (footnote omitted) (emphasis supplied).   The

ensuing events were summarized by Judge Carnes in his *Ensley II* opinion as follows:

> Before approving the decrees, the district court rejected the merits
> of the objections raised at the fairness hearing by the would-be
> intervenors.   The district court reasoned that the decrees "[did] not
> preclude the hiring or promotion of whites or males," *Jefferson County*,
> 28 Fair Empl. Prac. Cas. (BNA) at 1836, and that the City's hiring goals
> were "expressly made subject to the caveat that the [City] decree is not
> to be interpreted as requiring the hiring or promotion of a person who is
> not qualified or of a person who is demonstrably less qualified
> according to a job-related selection procedure," *id*. at 1837.   The court
> further noted that the "provisions for potentially preferential treatment
> [were] limited both in time and in effect" because they would expire on
> their own terms when the work-force parity goals were met and because
> either decree could "be dissolved after a period of six years" if the
> purposes of the decree had been substantially achieved.   *Id*.; *see also In
> re Birmingham Reverse Discrimination Employment Litig*., 37 Fair
> Empl. Prac. Cas. (BNA) 1, 3 n.5, 1985 WL 1415 (N.D. Ala. 1985)
> (describing the circumstances in which the decrees may be dissolved).
> In addition, the court reviewed the evidence of past discrimination
> against blacks and women and concluded that "there is more than ample
> reason for the Personnel Board and the City of Birmingham to be
> concerned that they would be in time held liable for discrimination"
> against blacks seeking promotional positions in the police and fire
> departments and against woman at all levels of hiring and promotion in
> those departments. *Jefferson County*, 28 Fair Empl. Prac. Cas. (BNA)
> at 1838.   On appeal, this Court affirmed the district court's denial of the
> BFA's intervention motion.   *Jefferson County*, 720 F.2d at 1516-19.

> Shortly after the district court approved the decrees and denied
> leave to intervene:

> > Seven individual white male firefighters . . . filed a complaint in
> > the district court against the Board and the City to enjoin the

enforcement of the consent decrees on the ground that the operation of the decrees would discriminate against them in violation of Title VII of the Civil Rights Act. They applied for a preliminary injunction, which, after a hearing, the district court denied.

*Jefferson County*, 720 F.2d at 1515 (footnote omitted). In the same opinion in which we affirmed the denial of the BFA's motion to intervene, we also upheld the district court's denial of the preliminary injunctive relief sought by the seven individual white male firefighters. *Id*. at 1520.

## C. THE REVERSE DISCRIMINATION LITIGATION

The district court's approval of the consent decrees, and our refusal to allow the BFA to intervene, brought forth a collection of cases that has come to be known as the "Birmingham Reverse Discrimination Employment Litigation." In these cases, a number of male, non-black City employees collaterally attacked the decrees and the affirmative action programs adopted under them. *See In re Birmingham Reverse Discrimination Employment Litig*., 833 F.2d 1492, 1495 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755, 109 S. Ct. 2180, 104 L. Ed. 2d 835 (1989). The United States, despite its status as a signatory of the consent decrees, also brought suit against the City, lodging allegations similar to those of the individual plaintiffs. *Id*., 833 F.2d at 1496; *cf. In re Birmingham Reverse Discrimination Employment Litig*., 37 Fair Empl. Prac. Cas. (BNA) 1, 8, 1985 WL 1415 (N.D. Ala. 1985) (permitting the United States to side with the reverse discrimination plaintiffs on the issue of whether the City was violating the decree). These cases were heard by the same judge who had heard the earlier consent-decree cases.

Prior to trial, the district court rejected the reverse discrimination plaintiffs' collateral challenge to the legality of the decrees. *See In re Birmingham Reverse Discrimination Employment Litig*., 37 Fair Empl. Prac. Cas. (BNA) at 3 & n.6. Instead, the district court restricted the

9

plaintiffs' action to the questions of whether the City or the Board had violated the decrees or had granted illegal preferences that were not required by the decrees. *Id*. at 3-4. At the close of the plaintiffs' case, the court further limited the action by dismissing for lack of evidence all claims against the Board. *See Martin v. Wilks*, 490 U.S. 755, 779 n.16, 109 S. Ct. 2180, 2194 n.16, 104 L. Ed. 2d 835 (1989) (Stevens, J., dissenting). This left the City as the only defendant.

At trial, the plaintiffs had claimed that some blacks promoted over more-qualified non-blacks despite the fact that the City decree specifically did not require the City to "promote a less qualified person, in preference to a person who is demonstrably better qualified based upon the results of a job related selection procedure." After trial, the district court found for the City, holding that the City had shown that its employment actions were required by the decrees. *Id*. at 780-81, 109 S. Ct. at 2194-95. The district court in effect decided that the provision quoted by the plaintiffs applied only if job related selection procedures were in place. *In re Birmingham Reverse Discrimination Employment Litig*., 833 F.2d at 1497. Although the district court agreed that "[m]ost but not all of those whites who were not selected for [the challenged promotions] had higher test scores" than the blacks who were selected, the court pointed out that the tests on which these scores were based had never been shown to be valid predictors of future job performance. The court further noted that the City " 'does not use a job-related selection procedure in evaluating the qualifications of certified candidates [and] has made no effort to develop . . . such a procedure.' " *In re Birmingham Reverse Discrimination Employment Litig*., 833 F.2d at 1497 (quoting the district court's December 26, 1985, order (emphasis and alteration added)). Accordingly, the district court rejected the plaintiffs' assertion that demonstrably better qualified whites had been passed over.

On appeal, this Court reversed. We observed that "the district judge treated the plaintiffs as if they were bound by the consent decrees," rendering the plaintiffs unable to challenge the decrees' validity, and limiting their action to a claim that the City had granted racial preferences beyond those mandated by the City decree. *Id*. at

1496.  This limitation was unfair to the male, non-black plaintiffs, we reasoned, because they had not participated in the negotiation or signing of the consent decrees.  *Id*. at 1498-99.   To give the reverse-discrimination plaintiffs their day in court, we ruled that they must be allowed to bring an action challenging the validity of the decrees. *Id*. at 1499-1500.  We therefore directed the district court to re-examine the legality of the decrees under the heightened scrutiny applicable to voluntary government affirmative actions plans. *Id*. at 1500-01. Finally, we ruled that the United States was estopped from collaterally attacking the decrees by its status as a signatory.  *Id*. at 1501.  "[I]f the United States believes that the decrees should be modified based on changed circumstances, its remedy . . . is to seek modification in the court which retained jurisdiction over the cases in which the decrees arose."  *Id*. at 1501.

Our decision was upheld by the Supreme Court in *Martin v. Wilks*, 490 U.S. at 769, 109 S. Ct. at 2188.  In affirming our reasoning, the Wilks Court implicitly suggested that plaintiffs in future cases could avoid such collateral challenges by insuring that all interested parties were joined from the outset.  *See id*. at 765-67, 109 S. Ct. at 2187.

The district court subsequently held a new trial on the reverse discrimination plaintiffs' challenge.  At the conclusion of that trial, the district court again ruled in favor of the City.  *Bennett v. Arrington*, 806 F.Supp. 926, 931 (N.D. Ala. 1992).  Applying strict scrutiny, *id*. at 928, the district court found that the City had "significant evidence" of past discrimination to support its affirmative action program. *Id*. at 929. The court further found the affirmative action provisions were narrowly tailored because the City had first tried alternative measures, and because these provisions were both flexible and temporary.  *Id*. at 929-30.  That ruling was recently reversed by another panel of this Court.  *See In re Birmingham Reverse Discrimination Employment Litig*., 20 F.3d 1525 (11th Cir. 1994).

## D.  THIS DECREE MODIFICATION PROCEEDING

11

After we suggested that the United States could not collaterally challenge the decrees but could seek modifications, *see In re Birmingham Reverse Discrimination Employment Litig.*, 833 F.2d at 1501, the parties began discussing modification as a possible means of resolving their outstanding differences. With that prospect in mind, the plaintiffs from the reverse-discrimination case moved to intervene in this, the original consent-decree, case and to consolidate this case with the reverse-discrimination case. On May 25, 1990, the district court denied the reverse-discrimination plaintiffs' motion to consolidate, but allowed them to intervene in this case "for the limited purpose of participating in any litigation regarding potential modification of the consent decrees." Subsequently, in an effort to gather all interested parties in a single proceeding, the district court certified both a class of "[a]ll present and future black and female employees . . . [and] applicants for employment with the City" (the "Bryant class"), and a class, represented by several of the plaintiffs from the parallel reverse-discrimination case, of "[a]ll present and future male, non-black employees . . . [and] applicants for employment with the City of Birmingham" (the "Wilks class").

*Ensley II*, 31 F.3d at 1558-60. The Wilks class was represented by attorney Raymond P. Fitzpatrick, Jr., and he and his present firm, Fitzpatrick & Brown, LLP, continue to represent that class of white male plaintiffs today.[13]

It is important to note that, during all of the foregoing litigation addressing the affirmative action provisions of the Personnel Board's and City's consent decrees, defendant Jefferson County, Alabama maneuvered like a stealth bomber underneath

---

[13]The court recognizes that Ray Fitzpatrick has partnered with several different attorneys over the years, and that he has been associated with law firms of various names. For the sake of convenience in discussing this motion, however, the court will use the name "Fitzpatrick & Brown" to refer to any firm with which Ray Fitzpatrick has been associated during any stage of his participation in this litigation.

the radar screen of intensive court scrutiny.  For example, the County's proposed consent decree was not presented to the court until a year-and-a-half after the City and Board decrees; it was signed by representatives of the United States and the Martin class of plaintiffs, on one side, and the Jefferson County Commission and Jefferson County Sheriff on the other (both governmental entities being hereafter collectively referred to simply as "the County") on December 28 & 29, 1982.  Judge Pointer "[e]ntered and conditionally Ordered" the decree into effect on December 29, 1982.[14]

The County's consent decree differs from those of the Personnel Board and City in at least two respects.  First, the County decree did not contain the race and gender preferences found in the Board and City decrees.  Instead, its "major purposes" were characterized as "insur[ing] that "blacks and women are considered for employment by the County on an equal basis with whites and males," and "correct[ing] for the effects of any alleged prior discriminatory employment practices by the County against blacks and women."[15]  To those ends, the decree enjoined the County from "engaging in any act or practice which has the purpose or effect of

_____

[14]*See* Consent Decree with Jefferson County.  The plaintiffs to the original action commenced by the Ensley Branch of the N.A.A.C.P. and several individual class representatives did not allege claims against Jefferson County.

[15]*Id.* at ¶ 5.

13

unlawfully discriminating against any employee of, or any applicant or prospective applicant [for employment] with, Jefferson County because of such individual's race, color or sex."[16]   The County also agreed "that all hiring, promotion, upgrading, training, job assignments, discharge or other disciplinary measures, compensation, or other terms and conditions or privileges of employment shall be maintained and conducted in a manner which does not unlawfully discriminate on the basis of race, color or sex."[17]   Further, the County's consent decree required only that it

> seek in good faith to achieve the employment of qualified blacks and females in job vacancies in the classified service of the County in numbers approximating their percentage representation among persons on the eligibility lists for such jobs as determined by the Jefferson County Personnel Board under nondiscriminatory recruitment and selection procedures set forth in its Consent Decree . . . and in job vacancies in laborer positions in the unclassified service in numbers approximating their percentage representation among qualified applicants for such jobs as determined by the County under the provisions of this Consent Decree.[18]

The second major respect in which the County's consent decree differs from those of the Board and City is that it has not been modified.

In addition, it must be noted that, since at least 1991, the focus of these

---

[16] *Id.* at ¶ 1.

[17] *Id.*

[18] *Id.* at ¶ 5.  While the City of Birmingham and Personnel Board decrees were modified after their entry, the County decree was not.

14

consolidated proceedings has been on modification, enforcement, and implementation of the Personnel Board and City decrees.  No party actively pursued enforcement of the County decree until sometime during the year 2006, when the Martin-Bryant parties began to gather evidence addressing the County's compliance with its consent decree.  Sometime during the discovery period, Jefferson County retained Fitzpatrick & Brown as additional counsel in any impending decree compliance proceedings.[19] Fitzpatrick & Brown entered an appearance on behalf of Jefferson County on August 28, 2007.[20]  From the inception of the Martin class's claims on January 7, 1974, until the date on which Fitzpatrick & Brown formally appeared as additional counsel for the County — a period of some 33 years, seven months, and 21 days — Jefferson County was represented solely by in-house counsel employed within the Jefferson County Attorney's Office.  Indeed, those in-house attorneys continue to represent the County to this date.

The Martin-Bryant parties filed their motion to disqualify Fitzpatrick & Brown

---

[19]The exact date on which Fitzpatrick & Brown commenced *de facto* representation of Jefferson County is in question.  However, from the parties' submissions, it is clear that the contract between Fitzpatrick & Brown and Jefferson County was *finalized* on August 28, 2007, when it was approved by the Jefferson County Commission.  *See* doc. no. 1423 (Supplemental Response of Fitzpatrick & Brown to Motion to Disqualify), at Exhibit 6 (Aug. 28, 2007 Resolution of the Jefferson County Commission, approving the representation contract between Jefferson County and Fitzpatrick & Brown).

[20]Doc. no. 1400.

as additional counsel for the County on September 18, 2007.[21]  On October 3, 2007,

the Martin-Bryant parties also filed a motion to hold Jefferson County in civil

contempt for failure to comply with the requirements of its consent decree, and to

modify the decree.[22]  All proceedings on the motion for contempt and modification

have been stayed pending a ruling on the motion to disqualify.

## I.  THE ISSUE OF STANDING

Despite Fitzpatrick & Brown's arguments to the contrary, the Martin-Bryant

parties possess standing to raise the issue of disqualification.  Binding authority states

that, whenever "an attorney discovers a possible ethical violation concerning a matter

before a court, he is not only authorized *but is in fact obligated* to bring the problem

to that court's attention."  *United States v. Gopman,* 531 F.2d 262, 265-66 (5th Cir.

1976) (emphasis supplied) (internal citation omitted).[23]  *See also Musicus v.*

*Westinghouse Electric Corporation,* 621 F.2d 742, 744 (5th Cir. 1980) ("A district

court is obliged to take measures against unethical conduct occurring in connection

with any proceeding before it. . . .  A motion to disqualify counsel is the proper

---

[21]Doc. no. 1406.

[22]Doc. no. 1413.

[23]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court.") (internal citation omitted).

The Alabama Rules of Professional Conduct also direct an attorney to raise questions about the ethical propriety of another attorney's behavior.  *See* Ala. R. Prof'l Conduct 8.3 (requiring a lawyer with knowledge of another lawyer's violation of ethical rules to "report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation"); R. 1.7 cmt. ("Where the conflict [of interest] is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question.").[24]

Fitzpatrick & Brown rely upon a single quote from an Alabama state court decision to support their argument that the Martin-Bryant parties lack standing to bring this motion to disqualify.  In *Ex parte Tiffin,* 879 So. 2d 1160 (Ala. 2003), the Alabama Supreme Court held that "a stranger to the attorney-client relationship lacks standing to assert a conflict of interest in that relationship." *Id.* at 1165 (internal

---

[24]This court recognizes the elevated potential for abuse or harassment when a motion to disqualify is brought by opposing counsel. *See, e.g., In re Employment Discrimination Litigation Against the State of Alabama*, 453 F. Supp. 2d 1323, 1332 (M.D. Ala. 2001) ("[B]ecause a motion for disqualification is such a 'potent weapon' and 'can be misused as a technique of harassment,' the court must exercise extreme caution in considering it to be sure it is not being used to harass the attorney sought to be disqualified, or the party he represents.") (citations omitted); Ala. R. Prof'l Conduct R. 1.7, cmt. (stating that an objection to opposing counsel's alleged conflict of interest "should be viewed with caution . . . for it can be misused as a technique of harassment."). Here, the Martin-Bryant parties' motion to disqualify Fitzpatrick & Brown is well-founded and, indeed, due to be granted.  The motion should not be considered harassment.

quotation marks omitted).  As an initial matter, *Tiffin* is distinguishable because its

strict holding was that *a non-party* lacked standing to assert a conflict of interest; the

court did not extend its holding to limit the standing of counsel representing other

parties to the lawsuit.  *See id.* at 1165.

Moreover, even if *Tiffin* were not distinguishable, its holding would not be

binding on this court.  "[T]he ethical standards that govern attorneys who practice

before a federal court are determined by federal and not state law."  *In re Employment*

*Discrimination Litigation Against the State of Alabama,* 453 F. Supp. 2d 1323, 1330-

31 (M.D. Ala. 2001) (citing *In re Snyder,* 472 U.S. 634, 645 n.6 (1985); *In re*

*Finkelstein,* 901 F. 2d 1560, 1564 (11th Cir. 1990)).  Therefore, even when, as in the

present case, a federal district court adopts a state bar association's ethical rules, "the

court is not bound by state court interpretations of those rules."  *In re Employment*

*Discrimination Litigation Against the State of Alabama,* 453 F. Supp. 2d at 1331

(citing *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1316 (3rd Cir. 1993)).[25]

## II.  LEGAL STANDARD GOVERNING A MOTION TO DISQUALIFY

Disqualification of an attorney in the United States District Courts within

---

[25]Fitzpatrick & Brown also assert that the Martin-Bryant parties lack standing to enforce the consent decree with Jefferson County.  The court need not decide that issue at present because, regardless of whether the Martin-Bryant parties lack standing to enforce the consent decree, they do possess standing to bring this motion for disqualification.

18

Alabama no longer can be based upon merely "an appearance of impropriety." *See, e.g., Wade v. Nationwide Mutual Fire Insurance Co.,* 225 F. Supp. 2d 1323, 1331 (S.D. Ala. 2002) (observing that, while an "appearance of impropriety" formerly constituted grounds for disqualification, the Alabama Rules of Professional Conduct "have since deleted their provisions concerning the appearance of impropriety in favor of the more precise rules governing client confidences, conflicts of interest and other matters").[26]

Thus, when a motion to disqualify is based upon an alleged ethical violation, the court must "clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule . . . ." *Schlumberger Technologies, Inc. v. Wiley,* 113 F.3d 1553, 1561 (11th Cir. 1997) (citing *Norton v. Tallahassee Mem'l Hosp.,* 689 F.2d 938, 941 (11th Cir. 1982)).   Further, the court should "not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is

---

[26]No higher duty — other than the usual fiduciary duty a class attorney owes to class members — exists because Fitzpatrick & Brown represent a class.  The Martin-Bryant parties cite two cases from the Southern District of New York which state that an "unacceptable appearance of impropriety" will result in disqualification of counsel, *Molina v. Mallah Organization, Inc.,* 804 F. Supp. 504, 513 (S.D. N.Y. 1992), and that, "[i]n a class action, even the appearance of divided loyalties should be avoided." *Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.,* 474 F. Supp. 223, 226 (S.D. N.Y. 1979).   When those cases were decided, however, the appearance of impropriety was sufficient grounds for disqualification in the State of New York.  In Alabama, the "appearance of impropriety" standard no longer applies.  Therefore, to the extent the *Molina* and *Chateau de Ville* decisions rely upon that standard, this court will not follow them.

19

unethical if responsible attorneys would differ in appraising the propriety of that conduct." *Schlumberger,* 113 F.3d at 1561 (quoting *In re Finkelstein,* 901 F.2d 1560, 1565 (11th Cir. 1990) (in turn quoting *In re Ruffalo,* 390 U.S. 544, 556 (1968) (White, J., concurring)) (internal quotation marks omitted)).  Finally,

> [t]he party bringing the motion to disqualify bears the burden of proving the grounds for disqualification.  *In re: BellSouth Corp.,* 334 F.3d 941, 961 (11th Cir. 2003).  "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist."  *Id.*  A disqualification order "is a harsh sanction, often working substantial hardship on the client" and should therefore "be resorted to sparingly."  *Norton v. Tallahassee Mem'l Hosp.,* 689 F.2d 938, 941 n.4 (11th Cir. 1982).

*Hermann v. GutterGuard, Inc.,* 199 Fed. Appx. 745, 752 (11th Cir. 2006).[27]

---

[27]Fitzpatrick & Brown also cite several principles set forth by Judge Thompson in *Nuri v. PRC, Inc.,* 5 F. Supp. 2d 1299 (M.D. Ala. 1998), as the governing standard for a motion to disqualify counsel.  Judge Thompson gleaned those principles from case law in other jurisdictions, after noting a dearth of authority within the Eleventh Circuit elucidating the process to be followed when considering an attorney disqualification issue.  Some of those principles discussed in the *Nuri* decision — including the seriousness of the disqualification issue, the heavy burden on the moving party, and the potential for abuse — are consistent with the case law cited above.  *See Nuri,* 5 F. Supp. 2d at 1303-04.  The *Nuri* court also discussed the need to balance competing interests, including "(1) the client's interest in being represented by counsel of its choice; (2) the opposing party's interest in a trial free from prejudice due to disclosures of confidential information; and (3) the public's interest in the scrupulous administration of justice."  *Id.* (citing *Meat Price Investigators Ass'n v. Spencer Foods, Inc.,* 572 F.2d 163, 165 (8th Cir. 1978)).  This court questions whether this balancing test still is necessary in light of the Eleventh Circuit's recent decision in *Hermann v. GutterGuard, Inc.,* 199 Fed. Appx. 745 (11th Cir. 2006).  In *Hermann,* the Eleventh Circuit's analysis centered upon whether the attorney had violated a specific ethical rule.  *See id.* at 752, 755.  The court held that, "[a]lthough a court should recognize that a motion to disqualify is a drastic measure, . . . the district court [is] not obligated to balance the plaintiff's fundamental right to counsel against the interests sought to be protected by disqualification."  *Id.* at 754.  The court is fully cognizant of the seriousness of the motion before it, but, based on the *Hermann* decision, it will not explicitly employ a balance of interests analysis.

### III.  ALABAMA RULE OF PROFESSIONAL CONDUCT 1.7

Attorneys admitted to the bar of the Northern District of Alabama are governed by the Rules of Professional Conduct adopted by the Supreme Court of Alabama.  *See* Local Rule LR 83.1(f).  Violation of any of those rules constitutes "misconduct," and subjects the offending attorney to the discipline of the court, including "removal from a particular case."  *Id.*[28]

The Martin-Bryant parties assert that Fitzpatrick & Brown's representation of Jefferson County violates Rule 1.7 of the Alabama Rules of Professional Conduct, which states that:

> (a) A lawyer shall not represent a client if the representation of

---

[28]The full text of the local rule cited in text reads as follows:

> **Standards for Professional Conduct; Obligations.**  Each attorney who is admitted to the bar of this court or who appears in this court pursuant to subsection (b) or (c) of this Rule is required to be familiar with, and shall be governed by, the Local Rules of this court and, to the extent not inconsistent with the preceding, the Alabama Rules of Professional Conduct adopted by the Alabama Supreme Court and, to the extent not inconsistent with the preceding, the American Bar Association Model Rules of Professional Conduct, except Rule 3.8(f) thereof.  Acts and omissions by any such attorney which violate such standards, individually or in concert with any other persons, shall constitute misconduct, whether or not occurring in the course of an attorney-client relationship, and shall be grounds for discipline, as shall the commission by an attorney of any serious crime.  Discipline under this Rule may consist of disbarment, suspension, censure, reprimand, removal from a particular case, ineligibility for appointment as court-appointed counsel, ineligibility to appear under subsections (b) and (c), monetary sanctions, or any other sanction the court may deem appropriate.

Local Rule LR 83.1(f).

that client will be directly adverse to another client, unless:

> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

> (2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

> (1) the lawyer reasonably believes the representation will not be adversely affected; and

> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Ala. R. Prof'l Conduct 1.7.

The parties disagree about whether the foregoing rule encompasses *potential* conflicts, or only *actual*, present conflicts. The official comment to Rule 1.7 resolves that dispute by stating that a lawyer "should adopt reasonable procedures appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the parties and issues involved and to determine whether there are *actual or potential* conflicts of interest." Ala. R. Prof'l Conduct 1.7 cmt. (emphasis supplied). The following statements — also drawn from the official comments to

22

Rule 1.7 — reveal that the intent of the draftsmen was for subsection (a) to cover actual, direct conflicts, and for subsection (b) to cover both actual conflicts and certain *potential* conflicts that are *likely* to arise:

> As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent.
>
> Paragraph (a) expresses that general rule. Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. *Paragraph (a) applies only when the representation of one client would be directly adverse to the other.* Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client.
>
> Paragraph (b) addresses such situations. *A possible conflict does not itself preclude the representation.* The critical questions are *the likelihood that a conflict will eventuate* and, if it does*, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.* Consideration should be given to whether the client wishes to accommodate the other interest involved.

*Id.* (emphasis supplied). The comment makes a similar point with regard to the more specific topic of conflicts of interest in the context of litigation, stating:

Paragraph (a) prohibits representation of opposing parties in litigation.  Simultaneous representation of parties whose interests in litigation *may conflict, such as coplaintiffs or codefendants,* is governed by paragraph (b).  An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, *incompatibility in positions in relation to an opposing party*, or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question.

*Id.* (emphasis supplied).

## A.     The Application of Rule 1.7(a)

There is no conflict under subsection (a) of Rule 1.7.  The Wilks class and Jefferson County *technically* are not "opposing parties" in that portion of this litigation concerning the County's compliance with the requirements of its December 29, 1982 consent decree.  Ala. R. Prof'l Conduct 1.7 cmt.  Indeed, the Wilks class never has *directly* asserted a legal claim against Jefferson County; instead, Jefferson County was named as a defendant only in those complaints filed by the Martin class in 1974 and the United States in 1975.[29]

Even so, when the Wilks class intervened in 1990, they intervened in *all* of the cases — a necessary step, because the separate actions had been consolidated — but only for the purpose of moving the court "to modify the Consent Decree *with the City of Birmingham* and [the] Consent Decree *with the Personnel Board of Jefferson*

---

[29]*See* Complaint by the United States in Civil Action No. CV-75-S-666-S; Complaint by the Martin plaintiffs in Civil Action No. CV-74-S-17-S.

*County.*"[30]   Judge Pointer subsequently certified the Wilks class in *all* of the consolidated cases — including *United States v. Jefferson County,* Civil Action No. CV-75-S-666-S; *Martin v. City of Birmingham,* Civil Action No. CV-74-S-17-S; and, *Ensley Branch of the N.A.A.C.P. v. Seibels,* Civil Action No. 74-S-12-S — but only "with respect to the proceedings to consider modification of *the City Decree.*"[31] There is no indication that the Wilks class ever sought modification of the County decree.  Indeed, the County's consent decree was entered in 1982 — eight years before the Wilks class intervened in these consolidated actions — and it has not since been modified.  Further, the only signatories to the County decree are the United States, the Martin plaintiffs, Jefferson County, and the Jefferson County Sheriff.[32]

Nevertheless, the Martin-Bryant parties argue that Fitzpatrick & Brown's representation of the County would materially interfere with their representation of the Wilks class, because the Wilks class includes some employees of the County.  The Martin-Bryant parties base this contention on the language of the order certifying the Wilks class: *i.e.,* the class is defined as including "[a]ll present and *future* male, non-

---

[30]*See* doc. no. 1416 (Response of Fitzpatrick & Brown to Motion to Disqualify), Exhibit 9 (Motion to Modify Birmingham and Personnel Board Consent Decrees of Plaintiffs Robert K. Wilks, *et al.*), at ¶ 1 (emphasis supplied).  *See also id.* at Exhibit 10 (May 25, 1990 order granting the Wilks class's motion to intervene).

[31]*Id.* at 3 (emphasis supplied).

[32]*See* Consent Decree with Jefferson County, at 31.

black employees of[,] and present and *future* male, non-black applicants for employment with[,] *the City*."[33]   Because the class includes *future* employees and applicants for employment, argue the Martin-Bryant parties, it could encompass some individuals who currently are employed by Jefferson County.  That argument is too tenuous to suggest that a conflict is *likely* to eventuate.  As Fitzpatrick & Brown point out, such an expansive interpretation of the Wilks class's potential membership would encompass every living, non-black male in the world.

Even so, it was revealed during a status conference conducted on February 19, 1991 that the Wilks class then included three persons who actually were County employees.  Judge Pointer, who then was presiding over the litigation, remarked that those individuals did not need to be "deleted" from the class.[34]   Despite Judge Pointer's remark, however, the order certifying the Wilks class clearly refers only to present and prospective *City* employees.   This discrepancy raises questions of whether the court intended the Wilks class to encompass all City employees *plus the three County employees* who were named as representatives of the so-called Wilks class at the time of the class's certification, or *all* present and future County

---

[33]Doc. no. 1416, Exhibit 18 (Jan. 3, 1991 order certifying classes), at 4 (emphasis supplied).

[34]Doc. no. 1406 (Motion to Disqualify), Declaration of Kristy Greenberg ("Greenberg Declaration I"), Exhibit 15 (Transcript of Feb. 19, 1991 Status Conference), at 37-38.

employees, or *no* County employees?  Unfortunately, the record does not provide a clear answer to this inquiry.

It *is* clear, nevertheless, that the record of proceedings leading up to the certification of the Bryant and Wilks intervening classes reveals Judge Pointer's intent to bind *all* interested parties to the proceedings to modify any of the consent decrees, in order to avoid the risk of future collateral attacks.[35]  In that vein, Judge Pointer mentioned County employees during a May 23, 1990 status conference, in the course of discussions about the proper parties to be brought before the court, saying:

> Well, I think it makes sense to have before the Court, prior to the consideration of [any motion for modification of a decree], the various segments that may be affected, and that includes the Wilks plaintiffs, includes possible unsuccessful applicants for City jobs.  *It includes County employees as well.  I think they should be somehow before the Court*, perhaps after a determination of the class under Rule 23 before that is considered.

> I feel that — so that hopefully *everybody who would be in an employee relationship with one of these governing bodies is going to be bound by the outcome of that at least prospectively*.  That seems to be the objective.[36]

At a later point during the same status conference, the parties discussed how to give proper notice to potential members of the classes that would be formed.  Judge

---

[35]*See generally* doc. no. 1424 (Martin-Bryant Parties' Reply to Supplemental Response of Fitzpatrick & Brown to Motion to Disqualify), Declaration of Kristy Greenberg ("Greenberg Declaration III"), at Exhibit 3 (Transcript of May 23, 1990 Status Conference).

[36]*Id.* at 29-30 (emphasis supplied).

27

Pointer stated:

> I don't know that you necessarily have to have class representatives or separate classes for Birmingham verses Jefferson County. Maybe you do. We do have two different decrees, and for that reason maybe you need two.
>
> . . . .
>
> But I don't think you need to add it to each separate employer. I don't think we have to go shopping around, in a sense, for the Sheriff's employees and the City of Homewood or whatever it may be. I don't think we have to do all that.[37]

Thus, while Judge Pointer obviously believed that County employees "should be somehow before the court," the question of whether they should belong to a separate class appears not to have been definitely answered during that status conference.

During a December 7, 1990 status conference, however, Judge Pointer remarked that the modification proceedings for the Personnel Board's decree would *not* require additional classes to be certified to cover the interests of *non-City employees*. He stated:

> Well, I'm not suggesting that the — that there may not be a need for some changes in the board's decree. I think it's possible that that may be. I just don't see the changes as being ones in which the board really needs any protection against other class members. It seems to me that it's going to be taken care of in that people are already before the Court in that — in that case and as joined in here. It's just not the same kind of problem that's presented when you're talking about an employer

---

[37]*Id.* at 39-40.

28

making selections from people on a list, whatever that list is.[38]

Later during that same status conference, *after* Mr. Fitzpatrick had remarked that he represented the interests of present and prospective *City* employees, Judge Pointer said: "there has been no one who has intervened that I know of for the purpose of representing the Homewood employees *or any of the other municipalities and groups*."[39] Less than two months later, Judge Pointer entered an order certifying the Wilks class to represent present and prospective *City* employees.

Two conclusions can be drawn from Judge Pointer's discussions leading up to certification of the Wilks class: (1) the explicit language of the order certifying the Wilks class includes only City employees; and (2) Judge Pointer did not find it necessary to certify any additional classes to cover the interests of non-City (*e.g.,* County) employees with regard to the Personnel Board decree modification proceedings.

The Martin-Bryant parties would have the court deduce, from Judge Pointer's decision not to certify additional classes, that the existing classes (including the Wilks

---

[38]Doc. no. 1425 (Sur-Reply of Fitzpatrick & Brown to Reply to Supplemental Response to Motion to Disqualify), Exhibit 1 (Transcript of Dec. 7, 1990 Status Conference), at 11-12. *See also id.* at 16 ("Well, I see that other jurisdictions might have some involvement conceivably in terms of being heard or considered in connection with any modification of the personnel board decree, but it's just hard for me to see how any new classes need to be formed with respect to that.").

[39]*Id.* at 18 (emphasis supplied).

29

class) were sufficiently broad to protect the interests of the employees of *all* involved jurisdictions, including Jefferson County.  But, such a deduction does not seem to follow logically from the foregoing facts; the record does not clearly reflect that such was Judge Pointer's intent, especially considering that the language of the order certifying the Wilks class explicitly refers only to *City* employees and the *City* decree. Thus, the court cannot conclude that the Wilks class actually encompasses prospective employees from all jurisdictions, including the County, or that Fitzpatrick & Brown have been representing the interests of current and prospective male, non-black, County employees since the certification of the Wilks class.[40]

## B.    The Application of Rule 1.7(b)

The foregoing conclusions do not end the analysis, however.  The outcome of this motion to disqualify will ultimately turn on whether Fitzpatrick & Brown's proposed dual representation would violate Alabama Rule of Professional Conduct 1.7(b).  Thus, the court must consider whether Fitzpatrick & Brown's representation of either the Wilks class or Jefferson County "may be materially limited by" their

---

[40]Indeed, if the Wilks class did include County employees, Fitzpatrick & Brown assert that they have been unaware of that fact.  They insist firmly in their briefs that they have "never represented County employees," and call the Martin-Bryant parties' argument that the Wilks class was created to represent the interests of City and County employees "utterly baseless," "frivolous," and "outlandish." Doc. no. 1423, at 3; doc. no. 1425, at 1-2.  This is consistent with Mr. Fitzpatrick's statement during the December 1990 status conference that he represented "present and prospective *city* employees." *Id.,* Exhibit 1 (Transcript of Dec. 7, 1990 Status Conference), at 14 (emphasis supplied).

responsibilities to the other, or by their own interests.  Ala. R. Prof'l Conduct 1.7(b).

A violation will occur if Fitzpatrick & Brown's loyalty to either the Wilks class or

Jefferson County will be impaired because counsel "cannot consider, recommend or

carry out an appropriate course of action for [one] client" due to their responsibilities

to the other client.  Ala. R. Prof'l Conduct 1.7 cmt.  "The critical questions are the

likelihood that a conflict will eventuate and, if it does, whether it will materially

interfere with [Fitzpatrick & Brown's] independent professional judgment in

considering alternatives or foreclose courses of action that reasonably should be

pursued on behalf of" either the Wilks class or Jefferson County.  *Id.*

Those questions are not easily answered in the context of a case like this one:

a controversy of extraordinary longevity and complexity.  During the course of more

than 34 years of litigation, this case file has accumulated more than 1,400 *numbered*

documents.   Innumerable  pieces  of  correspondence,  emails,  and  other  relevant

documents exist outside the official court file.  The relationships among the parties

and their attorneys continually evolve.  Over the years, the parties have changed

counsel, shifted alliances, and altered their positions on certain issues.  Suffice it to

say that even a marginal summary of the factual, legal, and political intricacies of

these consolidated controversies would comprise a formidable historical volume.  The

unique landscape of the litigation cannot be ignored in evaluating Fitzpatrick & Brown's alleged conflict of interest. *See In re: Employment Discrimination Litigation Against the State of Alabama,* No. 2:94cv356-MHT, 2006 WL 2841081 (M.D. Ala. Oct. 2, 2006) (slip opinion) (questioning whether "stark lines can realistically be drawn" in "a complex potential-class-action litigation," and noting that a "straightforward application" of the ethical rules in such a case is "difficult, if not inappropriate").[41] *See also* Ala. R. Prof'l Conduct 1.7 cmt. ("The propriety of concurrent representation can depend on the nature of the litigation.").

**1.** *Preliminary observations*

At the outset of the discussion of the applicability of Rule 1.7(b), the court

---

[41]The full context of this quote from Judge Thompson's unpublished opinion in the case cited and quoted in text is as follows:

> The struggle between these parties to define Clement's interests as either adverse to or aligned with those of the *Crum* plaintiffs raises a larger question about whether such stark lines can realistically be drawn in a case like this. *Crum* is a complex potential-class-action litigation, in which employees are both possible representatives of their employer and also possible class members (or aligned in interest with the class). A straightforward application of Rule 4.2, purely based on an employee's status or title, is therefore difficult, if not inappropriate. The defendants' alternative — that Clement is not truly adverse to the State in *Crum* because her opposition to discrimination helps, not hurts, the State's defense of Morgan's claims — is a good example of the way that fact witnesses often have co-existing and yet conflicting "interests." Such shifting loyalties can frustrate counsel on both sides and complicate any attempt to apply ethical strictures to their legal representation.

*In re: Employment Discrimination Litigation Against the State of Alabama,* 2006 WL 2841081, at *4. This court sympathizes.

must note that, if the relevant standard still were the *appearance* of impropriety, this motion could easily be decided. Given the historical background of this case, Fitzpatrick & Brown's proposed dual representation of the Wilks class and Jefferson County reeks impropriety. As mentioned above, these cases have been consolidated for many years. At least as long as they have been assigned to this judicial officer, all of the consolidated and intervening actions have effectively proceeded as one.[42]

---

[42]Fitzpatrick & Brown argue that this litigation has effectively been "'trifurcated' into separate proceedings [involving the three separate consent decrees] with a common case number." *See* doc. no. 1416 (Response by Fitzpatrick & Brown to motion to disqualify), at 10.

It is true that certain aspects of the cases involving only one, or less than all, of the parties have been initiated, argued, and decided with little or no participation from the parties that were not directly involved. The involvement of Jefferson County through the years is the best, and most pertinent, example. Jefferson County has not played a dominant role in the case until the most recent months, because no plaintiff or intervening party or class has actively pursued enforcement of the County's consent decree. Even so, attorneys from the County have consistently attended the monthly status conferences conducted by the court, have been included in correspondence among the parties, and have weighed in on issues raised by the court or by other parties. For example, the County filed a response to the court's suggestion that a monitor be appointed over the Personnel Board. Doc. no. 1252. Attorneys from the County attended the evidentiary hearing conducted on May 23, 2007, to determine whether contempt sanctions should be imposed upon members of the Citizens Supervisory Commission for disregarding this court's appointment of a Personnel Board member. *Testimony from that hearing showed that the Jefferson County Attorney's office had offered legal advice to the chairman of the Citizens Supervisory Commission regarding his response to the court's appointment*. Further, Jefferson County recognizes that its participation in this litigation intersects with that of parties that were not signatories to its consent decree, and has relied upon the consolidated nature of these cases to request the court to take action with regard to such parties. *The County moved the court to compel discovery from the Personnel Board — a non-signatory to the County decree and non-party to any claim against the County — on November 28, 2006.* Doc. no. 1321.

The Wilks class also understands the consolidated nature of this litigation. Here are just a couple of examples: the Wilks class served a copy of its original motion to modify the City's and Board's consent decrees upon counsel for Jefferson County. *See* doc. no. 1416, Exhibit 9, at 8 (Certificate of Service). Additionally, Ray Fitzpatrick wrote a letter to the court on November 14, 2006, in his role as counsel for the Wilks class, urging the court to evaluate the Martin-Bryant

All parties have attended the *combined* monthly status conferences and other proceedings scheduled by the court, all have been copied on the court's and parties' correspondence, and all have weighed in on issues raised by the court or by other parties.

Despite the fact that the Wilks class never has asserted a *direct* legal claim against Jefferson County, it has functioned during the entire course of these consolidated proceedings in the posture of an intervenor-plaintiff, whereas Jefferson County has functioned in the posture of a defendant. If Fitzpatrick & Brown are not disqualified from representing Jefferson County, they will simultaneously serve as counsel for an intervening plaintiff class of male, non-black employees and prospective employees asserting claims of discriminatory hiring and promotional practices *against* the largest governmental employer served by the Personnel Board (the City of Birmingham), as well as counsel for the second-largest governmental employer served by the Personnel Board (Jefferson County) *in defense of* claims asserted by a plaintiff class of black and female employees and prospective employees (the Martin-Bryant parties) for violation of a consent decree that prohibits, among other things, discriminatory hiring practices.

---

parties' alleged practice of "abusive and wasteful discovery *with regard to Jefferson County*." Doc. no. 1406 (Motion to Disqualify), Exhibit 3 (Nov. 14, 2006 letter from Ray Fitzpatrick), at 5 (emphasis supplied).

Fitzpatrick & Brown attempt to downplay the significance of this dual representation by asserting that proceedings addressing the consent decrees of the City of Birmingham and Personnel Board are "near a conclusion, and they have no overlap with the County decree."[43]  This court would very much like to agree with that statement, but — while the end to the City and Board proceedings finally is in sight — just how "near" it actually is remains to be seen.[44]

On August 20, 2007, this court denied a renewed motion by the City of Birmingham to terminate its consent decree, but granted the City the right to refile the motion after a period of additional discovery.[45]  Due to a significant change in the leadership of the City of Birmingham occasioned by the recent mayoral election, the court extended the discovery period to March 14, 2008, and allowed the City until April 14, 2008 to refile its motion to terminate the consent decree.[46]  Therefore, the proceedings against the City of Birmingham will continue through at least the middle of the current calendar year.

The Personnel Board only recently — on December 19, 2007 — filed a motion

---

[43]Doc. no. 1416, at 10.

[44]Stated differently, the shift in attention from the City's and Board's decrees to that of the County may not be a light at the end of a long tunnel, but the headlight of an oncoming train of renewed litigation.

[45]Doc. no. 1399.

[46]Doc. no. 1422.

to be released from court supervision.[47]   The parties will conduct discovery with

regard to that motion through March 21, 2008, and all objections to the motion must

be filed by April 21, 2008.[48]   A round of briefing will be allowed on any objections

that are filed.[49]   Regardless of whether objections are filed, the court will conduct a

thorough review of the record to determine whether the Personnel Board is entitled

to be released from supervision.  That review will take time, given the complexity and

longevity of this litigation.  Therefore, the Personnel Board proceedings will likely

remain pending for *at least* several more months, and will overlap in time with the

contempt proceedings related to Jefferson County's consent decree, which have been

suspended for only a short period of time, during the court's consideration of the

instant motion to disqualify.[50]

Yet another troubling fact is that, beginning in September of 2006, attorneys

from Fitzpatrick & Brown attended at least eleven depositions of Jefferson County

employees noticed by the Martin-Bryant parties in preparation for the Martin-Bryant

parties' motion to enforce Jefferson County's consent decree.[51]   The Martin-Bryant

---

[47]Doc. no. 1429.

[48]Doc. no. 1432.

[49]*Id.*

[50]*See* Transcript of October 18, 2007 status conference, at 30-31.

[51]*See* Greenberg Declaration I, at Exhibit 2 (deposition excerpts).

36

parties state that Fitzpatrick & Brown billed the Jefferson County Personnel Board for work performed at these depositions *on behalf of the Wilks class*.[52]  At eight of the depositions, all taken in September and October of 2006, the attorney present identified himself on the record as representing *the Wilks class*.  At the last three depositions, beginning in January of 2007, the attorney from Fitzpatrick & Brown attended, but did not identify himself as representing any particular party.[53]  The Fitzpatrick & Brown attorney did not actively participate in any of the depositions until January 11, 2007, but it is significant to observe that, on that date, he questioned the witness about the appointment of *an African-American female* to the position of Tax Assessor *for Jefferson County*.[54]

Further, although Fitzpatrick & Brown may not have been directly representing

---

[52]*See* doc. no. 1406, at 3 ("Pursuant to the billing arrangement between [Fitzpatrick & Brown] and the Personnel Board, [Fitzpatrick & Brown] billed the Personnel Board for its attendance at and preparation for those depositions, as matters related to the representation of the Wilks class.").  Fitzpatrick & Brown have not disputed this assertion.

[53]*See* Greenberg Declaration I, at Exhibit 2.

[54]*See* Greenberg Declaration I, at Exhibit 4 (excerpts from deposition of Kimberly Oden Webster).  Those questions led to a heated dispute among the attorney from Fitzpatrick & Brown, counsel for the Martin-Bryant parties, and counsel who had appeared on behalf of Jefferson County regarding whether an attorney for the Wilks class was entitled to question the witness. *Id.* at 407-15.

Fitzpatrick & Brown insist that the only reason they attended the depositions was to determine whether the testimony being developed implicated the interests of the Wilks class.  They determined it did not.  *See* doc. no. 1416, at 34-35.  The fact that they appeared on behalf of the Wilks class at depositions directly related to the matter on which they now seek to represent Jefferson County is, nonetheless, suspect.

Jefferson County employees since the creation of the Wilks class — other than, of course, those three individuals previously discussed in Part III(A) of this opinion[55] — the Martin-Bryant parties have raised two prior assertions by Mr. Fitzpatrick that reveal he may have welcomed the representation of non-black-male employees of the County, or at least believed it would be appropriate.

First, during a status conference conducted by Judge Pointer on May 22, 1995, the parties again discussed whether modification proceedings pertaining to the Personnel Board's decree should involve participants from any jurisdictions served by the Board, other than the City of Birmingham.  Mr. Fitzpatrick reminded Judge Pointer that the class he represented included "non black male employees and prospective employees of the City of Birmingham."[56]  Counsel for the United States reminded Judge Pointer that the County decree differed from the City and Personnel Board decrees, in that it did not contain race- or gender-based quotas.  The inference was that the County decree would not require modification like the City and Personnel Board decrees.  Significantly, Judge Pointer subsequently asked Mr. Fitzpatrick the following question:   "Is there a reason, Ray, why, in your representation of white slash males of the City you would have any conflict in

---

[55]See the text accompanying note 34 *supra*.

[56]Doc. no. 1423, Exhibit 4 (Transcript of May 22, 1995 Status Conference), at 31.

38

representing white slash males for *other governmental agencies subject to the Personnel Board*?"[57]   Mr. Fitzpatrick responded, "*I can't immediately perceive any conflict.*"[58]

Fitzpatrick & Brown attempt to dismiss Mr. Fitzpatrick's statement as a response to a merely "theoretical question" by the court concerning a discrete issue, *i.e.,* modification of the Personnel Board's decree.[59]   The court is not persuaded that Judge Pointer's question was either theoretical, or that it can be so nicely diced.   For example, later during the same status conference, Judge Pointer instructed counsel for the Martin-Bryant parties and Wilks class as follows:

> Well, I think though that the two that are representing classes need to evaluate where there is a conflict in some way of modification being designated as expanding the particular classes to include Jefferson County or other municipalities subject to the Board's decree because we do have the problem about then somebody coming in later and saying I'm not — you know, I shouldn't have had my rights in any way affected by it.   So I think I just direct the two of you to think through this problem.[60]

Judge Pointer's clear intent, once again, was to ensure that all interested persons — all present employees of (and all future applicants for employment with) *any of the*

---

[57]*Id.*

[58]*Id.* at 31-32 (emphasis supplied).

[59]Doc. no. 1423, at 3.

[60]Doc. no. 1423, Exhibit 4 (Transcript of May 22, 1995 Status Conference), at 33.

*governmental hiring authorities serviced by the Personnel Board* (*e.g.,* Jefferson County) — would be bound by the modification proceedings, to insulate the judgments from collateral attacks upon the subsequent appearance of a person asserting that his or her rights had not been adequately represented.

Neither of the class attorneys ever responded to Judge Pointer's inquiry, and the existing classes were not subsequently expanded or otherwise modified.[61]  Thus, Mr. Fitzpatrick's statement that he then could not "perceive any conflict," when juxtaposed with his later failure to respond to Judge Pointer's question, demonstrates that the inquiry and Mr. Fitzpatrick's tacit response (deafening silence) were not inconsequential.  If Mr. Fitzpatrick had responded that a conflict *did* exist, or had followed up by stating that the Wilks class could *not be* expanded to include County

---

[61]The Martin-Bryant parties state they did not pursue the issue any further with Judge Pointer because they "concluded that the existing classes were sufficient to bind" employees of the County and other jurisdictions. Doc. no. 1424, at 10.  Specifically, the Martin-Bryant parties concluded:

> (1) the classes as defined included "future" employees and applicants of the City, which therefore included current employees of other jurisdictions; (2) the Court and parties had been very clear in 1991 that all persons were to be bound in order to prevent any collateral attack; and (3) in fact, three named Wilks class representatives, at the time it was formed, were County employees.  Those facts, coupled with Mr. Fitzpatrick's representation that there was no conflict that would require separate representation for employees of other jurisdictions, led us to conclude that we did not need to advise the Court about any additional measures that needed to be taken to make sure that all were bound.

*Id.*  Fitzpatrick & Brown do not explain why Mr. Fitzpatrick did not respond to Judge Pointer's inquiry, but they *imply* that it was because Mr. Fitzpatrick did not intend to represent County employees.

employees, Judge Pointer may have deemed it necessary to certify additional classes represented by separate counsel.

Nor is the significance of Mr. Fitzpatrick's statement that he then could perceive no conflict diminished by the fact that the words were uttered in the context of a discussion of modification of the Personnel Board's decree. Mr. Fitzpatrick's statement in 1995 that he could represent County employees in the context of those issues without any conflict of interest seriously calls into question his firm's ability to now fairly represent the County, regardless of the context in which the prior statement was uttered.

The second troubling statement by Mr. Fitzpatrick was uttered in the context of a lawsuit filed in this court by Charles Horton, a white-male employee of the Jefferson County Sheriff's Department. In 1994, Mr. Horton sued the Sheriff and the individuals who served at the time as members of the Jefferson County Personnel Board. The case was assigned to Judge Robert Propst, who summarized Mr. Horton's claims as follows:

> Plaintiff has been employed by the Jefferson Country [sic] Sheriff's Department since 1966. Plaintiff began his tenure with the Sheriff's Department as a Deputy. He held the Deputy position in the patrol Division until 1973, when he was promoted to Deputy Sheriff Sergeant. In March, 1980, plaintiff was transferred to the Bessemer branch of the Sheriff's Department. In the Bessemer branch, plaintiff

41

was employed as a Vice Sergeant–Narcotics.  In 1992, plaintiff was transferred to the Criminal Division, and is presently employed as a Sergeant in that division.

Plaintiff's claim is two-fold: that, in 1993, defendants unlawfully upgraded the classification of the position of Vice Sergeant–Narcotics to the position of Lieutenant, and that he was unlawfully passed over for a promotion to the position of Lieutenant.[62]

Judge Propst granted summary judgment to the Sheriff on all claims, and granted summary judgment to the Board members on Horton's claims for wrongful classification and denial of a promotion.[63]

Significantly, Judge Propst also perceived Mr. Horton's complaint as potentially asserting a generalized challenge to certain requirements of the Personnel Board's consent decree.[64]  He entered a memorandum opinion on February 22, 1995, stating that,

---

[62]Greenberg Declaration III, Exhibit 6 (Feb. 22, 1995 Memorandum Opinion in *Horton v. Bailey,* Civil Action No. CV-94-PT-992-S), at 1-2.

[63]*See* Greenberg Declaration III, Exhibit 1 (Feb. 22, 1995 Order granting in part the motion for summary judgment by the Jefferson County Personnel Board in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S); Exhibit 6 (Feb. 22, 1995 Memorandum Opinion in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S); Exhibit 7 (Feb. 14, 1995 Memorandum Opinion in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S); Exhibit 8 (Order granting summary judgment in favor of the Sheriff in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S).

[64]*See* Greenberg Declaration III, Exhibit 6 (Feb. 22, 1995 Memorandum Opinion in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S), at 20 ("As stated previously, the court is unsure of whether plaintiff is challenging, in a general fashion, the supplementation requirements set forth in the Consent Decree.  The court assumes, for purposes of this discussion, that plaintiff is making such a claim.").

> if [Mr. Horton] intends to assert, in a general fashion, that the
> supplementation procedure required by the original Consent Decree is
> unconstitutional, it is clear that the intervening parties to the litigation
> in United States v. Jefferson County have argued, and continue to argue,
> substantially the same contentions as [Mr. Horton].
>
> To the extent [Mr. Horton] seeks to challenge generally the
> supplementation procedure required under the Consent Decree, [he]
> should seek to do one of two things: either intervene in United States v.
> Jefferson County, CV-P-75-666-S, or move the court in United States
> v. Jefferson County, CV-P-75-666-S, to consolidate those claims in this
> action which challenge, in a general fashion, the constitutionality of the
> supplementation procedure required by the original Consent Decree.[65]

Judge Propst also stayed further consideration of the motion for summary judgment

in his case for forty-five days, and required the following of the parties:

> Unless [Mr. Horton] concedes that his interests are already being
> protected in United States v. Jefferson County, CV-P-75-666-S, [he] is
> to file, within 15 days, a Motion to Intervene in United States v.
> Jefferson County, CV-P-75-666-S, or a Motion to Consolidate his claim
> in this action concerning the constitutionality of the supplementation
> procedure with United States v. Jefferson County, CV-P-75-666-S. Any
> Motion to Consolidate should be filed before the court in United States
> v. Jefferson County. Within 30 days, the parties are to advise the court
> as to whether the issue concerning the constitutionality of the
> supplementation procedure is already being addressed in United States
> v. Jefferson County, CV-P-75-666-S, and whether or not [Mr. Horton]'s
> interest in that regard is already protected in that case. Reasons either
> way will be given. [Mr. Horton] will report, within 45 days, as to the
> status of his motion(s) as indicated above. Within 45 days, the parties
> will also address whether, under the law, it is appropriate for [Mr.
> Horton] to, in effect, collaterally attack the Consent Decree in United
> States v. Jefferson County, CV-P-75-666-S. Failure of Mr. Horton to

---

[65]*Id.* at 20-21.

file either of these motions, or to file an explanation with this court of his reasons for failing to file such motions, will result in dismissal of this action.

In the event the district court in <u>United States v. Jefferson County</u>, CV-P-75-666-S, lacks jurisdiction over the action, the parties are still to address why, if any reason, plaintiff's interests in his claim concerning the constitutionality of the supplementation procedure are not being adequately represented by intervenors in United States v. Jefferson County, CV-P-75-666-S.[66]

Mr. Horton chose the option of intervening in the action styled *United States v. Jefferson County*. On March 7, 1995, he filed a motion to intervene for the purpose of asking Judge Pointer to determine whether the Personnel Board decree

has been substantially achieved, and should be dissolved, and further for this Court to determine whether or not Defendant, Personnel Board continued use [sic] of said Consent Decree results in reverse discrimination of [sic] white males for promotion within the Rules and Regulations of the Jefferson County Personnel Board in implementing the Consent Decrees . . . .[67]

Judge Pointer granted the motion to intervene on March 15, 1995.[68] The day before that action, however, Mr. Fitzpatrick had mailed a letter to Mr. Horton's attorney (Joe Fawwal), stating:

---

[66]Greenberg Declaration III, Exhibit 1 (Order granting in part motion for summary judgment by Jefferson County Personnel Board in *Horton v. Bailey,* Civil Action No. CV-04-PT-992-S), at 1-2.

[67]Doc. no. 1423, Exhibit 1 (Horton's Motion to Intervene), at 2-3.

[68]Doc. no. 1423, at Exhibit 2 (Order granting Motion to Intervene).

44

I am in receipt of a copy of the Petition to Intervene you recently filed in the referenced case on behalf of a nonminority employee of the Jefferson County Sheriff's Department. In essence, your motion seeks leave to intervene as a party in order to vacate or modify the Personnel Board Consent Decree.

I represent a certified class of nonminority male employees and prospective employees of the City of Birmingham that have already intervened in the referenced case. In 1991, Judge Pointer conducted a modification hearing and determined that certain aspects of the Personnel Board Decree would be modified. Together with the United States Department of Justice, we appealed to the Eleventh Circuit Court of Appeals and recently obtained a partial reversal of the 1991 decision. *See Ensley Branch v. Seibels,* 31 F.3rd [sic] 1548 (11th Cir. 1994). As a result of the Eleventh Circuit's action, further proceedings will take place in the district court.

> ***It is my opinion that the interests of your client are aligned with, if not covered by, the class that I have represented for several years and are governed by the Eleventh Circuit's decision****. Please serve me with a copy of any further filings in this case.* If you wish to discuss this matter further, I will be glad to speak with you about it.[69]

The court notes that this letter was drafted more than two months *before* the

May 22, 1995 status conference, during which Mr. Fitzpatrick informed Judge Pointer

that he could not "perceive any conflict" in his representation of County employees.

This sequence of events lends further credence to this court's conclusion that Mr.

Fitzpatrick's statement during the May 22 status conference should not be considered

---

[69]Doc. no. 1421 (Martin-Bryant Parties' Corrected Reply to Fitzpatrick & Brown's Response to Motion to Disqualify), Declaration of Kristy Greenberg ("Greenberg Declaration II"), at Exhibit 2 (March 14, 1995 letter from Mr. Fitzpatrick to Mr. Fawwal) (emphasis supplied).

simply an off-the-cuff response to a "theoretical" question from the court.   Mr. Fitzpatrick's letter to Mr. Fawwal suggests that Mr. Fitzpatrick had been contemplating, since at least March 14, 1995, that the interests of his Wilks class clients were "aligned with" those of County employees.  In any event, Judge Pointer's office received a copy of Ray Fitzpatrick's letter on March 15, 1995, the same day he granted Mr. Horton's motion to intervene.[70]   On March 29, 1995, Judge Propst dismissed the remaining claim in Mr. Horton's case before him, because Mr. Horton had intervened in these consolidated cases.[71]

Fitzpatrick & Brown assert that Mr. Fitzpatrick's letter to Mr. Horton's attorney

> was intended to request proper service of filings in the case and put him on notice that counsel was seeking modification of the Personnel Board decree on behalf of the class of non-black male City employees.  Those efforts were similar to Mr. Horton's stated goal of relief from race-conscious requirements of the 1981 Board decree.  The letter was a courtesy advising that City employees were seeking a similar goal — and had been doing so for several years.[72]

Fitzpatrick & Brown also emphasize that Mr. Horton never asserted a direct legal claim against Jefferson County, and that Mr. Fitzpatrick never became Mr. Horton's

---

[70]*See id.*

[71]*See* doc. no. 46 in Civil Action No. CV-94-PT-992-S.

[72]Doc. no. 1423, at 2-3.

attorney.   When carefully parsed, all of the foregoing assertions are technically accurate.  Mr. Fitzpatrick's letter to Mr. Fawwal did request service of filings in the consolidated litigation.  Mr. Fitzpatrick did inform Mr. Fawwal that his clients — the members of the Wilks class — were seeking modification of the Board decree for reasons similar to those advanced by Mr. Horton.  Mr. Horton never sued Jefferson County, but he did sue the Sheriff of Jefferson County, who joined in and consented to the entry of the County decree, as well as members of the Personnel Board.  There is no evidence that Mr. Fitzpatrick and Mr. Horton ever entered into an attorney-client relationship, and Mr. Fitzpatrick never entered an appearance on behalf of Mr. Horton.

The analysis does not end there, however.  Implicit in Mr. Fitzpatrick's statement that Horton's interests were "aligned with if not covered by" those of the Wilks class is the suggestion that Mr. Fitzpatrick *could* have represented Mr. Horton if both he and Mr. Horton had been willing.[73]  And if Mr. Fitzpatrick could have represented Mr. Horton — a non-black *County* employee whose interests he admits were "aligned with if not covered by" the Wilks class — how can he now represent the County?

---

[73]Indeed, it would not be unreasonable to interpret Mr. Fitzpatrick's letter as a subtle invitation for Mr. Fawwal to associate his services as counsel.

47

Further, the timing of Mr. Fitzpatrick's letter suggests that he may have intended the correspondence to precipitate certain consequences.  The letter was written while Mr. Horton's motion to intervene in this consolidated litigation still was pending.  It also was written during the thirty-day time period Judge Propst had allowed the parties in his case to brief the court on whether Mr. Horton's interests already were being protected by the intervening parties (*i.e.,* the Wilks class) in this consolidated litigation.  Judge Propst made it clear to the parties in his case that Mr. Horton's decision about intervening in, or moving for consolidation of his claims with, these already-consolidated cases would affect the disposition of Mr. Horton's case in his court; and indeed it did.  Judge Propst dismissed Mr. Horton's lawsuit *because* Mr. Horton had intervened in this litigation.

It is true that the record contains no evidence that either Judge Pointer or Judge Propst actually considered Mr. Fitzpatrick's letter in making their respective decisions regarding Mr. Horton's claims.  Even so, the fact that Mr. Fitzpatrick wrote the letter during a time period when its contents could have been consequential for Mr. Horton's claims heightens the appearance of impropriety inherent in Fitzpatrick & Brown's proposed dual representation of the Wilks class and Jefferson County. Surely Mr. Fitzpatrick made the statement about the alignment of Mr. Horton's

48

interests with those of the Wilks class because he deemed doing so to be in the best interest of the Wilks class members, or in his own best interest, or both.  His attempt to now disavow or minimize the significance of his statement calls into question his ability to vigorously represent the interests of both clients.

The court recognizes that, while these observations do demonstrate the improper appearance of Fitzpatrick & Brown's proposed dual representation, they are not sufficient, standing alone, to support a violation (or even a likely violation) of Alabama Rule of Professional Conduct 1.7(b).  Nonetheless, the facts outlined in this section are relevant and cannot be ignored, as they serve to illustrate the factual, legal, and historical landscape of this case, and to illuminate the intersecting roles of the parties and their counsel.  *See Hermann v. GutterGuard, Inc.,* 199 Fed. Appx. 745, 755 (11th Cir. 2006) (approving the district court's discussion of aspects of the offending attorney's conduct that "did not themselves rise to the level of ethical violations" because "[t]he district court was entitled to consider the entire course of [the attorney's] conduct").

## 2. *Alleged conflicts*

The Martin-Bryant parties have raised several possible manifestations of the alleged conflict of interest.  The court will address each of the situations in turn, to

49

determine if any produce, or are likely to produce, a conflict of interest under Rule 1.7(b).

      **a.**    *Conflicts with regard to the Wilks class's potential claims against the County*

The Martin-Bryant parties first claim that Fitzpatrick & Brown will be unable to adequately defend the County decree, and the remedial measures contained therein, because they have previously represented the Wilks class in attacking various portions of the City and Personnel Board decrees as unlawful "reverse discrimination."[74] The court is not persuaded by this argument. The remedies set forth in the County decree differ significantly from those set forth in the original consent decrees with the City of Birmingham and Personnel Board. Most significantly, the County decree — unlike the original City and Board decrees — does not contain race- or gender-conscious hiring quotas as a remedy for past discrimination. Such affirmative action "goals" were the primary fuel for the "reverse discrimination" attacks on the original City and Personnel Board decrees.[75] As

---

[74]Doc. no. 1406, at 12. The County Decree requires *all* parties to it — not just the County itself — to defend the decree against attack. *See* Consent Decree with Jefferson County, at 3-4, ¶ 3 ("[T]he parties hereto agree that they shall individually and jointly defend the lawfulness of such remedial measures in the event of challenge by any other party to this litigation or by any other person or party who may seek to challenge such remedial measures through intervention or collateral attack.").

[75]*See supra* page 13.

opposed to requiring strict adherence to racial or gender quotas, the County's decree

requires it to

> seek in good faith to achieve the employment of qualified blacks and
> females in job vacancies in the classified service of the County in
> numbers approximating their percentage representation among persons
> on the eligibility lists for such jobs as determined by the Jefferson
> County Personnel Board under nondiscriminatory recruitment and
> selection procedures set forth in its Consent Decree . . . .[76]

Thus, the County's obligations are derivatives of the Personnel Board's obligations.

Following the Eleventh Circuit's decision in *Ensley Branch, N.A.A.C.P. v. Seibels,*

31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*"), the Personnel Board's decree was

modified to reflect the "long-term objective" of ensuring

> that any and all alleged unlawful barriers to employment, assignment,
> and promotion that have existed for blacks and women are removed, that
> any present effects of alleged past employment discrimination by the
> Personnel Board are fully remedied, and that equal employment
> opportunities are available to all persons, regardless of race or sex, as

---

[76]Consent Decree with Jefferson County, at 4, ¶ 5.  The County Decree also states that

Jefferson County will insure that blacks and women are selected for appointment [to
certain identified jobs] in a nondiscriminatory manner . . . from the group of
applicants certified by the Personnel Board.  It is the expectation of the defendant
Jefferson County and the plaintiffs, [sic] that such nondiscriminatory hiring pursuant
to this Decree will result in the selection of qualified blacks and women for these
jobs approximating their overall representations on the certification lists received
from the Personnel Board for such positions.

*Id.* at 6-7, ¶ 9.

required by Title VII of the Civil Rights Act of 1964, as amended.[77]

To that end, the modified decree required the Personnel Board to

> establish that each selection procedure required or used by the Personnel Board, including each standard (including minimum qualifications used to determine which applicants are qualified or eligible to apply for a job or submit to a selection device), procedure, test or other device, shall either (1) have no adverse impact on the basis of race or sex, as defined by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq. (1994), (hereinafter "the Uniform Guidelines"); or (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Uniform Guidelines and other applicable Federal law.[78]

Essentially, Jefferson County is required to make *race-and-gender-neutral* employment and promotional decisions based upon the supposedly *race-and-gender-neutral* lists produced by the Personnel Board's supposedly *race-and-gender-neutral* selection procedures.  The County's decree does not require it to make the type of "affirmative action" selections that prompted the Wilks class's challenge to the City's and Personnel Board's original consent decrees.  Therefore, the mere fact of Fitzpatrick & Brown's past reverse discrimination challenges to affirmative-action, quota-based, consent decrees does not axiomatically prevent them from defending the

---

[77]1995 Order Modifying the Jefferson County Personnel Board Consent Decree, appended to doc. no. 595 (Order provisionally approving modifications to the Personnel Board Decree), at ¶ 7.

[78]*Id.* at ¶ 12 (footnote omitted).

County's decree.

    **b.**    *Conflicts with regard to Personnel Board issues*

The Martin-Bryant parties also assert that Fitzpatrick & Brown's concurrent representation of both the Wilks class and Jefferson County would create a conflict of interest with regard to issues concerning the Personnel Board.  First, the Martin-Bryant parties point out that the Wilks class has expressed interest in supporting the Board in the face of recent legislative efforts to abolish it, or at least to significantly alter its composition.  During a status conference conducted on February 22, 2007, counsel for the Wilks class encouraged all the parties present to "rally behind [the] board," despite the public criticism it had been receiving, because the Board is a "viable organization" that is "worth the effort that has been put into it."[79]  Counsel for the Wilks class has elsewhere expressed interest in keeping the Personnel Board intact.  Fitzpatrick & Brown objected to the City's motion to terminate its consent decree based on the possibility that the City might seek to separate itself from the Personnel Board, thereby depriving the Board of a significant portion of its funding and rendering it defunct.[80]  The members of the Jefferson County Commission, on the

---

[79]Greenberg Affidavit I, Exhibit 19 (Transcript of Feb. 22, 2007 Status Conference), at 15, 22.

[80]*See* doc. no. 1350 (Response of Wilks class to City's Motion to Terminate Consent Decree), at 7 ("[I]f for any reason the City ceases to be a member jurisdiction of the Personnel Board, then the Board would no longer exist in its present form.  The City contributes between 30% and 40% of

other hand, voted unanimously in May of 2007 to support a bill that would abolish the current Board and replace it with a Board comprised of seven members, including the Commission Chairperson.[81]  The Commission reaffirmed its support of that bill in a meeting conducted on December 11, 2007.  One of the Commissioners was quoted in *The Birmingham News* as saying that "[a]ny change in the personnel board will be an improvement."[82]  The County Commission members also have expressed a desire to separate from the Personnel Board and establish an internal personnel system.[83]

Clearly the positions of the Wilks class and Jefferson County conflict on these lifeblood issues for the Personnel Board.  What the court must decide is whether this conflict is sufficiently likely to affect Fitzpatrick & Brown's professional judgment that it will render them unable to "consider, recommend or carry out" appropriate courses of action for either the Wilks class or Jefferson County.  *See* Ala. R. Prof'l

_____

the resources required to operate the Board.  The efforts made by this Court through the appointment of a Receiver to completely overhaul the Board's operations will be substantially diluted should the City no longer be a jurisdiction under the Board.").

[81]*See* Greenberg Declaration I, at Exhibit 17 (Barnett Wright, *Officials Tell Legislators of Concerns*, B'ham News, May 24, 2007, *available at* www.al.com).

[82]Barnett Wright, *Jeffco Wants Board Expansion:  Personnel Board Bill Headed for Legislature*, B'ham News, Dec. 12, 2007, *available at* www.al.com.

[83]*See* Greenberg Declaration I, at Exhibit 18 (Eric Valesco, *Members Favor End to Personnel Board Rule*, B'ham News, Sept. 21, 2004, *available at* www.al.com).

Conduct 1.7 cmt.  Fitzpatrick & Brown contend that their judgment will not be so impaired.  They assert that Jefferson County's position on pending legislation is a matter of public concern that is irrelevant to this litigation, and that any prediction about whether the County may seek to separate itself from the Personnel Board is too speculative to justify disqualification.  They also assert that the County's position on pending Personnel Board legislation is "of no interest" to the Wilks class, because the members of that class are City employees, not County employees.[84]

The court agrees that the possibility of Jefferson County's departure from the Personnel Board system is too speculative to serve as the basis for an order of disqualification.  As far as the court knows, Jefferson County has adopted no official policy favoring separation from the Personnel Board, and the County Commission's policies may evolve over time as Commission members shift in and out of office.  The County's position on pending Personnel Board legislation, however, is more concrete, as the County Commission has actually — *and unanimously* — voted to support legislation abolishing the Board or altering its composition.  Fitzpatrick & Brown cannot credibly argue that the County's vote to change the Board is "of no interest" to the Wilks class.  If the Wilks class had no interest in the Board's future, Fitzpatrick & Brown would not have made a plea *on behalf of the Wilks class* to promote public

---

[84]Doc. no. 1416, at 38.

support for the Board, and, they would not have objected to termination of the City's decree on the grounds that the City's withdrawal from the Personnel Board system would be damaging to the Board. The conflict is real and present, and it would likely affect the professional judgment of the attorneys at Fitzpatrick & Brown to the detriment of its respective, proposed clients. The County wants the Board to be abolished, or its composition altered significantly, but the Wilks class wants it to stay the same, at least until the conclusion of this litigation. If Fitzpatrick & Brown took actions that would promote the County's goal of abolishing or changing the composition of the Board, those actions would likely prevent the Wilks class from furthering its contrary goal of preserving and promoting the Board.

It also is likely that a material conflict will arise with regard to the Wilks class's and County's respective positions on termination of the Personnel Board's consent decree. The County has asserted, both in discovery and in correspondence, that the Board's actions or inactions have caused some of the deficiencies that have been attributed to the County in the Martin-Bryant parties' motion for contempt.[85]

---

[85]*See* Greenberg Declaration I, Exhibit 20 (Jefferson County's Answers to Interrogatories), at ¶ 1 ("[I]t should be noted that the Personnel Board is responsible for 'selecting' qualified candidates and 'certifying names of eligible candidates to the County in accordance with the Enabling Act and the Board's own rules and regulations. The County does not test candidates but simply interviews candidates supplied by the Personnel Board."); ¶ 4 ("[T]he Jefferson County Commission does not recruit for classified positions. The Personnel Board handles this phase of hiring for the Jefferson County Commission."); ¶ 7 ("[A]s it relates to paragraph 51(a) [of the County decree], the recruitment of personnel for classified positions is handled by the Personnel

It appears likely, therefore, that the County will argue that it should not be held in contempt because the Personnel Board is responsible for some of the actions and failures alleged in the contempt motion.  If the court were to determine that the Personnel Board is responsible for any of the allegedly contumacious acts or omissions of the County, then termination of the Personnel Board's decree would be delayed.[86]  The Wilks class's position on whether and when the Personnel Board's decree should be terminated will likely have nothing to do with the Personnel Board's

Board thus the Personnel Board maintains the records in this regard. . . .  Paragraph 51(b) [of the County decree] requests recordkeeping obligations regarding applications.  The Personnel Board maintains application records for classified positions."); ¶ 8 ("Paragraph 53(a).  For classified employees, the Personnel Board along with the HR Department maintains a list of all persons, by job classification, department, race and sex, to whom positions have been offered with an indication thereon of whether or not the position was accepted. . . .  Paragraph 53(b).  The Personnel Board maintains a list of all promotions to permanent full-time positions in the classified service, by job classification and department, during the twelve month reporting period indicating the race, sex, date of initial hire in the classified service and date of promotion. . . .  Paragraph 53(c).  The Personnel Board maintains a breakdown of the applicant flow for employment with the County which indicates by race and sex the number of applicants for each department and job classification, number of applicants hired, rejected and pending for each job classification and department for classified positions. . . .  Paragraph 53(d).  The Personnel Board maintains and reports on the recruiting activities conducted for classified positions.").  *See also id.* at Exhibit 21 (Mar. 10, 2004 letter from Assistant County Attorney Charlie Wagner to Olivia Zach and Barbara Thawley), at 1 ("The County relies solely upon the Personnel Board to retain and report the information identified in the Consent Decree."); Exhibit 22 (June 16, 2005 letter from Assistant County Attorney Charlie Wagner to Rowan Wilson), at 1 ("With respect to your first and second requests, all the information required to be reported concerning classified personnel has been submitted either by the Personnel Board in their semi-annual report or by the County in its semi-annual report.").

[86]Fitzpatrick & Brown acknowledge that "[s]hould this Court find that Jefferson County is not in compliance with some aspect of its consent decree and that the Board's record keeping is deficient, the Court would most likely direct the Board to correct the deficiency."  Doc. no. 1416, at 38-39.  Surely Fitzpatrick & Brown do not expect the court to terminate the Board's consent decree, but then continue to monitor the Board's record keeping practices with regard to the County.

influence on the County's allegedly contemptuous actions.  Rather, because the parties (including the Wilks class) have lodged no objections to the Board's remaining selection procedures, the Wilks class would likely object to termination of the Board's decree only if it believed the Board could not function adequately to protect the interests of its class members.  Given some of the statements made by Fitzpatrick & Brown in response to the Martin-Bryant parties' motion to disqualify, no such objection seems likely.  Fitzpatrick & Brown have urged the court to view all proceedings involving the City and Board decrees as nearing an end. Significantly, they point out that "it has been some time since all of the Personnel Board's procedures were found to be lawful.  Why the Board has delayed in moving for termination of its decree is a mystery to the undersigned counsel."[87]  Fitzpatrick & Brown could not credibly argue, on behalf of the Wilks class, that the Board's decree should be terminated, while simultaneously arguing, on behalf of the County, that the court should retain jurisdiction to hold the Personnel Board responsible for the County's alleged deficiencies in record keeping and other areas.  Advocating one of these positions on behalf of one client would require Fitzpatrick & Brown to

---

[87]Doc. no. 1416, at 28.  *See also id.* at 32 (stating that the Personnel Board "should have moved for dissolution of its decree by now").  As discussed above, the court does not agree that termination of the Board's decree is as imminent as Fitzpatrick & Brown suggest.  *See supra,* pages 35-36.  Regardless of whether the court agrees, however, the significant fact is that Fitzpatrick & Brown have taken this position.

abandon an argument on behalf of the other client.  That is exactly the type of situation Rule 1.7 was designed to prevent.

      **c.**    *Conflicts with regard to the Wilks class's and County's positions on validation*

Finally, the Martin-Bryant parties argue that Fitzpatrick & Brown's dual representation of the Wilks class and Jefferson County will compromise the Wilks class's position on when an employer's selection procedures must be validated:  that is, demonstrated to be job-related and consistent with business necessities.[88]  The Wilks class has persistently argued in proceedings before this court and the Eleventh Circuit Court of Appeals that the City of Birmingham and the Personnel Board should be required to validate *all* employee selection procedures — not just those procedures for which adverse impact on the basis of race or sex has been identified.[89]  Jefferson

---

[88]*See Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607 *et seq.* (1994).

[89]The Eleventh Circuit chronicled the Wilks class's advocacy of this position in *Birmingham Fire Fighters Ass'n v. Jefferson County,* 290 F.3d 1250 (11th Cir. 2002).  *See infra,* pages 62-64. The record of this litigation also reveals examples of the Wilks class taking this position.  *See* doc. no. 1423, Exhibit 3 (Transcript of May 22, 1995 Status Conference), at 28-29 (in response to a query by the attorney for the City of Birmingham, asking whether, "in the absence of impact, do we have an independent duty to validate?," Mr. Fitzpatrick said:  "I think Judge Carnes' opinion made very clear that the City was due to have valid job related selection procedures at the selection level," and the *Ensley II* opinion "made very clear that the City is due to have a valid procedure."); doc. no. 1140 (Wilks class Oct. 4, 2004 Opposition to the City of Birmingham's Motion to Terminate Consent Decree), at 4 ("Given the Eleventh Circuit's mandate, in addition to the requirements of *Freeman, supra,* is the ultimate question of whether the city has fulfilled the *Ensley Branch* mandate to develop valid, job-related selection procedures.  At this point in time, save for the Police Captain and Public Safety Dispatcher II procedures that were specifically ordered by this Court, the City has not and

County, on the other hand, would benefit from arguing that validation is required only when it is demonstrated that a particular selection procedure has an adverse impact on the basis of race or gender.

Mr. Fitzpatrick has acknowledged to this court in the past that "the County currently utilizes an interview system that is very similar to that used by the City of Birmingham"; and that, "like the City's procedure, the County's structured oral interview system has not been validated."[90] Thus, as the Martin-Bryant parties point

cannot demonstrate that any of its procedures are job-related. The City's selection devices are not valid under the *Uniform Guidelines* or any professional standard, nor do they comport with the *Ensley Branch* remand instructions. Upon the entry of this Court's 1995 Modification Order, the City fled to what it perceived to be the safe harbor of 'no adverse impact' without regard for the consideration of *Ensley Branch*'s 'job-related' mandate. The end result has been a stiff resistence to validation of any of its procedures unless specifically ordered by the Court. The city still clings to its claim of arithmetically non-discriminatory procedures. However, such an approach is perilous considering the fluid nature of applicant and selection data as opposed to the anchor of validated procedures."); Greenberg Declaration I, Exhibit 3 (Nov. 14, 2006 letter to the court from Ray Fitzpatrick), at 3 ("A remedy requires a valid, job-related procedure.").

It is a fair conclusion that the Wilks class's position extends to the Personnel Board's selection procedures as well. *See* Greenberg Declaration II, Exhibit 7(a) (Aug. 11, 2003 letter from Gary Brown to Dave Boyd and Aaron Dettling), at 1 ("Apparently some parties to this litigation desire an added measure to ensure that acceptable tolerances of adverse impact will be maintained, with little concern for the job-relatedness of the procedures. We find this unacceptable."), and 7(b) (July 2, 2004 letter from Gary Brown to Dave Boyd and Aaron Dettling), at 2 ("At this stage of the development process we believe that the Board's efforts should be primarily focused on evaluating whether the procedure is sufficiently job–related, rather than expending additional time and resources to develop new and creative ways to further manipulate the scores. Too often we are left with the impression that the 'tail (elimination of impact) is wagging the dog (job related procedures.).' The primary concern should be job-relatedness."). This further heightens the impact of the conflict of interest, as the County decree is derivative of the Personnel decree.

[90]Greenberg Declaration I, Exhibit 3 (Nov. 14, 2006 letter to the court from Ray Fitzpatrick), at 5. *See also* Greenberg Declaration II, Exhibit 4 (Excerpts from the Deposition of Demetrius Taylor), at 43-44 (acknowledging that the County's structured interview program "pretty much mimic[s] what the City of Birmingham has in place").

out, "[r]epresentation of the County would place [Fitzpatrick & Brown] in the impossible position of challenging the City's failure to validate its nondiscriminatory selection procedures while defending the County's allegedly 'very similar' devices."[91] Stated slightly differently, Fitzpatrick & Brown "cannot simultaneously attack the City's failure to validate selection procedures while defending the County's supposed copying of those City procedures."[92]

Fitzpatrick & Brown do not deny that they have taken these positions on behalf of the Wilks class.  Rather, they assert that the positions are insignificant, and "[t]he Martin-Bryant parties place far too much emphasis on whether the Wilks class demanded validated selection procedures."[93]  They also state:

> In this litigation, the Wilks Class perceived that the City of Birmingham has not been enthusiastic in its efforts to comply with its decree.  The Wilks Class, on the other hand, has attempted to encourage the City to achieve consent decree compliance by validation of its procedures.  The Wilks Class has been unsuccessful in its efforts.  The City has only validated selection procedures when it was found to be out of compliance with the 80% rule and was subsequently ordered by the Court to validate a procedure.  The Wilks Class is also aware that this Court has found that the city's selection procedures meet the standards of the Eleventh Circuit's mandate.  The Wilks Class may not *like* that, but it remains the ruling of this Court.[94]

---

[91]Doc. no. 1406, at 19.

[92]Doc. no. 1421, at 19-20.

[93]Doc. no. 1416, at 36.

[94]*Id.* at 35-36 (emphasis in original).

Fitzpatrick & Brown's attempt to downplay the significance of the arguments they have so vigorously and persistently advanced on behalf of the Wilks class by characterizing them as mere "encouragements" will not wash.  Indeed, the arguments advanced by Fitzpatrick & Brown in the paragraph quoted above actually serve to further illuminate the significance of the conflicting positions on validation.  This court *has* "found that the city's selection procedures meet the standards of the Eleventh Circuit's mandate."[95]   This court's approval of the City's selection procedures was based upon paragraph 8 of the 1995 order modifying the City's decree, which required that

> each selection procedure required or used by the City shall *either*:  (1) have no adverse impact on the basis of race or sex as defined by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq. (1994), (hereinafter "the Uniform Guidelines"); *or* (2) be job related for the job classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Uniform Guidelines and other applicable Federal law.[96]

Judge Pointer announced more than a decade ago that he interpreted Paragraph 8 to require validation only if adverse impact has been demonstrated.  The Eleventh Circuit chronicled the development of that ruling — and the Wilks class's

---

[95]*See supra* note 94 and accompanying text.

[96]Doc. no. 598 (Order Modifying City of Birmingham Consent Decree, at ¶ 8 (footnotes omitted) (emphasis supplied).

unsuccessful attempts to advance a contrary position — in *Birmingham Fire Fighters Ass'n v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002). Following remand to the district court from the *Ensley II* decision in 1994, the Wilks class "moved the district court to modify the [City's] decree to require the City to conduct job validation studies for *all* of its selection procedures, *even those for which no adverse impact was found*." *Id.* at 1252 (emphasis supplied). Judge Pointer ultimately rejected that argument and, in 1995, he modified the City's decree to include the version of Paragraph 8 quoted above. No party appealed any aspect of the 1995 modification order. Approximately five years later, in 2000, and after these cases were reassigned to the present judicial officer, "the Wilks class filed a motion asking the district court to modify the decree further so that it would require the City to validate the selection procedures governing hiring and promotion for *all positions*, *not just those procedures identified as having disparate impact*." *Birmingham Fire Fighters Ass'n*, 290 F.3d at 1253 (emphasis supplied). The Wilks class reasoned that "[s]imply requiring the avoidance of adverse impact is tantamount to an order to continue a program of racial balancing." *Id.* (bracketed alteration in original, internal quotation marks omitted). This court denied that motion, and the Wilks class appealed. In its appellate brief, the Wilks class argued that:

63

The curing of the City's problems through the manipulation of adverse impact ratios does not address the systemic bias lingering in the City's decision makers.   Only proven job-related selection procedures will suffice.   The City has failed to demonstrate that any of its selection procedures utilized in the public safety classifications are appropriately job-related.[97]

The Wilks class's appeal ultimately was dismissed for lack of jurisdiction, because the arguments it raised were not timely.   *See Birmingham Fire Fighters Ass'n*, 290 F.3d at 1255.

The issue of whether the City should be permitted to use job selection procedures that have not been job-validated, if those procedures do not have an adverse impact on race or sex, was raised and fought out by the parties after our 1994 remand.   That issue was decided by the district court, and its decision about the issue is embodied in the key terms of the court's December 1995 Modification Order.   The Wilks Class could have had the decision of that issue reviewed by appealing the modification order then.   It did not.   A party cannot undo its failure to timely appeal an earlier order by the simple expedient of asking the district court to undo that order years later.   The time limits of Rule 4 have more steel in them than that.

*Id.* at 1254.   Stated more succinctly, "[i]f the district court's 1995 modification order is wrong, it was wrong from the get go, and the Wilks class should have filed a notice of appeal within sixty days after that order was entered six [now thirteen] years ago." *Id.* at 1254-55.   Thus, it is the law of this case that validation of an employer's selection procedures is required *only when* adverse impact on the basis of race or

---

[97]Greenberg Declaration I, Exhibit 12 (Brief of the Wilks class at 39, *Birmingham Fire Fighters Ass'n v. Jefferson County*, No. 01-14262-I (11th Cir. 2001)) (emphasis supplied).

gender has been demonstrated. *See, e.g., Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir. 2000) (citing *United States v. Excobar-Urrego*, 110 F.3d 1556 (11th Cir. 1997)) ("Under the law-of-the-case doctrine, an issue decided at one stage of a case is binding at later stages of the same case.").

Finally, Fitzpatrick & Brown have demonstrated just how much the Wilks class "does not *like*" this court's prior rulings on the City's selection procedures by carefully attempting to preserve their right to raise the validation arguments on appeal.[98]   Fitzpatrick & Brown again attempt to de-emphasize their appeal

---

[98]*See* doc. no. 1350 (Wilks class's April 2, 2007 Opposition to the City of Birmingham's Motion to Terminate Consent Decree), at 9 ("The Wilks Class continues to assert all of its objections to termination of the City Decree. In our view, the City of Birmingham has not met its burden of demonstrating that its selection procedures are lawful race-neutral devices. The Court incorrectly placed the burden on the Wilks Class to demonstrate adverse impact to a statistical certainty. All of the objections set forth in our previous filings objecting to termination of the City Decree or in other respects objecting to the adequacy of the city's compliance efforts are reasserted and not waived."). *See also* doc. no. 1140 (Wilks class' Oct. 4, 2004 Opposition to the City of Birmingham Motion to Terminate Consent Decree and to be Dismissed as a Party) ("As stated in numerous previous filings, the City of Birmingham has done very little to meet the mandate of *Ensley Branch v. Seibels,* 31 F.3d 1548 (11th Cir. 1994)."); Greenberg Declaration I, Exhibit 14 (Excerpts from Transcript of Aug. 25, 2005 Status Conference), at 53-55; Greenberg Declaration II, Exhibit 1 (Excerpts from Transcript of April 19, 2007 Status Conference), at 7 ("[I]n our view, the City has weaved and dodged to essentially do the minimum to try to meet the standards of *Ensley Branch,* as this Court has interpreted it. We have pointed out to the Court that we think *Ensley Branch* required more. This Court has not agreed with us. ***Those issues are preserved, and we'll decide whether or not those issues proceed further in due course***.") (emphasis supplied); *id.* at 8-9 ("There is much I could say about the City's procedures or lack of selection procedures. I discussed that at length two years ago. I think everything that I said then applies today, just as well.").

Given the Eleventh Circuit's ruling in *Birmingham Fire Fighters Ass'n v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002), this court questions whether the appellate court would even entertain such an appeal. The Wilks class, nonetheless, has made it clear that it wants the right to try.

preservation efforts, arguing that they "prove[] nothing more than that option may remain available for the Wilks Class" once a final order dissolving the City decree has been entered.[99]  But, that *is* the point:  the option of appealing any final order dissolving the City decree *does* remain open to the Wilks class, and as Fitzpatrick & Brown point out, whether the Wilks class will appeal "is a decision for a future date and could depend on a wide variety of factors."[100]   Fitzpatrick & Brown's representation of Jefferson County should *not be* one of the factors influencing that decision.  Yet, if Fitzpatrick & Brown are allowed to represent both the Wilks class and Jefferson County, they will face the decision of whether to sacrifice one client's interests to serve the other.  Either they will cease pursuing the Wilks class's position that *all* selection procedures — and not just those procedures identified as having adverse impact — must be validated, or they will continue to pursue that position at the risk of rendering Jefferson County's consent decree compliance more difficult to prove.  The two positions cannot be reconciled, and the conflict is not only likely, but *certain.*  Fitzpatrick & Brown's representation of either the Wilks class or Jefferson County *will* materially limit their ability to consider and carry out courses of action on behalf of the other.  The concurrent representation cannot continue without a

---

[99]Doc. no. 1416, at 36.

[100]*Id.*

violation of Rule 1.7(b).

### IV.  CAN THE CONFLICT OF INTEREST BE EXCUSED?

Because a conflict of interest exists under Alabama Rule of Professional Conduct 1.7(b), the court now must evaluate whether the conflict can be excused. Rule 1.7(b) allows an attorney to pursue dual representation despite a conflict of interest, but *only* if "(1) the lawyer *reasonably* believes the representation will not be adversely affected; *and* (2) the client consents after consultation."  Ala. R. Prof'l Conduct 1.7(b) (emphasis supplied).

### A.    Rule 1.7(b)(1) — Adverse Effect of Representation

The first question is whether Fitzpatrick & Brown could *reasonably* believe that their simultaneous representation of both the Wilks class and Jefferson County will not adversely affect either client.  As the comment to Rule 1.7 states, a client's consent is ineffectual if the proposed dual representation would adversely affect either client, because "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."  Ala. R. Prof'l Conduct 1.7 cmt.

Although Fitzpatrick & Brown clearly believe that their dual representation

67

will not adversely affect either the Wilks class or Jefferson County, the court cannot conclude that belief is reasonable, or that a disinterested lawyer would support the dual representation.  As discussed in Part III(B)(2), *supra,* it is highly likely (if not certain) that Fitzpatrick & Brown's dual role will materially limit their representation of either the Wilks class or Jefferson County (if not both) by impairing their ability to impartially recommend or carry out courses of action on behalf of one client or the other.  Fitzpatrick & Brown will likely face the decision whether to continue expressing the Wilks class's support for the Personnel Board as it is presently constituted, or to support the County Commissioner's contrary objective of abolishing, or significantly altering the composition of, the Board.  They will also likely have to choose between continuing to advance the Wilks class's position that the Board's decree should quickly be terminated, or backing off that position to further the County's apparent goal of holding the Board responsible for some of its allegedly contemptuous actions and omissions.  Further, the Wilks class *will* have to decide whether to appeal any final order terminating the consent decrees of the City and Personnel Board.  In the course of that decision-making process, Fitzpatrick & Brown *will* either have to abandon — or at least compromise — the Wilks class's position that *all* selection procedures must be validated, regardless of adverse impact,

68

or advocate a standard that imposes a higher burden on Jefferson County for demonstrating consent decree compliance.  Surely no disinterested lawyer would recommend that any client agree to legal representation that could potentially compromise so many of its interests.

Fitzpatrick & Brown suggest their dual representation is reasonable because they received an informal opinion from the General Counsel of the Alabama State Bar holding that the representation is permissible under prevailing ethical rules.  In his August 24, 2007 letter to the General Counsel requesting an advisory opinion, Mr. Fitzpatrick stated:

> The referenced case is a complex employment discrimination action which has been pending in the federal court in Birmingham in [sic] the mid-1970's.  In the early 1980's three separate comprehensive consent decrees were entered by the Court resolving the claims of the United States Department of Justice and a class of black and female employees.   The three separate consent decrees involved the employment practices of the City of Birmingham, the Personnel Board of Jefferson County, and Jefferson County.  In the past 15 plus years, litigation has been active in matters involving the implementation of the two decrees with the City of Birmingham and the Personnel Board.  See *Ensley Branch v. Seibels,* 31 F.3d 1548 (11th Cir. 1994).  Since 1990, I have represented a class of non-black intervenors in the case known as the Wilks Class.  The Wilks Class intervened to ensure that employment practices of the City of Birmingham and the Personnel Board were race-neutral.  At no time has the Wilks Class made any claims against Jefferson County or been adverse to Jefferson County.  The Wilks Class is solely composed of employees of the City of Birmingham and not County employees.

The Jefferson County Attorney's Office has requested that this firm appear as additional counsel for Jefferson County in newly-initiated proceedings to enforce the Jefferson County Decree. We believe there is no conflict of interest or potential for conflict in representing these multiple parties in separate facets of this litigation. We have discussed this matter with representatives of Jefferson County and disclosed it in our retention letter with the County. Similarly, we have disclosed this matter with leadership of the City of Birmingham employees, have received a written waiver from the Fire Department employees and have a second waiver from the Police Department employees forthcoming.

Proceedings involving the City of Birmingham and Jefferson County Personnel Board decrees are near an end. Proceedings concerning the Jefferson County Decree have been relatively dormant in the past, but will soon be active with the initiation of this new enforcement action.

Jefferson County has requested our assistance in this most important matter. We believe there is no violation with the letter or spirit of the Rules of Professional Conduct.[101]

The General Counsel responded to Mr. Fitzpatrick on August 27, 2007. He quoted Alabama Rule of Professional Conduct 1.7, and then stated:

It appears *from the facts outlined in your letter* that an actual conflict of interest does not exist. Rather it appears that the non-black intervenors and Jefferson County are not adverse to one another in the current matter. As such, representation of both parties is permissible. Moreover, it appears that both parties have already waived and consented to any possible current conflict of interest.

However, both parties should be advised that if, at any time, their positions become adverse, you will be required to withdraw from

---

[101]Doc. no. 1416, at Exhibit 22 (Correspondence between Ray Fitzpatrick & General Counsel of the Alabama State Bar).

> representation of parties.  If the parties' positions become adverse for any reason, continued representation of either party would be prohibited, regardless of whether the clients are willing to waive any conflict of interest.[102]

This court, of course, is not bound by the opinion of the General Counsel.  *See In re Employment Discrimination Litigation Against the State of Alabama,* 453 F. Supp. 2d at 1331 (holding that, even if a federal district court adopts a state bar association's ethical rules, "the court is not bound by state court interpretations of those rules").

Even if this court were bound to consider the General Counsel's opinion, it would not fully credit that opinion because Mr. Fitzpatrick's letter did not present a complete picture of the relevant factual and legal considerations.  By this court's cursory count, at least 1,148 pages of briefs and evidentiary submissions have been filed in conjunction with the present motion to disqualify.  Fitzpatrick & Brown filed 517 of those pages.  This memorandum opinion now numbers eighty pages.  When compared to the voluminous record before this court, the one-and-a-half-page letter Mr. Fitzpatrick submitted to the General Counsel of the Alabama State Bar Association cannot seriously be considered an adequate representation of the facts material to the ethical questions raised.

---

[102]*Id.* (emphasis supplied).

**B.      Rule 1.7(b)(2) — Consent**

As Fitzpatrick & Brown failed to demonstrate a *reasonable* belief that their concurrent representation will not adversely affect either the Wilks class or Jefferson County, the conflict of interest cannot be cured by the clients' consent.  Even so, for the sake of completeness, the court will explain why the clients have not provided effective consent under Rule 1.7(b)(2).

Fitzpatrick & Brown submitted three documents purporting to be written consents to the dual representation.  First is a letter from Assistant County Attorney Charlie Wagner to Mr. Fitzpatrick dated August 24, 2007.  Mr. Wagner referenced "USA v. Jefferson County, Federal District Court Case No. CV-75-S-066," and stated:

> Pursuant to our conversation this afternoon, this letter will confirm that Jefferson County waives any and all *potential* or actual conflicts that *may* exist in your representation of the County in the above referenced case.  The County understands that you represent the Wilkes [sic] Class in a separate case styled USA v. City of Birmingham, Federal District Court Case No. CV-74-S-0017, and sees no conflict of interest whatsoever in your continued representation of the Wilkes [sic] Class in that case and representing Jefferson County in the instant case. Assistant County Attorney Theo Lawson and I will continue to be the lead counsel for Jefferson County in this case, and your association with us in representing the County will be of great assistance.[103]

---

[103]Doc. no. 1423, at Exhibit 5 (August 24, 2007 letter from Charlie Wagner to Ray Fitzpatrick) (emphasis supplied).  Mr. Wagner's use of the terms "potential" and "may" suggests the County is well aware that potential conflicts, as well as actual ones, are significant under the

72

Fitzpatrick & Brown also submitted a statement signed by an individual named

Michael Pennington, and reading as follows:

> This is to confirm that I am an employee of the Birmingham Fire and Rescue Service and a class member of Wilks Class [sic] **in the *United States v. Jefferson County, et al.,* litigation**.  The class of which I am a member is comprised of non-black, male employees of the City of Birmingham.  I am also the elected President of the Birmingham Fire Fighters Association, IAFF Local 117.  Over the years, BFFA leaders that are members of the Wilks Class have provided class leadership functions in interacting with class counsel.  At various times during this lawsuit I have been consulted by our attorneys concerning issues related to that litigation as a class representative.

> I understand that our attorneys, Fitzpatrick & Brown, LLP, have been asked by Jefferson County to represent the County in matters in the lawsuit that pertain to the Consent Decree with Jefferson County.  I have been apprised of the matter and do not believe there is a conflict of interest in such a representation of both the Wilks Class with respect to the City and Board decrees and the County with respect to its decree and do not object to Fitzpatrick & Brown, LLP representing Jefferson County in these matters.[104]

Finally, Fitzpatrick & Brown submitted a statement, also dated August 24,

2007, and signed by an individual whose signature appears to read "Michael Collins."

The signator states:

> This is to confirm that I am an employee of the Birmingham Police Department and a class member of Wilks Class [sic] **in the**

---

Alabama Rules of Professional Conduct.  *See* discussion, pages 22-24, *supra.*

[104]Doc. no. 1423, at Exhibit 5 (August 24, 2007 Statement by Michael Pennington) (boldface emphasis supplied).

***United States v. Jefferson County, et al.*, litigation**.  The class of which
I am a member is comprised of non-black, male employees of the City
of Birmingham.  I am also a member of the Fraternal Order of Police,
Lodge 1.  Over the years, FOP leaders that are members of the Wilks
Class have provided class leadership functions in interacting with class
counsel.  At various times during this lawsuit I have been consulted by
our leadership concerning issues related to that litigation as a class
representative.

I understand that our attorneys, Fitzpatrick & Brown, LLP, have
been asked by Jefferson County to represent the County in matters in the
lawsuit that pertain to the Consent Decree with Jefferson County.  I have
been appraised of the matter and do not believe there is a conflict of
interest in such a representation of both the Wilks Class with respect to
the City and Board decrees and the County with respect to its decree and
do not object to Fitzpatrick & Brown, LLP representing Jefferson
County in these matters.[105]

The court's first observation with respect to these three documents is that they

do not reflect that any of the clients received a full explanation of the implications of

the dual representation, as required by Rule 1.7(b).  *See* Ala. R. Prof'l Conduct

1.7(b)(2) ("When representation of multiple clients in a single matter is undertaken,

the consultation shall include an explanation of the implications of the common

representation and the advantages and risks involved.").  Mr. Wagner's purported

waiver does not even state that Fitzpatrick & Brown consulted with him regarding the

implications of the conflict.  It only states that Mr. Wagner is aware of Fitzpatrick &

---

[105]*Id.* (August 24, 2007 Statement by Michael Collins) (boldface emphasis supplied).

74

Brown's representation of the Wilks class and he perceives no conflict of interest.[106]
Perhaps Fitzpatrick & Brown would have the court *assume* that Mr. Wagner
understands all of the potential implications of the dual representation because he is
an attorney representing the County in this litigation.  The rule, however, requires
proposed counsel to fully consult *with the client*, and makes no exception for
situations in which *the client* is represented (as in this instance) by other counsel.  To
draw the point tightly, there is no evidence that Fitzpatrick & Brown consulted with
*any* of the elected members of the Jefferson County Commission, much less a
majority of the Commissioners.

The statements by Mr. Pennington and Mr. Collins fare little better, although
those gentlemen do state they "have been apprised of the matter and do not believe
there is a conflict of interest."[107]  Despite these conclusory representations, it appears
that Mr. Pennington and Mr. Collins were provided with only the following
information during their "consultation" with Fitzpatrick & Brown:  Jefferson County
asked Fitzpatrick & Brown to represent it "in matters in the lawsuit that pertain to the

---

[106]Mr. Wagner's statement bears a curious similarity to Mr. Fitzpatrick's response to Judge
Pointer's question during the May 22, 1995 status conference about whether there would be a
conflict if the Wilks class encompassed County employees.

[107]Doc. no. 1423, at Exhibit 5 (statements by Michael Pennington and Michael Collins).

Consent Decree with Jefferson County,"[108] and the County decree is separate from the City and Personnel Board decrees.  Based on this scant information, Mr. Pennington and Mr. Collins concluded no conflict exists in Fitzpatrick & Brown's "representation of both the Wilks class with respect to the City and Board decrees and the County with respect to its decree. . . ."  As the length of this opinion should suggest, that decision could not possibly have been based on a *full* "explanation of the implications of the common representation and the advantages and risks involved."  Ala. R. Prof'l Conduct 1.7(b)(2).  The implications to the Wilks class of Fitzpatrick & Brown's dual representation are far more intricate than the simplistic assessment stated by Mr. Pennington and Mr. Collins.  Thus, the court cannot conclude that Mr. Pennington and Mr. Collins received an adequate consultation prior to giving their consent to Fitzpatrick & Brown's dual representation.

An additional deficiency exists with regard to the purported waivers from Pennington and Collins.  Those two individuals cannot consent to the conflict on behalf of the entire *Wilks class*.  Neither Pennington nor Collins is a named Wilks class representative.  Further, Pennington is a firefighter, and Collins is a police officer.  They both offer their consents as members and leaders of their respective trade unions.  The Wilks class, however, is composed of *all* present and future male,

[108]*Id.*

76

non-black employees and applicants for employment with the City of Birmingham, not just firefighters and police officers.  Although the court could locate no Eleventh Circuit law on the subject, other district courts have held that a single class member, or even a handful of class members, cannot consent to a conflict of interest on behalf of the entire class.  *See Davis v. Kraft Foods North America,* No. Civ.A. 03-6060, 2006 WL 237512, at *13 (E.D. Pa. Jan. 31, 2006) ("Even assuming [the putative class representative] has knowingly and intelligently waived a conflict on her own behalf, I do not believe she can waive any conflict on the class's behalf."); *In re: Terazosin Hydrochloride Antitrust Litigation,* 223 F.R.D. 666, 677 (S.D. Fla. 2004) ("[E]ven assuming these [twenty-three] sophisticated putative class members can waive any potential conflicts, it is doubtful that these representative members can waive any actual or potential conflicts for the remaining approximately 1,947 members of the defined proposed class."); *Palumbo v. Tele-Communications, Inc.,* 157 F.R.D. 129, 132-33 (D. D.C. 1994) ("The fact that Mr. Snyder and his firm seek to represent a national class of plaintiffs makes the decision to disqualify even more compelling. If Mr. Snyder were representing only an individual plaintiff, he could conceivably seek a written waiver of conflict of interest.  But in this case, Mr. Snyder seeks to represent a large, unenumerated and as yet unidentified class of plaintiffs.

Unidentified class members cannot waive a potential conflict of interest."); *Molina v. Mallah Organization,* 804 F. Supp. 504, 513 n.16 (S.D. N.Y. 1992) ("We are also not convinced that full disclosure and consent as dictated in [the jurisdiction's applicable ethical rule] is a viable option for a class of at least 470 persons."); *In re: Mid-Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485, 491 (D. Md. 1982) ("[F]ull disclosure and consent would be extremely difficult to obtain in a class action should a conflict of interest present itself.").

This court is persuaded by the reasoning of these cases, and does not find them distinguishable as Fitzpatrick & Brown assert. It is true that all of these cases address consent by putative, rather than actual, class members. Even so, the fact that the interests of putative class members were at stake was not essential to the decisions, which were based on the inability of a single class member, or a small group of class members, to consent on behalf of the entire class. There is no reason why that principle should not apply to a certified class. Further, because the Wilks class encompasses future employees and applicants, it is "unenumerated," and includes some "as yet unidentified" members. *See Palumbo,* 157 F.R.D. at 133. The two individuals from whom Fitzpatrick & Brown obtained waivers could not consent to a conflict of interest on behalf of all of the other class members, both known and

unknown.  Therefore, the conflict of interest inherent in Fitzpatrick & Brown's dual representation cannot been excused by the clients' purported consents.

**PART THREE**

*Conclusion and Order*

Ray Fitzpatrick and Gary Brown are able attorneys.  Mr. Fitzpatrick has zealously and successfully represented the interests of male, non-black employees of the City of Birmingham for more than twenty-five years.  Mr. Brown's more recent involvement in this case has been equally dedicated, and equally skilled.  The court has no reason to question either attorney's competence.  Indeed, it was likely because of the quality of Fitzpatrick & Brown's representation of the Wilks class — coupled with their experience in this and other consent decree litigation — that Jefferson County sought their assistance in defending it against the Martin-Bryant parties' charges of contempt.

Even so, the court cannot allow Fitzpatrick & Brown's proposed dual representation of the Wilks class and Jefferson County to continue, because doing so would lead to an impermissible conflict of interest under Alabama Rule of Professional Conduct 1.7(b).  The conflict cannot be excused or consented to.

Accordingly, it is ORDERED, ADJUGED, and DECREED that the Martin-

79

Bryant parties' motion to disqualify the law firm of Fitzpatrick & Brown LLP from serving as additional counsel for Jefferson County, Alabama be, and it hereby is, GRANTED.

The Clerk of Court is directed to amend the docket sheet to reflect that Fitzpatrick & Brown no longer represent Jefferson County.

A revised schedule for submission of the Martin-Bryant parties' motion for contempt, and for modification of the County decree, will be entered by separate order.

DONE this 16th day of January, 2008.

_____
United States District Judge