## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | ) | |
| vs. | ) | Civil Action No. CV-75-S-666-S |
| JEFFERSON COUNTY, ALABAMA, *et al.*,<br>    Defendants. | ) | |
| JOHN W. MARTIN, *et al.*,<br>    Plaintiffs, | ) | |
| vs. | ) | Civil Action No. CV-74-S-17-S |
| CITY OF BIRMINGHAM, ALABAMA, *et al.*,<br>    Defendants. | ) | |
| ENSLEY BRANCH OF THE N.A.A.C.P., *et al.*,<br>    Plaintiffs, | ) | |
| vs. | ) | Civil Action No. CV-74-S-12-S |
| GEORGE SEIBELS, *et al.*,<br>    Defendants | ) | |

## MEMORANDUM OPINION

For more than seventy-three years, the professional staff and employees of the public institution known as the Personnel Board of Jefferson County, Alabama ("Personnel Board" or "Board") have been governed by a three-person board, the members of which are vested by the terms of a state enabling act[1] with the primary

---

[1] The enabling act was originally enacted in 1935, *see* Act No. 284, 1935 Acts of Alabama, at 691-713, and reenacted in 1945. *See* Act No. 248, 1945 Acts of Alabama, at 376-400. *See also* 1940 Code of Alabama, Appendix § 645 *et seq.* (Recomp. 1958). Both the original enabling act and the 1945 re-enactment were so-called "general acts of local application," meaning that the legislation applied only to Alabama counties and municipalities that satisfy population requirements specified in the statute. As a result of the population figures of 200,000 residents specified in the 1935 Act, and 400,000 residents in the 1945 Act, the law has applied since its inception only to Jefferson

responsibility of promulgating rules regulating the employment and promotion of persons in the classified public service of twenty-two county and municipal governmental entities.[2]

The screening, testing, certification, and other professional practices of the Personnel Board's staff are managed by a "Personnel Director,"[3] an official who is appointed by, serves at the pleasure of, and is supervised by the three-person governance board — the members of which are, in turn, appointed for six-year terms by a group of private citizens known as the "Citizens' Supervisory Commission."[4]

---

County, the largest county in Alabama.

[2] *See infra* **Appendix I** (§ 2 of the enabling act). The governmental entities ("appointing authorities") served by the Personnel Board include the Jefferson County Commission, the Jefferson County Department of Health, the Jefferson County Emergency Management Agency, the Jefferson County Storm Water and Sewer Administration, the Jefferson County Personnel Board as an entity, and the following cities: Birmingham; Bessemer; Fairfield; Fultondale; Gardendale; Graysville; Homewood; Hueytown; Irondale; Leeds; Midfield; Mountain Brook; Pleasant Grove; Tarrant; Trussville; Vestavia Hills; and Warrior.

The Personnel Board and appointing authorities share responsibility for hiring and promoting employees. The professional staff of the Personnel Board administers tests, tracks employee seniority points, and develops lists of candidates qualified for employment or promotion by the appointing authorities ("registers of eligibles"). When a job opening occurs within one of the appointing authorities, the Board submits a list of candidates eligible for employment or promotion, and the appropriate county, municipal, or other governmental official selects a candidate from the Board list ("certificate of eligibles").

[3] At some undetermined point, the occupant of this position began to be called "Executive Director" by the members of the three-person governing board, but the correct, statutory title remains either "Personnel Director" or "Director of Personnel." *See* § 1 of Act No. 680 and § 4 of Act No. 684, 1977 Acts of Alabama (both amending § 12 of Act No. 248, 1945 Acts of Alabama, defining the "Duties of personnel director").

[4] *See infra* **Appendix II** (§ 3 of the enabling act). With the sole exception of one of the two Probate Judges serving Jefferson County, the persons serving on the Citizens Supervisory Commission are not employed by any of the appointing authorities served by the Personnel Board and hold no elective public office. Since the legislation creating the Jefferson County Personnel

The Alabama Legislature purported to change this seven-decades-old structure during its most recent regular session when Alabama Act No. 2008-408 ("Act No. 408") was enacted and signed into law by the Governor.  That legislation would abolish the Citizens Supervisory Commission and replace the current three-person governing board with a seven-member board comprised of the following persons:  the Chair of the Jefferson County Commission; the mayor of the municipality having the largest number of employees in the classified service (currently, the City of Birmingham); one member of the Jefferson County Mayors' Association; two employees in the classified service, *one of whom must be an African-American*, elected by popular vote among all permanent employees in the classified service; and two persons appointed by the Probate Judge of Jefferson County, *one of whom must be an African-American*, one of whom must reside in the Bessemer judicial division, and one of whom must reside in the Birmingham judicial division.[5]

---

Board was originally enacted in 1935, the section providing for the method of selecting members of the Citizens Supervisory Commission has been amended by nine Acts of the Alabama Legislature passed from 1939 through 1977.  The current method of selecting those persons who may serve as members of the Citizens Supervisory Commission, however, was established by a final judgment entered by this court in the case styled *Woods v. Florence*, No. CV82-PT-2272-S (N.D. Ala. Apr. 29, 1985) (Propst, J.); *see also id*. (N.D. Ala. Jan. 31, 1985) (findings of fact and conclusions of law holding that portions of § 5, Act. No. 248, 1945 Acts of Alabama, as subsequently amended, "have been amended and maintained with the intent to discriminate and continue to have an adverse impact on plaintiffs and other black citizens" in violation of the Fourteenth Amendment to the United States Constitution).

[5] *See infra* **Appendix III**.

Shortly after the enactment of Act No. 408, the Wilks class — a group composed of all present and future male, non-black employees and applicants for employment with the City of Birmingham[6] — filed a motion challenging the constitutionality of those portions of the statute mandating that two members of the new governing board be African Americans, and asking this court to permanently enjoin implementation of those race-based provisions.[7]  The members of the three-person board governing the Personnel Board as an entity later joined in the motion,[8] echoing the constitutional contentions of the Wilks class, but arguing that the entire Act should be declared unconstitutional because the race-conscious provisions are not severable from the remainder of the statute.[9]

---

[6] *See* Jan. 3, 1991 Order Certifying Classes (appended to doc. no. 1406 as Exhibit 1 to the Declaration of Kristy Greenberg), at 3-4 ("[T]he Court certifies the following classes of interested parties with respect to the proceedings to consider modification of the City Decree: . . .  All present and future male, non-black employees of and present and future male, non-black applicants for employment with the City."); *see also*, *e.g.*, *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1560 (11th Cir. 1994).

[7] *See* doc. no. 1479 ("Wilks Class' Motion for Declaratory and Injunctive Relief from Race-Based Provisions of Act No. 2008-408 of the 2008 Regular Session of the Alabama Legislature," filed May 30, 2008).

[8] *See* doc. no. 1516 ("Defendant, Personnel Board of Jefferson County's Joinder in Motion").

[9] *Compare* doc. no. 1479, at 1 n.1 (where the Wilks Class makes clear that it "is not asking this Court to enjoin implementation of Act No. 408 **in its entirety**, but only to sever the race-based provisions from the Act") (underscored emphasis in original, boldface emphasis supplied) *with* doc. no. 1516, at 4 (where the Personnel Board argues that the race-based provisions of Act No. 408 cannot be severed from the non-offensive portions and, therefore, that the Act "should be declared unconstitutional on its face, ***and in its entirety***") (boldface emphasis supplied).  *See also* doc. no. 1491 ("Defendant, Personnel Board of Jefferson County's Submission in Response to Court's Order of June 3, 2008," filed June 16, 2008), at 10 (arguing that Act. No. 408 must be declared unconstitutional in its entirety because the Act's legislative history makes clear that the invalid

The argument that the race-conscious provisions of Act No. 408 constitute unconstitutional racial quotas is extraordinarily compelling. State-created affirmative action plans embodying racial preferences are subject to strict scrutiny, and must be narrowly tailored to the purpose of promoting compelling governmental interests. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.").[10] No party has presented evidence indicating that the racial quotas contained in Act No. 408 were narrowly

---

provisions were the *quid pro quo* for enactment of the valid parts; therefore, "it cannot be presumed the Legislature would have passed the one without the other").

[10] *See also, e.g., City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989) (holding that strict scrutiny is the standard of review to be applied to all claims of race-based discrimination by state governmental entities, and that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification") (O'Connor, J., plurality opinion); *id.* at 520 ("I agree . . . with Justice O'CONNOR's conclusion that strict scrutiny must be applied to all governmental classification by race.") (Scalia, J., concurring with plurality opinion and judgment); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 273 (1986) (observing that "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination") (Powell, J., plurality opinion); *Regents of University of California v. Bakke*, 438 U.S. 265, 289-90 (1978) ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.") (Powell, J., joined by White, J.). *Cf. Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.") (Stevens, J., dissenting); *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.").

tailored by the Alabama Legislature for the purpose of furthering *any* "compelling"

governmental interest.[11]   Instead, the Martin class of plaintiffs and Bryant class of

intervening plaintiffs ("Martin/Bryant parties") have engaged opposing counsel in

---

[11] Only the City of Birmingham supports the validity of Act No. 408.  *See* doc. no. 1488 ("City of Birmingham's Response in Opposition to Wilks Class' Motion for Declaratory and Injunctive Relief From Race-Based Provisions of Act No. 2008-408 [*etc.*]").  The City's present attorneys hypothesize that the statute's race-based quotas were

> narrowly tailored to strengthen the County Personnel Board . . . to remedy the Board's long and well-documented history of discrimination and administrative failings, to continue the Board's progress towards implementing non-discriminatory practices, and to prevent the Board from slipping back to its discriminatory practices of yore.

*Id.* at 2 (footnote omitted).  The City's argument explicitly assumes that "ensuring black membership and representation on the Board is necessary to strengthen the Board and put the Board back on track to achieve its long-term goals."  *Id.* at 8.

The weakness of the City's argument lies in several facts.  First, there is no evidence even suggesting, much less establishing, that *any* member of Jefferson County's state legislative delegation consciously thought of *any* of the interests hypothecated by the City's attorneys during the period that Act No. 408 was under consideration.  This total lack of evidence is damning because, in the absence of *legislative statements* of the need and basis for such race-conscious preferences, *plus* evidence showing that the stated rationales constitute "compelling governmental interests," *as well as* evidence clearly demonstrating that the racial quotas were narrowly tailored to the justifications articulated by the legislature, the statute *must* fall.  *See, e.g., Adarand*, 515 U.S. at 228 ("*Unless Congress clearly articulates the need and basis* for a racial classification, *and also tailors the classification to its justification*, the Court should not uphold this kind of statute.") (emphasis in original, citation and internal quotation marks omitted).

Moreover, the statutorily-mandated racial-quotas have no fixed duration:  they are indefinite and, as the Wilks class suggests, potentially "everlasting."  Doc. no. 1479 ("Wilks Class' Motion for Declaratory and Injunctive Relief from Race-Based Provisions of Act No. 2008-408 [*etc.*]"), at 8.  Indeed, the composition of the present governance board has existed for more than seventy-three years.  As the Eleventh Circuit observed, "the Constitution demands that race-conscious affirmative action programs end as soon as their purposes are accomplished."  *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1570 (11th Cir. 1994) ("*Ensley II*").  *Cf. In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525, 1543 (11th Cir. 1994) ("It is not permissible . . . for a government to implement a rigid quota of race-based promotions, to continue indefinitely, with no basis at all for the quota figure selected.").

6

acrimonious argument over other, precedent issues:  *i.e.*, (*i*) whether an Article III case or controversy exists; (*ii*) if so, whether individual members of either the Wilks class or the three-person board possess standing to challenge Act No. 408; and (*iii*) whether the present litigation is the proper forum for considering the constitutionality of the statute.  After full consideration of the parties' submissions, the court is of the opinion that this is an appropriate forum to address the constitutionality of Act No. 408, and that individual members of the Wilks class and three-person board have standing to raise that issue.  This court remains concerned, however, that the City of Birmingham may not be an appropriate party to defend the constitutionality of the statute.  A more appropriate party would have been the Attorney General of the State of Alabama.  He was invited to intervene for that purpose,[12] but failed to respond.  For these reasons, the court concludes that the viability of Act No. 408 can and should be decided on grounds other than its facial constitutionality under the Equal Protection Clause.

## DISCUSSION

This litigation has dragged on for more than thirty-four years.  With the possible exception of some school desegregation cases that long have been moribund, but which no one has taken the time to officially declare dead and buried, there are,

---

[12] *See* doc. no. 1482 (June 3, 2008 "District Court Certification of Constitutional Question").

so far as this judicial officer has been able to ascertain, no federal cases that have

been pending longer.  Without question, this is the oldest, governmental, systemic,

employment discrimination litigation still active in any court in the United States.  It

has exceeded the lifespan of the first judge to whom it was assigned,[13] some of the

original attorneys,[14] at least one of the named parties,[15] and, if Act No. 408 is allowed

to take effect, promises to accompany the present judicial officer into the winter of

his years.  Further, during the pendency of this protracted litigation — an amalgam

of five consolidated and intervening class actions against the City of Birmingham,

Jefferson County, and the Personnel Board[16] — various orders of this court have been

---

[13] Sam Clyde Pointer, Jr., was nominated by President Richard M. Nixon to a new seat on the U.S. District Court for the Northern District of Alabama created by 84 Stat. 294 on Sept. 22, 1970.  He was confirmed by the Senate on Oct. 8, 1970, and received his commission on Oct. 14, 1970.  He then was 35 years of age, and became the youngest U.S. District Judge in the Nation. Judge Pointer served as Chief Judge of the court from 1982 until Nov. 19, 1999, when he assumed senior status.  His service terminated on April 2, 2000, due to retirement.  Judge Pointer died on March 15, 2008, at age 73.

[14] For example, Oscar W. Adams was lead counsel for plaintiffs in the first action to be filed: *i.e.*, the suit commenced on Jan. 4, 1974, by the Ensley Branch of the N.A.A.C.P. against George Seibels, then Mayor of the City of Birmingham, and others.  Mr. Adams later left the practice of law to become an Associate Justice on the Supreme Court of Alabama.  He died eleven years ago.

[15] George G. Seibels, Jr., served from 1967 to 1975 as the first Republican Mayor of Birmingham, Alabama, and died during March of 2000 at age 87.

[16] The three class actions listed in the caption of this opinion were consolidated.  The two plaintiff classes that were allowed to intervene, but are not referenced in the caption, are generally referred to by the shorthand phrases of "Bryant intervenors" and "Wilks class."  The class of "Bryant intervenors" consists of all present and future black and female employees, and applicants for employment, with the City of Birmingham.  As thus defined, the Bryant class of intervening plaintiffs overlaps the Martin class of plaintiffs; nevertheless, this court allowed the Bryant class to intervene "in an effort to gather all interested parties in a single proceeding."  *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1560 (11th Cir. 1994) ("*Ensley II* ").  As stated in the text

addressed by nine appellate opinions:  one by the former Fifth Circuit,[17] six by the

present Eleventh Circuit,[18] and one by the Supreme Court.[19]  The costs of the

litigation to the parties are staggering, and mounting, literally, by the hour.  If any one

doubts the accuracy of that assertion, he or she need look no further than the affidavit

submitted by the attorneys for the Martin/Bryant parties in support of their motion

seeking monetary sanctions from Jefferson County for that defendant's egregious

abuse of the discovery process.[20]  The total amount of fees and costs accumulated by

those attorneys over the course of *just the last four years* exceeds Ten Million dollars

---

accompanying note 6 *supra*, the "Wilks class" consists of all present and future male, non-black employees, and applicants for employment, with the City of Birmingham.  *See*, *e.g.*, *id.* at 1560. Consistent with the Supreme Court's decision in *Martin v. Wilks*, 490 U.S. 755 (1989), *aff'g In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1988), this court allowed the Wilks class of plaintiffs — who were not parties to the consent decrees executed in 1981 by the City of Birmingham and the Personnel Board, nor the consent decree executed the following year by Jefferson County — to intervene, originally for the purpose of collaterally attacking the City's and Personnel Board's consent decrees and the affirmative action programs adopted under them, but later, and more broadly, "for the limited purpose of participating in any litigation regarding potential modification of the consent decrees."  *Ensley II*, 31 F.3d at 1560.

[17] *Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir. 1980) ("*Ensley I* ").

[18] *See Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250 (11th Cir. 2002); *Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289 (11th Cir. 2002); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II* "); *In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994); *In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755 (1989); *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1984).

[19] *Martin v. Wilks*, 490 U.S. 755 (1989), *aff'g In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir. 1987).

[20] *See* doc. no. 1529 (Affidavit of Rowan D. Wilson).

($10,000,000.00)![21]   Multiply such sums by the number of attorneys involved from the inception of this litigation to the present — not to mention the billable hours that will accumulate, and the judicial resources that will be expended, during the additional years of litigation that will be required to resolve the remaining controversies, if Act No. 408 is allowed to take effect[22] — and one can reasonably speculate that these cases may become (if they are not already) the most expensive

---

[21]*Id.* at ¶ 3.

[22] The Supreme Court has held that the following questions must be answered affirmatively before court supervision of a public institution pursuant to a remedial consent decree can be withdrawn:  (*i*) has the defendant "fully and satisfactorily complied" with the requirements of its decree?; (*ii*) is retention of judicial control "necessary or practicable" to achieve compliance with any outstanding decree requirements or court orders?; and (*iii*) has the public institution demonstrated "its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance"? *Freeman v. Pitts*, 503 U.S. 467, 491 (1992).  *See also, e.g., Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367 (1992); *Bd. of Educ. of Oklahoma City v. Dowell*, 498 U.S. 237 (1991); *United States v. City of Miami*, 2 F.3d 1497 (11th Cir. 1993).  In addition, the reviewing court must find that it is "unlikely that [the public institution] would return to its former ways" following the termination of judicial supervision.  *Dowell*, 498 U.S. at 247.  "In sum, termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent discrimination in the future or to remedy the effects of past discrimination."  *City of Miami*, 2 F.3d at 1508.

This court had begun the process of evaluating the record of the professional staff of the Personnel Board and its current, three-person governance board in the light of the legal requirements summarized in the preceding paragraph when Act No. 408 was signed into law by the Governor of Alabama.  *See, e.g.*, doc. no. 1429 ("Personnel Board of Jefferson County's Motion for Final Relief From 1981 Consent Decree, As Amended, With Supporting Memorandum").

If Act No. 408 is allowed to take effect, the three-person board will be abolished, and its record of compliance (as well as all acts of the Board's professional staff pursuant to the rules and regulations adopted by the three-person board) will cease to be legally significant.  In other words, there will be no factual basis upon which this court can determine whether the Personnel Board, *as a public institution under the governance of a newly-constituted, seven-person board*, will or will not be likely to return to the institution's former ways, absent judicial supervision.  The Board's professional staff and seven-person board will have to build a new record of compliance, a tedious effort that would require at least two additional years of supervision.

systemic employment discrimination controversies in history.

For such reasons, this litigation has become the American equivalent of *Jarndyce vs. Jarndyce*, the Chancery case depicted by Charles Dickens in his novel *Bleak House* as having "passed into a joke" within the English Bar because "innumerable children [had been] born into [it]; innumerable young people [had] married into it; innumerable old people [had] died out of it"; and, "in the course of time, [the original controversy had] become so complicated, that no man alive [knew] what it meant."  Like the present litigation, the case just "drone[d] on" and on.[23]

Some fourteen years ago, however, the Eleventh Circuit issued clear marching orders:  bring these cases to a close, *and do so* "*forthwith*."  *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1577 (11th Cir. 1994) (Carnes, J.) (emphasis supplied) ("*Ensley II* ").  That opinion criticized the Personnel Board's lack of progress over the (then) preceding thirteen years in developing employment selection procedures that complied with federal law.  *See*, *e.g.*, *id.* at 1571-72 ("Little or no progress . . . has been made."); *id*. at 1573 ("The time has long passed for the Board and the City to strip away the past and adopt fresh, race-neutral selection procedures.").  The *Ensley II* panel insisted that the trial judge bare sufficiently sharp procedural "teeth" to ensure the Board's prompt compliance with the terms of its

---

[23] Charles Dickens, BLEAK HOUSE 18 (Easton Press ed. 1970).

11

consent decree. *Id.* at 1572.  Indeed, the district court was clearly instructed to waste

no time in the pursuit of the Eleventh Circuit's mission statement because, as Judge

Carnes emphasized when speaking for the panel,

> [t]he Constitution was not designed to ease the lot of public officials, and it is not the role of federal courts to insulate public officials from the people.  Instead, woven throughout the Constitution is a commitment to democratic self-rule, making public officials answerable to the people. While one of the most important duties of federal courts is to protect the constitutional and statutory rights of minorities, interference in the processes of another branch of government should be as narrow and short-lived as fulfilling that constitutional duty allows.  Remedial decrees should require the responsible officials to end their unconstitutional action *posthaste*.  Remedial decrees should not foster prolonged oversight and management by the least representative branch. Federal court supervision of local government has always been "intended as a temporary measure" and should "'not extend beyond the time required to remedy the effects of past intentional discrimination.'"

*Ensley II*, 31 F.3d at 1574-75 (quoting *Board of Education of Oklahoma City v.*

*Dowell,* 498 U.S. 237, 248 (1991) (in turn quoting *Spangler v. Pasadena City Board*

*of Education*, 611 F.2d 1238, 1245 n.5 (9th Cir. 1979) (Kennedy, J., concurring))

(emphasis supplied).

For such reasons, the *Ensley II* panel directed this court to *ensure* that the

Personnel Board began to

> develop race-neutral selection procedures *forthwith*, not at the casual pace the Board has passed off as progress for [then] thirteen years.  The Board's decree is not a security blanket to be clung to, but a badge of shame, a monument to the Board's past and present failure to treat all

> candidates in a fair and non-discriminatory manner.  Federal judicial
> oversight should provide public employers no refuge from their
> responsibilities.  We are confident that, on remand, the district court will
> modify *and enforce the decrees in a way that will bring that truth home*.

*Ensley II*, 31 F.3d at 1577-78 (emphasis supplied).  This judge can recognize an order

when he reads one and — just the same as those men and women who serve in this

Nation's Armed Forces — the duty of all United States District Judges is to obey the

orders of superior officers.

The pointed directives spread throughout the *Ensley II* opinion cannot be

misinterpreted.  In 1994 — now some fourteen years ago — Judge Carnes clearly

stated the panel's expectation that this court would ensure the Board's compliance

with its consent decree, and waste no time in doing so.  This court understands the

importance of that objective.  The Personnel Board lies at the center of the web of

discriminatory practices that led to the commencement of these actions.

Unfortunately, the task of untangling that web has proven more difficult than

expected.  The *Ensley II* Court's concerns over lack of progress and lingering federal

oversight have now been compounded by *fourteen additional years* of resistance by

the defendants, political maneuvering, and other intentional and unintentional barriers

to progress.  This judge has, nonetheless, persisted in pursuing the goals set for the

district court in 1994.  Indeed, the Eleventh Circuit's directives have underscored

13

every action taken by the present judicial officer to further this litigation since it was reassigned in 2000.

In 2002, this court held the Personnel Board in civil contempt for its repeated, flagrant failures to comply with this court's orders and its own consent decree, and appointed a Receiver to assume control of the Board's day-to-day functions. This court underscored in the memorandum opinion and order appointing the Receiver[24] that it was acting pursuant to its power and duty to ensure compliance with the consent decree, the Constitution, federal statutes, and binding authorities. This court also emphasized that it would not be deterred in its objectives by any contrary state action, legislative or otherwise.[25]

Indeed, the memorandum opinion explaining the events that compelled the appointment of a Receiver preemptively rejected any attempt that might be undertaken by state actors to alter the Board, and clearly established this court's control over the Board's operations. Specifically, this court wrote:

> Any attempt to abolish the Board, or radically alter the scope of its functions, after nearly three decades of litigation only would spawn more suits, appeals, and legal expenses. Should there be any attempt,

---

[24] *See* doc. nos. 934 and 935 (July 8, 2002 memorandum opinion and order, respectively, imposing a Receivership upon the Personnel Board).

[25] *See* doc. no. 934, at 104 ("[T]o the extent that state law contravenes federal court orders and constitutional objectives, it is displaced by the Supremacy Clause of the United States Constitution.") (citations omitted).

14

*legislative or otherwise*, to alter the functions or scope of the Personnel Board during the pendency of the receivership imposed by this court, those actions shall be superceded and stayed until the litigation is concluded.  This court does not desire to enter the thicket of enjoining a branch of state government, but is prepared to do so if necessary to preserve its jurisdiction.[26]

It is important to note that this court has not formally terminated the Receivership.  Instead, the court has adopted, and supervised the administration of, plans for transition of authority from the Receiver back to the three-member board.[27] The court also has continued to supervise compliance by the professional staff and three-person governing board with the terms of the Personnel Board's consent decree, and has appointed a Monitor to observe and report on the progress of such persons.[28] Through these and other efforts, substantial progress has been made toward termination of the Personnel Board's decree.

In May of 2007, when a vacancy occurred due to the resignation of Dr. Leta Clark, who then served as Chair of the three-person board, this court took action to ensure that the uncertainty likely to arise from that vacancy did not derail the Board's

---

[26] *Id.* at 106 (emphasis supplied).

[27] *See* doc. no. 1132 (order adopting transition plan), doc. no. 1163 (order adopting revised transition plan), and doc. no. 1213 (order adopting second revised transition plan).

[28] *See* doc. no. 1270 (order appointing monitor).  The court appointed Dr. William I. Sauser, Jr. as Monitor.  Dr. Sauser holds a PhD in Industrial/Organizational Psychology from Georgia Institute of Technology and is Associate Dean for Business and Engineering Outreach and Professor of Management at Auburn University.  He currently serves in the Office of the Provost of Auburn University.

15

recent progress.  Noting that the litigation had "reached a critical juncture," and that "[a]ny barrier to its satisfactory conclusion is simply unacceptable," this court appointed Birmingham attorney Alfred F. ("Buddy") Smith, Jr., to fill Dr. Clark's seat.[29]  Soon after that appointment was made, the Citizens' Supervisory Commission ("CSC") attempted to override it.  As reported in the May 16, 2007, edition of the *Birmingham News,* in an article entitled "Citizen Committee Overrides Federal Judge's Appointment," the CSC convened a meeting on May 15, 2007, and appointed a different individual to Dr. Clark's position.  The chair of the nominating committee that selected the CSC's candidate was quoted as saying, "No disrespect intended, but we view what Judge Smith did as simply a well-regarded nomination. . . .  The CSC is not a party to the consent decree, nor are we subject to the action of the referee or whomever directs them."[30]  The court considered the CSC's actions as an obvious affront to the authority of the federal judiciary and, following a lengthy evidentiary hearing on May 23, 2007, declared the CSC's appointment void *ab initio.*[31]  Since that time, Mr. Smith has served as Chair of the three-person board in an exemplary

---

[29] Doc. no. 1361, attachment 1, at 1.  Mr. Smith is a graduate of the University of Alabama School of Law, a member of the Alabama State Bar, and a partner in the Birmingham, Alabama, law firm Bainbridge, Mims, Rogers & Smith, LLP.  *See* www.lawyers.com/Alabama/Birmingham/ Bainbridge,-Mims,-Rogers-and-Smith.-LLP.

[30] *See* doc. no. 1361, at 2.

[31] *Id.*

16

manner.

Another vacancy on the three-person board occurred on August 1, 2007, due to the resignation of Rev. Tommy Hagler. Upon being informed of the vacancy, the court noted that evidence presented during the May 23, 2007 evidentiary hearing

> established, unequivocally, that the Citizens Supervisory Commission, in its present state, is not capable of discharging its duties in a manner that will promote the expeditious conclusion of this litigation consistent with the requirements of the consent decree of the Personnel Board of Jefferson County. Indeed, several Commission members who testified were not even aware that the consent decree litigation existed, and most had absolutely no clue as to the duties of those persons who are appointed to serve on the three-member Personnel Board.[32]

Thus, and again acting pursuant to this court's inherent supervisory authority, the July 8, 2002 order imposing a Receivership on the Board, "and in accordance with the Eleventh Circuit's mandate to conclude this [then] thirty-three-year-old litigation 'forthwith, not at the casual pace the Board has passed off as progress'" for far too-many years,[33] this court appointed Mrs. Ann D. Florie to fill Rev. Hagler's vacancy.[34] The court subsequently renewed Ms. Florie's appointment for an additional six-year

---

[32] Doc. no. 1395, at 1-2.

[33] *Id.* at 2 (quoting *Ensley II*, 312 F.3d at 1577).

[34] Ann D. Florie holds a Bachelor of Arts degree in Political Science from Newcomb College of Tulane University. Mrs. Florie has served the greater Birmingham metropolitan area in a variety of civic leadership positions. She currently is the Executive Director of Leadership Birmingham. *See* www.leadershipbirmingham.org.

term commencing on November 1, 2007.[35]  Mrs. Florie's service on the governance

board also has been exemplary.

Chairman Smith, Mrs. Florie, and the third member of the governing board,

Kenneth L. Moore, an attorney and former municipal judge in Bessemer, Alabama,

have formed an extraordinarily-effective team.   Working cooperatively and

intelligently, they have made great progress toward the goal of terminating federal

supervision over the functions of the Personnel Board.  Indeed, this court was poised

to commence evidentiary hearings on the Board's motion for final relief from its

consent decree when Act No. 408 was signed into law by the Governor.[36]

Importantly, both Mr. Smith and Mrs. Florie were appointed to their positions

*by order of this court.*  Their appointments were for definite terms, *and neither of the*

*terms has expired.*  Thus, if Act No. 408 is implemented, it effectively will override

two federal court orders, both of which were entered for the specific purpose of

furthering the enforcement of a federal consent decree designed to protect rights

firmly grounded in the Fourteenth Amendment to the United States Constitution,[37]

---

[35] *See* doc. no. 1418.

[36] See the discussion in note 22 *supra*.

[37] In relevant part, the Fourteenth Amendment provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1 (1868).

and federal statutes enacted to enforce such rights.[38]  The Supremacy Clause of the

United States Constitution does not countenance such a result.  That clause provides:

> This Constitution, and the Laws of the United States which shall
> be made in Pursuance thereof; and all Treaties made, or which shall be
> made, under the Authority of the United States, shall be the supreme
> Law of the Land; and the Judges in every State shall be bound thereby,
> *any Thing in the Constitution or Laws of any State to the Contrary*
> *notwithstanding.*

U.S. Const., art. VI, cl. 2 (emphasis supplied).

Fifty years ago, in the case of *Cooper v. Aaron*, 358 U.S. 1 (1958), the Supreme

Court interpreted the Supremacy Clause to mean that a federal court's enforcement

of a decree is supreme over state law, and any state law that frustrates the federal

court's constitutional objectives is a nullity.  The dispute that culminated in the

*Cooper* decision began with the Supreme Court's opinion in the case of *Brown v.*

*Board of Education*, 347 U.S. 483 (1954) ("*Brown I* "), *overruling in part Plessy v.*

*Ferguson*, 163 U.S. 537 (1896), and holding that state sponsored and enforced racial

segregation of public school students "is a denial of the equal protection of the laws

enjoined by the Fourteenth Amendment."  *Cooper*, 358 U.S. at 5 (construing *Brown*

*I* ).[39]  Within a year of the first *Brown* decision, the Supreme Court entered a second

---

[38] *See id.*, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.").

[39] More specifically, the first *Brown* decision — one of the most momentous decisions in the history of the United States Supreme Court — held that segregation of white and Negro ("black")

decree to effectuate its prior decision.  *See Brown v. Board of Education*, 349 U.S.

294 (1955) ("*Brown II* ").  The Supreme Court required lower federal courts to

effectuate "a prompt and reasonable start toward full compliance," and to take such

action as deemed necessary to bring about the end of racial segregation in the public

schools "with all deliberate speed."  *Brown II*, 349 U.S. at 301.[40]

   In compliance with the second *Brown* decision, the School Board of Little

---

children in the public schools of a state solely on the basis of race, and pursuant to state laws permitting or requiring such segregation, denied to black children the equal protection of the laws guaranteed by the Fourteenth Amendment, even if the physical facilities and other "tangible" factors of the biracial systems were equal.  In the words of Chief Justice Warren, who authored the opinion for a unanimous Court, "We conclude that in the field of public education, separate but equal has no place.  Separate educational facilities are inherently unequal."  *Brown I*, 347 U.S. at 495.  The weakness of the first *Brown* opinion lay in the Court's decision to not immediately address the critical issues of how, and at what pace, relief should be provided to the prevailing parties.  Instead, the four class-actions consolidated under the style of "Brown v. Board of Education of Topeka, Kansas" were restored to the Court's docket for additional briefing and argument of critical remedial questions.  *See id.* at 495 n.13.

   [40] During argument of the remedial questions left hanging in the first *Brown* opinion, counsel for the Legal Defense and Education Fund of the National Association for the Advancement of Colored People ("N.A.A.C.P.") urged the Court to order that desegregation of all public school systems proceed immediately, or at least within firm deadlines.  The Court did neither, however, and remanded the hard questions to lower courts.  Worse, the second *Brown* opinion provided little guidance about how remedial decisions should be fashioned or given effect, beyond that of directing lower federal courts "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis *with all deliberate speed* the parties to these cases."  *Brown II*, 349 U.S. at 300 (emphasis supplied).

   The directive for lower courts to dismantle segregated public school systems "with all deliberate speed" surely is among the least-happy utterances in American constitutional law.  It provided an interstitial space into which racist demagogues throughout the Nation — but especially those hate-mongers residing within the eleven states comprising the former Confederate States of America — drove obstructive wedges.

   Note well, however, that Judge Carnes, when speaking for the *Ensley II* panel, employed language that was extraordinarily clear and firm regarding that Court's expectations for this court's resolution of the remedial questions of this litigation.

Rock, Arkansas began, in good faith, to prepare for the desegregation of public

schools in that city, starting with high school students in the Fall of 1957.  Other state

authorities, however, actively pursued a program designed to perpetuate racial

segregation, including "an amendment to the State Constitution flatly commanding

the Arkansas General Assembly to oppose 'in every Constitutional manner the

Un-constitutional desegregation decisions of May 17, 1954 and May 31, 1955 of the

United States Supreme Court'"; and, in accordance with that "state constitutional

command, a law relieving school children from compulsory attendance at racially

mixed schools."  *Cooper*, 358 U.S. at 8-9.

The Governor of Arkansas also engaged in obstructive conduct.  He ordered

National Guard troops to blockade entrances to Central High School, the first facility

that was to be integrated.  *Id.* at 9.  In the words of the district judge on the spot,

"chaos, bedlam and turmoil" ensued.  *Cooper v. Aaron*, 163 F. Supp. 13, 21 (E.D.

Ark. 1958).  In February of 1958,

> the School Board and the Superintendent of Schools filed a petition in
> the District Court seeking a postponement of their program for
> desegregation.  Their position in essence was that because of extreme
> public hostility, which they stated had been engendered largely by the
> official attitudes and actions of the Governor and the Legislature, the
> maintenance of a sound educational program at Central High School,
> with the Negro students in attendance, would be impossible.  The Board
> therefore proposed that the Negro students already admitted to the
> school be withdrawn and sent to segregated schools, and that all further

21

> steps to carry out the Board's desegregation program be postponed for
> a period later suggested by the Board to be two and one-half years.

*Cooper*, 358 U.S. at 12-13.  The district court granted the relief requested by the

School Board.  An appeal was filed by the minority students with the U. S. Court of

Appeals for the Eighth Circuit, which reversed, but stayed its mandate to allow the

School Board to petition the Supreme Court for *certiorari* review.  *Id.* at 13.

The Arkansas Governor and State Legislature argued before the Supreme Court

that they were not bound by the Supreme Court's holdings in the *Brown* cases, *see id.*

at 17, and that "there is no duty on state officials to obey federal court orders resting

on [the] Court's considered interpretation of the United States Constitution."  *Id*. at

4.  The Court dispatched those contentions with a discussion of "some basic

constitutional propositions which are settled doctrine."  *Id*. at 17.

> Article VI of the Constitution makes the Constitution the
> "supreme Law of the Land."  In 1803, Chief Justice Marshall, speaking
> for a unanimous Court, referring to the Constitution as "the fundamental
> and paramount law of the nation," declared in the notable case of
> *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60, that "It is
> emphatically the province and duty of the judicial department to say
> what the law is."  This decision declared the basic principle that the
> federal judiciary is supreme in the exposition of the law of the
> Constitution, and that principle has ever since been respected by this
> Court and the Country as a permanent and indispensable feature of our
> constitutional system.  It follows that the interpretation of the Fourteenth
> Amendment enunciated by this Court in the *Brown* case is the supreme
> law of the land, and Art. VI of the Constitution makes it of binding
> effect on the States "any Thing in the Constitution or Laws of any State

22

to the Contrary notwithstanding." Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, ¶ 3 "to support this Constitution." Chief Justice Taney, speaking for a unanimous Court in 1859, said that this requirement reflected the framers' "anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State." *Ableman v. Booth*, 21 How. 506, 524, 16 L.Ed. 169.

No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. Chief Justice Marshall spoke for a unanimous Court in saying that: "*If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery*." *United States v. Peters*, 5 Cranch 115, 136, 3 L.Ed. 53. A Governor who asserts a power to nullify a federal court order is similarly restrained. If he had such power, said Chief Justice Hughes, in 1932, also for a unanimous Court, "it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases." *Sterling v. Constantin*, 287 U.S. 378, 397-398, 53 S.Ct. 190, 195, 77 L.Ed. 375.

*Cooper*, 358 U.S. at 18-19 (bracketed text in original) (emphasis supplied).

The *Cooper* decision effectively nullified several statutes enacted by the Arkansas General Assembly, and reaffirmed the keystone principle supporting the federal system erected following ratification of the United States Constitution: *i.e.*, the "obedience of the States" to the Supreme Court's interpretation of constitutional provisions is "indispensable for the protection of the freedoms guaranteed by our fundamental charter for all of us." *Id*. at 19-20.

23

Of course, *Cooper* was a school desegregation case, and the federal interests implicated there are not perfectly congruent with those at play here. Even so, the fundamental principles and issues are not greatly different, bottomed as they are upon the Equal Protection Clause of the Fourteenth Amendment. Accordingly, there is no reason to limit the holding of *Cooper* to the context of school desegregation cases. Indeed, courts have applied the "basic constitutional principles" and "settled doctrine" explicated in *Cooper* in a variety of contexts. For example, it has been noted that "[a] state statute that thwarts a federal court order enforcing federal rights cannot survive the command of the Supremacy Clause." *Reynolds v. Alabama Department of Transportation*, No. 2:85cv665-MHT, 2006 WL 3924790, at *5 n.1 (M.D. Ala. Dec. 6, 2006) (Thompson, J.) (consent decree addressing employment practices within the Alabama Department of Transportation) (quoting *Brinn v. Tidewater Transportation Dist. Com'n*, 242 F.3d 227, 233-34 (4th Cir. 2001) (considering a state statute that prohibited federal courts from exercising the discretion granted them by Americans with Disabilities Act and the Rehabilitation Act to award attorney's fees to prevailing plaintiffs) (quoting, in turn, *State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695 (1979) (considering a state statute that conflicted with a federal treaty)).

24

Furthermore, in *Cooper*, "the Supreme Court said that its interpretations of the Constitution are binding on state officials, even on those who were not parties to the case or bound by a court order."  *Johnson v. United States Railroad Retirement Board*, 969 F.2d 1082, 1092 (D.C. Cir. 1992) (construing *Cooper*).  The Fourth Circuit essayed a subtle variation on this doctrine in the *Brinn* case, *supra*, when saying:

> Although "federal courts are appropriately reluctant to displace state law," the Supremacy Clause mandates that federal law supersedes state law that either directly or by implication conflicts with federal law.  *See Metro. Life Ins. Co. v. Pettit*, 164 F.3d 857, 861 (4th Cir. 1998).  Such a conflict arises when "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of the relevant federal law."  *Nat'l Home Equity Mortgage Assoc. v. Face*, 239 F.3d 633, 636-37 (4th Cir. 2001) (internal quotation marks omitted).

*Brinn*, 242 F.3d at 233.

These constitutional principles apply with equal force in the present case. Although not to such a dramatic degree, the State of Alabama has taken precisely the same type of action when enacting Act No. 408 as was admonished by the Supreme Court in *Cooper*.   The effect of Act No. 408 is crippling to this court's implementation of consent decrees that are aimed at the purposes of eradicating the vestiges of racial and gender discrimination, and fulfilling the mandate of the Eleventh Circuit.  Furthermore, Act No. 408 steps far beyond the bounds of a state's

authority in that, if the Act is allowed to stand, it will render void a federal court's orders entered to enforce federal law.  Stated differently, the central purpose of Act No. 408 — *i.e.*, replacing the three-person board that has governed the activities of the Personnel Board as a public institution for more than seventy-three years with seven new members, the majority of whom represent the interests of the governmental employers served by the Board — is directly contrary to this court's prior orders. Consequently, the Act is in square violation of the Supremacy Clause, and it is adjudged to be null and void.[41]  *See*, *e.g.*, *Brinn*, 242 F.3d at 233-34 ("A state statute that thwarts a federal court order enforcing federal rights 'cannot survive the command of the Supremacy Clause.'") (quoting *Washington*, 443 U.S. at 695); *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 767 (11th Cir. 1998) (holding that a state law that conflicts with federal law is "without effect"); *National Home Equity Mortgage Ass'n v. Face*, 239 F.3d 633, 637 (4th Cir. 2001) (noting that, pursuant to the Supremacy Clause of the United States Constitution, "federal legislation, if enacted pursuant to Congress' constitutionally delegated authority, can nullify conflicting state or local actions") (quoting *Worm v. American Cynamid Co.*, 970 F.2d 1301, 1304-05 (4th Cir. 1992)).

---

[41] The terms "without effect," "void," "nullity," and *nullius juris*" are synonyms.  A "void" statute is "[o]f no legal effect; null," BLACK'S LAW DICTIONARY 1604 (8th ed. 2004), while a "nullity" is "something that is legally void." *Id.* at 1098.  Similarly, a statute that is declared *nullius juris* has "no legal force." *Id.* at 1099.

26

## CONCLUSION

The joint motion of the Wilks class and Personnel Board for declaratory and injunctive relief is due to be granted, insofar as it seeks a declaration that Act No. 408 is ineffectual.  Alabama Act No. 2008-408 will be declared void *ab initio* as violative of the Supremacy Clause, and the three current members of the governing board shall continue to serve until their respective terms expire, or they are otherwise relieved of their duties by further order of this court.  An appropriate judgment and order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 12th day of September, 2008.

_____
United States District Judge

# APPENDIX I

## SECTION 2 OF THE ENABLING ACT[42]

(as amended by Act No. 19, 1956 Acts of Alabama; Act No. 657, 1959 Acts of Alabama; and
Act Nos. 677 & 782, 1977 Acts of Alabama)

==========================================================

**Section 2**.  *Personnel Board*; *extent of its authority defined*.  In and for each separate county of the State of Alabama which has a population of four hundred thousand or more people according to the last or any future federal census, there shall be a personnel board for the government and control, by rules and regulations and practices hereinafter set out or authorize[d], of all employees and appointees having a population of five thousand of more inhabitants, according to the last federal census, whose corporate limits lie wholly within the county, the police officers who are employed by any municipality therein having a population of 2500 or more inhabitants, according to the last federal census, whose corporate limits lie wholly within the county, and the County Board of Health, and such personnel board is vested with such powers, authority and jurisdiction.  Provided, however, that such board shall not govern any officers or appointees holding positions in the unclassified service. The unclassified service shall include: All employees or appointees of a city or county board of education, or a library board; persons engaged in the profession of teaching or in supervising teaching in the public schools; officers elected by  popular vote; the judge of any court; the county attorney; the director of personnel; the county health officer, provided, however, that if any law or laws now or hereafter enacted shall cause the offices of all other county health officers in the State of Alabama to become subject to any state or county civil service of merit system now or hereafter established, in such event, the office of county health officer in each county subject to the provisions of this Act shall be a position in the classified service as herein defined; one private secretary of a member of the governing body and of each officer except judges elected by vote of the people; interns, resident physicians, resident dentists, student technicians and student nurses, while undergoing training in a county health department or in a hospital maintained by public funds; common laborers, members of boards who are not employed on a full time basis and are not required to devote their time and services exclusively to such counties and municipalities therein; attorneys,

---

[42] *See supra* notes 2 and 3, and accompanying text.

physicians, surgeons and dentists who with the express or implied permission of an appointing authority or of such county or city hold themselves out for employment by others in the same or a like line of work as that performed by them for such appointing authority; where there are two county sites or county court house sites maintained in one county and a county officer or officers are required to maintain an office in one courthouse and a branch of subsidiary office in the other of said courthouses, the chief deputy of each elective officer in charge of such branch office. The classified service shall include all other offices and positions in the county and municipal service, including the services of the county Board of Health and the Board of Registrars of such county, except as otherwise provided in this Act. Each member of the board in all hearings before it may administer oaths, certify to official acts, issue subpoenas, compel the attendance of witnesses and the production of papers, books and records and may punish for contempt of the Board in like manner and extent as may be done by courts of county commissioners: A member of the board or his employer shall be prohibited from selling materials, supplies or services to a county or municipality unless such sales are made as the result of open competitive bidding. The term 'independent contractor,' as used in this section shall include a prospective independent contractor, and the term 'appointing authority' as used in this section, shall also include the public entity for which an appointing authority acts. The term 'employee' as used in this Act, shall not be deemed to include 'independent contractors,' but in order to prevent evasions of the policy of this Act, the board shall have the power to control, in the manner hereinafter specified, the use of independent contractors for performance of work for an appointing authority except in cases hereinafter specifically exempted from such control. The board shall exercise constant vigilance to see that the policy of this Act be not evaded by the use of independent contractors, and whenever the board shall have reason to believe that work is about to be, or is being done, continued or completed by an independent contractor for an appointing authority, and that such work is such as to be, or, at the time of commencement thereof, to have been, performable as well, practically, expeditiously and economically by one or more employees appointed or appointable, under this Act as by an independent contractor, the board may serve such appointing authority, and such independent contractor, if such independent contractor be known, with a written request to appear before the board at a time and place specified in such written instrument and show cause, if any there be, why such work should not be done, continued or

completed by one or more employees appointed, or appointable, under this Act. Deposit of such written request in the United States registered mail, postage and registration fee prepaid and properly addressed, shall be sufficient service. At the time and place specified in said written request such appointing authority and independent contractor, or either of them may appear, and, in such event, shall be accorded a fair hearing. If, upon such hearing, or in the event opportunity therefor be not availed of, in the absence thereof, the board shall determine that such work is such, or of such character, as to be, or, at the time of commencement thereof, to have been performable as well, practically, expeditiously and economically by one or more employees appointed, or appointable, under this Act as by an independent contractor, and that no sufficient reason has been made to appear why such work should be performed by an independent contractor in preference to one or more employees appointed, or appointable, under this Act, the Board may enter an order prohibiting the doing, continuance or completion of such work after a date specified in such order otherwise than by and through one or more employees appointed, or to be appointed, under this Act, and no compensation shall be paid to, or received by, an independent contractor effected by such order for work done after the date specified in such order. In arriving at its determination the board shall consider, among other things, and give appropriate weight, to the circumstances of whether or not competent persons are available for appointment under this Act for performance of the type of work involved, and of whether or not the type of work involved is such as may be reasonably expected to be continuous for an indefinite time, regularly recurrent, or sporadic, and of whether or not the type of work involved is such as is customarily and generally let to independent contractors, and or whether or not the appointing authority possesses, or should reasonably be expected to obtain, physical facilities for performance of such work by one or more employees appointed, or appointable under this Act. The board, however, shall have no power to prohibit the use of independent contractors for the construction of viaducts, bridges, street improvements, sewers, canals, public buildings, or public utilities, and, should an appointing authority desire to do any such construction work by means of its own construction forces or employees, the board, upon application to its first made, may, but is not required, to permit the doing of such construction work by construction forces of employees of the appointing authority not appointed under this Act, subject to such conditions and limitations as the board may prescribe. In order to forestall the possibility of prohibition by the board

30

of use of an independent contractor for the further performance of any work after such work has been let to such independent contractors, an appointing authority may apply to the board in advance of the letting of any work to an independent contractor for permission to do so, such application to be in writing and to contain a copy of the proposed contract or such general description of its substance as may be satisfactory to the board.  The board may grant such application with or without conditions or limitations, and if the same be granted the board shall not thereafter prohibit anything thus authorized.  In its determination concerning grant or refusal of such application, the board shall be guided by the same considerations as are hereinabove indicated for guidance of its determination upon the request of whether or not to prohibit the commencement or continuation of work by an independent contractor. In the event the governing body of any municipality whose corporate limits lie partly within said county and partly within any other county and having a population of five thousand or more inhabitants, according to the last federal census, or any succeeding federal census, shall adopt a resolution in favor of such municipality coming under the provisions of this act, and transmit or cause to be transmitted a certified copy of such resolution to the Personnel Board of such civil service system, then, sixty days after effective date of such resolution, the provisions of this Act shall apply to any such municipality having the required number of inhabitants and whose corporate boundaries lie partly within said county and partly without said county. Any municipality which adopts a resolution and comes under the provisions of this Act, as herein provided, shall thereafter remain under this Act, and may not repeal or rescind such action either by the adoption of a resolution or otherwise.

# APPENDIX II
## SECTION 3 OF THE ENABLING ACT[43]
(as amended by Act No. 636, 1967 Acts of Alabama; Act No. 684, 1977 Acts of Alabama;
Act Nos. 225 & 799, 1987 Acts of Alabama; and Act No. 739, 1989 Acts of Alabama)
========================================================

**Section 3**.  *Membership of Personnel Board*.  Said personnel board shall consist of three members designated respectively as member number one, member number two and member number three, each of whom shall be over twenty-one years of age, of recognized character and ability, a bona fide resident and qualified voter of such county and shall not, when appointed, nor for the three years then last past before the date of his appointment have held public office or political party office, nor have been a candidate for such and who shall not directly or indirectly have solicited membership on such board, provided that in any county which is or may hereafter be divided by law into two divisions for the trial of cases in the circuit court of such county, not more than two members of the board shall be residents of the same division.  The board shall meet once a month on dates to be fixed by its rules and regulations and as often as shall be necessary for the orderly dispatch of its business. Members number one, two, and three shall be appointed by the citizens supervisory commission of such county, which commission shall likewise appoint their successors. In all counties becoming subject to the provisions of this Act, said board shall be appointed as soon as it is determined that such county is in the population class subject to this Act. Member number one who shall be the chairman of the board shall hold office for a term of two years and until his successor is appointed and has qualified. His successors shall hold office for terms of six years each beginning at the ends of the legal terms, as distinguished from the possible holdover terms of their respective predecessors. Member number two shall hold office for a term of four years and until his successor is appointed and has qualified. His successors shall hold office for terms of six years each beginning at the ends of the legal terms, as distinguished from the possible holdover terms of their respective predecessors. Member number three shall hold office for a term of six years each beginning at the ends of the legal terms, as distinguished from the possible holdover terms of their respective predecessors. In the event of a vacancy on the board occasioned by death, resignation,

---

[43] *See supra* notes 2 and 3, and accompanying text.

impeachment or other cause, such vacancy shall be filled by the citizens supervisory commission for the then unexpired term. The chairman of the board shall receive a expense allowance of one hundred dollars ($100.00) for each meeting of the board attended by him and a expense allowance of one hundred twenty-five dollars ($ 125.00) per day for attendance upon trials and hearings. Each member of the board other than the chairman shall receive a expense allowance of seventy-five dollars ($75.00) for each meeting of the board attended by him and an expense allowance of One Hundred dollars ($100.00) per day for attendance upon trials or hearings. No accounting shall be required for such expense allowance. This expense allowance shall not be deemed to be compensation. This expense allowance shall qualify as per diem amount under Act No. 87-706 of the Alabama Legislature, Section 10-11-1 et seq., Code of Alabama 1975. This expense allowance shall not reduce or limit the ability of the chairman and members of the board to receive reimbursements for further actual expense as approved by the board. This expense allowance shall be paid as the salaries of county employees are paid on the warrant of the member claiming such expense allowance, and said expense shall be the sole remuneration received by the chairman and members of the board.

# APPENDIX III

### Alabama Act No. 2008-408

(abolishing Section 3 of the Enabling Act *supra*, and replacing it with the following text)

================================================================

**Section 3**. *Membership of the personnel board*.  The personnel board shall be comprised of seven members consisting of the following persons: The Chair of the County Commission of Jefferson County; the mayor of the municipality having the greatest number of employees in the classified service; one member of the Jefferson County Mayors Association, an Alabama nonprofit corporation, not otherwise serving hereunder who is appointed by its governing body; two employees in the classified service, one of whom shall be African American not otherwise serving hereunder who shall be elected by popular vote of the permanent employees in the classified service from a list of nominations submitted to the director under the signatures of at least five employees in the classified service on or before September 30 of each year; and two persons appointed by the presiding Judge of Probate of Jefferson County, one of whom must reside in the Bessemer judicial division and one of whom must reside in the Birmingham judicial division, one of whom shall be African American and each of whom shall be qualified electors in the county, and neither of whom, nor any spouse or lineal descendant of a grandparent of such person or his or her spouse, shall be a current or former employee in the classified service or have any public office of an appointing authority at any time.  The term of office of each employee member of the personnel board shall be three years, except that notwithstanding the expiration of an employee member's term of office, he or she shall continue to serve until such time as his or her successor has been elected.  The term of office of each judicial appointee member of the personnel board shall be three years except that notwithstanding the expiration of a judicial appointee member's term of office, he or she shall continue to serve until such time as his or her successor has been appointed.  The board shall elect its chair from among the members and may create and fill such other of its offices as it may determine from time to time.  The term of office of the chair shall be one year, and any chair or former chair shall be eligible for reelection to such office.  The board shall meet once a month on dates to be fixed by its rules and regulations and as often as shall be necessary for the orderly conduct of its business.

34