# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-75-S-666-S** |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA,** *et al.*, | ) | |
| **Defendants.** | ) | |
| ——————————————— | ) | |
| **JOHN W. MARTIN,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-74-S-17-S** |
| | ) | |
| **CITY OF BIRMINGHAM, ALABAMA,** *et al.*, | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This opinion addresses the motion filed by the Martin class of plaintiffs and the Bryant class of plaintiff-intervenors ("the Martin-Bryant parties"), petitioning the court to hold defendant Jefferson County, Alabama, in civil contempt for failing to comply with the requirements of the consent decree entered on December 29, 1982, and seeking a modification of some provisions of that decree.[1]  Jefferson County was ordered to respond to the motion, and to show cause why it should not be held in contempt, and why its decree should not be modified.[2]

A bench trial on those issues commenced on March 30, 2009, but was recessed on April 1, 2009, for reasons related to the health of the undersigned.  Those same,

---

[1] *See* doc. no. 1413 (Martin/Bryant Parties' Motion to Hold Defendant Jefferson County in Civil Contempt and Modify Jefferson County Consent Decree).

[2] *See* doc. no. 1458.

and subsequent, health issues delayed the resumption of trial until December 3, 2012, when the court heard seven additional days of live testimony, and received 1,144 documentary exhibits,[3] including the designated deposition testimony of several witnesses.

========================================================

### TABLE OF CONTENTS

I.    A SHORT HISTORY OF THIS LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Beginning: *1974 - 1975* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    The First Twenty-Four Years of Litigation: *1976 - 2000* . . . . . . . . . . . . . . . . . . . 7

    C.    Transitions: *2000 - 2002* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.    The Personnel Board in Receivership: *2002 - 2008* . . . . . . . . . . . . . . . . . . . . . . . 18

    E.    The Shift to Birmingham: *2008 - 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    The Langford *interregnum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        2.    Mayor Bell and the restoration of focus . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    F.    *Finally*, Jefferson County! . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.   CIVIL CONTEMPT STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.  STANDARDS FOR MODIFICATION OF A CONSENT DECREE . . . . . . . . . . . . . . . . . . . . . . . 40

    A.    Significant Change in Facts or Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.    "Suitably Tailored" Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

---

[3] Of this number, 999 exhibits were offered by the Martin-Bryant parties, and 145 by Jefferson County.

IV.   THE COUNTY'S ADMISSIONS OF NONCOMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

V.    THE COUNTY'S STIPULATIONS AS TO MODIFICATIONS .. . . . . . . . . . . . . . . . . . . . . . . 48

VI.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      A.   The County's Irrelevant Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      B.   Receivership Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

           1.   Have there been repeated failures to comply with court orders? . . . . . . . . 57

                a.   Human Resources Department . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

                b.   Affirmative Action Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                c.   Anti-harassment and anti-nepotism policies and training . . . . . . . . 70

                d.   Consent decree training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

                e.   Recruiting at historically black colleges and universities . . . . . . . . 79

                f.   Production of semi-annual and annual reports . . . . . . . . . . . . . . . . 80

                g.   Monthly reports and quarterly newsletters . . . . . . . . . . . . . . . . . . 83

                h.   Structured interview process . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

                i.   Other decree violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

           2.   Will further efforts to secure compliance only lead to
                confrontation and delay? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

           3.   Is leadership available to turn the tide within a reasonable time? . . . . . . 101

                a.   County Commissioners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

                b.   County Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

           4.   Has there been "bad faith" on the part of the County? . . . . . . . . . . . . . 117

           5.   Are resources being wasted? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

3

**6.**   **Can a Receiver provide a quick and efficient remedy?** . . . . . . . . . . . . . . . 129

**VII**. **CONCLUSIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

==================================================

# I.  A SHORT HISTORY OF THIS LITIGATION

*Those who cannot remember the past are condemned to repeat it.*

George Santayana, *The Life of Reason*, vol. 1, ch. 12 (1905).[4]

The incumbent members of the Jefferson County Commission are George Bowman (District 1), Sandra Little-Brown (District 2), Jimmie Stephens (District 3), Joe Knight (District 4), and David Carrington (District 5).  Mr. Carrington currently serves as "President" of the Commission:  *i.e.*, the statutory title of the presiding officer, and a position filled by majority vote of the five District Commissioners.  *See* Ala. Act No. 97-147.  None of those persons exhibited adequate knowledge of the County's obligations under its consent decree when testifying.  All demonstrated even less awareness of this litigation's long and tortuous history.  Consequently, their affirmations of commitment to federal law and fulfillment of the County's responsibilities under its decree rang hollow.

The incumbent members of the Jefferson County Commission are serving their inaugural term of office, however, and their individual failures to fully grasp the

---

[4] *Cf.*, *e.g.*, *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.) (observing that "a page of history is worth a volume of logic").

significance of this suit and the County's requirements under its consent decree may, *perhaps*, be forgiven for that reason. Nevertheless, the urgency with which Jefferson County must bring itself into compliance with federal law is a lesson that must be brought home to each member of the Commission.

Part I of this opinion, therefore, is a summary of the history of this litigation, provided for the edification of the present Commissioners, because knowledge of the place from whence the County has come is necessary for understanding why this court ***must*** "give teeth" to the decree's "provisions requiring valid selection procedures." *Ensley Branch, N.A.A.C.P. v. Siebels*, 31 F.3d 1548, 1572 (11th Cir. 1994) (Carnes, J.) (alteration and emphasis supplied) ("*Ensley II* ").

## A. **The Beginning**: *1974-1975*

The parties who commenced the original suit on January 4, 1974 included the Ensley Branch of the National Association for the Advancement of Colored People ("N.A.A.C.P.") and several African-American ("black") individuals who sued for themselves, and on behalf of a class of similarly-situated persons.[5] The defendants to that action were: George Seibels, then Mayor of Birmingham, Alabama; the City

---

[5] *See, e.g.*, *United States v. Jefferson County*, 720 F.2d 1511, 1514 n.1 (11th Cir. 1983) ("The Ensley Branch of the NAACP is a membership organization of black citizens of Birmingham, Alabama. It, along with three black males who had applied for positions with the City of Birmingham, Alabama, and taken tests administered by the Jefferson County, Alabama, Personnel Board, filed a class action complaint against the City, George Seibels, Jr., then Mayor of Birmingham, the Board, the three members of the Board and the director of the Board.").

of Birmingham; the individual members of the Personnel Board of Jefferson County, Alabama ("Personnel Board" or "Board"); and the Board's Personnel Director.  The complaint alleged that those defendants had engaged in discriminatory hiring practices against blacks in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

That action was followed just three days later by another suit raising the same constitutional and statutory allegations, and filed by John W. Martin and six other black individuals (the "Martin class of plaintiffs") against the same defendants *and Jefferson County and its individual Commissioners*.

The following year, on May 27, 1975, the United States brought suit against *Jefferson County*, the Personnel Board, and the various municipalities and other governmental entities serviced by the Board.  The government alleged, among other things, a pattern or practice of discriminatory employment practices against blacks *and females* in violation of the Fourteenth Amendment, Title VII, and 42 U.S.C. § 1981, a part of the Civil Rights Act of 1866.[6]

---

[6] Yet a fourth action was filed on February 20, 1976 by Lucy Walker, who challenged the employment practices of the Jefferson County Nursing Home under Title VII and 42 U.S.C. § 1981. That suit was settled and dismissed long before the three, principal actions described in text.  *See*, *e.g.*, *Walker v. Jefferson County Home*, 726 F.2d 1554 (11th Cir. 1984); *Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 815 (11th Cir. 1980) ("*Ensley I* ").

B.   **The First Twenty-Four Years of Litigation**:  *1976-2000*

All of the cases were consolidated for trial and, on December 20-22, 1976, Judge Sam C. Pointer, Jr., conducted a bench trial on the limited issue of whether the entry-level tests used by the Personnel Board to screen and rank applicants for firefighting and police officer positions violated the constitutional or statutory rights of black applicants.[7]  All other issues under the consolidated complaints were reserved until a later date.[8]  Judge Pointer concluded that the tests violated Title VII because both

> had a significant adverse impact on black applicants, a phenomenon defined as a passing rate "less than four-fifths . . . of the rate for [whites]." *Ensley Branch*, 13 Empl. Prac. Dec. (CCH) ¶ 11,504, at 6796-97 (internal quotation marks omitted).  The court ruled that the tests could be used only if, despite their adverse impact, they were sufficiently "job related" to predict effectively test takers' future job performance. *Id*. at 6796 nn.10-11, 6806.  After reviewing testing data, the court concluded that the tests failed to meet this standard. *Id*. at 6798-6808.

---

[7] The City of Birmingham and Jefferson County — the two largest governmental employers serviced by the Personnel Board of Jefferson County, an independent governmental entity — and the Personnel Board share responsibility for hiring and promoting employees of the City or County. The Board, pursuant to state law, administers written tests and other job selection procedures that produce a pool of qualified candidates for a particular position (a "register" of persons considered eligible for the particular position).  The Board ranks the passing applicants and, when a vacancy occurs, forwards a list of candidates to the City or County for final selection (a "certificate of eligibles").  The original complaints alleged, among other things, that the Board used discriminatory tests to determine eligibility for hiring and promotion, and that the City, County, and other governmental employers engaged in still further discrimination when selecting individuals from the Board's already tainted certificates of persons eligible for hire or promotion.  *See*, *e.g.*, *Ensley Branch, N.A.A.C.P. v. Siebels*, 31 F.3d 1548, 1552 (11th Cir. 1994) ("*Ensley II* ").

[8] For example, the United States did not press at this trial its coordinate claim that the tests also were discriminatory against female applicants.

7

*Ensley II*, 31 F.3d at 1554 (alterations in original).[9]  Judge Pointer entered a final

judgment on the limited issues addressed in the first trial on January 10, 1977,[10] and

ordered remedial actions by the Board and City.

> Specifically, [Judge Pointer] ordered that blacks be referred for openings on the police and firefighter forces at the rate at which they took the tests when most recently administered.  To accomplish this, [he] ordered that the names of a sufficient number of blacks be added to the current police and firefighter eligibility lists so that the lists [would] be representative of the racial composition of the test-takers, *i.e.*, 28 and 14 percent black for police and firefighter lists, respectively; that, one-third of future certifications, *i.e.*, referrals from the lists for actual employment, [were] to be black until, considering all certifications since the relevant 1975 and 1976 dates, the numbers of certifications become representative of the racial composition of the test-takers.  Thereafter, blacks [were] to be certified in accordance with their representation on the lists, *i.e.*, 28 and 14 percent of certifications for policemen and firefighters, respectively, [were to] be black. Similarly, referrals from future lists [were to] be a function of the rate at which blacks [took] the examinations on which the lists [were] based, until or unless defendants develop[ed] valid tests.

*Ensley Branch of the N.A.A.C.P. v. Seibels*, 616 F.2d 812, 815 n.6 (5th Cir. 1980)

(alterations supplied) ("*Ensley I* ").

The Personnel Board appealed, and the United States and Martin class of

plaintiffs cross-appealed.[11]  While that appeal was pending, Judge Pointer conducted

---

[9] For a succinct discussion of Judge Pointer's specific findings on the issue of liability, read the opinion in *Ensley II*, 31 F.3d at 1554-55.

[10] *See Ensley Branch of the N.A.A.C.P. v. Seibels*, No. CA 74-2-12-S, 1977 WL 806 (N.D. Ala. Jan. 10, 1977).

[11] The Personnel Board contended that its test devices did not violate Title VII, while the United States and the Martin plaintiffs contested Judge Pointer's determination as to the date on

a second bench trial during August of 1979.  "That trial involved challenges to other Board practices, including:  written tests for eighteen more positions; various rules affecting promotional opportunities; the imposition of height, weight, and educational requirements for certain jobs; and the restriction of some job announcements and certifications to persons of a particular sex."  *Ensley II*, 31 F.3d at 1556.  Notably, the plaintiffs' independent claims against the City of Birmingham *and Jefferson County* were not tried.

While awaiting Judge Pointer's decision on the issues raised in the August 1979 trial, and following the former Fifth Circuit's affirmance of his January 1977 finding of Title VII violations, *see Ensley I*, 616 F.2d at 822,[12]  the parties entered into settlement negotiations that resulted in the execution of two proposed consent decrees between all plaintiffs and the City of Birmingham ("the City decree") and the Personnel Board ("the Board decree").  The proposed decrees were signed by counsel for the affected parties on May 19, 1981.  Judge Pointer provisionally approved the proposed consent decrees the following month, but reserved final approval until a fairness hearing could be convened for the purpose of considering objections that

---

which Title VII liability commenced.  *See id.* at 815.

    [12] While the former Fifth Circuit affirmed Judge Pointer's determination of Title VII liability, it reversed and remanded for additional proceedings on the question of when the City's liability under Title VII commenced.  *See id.* at 822-25.

might be filed by interested parties.

The "keystone" of the consent decrees tendered to Judge Pointer was "an extensive regime of affirmative action for blacks and women." *Ensley II*, 31 F.3d at 1556. That fact prompted several interested non-parties to appear at the fairness hearing conducted during August of 1981, for the purpose of challenging the proposed decrees. Chief among the objectors was the Birmingham Firefighters' Association No. 117 ("BFA"), a labor association representing a majority of the City's firefighters, almost all of whom were white males. The day after the fairness hearing, the BFA and two of its members moved to intervene in the pending cases, based upon their contention that the proposed consent decrees would have a substantial adverse impact upon the firefighters. Judge Pointer denied the motion as untimely, and approved the consent decrees. *See United States v. Jefferson County*, 720 F.2d 1511, 1515 (11th Cir. 1983).

Shortly after Judge Pointer approved the City and Personnel Board consent decrees, seven white male firefighters filed a complaint in the district court seeking an injunction against the enforcement of the decrees. They alleged that the operation of the decrees would discriminate against them in violation of Title VII of the Civil Rights Act of 1964. After a hearing, Judge Pointer denied relief, and the Eleventh Circuit affirmed. *Id*. at 1520.

10

Judge Pointer's approval of the consent decrees, and the Eleventh Circuit's approval of his refusal to allow the BFA to intervene and denial of injunctive relief in the suit brought by the seven white male firefighters, brought forth a collection of cases that came to be known as the "Birmingham Reverse Discrimination Employment Litigation."  In those cases, a number of white male City employees collaterally attacked the City and Personnel Board consent decrees and the affirmative action programs adopted under them.  *See In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492, 1495 (11th Cir. 1987), *aff'd sub nom. Martin v. Wilks*, 490 U.S. 755 (1989).

Judge Pointer rejected the reverse-discrimination plaintiffs' collateral challenge to the legality of the consent decrees and, at trial, restricted their claims to the questions of whether the City or Personnel Board had violated the decrees, or had granted illegal preferences that were not required by the decrees.  *See In re Birmingham Reverse Discrimination Employment Litigation*, 37 Fair Empl. Prac. Cas. (BNA) 1, 3-4 & n.6, 1985 WL 1415 (N.D. Ala. 1985).  At the close of the reverse-discrimination plaintiffs' case, Judge Pointer further limited their action by dismissing for lack of evidence all claims against the Personnel Board.  *See Martin v. Wilks*, 490 U.S. 755, 779 n.16 (1989) (Stevens, J., dissenting).

The Eleventh Circuit reversed, saying that Judge Pointer's treatment of the

11

reverse-discrimination plaintiffs "as if they were bound by the consent decrees," as well as his limitation of their collateral attack to a claim that the City had granted racial preferences beyond those mandated by its decree, was unfair, because the white male firefighters had not participated in the negotiation or signing of the consent decrees. *In re Birmingham Reverse*, 833 F.2d at 1498-99. The Eleventh Circuit ruled that the reverse-discrimination plaintiffs had to be allowed to bring an action challenging the validity of the City and Personnel Board decrees, and directed Judge Pointer to re-examine the legality of the decrees under the heightened scrutiny applicable to voluntary governmental affirmative action plans. *Id*. at 1499-1501; *see also City of Richmond v. J.A. Croson Co*., 488 U.S. 469, 498-508 (1989) (holding that race-conscious, affirmative-action programs that were voluntarily adopted by local governments are subject to strict scrutiny, and must be "narrowly tailored" to the compelling governmental interest of ending racial discrimination). The Eleventh Circuit's decision was upheld by the Supreme Court in *Martin v. Wilks*, 490 U.S. 755, 769 (1989).

Judge Pointer subsequently held a new trial on the reverse-discrimination plaintiffs' challenge, but again ruled in favor of the City. *Bennett v. Arrington*, 806 F. Supp. 926, 931 (N.D. Ala. 1992). Applying strict scrutiny, Judge Pointer found that the City had "significant evidence" of past discrimination that was more than

12

sufficient to support the affirmative action program incorporated into the City's consent decree, and that the affirmative action provisions were "narrowly tailored" to the compelling governmental interest of ending racial discrimination, because the alternative measures previously attempted by the City had failed to ameliorate the discrimination against blacks and females, and also because the affirmative action provisions incorporated into the City's consent decree were both flexible and temporary. *Id*. at 928-30.  The latter part of that ruling was reversed by an Eleventh Circuit panel. *See In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525 (11th Cir. 1994).

A separate Circuit panel addressed the Personnel Board's consent decree, and held that the Board had not satisfied the requirement to develop and enforce "valid, non-discriminatory selection procedures" — a term that was defined as

> selection procedures that *either* had no disparate impact on blacks and women *or that*, despite having disparate impact, were "job related" as that term is used in Title VII.  Moreover, if the Board chose the second approach, adopting procedures that were job-related despite having some disparate impact, then the Board was required to search for selection procedures that were equally job-related but with less adverse impact. These decree provisions roughly parallel the requirements of Title VII, which mandates that an employer use either a selection procedure with no adverse impact or a job-related selection procedure that has no more adverse impact than other, equally job-related selection procedures.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S. Ct. 2362, 2375, 45 L. Ed. 2d 280 (1975).  Although the decree ordered the Board to comply with Title VII by developing valid tests, it provided no deadlines or formal

13

review mechanism to ensure that the Board actually did so.  That omission
turned out to be a serious flaw.

*Ensley II*, 31 F.3d at 1571 (emphasis supplied).  The *Ensley II* panel noted that, while

it might prove to be "administratively burdensome to design and validate" non-

discriminatory selection procedures, "minimizing inconvenience is not a

constitutional value," and administrative burdens "certainly" did not "outweigh the

importance of ending racial [or gender] discrimination."  *Id*. at 1574 (alteration

supplied, citation omitted).  The *Ensley II* panel also held that, "[i]f the process of

approving selection procedures places undue strain on the district court's resources,

it may appoint a special master to assist with the task."  *Id*. (alteration supplied).

In sum, the *Ensley II* panel observed that nearly thirteen years of experience (*i.e.*,

the time elapsing between December of 1981, when Judge Pointer ratified the

proposed consent decrees, and the panel's decision in August 1994) had taught only

that "the decrees as written are simply too weak to make the City and the Board

develop non-discriminatory selection procedures.  The district court should remedy

this defect.  *The provisions requiring valid selection procedures must be given teeth*

. . . ."  *Id*. at 1572 (emphasis supplied).  The *Ensley II* panel ordered that, following

remand, Judge Pointer should aggressively compel the City and Personnel Board to

develop "valid, non-discriminatory selection procedures" in accordance with a

14

schedule of specific, "reasonably prompt deadlines." *Id*. at 1583, 1584.

In 1995, following remand, Judge Pointer modified the Personnel Board's consent decree to require a series of interim deadlines, or "timetables," for the production of information necessary for the development of valid selection procedures.[13]  When the Personnel Board missed *all* of its interim deadlines, Judge Pointer entered an order on July 20, 1995, appointing Dr. John G. Veres, III (who then served as Executive Director for University Outreach at Auburn University in Montgomery, but who currently is Chancellor of that institution) to serve as Special Master for the purpose of "assist[ing] the parties in the development of a realistic schedule governing the transmission of data among the parties and the completion of job analysis and validation procedures."[14]  Even then, no meaningful progress toward compliance was made during the remaining years of the Second Millennium.

C.  **Transitions**: *2000 – 2002*

Chief Judge Sam C. Pointer, Jr., retired on April 3, 2000, after thirty years of distinguished judicial service to the United States.[15]  Supervision of these cases then

---

[13] *See* 1995 Modification Order for Personnel Board's Consent Decree.

[14] *See* doc. no. 643 (July 20, 1998 Order Appointing Special Master) (alteration supplied).

[15] Sam Clyde Pointer, Jr., was born Nov. 15, 1934, in Birmingham.  He was awarded degrees by Vanderbilt University (A.B. 1955), the University of Alabama School of Law (J.D. 1957, graduating first in his class, just ahead of two other, future judges of the Northern District of Alabama: Robert Propst (second) and James H. Hancock (third)), and the New York University School of Law (LL.M. 1958, graduating first in his class).  He was nominated by Richard M. Nixon on Sept. 22, 1970, and confirmed by the Senate on Oct. 8, 1970.  He received his commission on

15

was reassigned to the undersigned.[16]  From that time until January 27, 2012, the focus

of these consolidated proceedings was on modification, enforcement, and

implementation of the consent decrees of, primarily, the Personnel Board of Jefferson

County[17] and, secondarily, that of the City of Birmingham.[18]  This court's scrutiny

concentrated upon the Personnel Board's consent decree because that entity is the

principal civil service agency for persons employed by, or seeking employment with,

the twenty-three county and municipal governmental employers in Alabama's largest

metropolitan area.[19]  The Board is charged by Alabama law[20] with the function of

administering written tests and other job selection procedures that produce "registers"

_____

Oct. 14, 1970.  He served as Chief Judge from 1982-1999, assumed senior status on Nov. 19, 1999, and retired on Apr. 3, 2000.  He departed his life on Mar. 15, 2008.

[16] *See* doc. no. 677 (Notice of Reassignment).

[17] *See* doc. no. 1573 (Order on Joint Motion for Termination of Consent Decree With the Personnel Board of Jefferson County, Approval of Agreement, and Termination of Receivership), entered on Nov. 20, 2008.

[18] *See* doc. no. 1724 (Order Terminating City of Birmingham's Consent Decree), entered on Jan. 27, 2012.

[19] The governmental employers served by the Personnel Board include:  Jefferson County; the Jefferson County Personnel Board as an entity; the Jefferson County Department of Health; the Jefferson County Nursing Home; the Jefferson County Emergency Management Agency; the Jefferson County Storm Water and Sewer Administration; and the cities of Birmingham, Bessemer, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Irondale, Leeds, Midfield, Mountain Brook, Pleasant Grove, Tarrant, Trussville, Vestavia Hills, and Warrior.

[20] The Jefferson County Personnel Board was created by an Alabama statute originally enacted in 1935, and reenacted in 1945.  *See* Act No. 248, 1945 Acts of Alabama, at 376-400; Act No. 284, 1935 Acts of Alabama, at 691-713; *see also* 1940 Code of Alabama, Appendix § 645 *et seq*. (Recomp. 1958).

16

and "certificates" of persons considered eligible for employment or promotion[21] to

classified positions[22] with the governmental entities served by the Personnel Board.

Consequently, until such time as the Personnel Board could be compelled to comply

with the requirements of its consent decree, no meaningful progress could be made

in the development of lawful selection procedures for persons employed by, or

seeking employment with, the two largest governmental employers serviced by the

Board:  the City of Birmingham, and Jefferson County, Alabama.

For such reasons, this court entered a revised schedule on December 18, 2000,

requiring the Personnel Board to develop lawful selection procedures in accordance

with a detailed timetable, specifying position-by-position, step-by-step, deadlines for

each task.[23]  Nevertheless, the Board missed deadline after deadline.  Even when the

Board managed to develop selection procedures for some job classifications, those

---

[21] Successful applicants for employment or promotion are placed by the Personnel Board on "registers of eligibles."  Once a register for a particular job classification has been established, a governmental entity served by the Board may request a "certificate of eligibles" when vacancies occur.  The certificate contains the names of the highest ranked candidates on the register who have indicated a desire to work for that particular employer.  The number of persons appearing on the certificate is a function of the number of vacancies to be filled.  State law provides that the number of candidates to be certified to the selecting authority is equal to the number of vacancies to be filled plus nine.  Ala. Code § 36-26-17 (1975).  Thus, if there is one vacancy, ten candidates are certified (the so-called "Rule of Ten").

[22] The Board's enabling legislation excludes such positions as elected officials, certain appointed officials and professionals, and "common laborers" from merit positions in the classified service.  *See* Acts No. 677 and 782, 1977 Acts of Alabama.

[23] *See* doc. no. 708 (December 18, 2000 Order Extending 1981 Consent Decrees and 1995 Modification Orders).

procedures did not meet the requirements of federal law, or of the decree itself.[24]

**D**.   **The Personnel Board in Receivership**: *2002 - 2008*

> *Now, this is not the end.  It is not even the beginning of the end.*
> *But it is, perhaps, the end of the beginning.*
> Prime Minister Winston S. Churchill[25]

For the reasons discussed in the previous Section — as well as the repeated failures of the Personnel Board's professional staff and attorneys to provide the parties with requested information, the Board members' ignorance of and disregard for the requirements of the Board's consent decree, and the Board's lack of an effective infrastructure — this court held the Personnel Board in civil contempt on July 8, 2002.  Dr. Ronald R. Sims, Ph.D., and Floyd Dewey Gottwald Professor in the Graduate School of Business at the College of William and Mary in Williamsburg, Virginia, was appointed Receiver of the Board.[26]

This court initially contemplated that the Receiver's overhaul of the Personnel Board could be completed within a year to eighteen months.[27]  In hindsight, that goal was comically optimistic.  The return of authority from the Receiver to the Personnel

---

[24] *See* doc. no. 934 (Memorandum Opinion Imposing Receivership on the Personnel Board), at 38-57 (outlining the Board's failures from 2000 forward).

[25] Remarks delivered during a Nov. 10, 1942 speech at the Mansion House in London, referring to the defeat of German General Erwin Rommel's Afrika Korps by British General Harold Alexander and Lt. Gen. Bernard Law Montgomery at the Second Battle of El Alamein.

[26] *See* doc. no. 934 (Memorandum Opinion) and 935 (Order Imposing Receivership).

[27] *See* doc. no. 935 ¶ 4 (requiring the Receiver to submit "a twelve-month plan" for the fulfillment of his duties).

18

Board was not completed until July 11, 2005,[28] fully three years after the Receiver assumed his supervisory responsibilities at the Board, and he remained involved in the case in an advisory role long after that.

The lifting of the Receiver's day-to-day control over the Personnel Board did not end this court's supervision.  The Board was advised that it should move for termination of its consent decree only when it had, *independently of the Receiver*, "developed sufficient evidence of its compliance with the Consent Decree and federal law and its likely future compliance with federal law."[29]  In a fashion that has been typical of this litigation, issue after issue cropped up to prevent the Board from making such a showing.

After several months of watching the Board struggle, this court entered an order on November 15, 2005, appointing Dr. William I. Sauser, Jr., Professor of Management at Auburn University, to serve as a Monitor, and "to oversee the efforts of the Personnel Board to comply with its obligations under its [consent decree] and, to assist this court and the parties in determining the Board's ability and commitment to function in compliance with Federal law absent judicial supervision."[30]  The Monitor tendered monthly reports to the court and parties on the Board's progress (or

---

[28] *See* doc. no. 1213 (Second Revised Transition Plan) ¶¶ 6-13.

[29] *Id.* ¶ 16.

[30] Doc. no. 1270 (Order Appointing Monitor), at 1 (alteration supplied).

19

lack thereof).  And the court continued its long-standing practice of holding monthly status conferences.

More than three additional years elapsed before there was sufficient evidence of the Board's commitment to comply with federal law absent judicial supervision. Plaintiffs and the Board submitted a joint motion to terminate the Board's decree on November 7, 2008,[31] and this court entered an order on November 20, 2008, approving the parties' agreement, terminating the consent decree and judicial supervision, and formally ending the Receivership.[32]

**E.    The Shift to Birmingham**:  *2008 – 2012*

The City of Birmingham first moved to terminate its consent decree on July 6, 2004, during the second year of the Receiver's control of the Personnel Board.[33] Following a period of discovery and briefing, the court entered an order on July 12, 2005 that granted the motion, but only in part.[34]  The court found that the City had complied with almost all of the requirements of its consent decree, and that the City had demonstrated its good faith commitment to continued compliance with the decree in the future, but with one significant exception that touched the heart of the claims

---

[31] Doc. no. 1562.
[32] Doc. no. 1573.
[33] Doc. no. 1113.
[34] Doc. no. 1228.

asserted by the reverse-discrimination plaintiffs:   *that is*, the City's selection procedure for the "Fire Apparatus Operator" job classification resulted in a statistically significant adverse impact against whites, and it had not been shown to be job-related.[35]   Therefore, this court retained judicial supervision

> for the limited purpose of obtaining the City's compliance with paragraph 8 of the 1995 Modification Order for the Fire Apparatus Operator classification, until such time as the City either shoulders the burdens of production and persuasion necessary to validate (*i.e.*, demonstrate the job relatedness of) its supplemental application, or revises the selection procedure in a manner that, all parties agree, complies with federal law.[36]

The City initially was ordered to develop and administer a revised testing procedure for the Fire Apparatus Operator position by February 14, 2006, with any results of the procedure, and any objections thereto, to be submitted to the court after March 28, 2006.[37]   The deadline for administering the revised test subsequently was extended to sometime in June of 2006, with any objections to be submitted to the court approximately eight weeks later.[38]   The City completed its revision of the Fire

---

[35] Doc. no. 1227 (Memorandum Opinion on City's Motion to Terminate Consent Decree), at 43-49.

[36] *Id.* at 48.

[37] *See* doc. no. 1263 (Order Setting Deadlines for the Fire Apparatus Operator position).

[38] Doc. no. 1285.   *See also* doc. no. 1271 (City's Proposed Revision of Fire Apparatus Operator Deadlines); doc. no. 1274 (Transcript of December 1, 2005 Status Conference), at 30-31 (stating that all deadlines for the Fire Apparatus Operator position would be continued indefinitely until new deadlines were entered).

Apparatus Operator selection procedure, and filed a motion to terminate the remainder of its decree on February 2, 2007.[39] There was no dispute that the City had adequately revised the testing procedure for that job classification, but the court, nevertheless, entered an order on August 20, 2007, denying the City's motion to terminate the decree.[40]

The reason for the court's denial was based upon shifting political winds and demagoguery on the part of some members of the Birmingham City Council — rants that had generated uncertainty over the question of whether the City would seek to withdraw from the jurisdiction of the Personnel Board after the City was released from federal supervision.  Such an action by the largest governmental employer served by the Personnel Board since its creation in 1935 would have drained most of the Board's financial lifeblood, nullified 38 years of work by this court, and wasted *millions* of taxpayer dollars expended for attorneys' fees, the services of expert witnesses and paralegals, and court costs.  The statements of some members of the Council signaled that the City was not fully committed to complying with federal law in the absence of court supervision.[41]  *See Board of Education of Oklahoma City*

---

[39] Doc. no. 1332.

[40] Doc. no. 1399 (Memorandum Opinion and Order denying the City's Motion to Terminate the Remainder of its Decree).

[41] *Id.* at 10-20.

*Public Schools v. Dowell*, 498 U.S. 237, 247 (1991) (holding that judicial supervision may be terminated only when the court determines that the public entity "was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment," and, "that it was unlikely that the [entity] would return to its former ways") (alteration supplied).

For such reasons, this court ordered that discovery be conducted on two issues: "(1) whether the Birmingham City Council will pass a resolution to remain under the jurisdiction of the Personnel Board; and, if not, (2) what the City's plans will be for establishing a personnel system that can produce hiring and promotional decisions that comply fully with governing law."[42] The court also set a deadline of December 16, 2007, for the City to file a renewed motion to terminate its consent decree.[43]

---

[42] *Id.* at 19.  The discovery on this subject was less than conclusive.  The least equivocal response received by the City was that it had no *present* intent to withdraw from the Board's jurisdiction.  *See* doc. no. 1350 (Wilks Class's Opposition to the City of Birmingham Motions to Terminate Consent Decree and to be Dismissed as a Party), Exhibit 8 (City's Responses to Martin-Bryant Parties' First Set of Requests for Admission), at Response No. 2 ("The City intends to continue paying for and receiving the Personnel Board's services."), Response No. 3 ("The City is not seeking to withdraw from the Personnel Board.")  *See also* doc. no. 1506-1 (Declaration of Elizabeth Lewis), Exhibit 46 (March 20, 2008 Deposition of Barbara White), at 46-47 (City's Personnel Director stating that she was not aware of any plans for the City to remove itself from the jurisdiction of the Personnel Board).  Despite the lack of an unequivocal commitment from the City, the court became less concerned that the City would separate from the Board's jurisdiction following the election of Larry Langford as Mayor (discussed in the following section), and the focus of this litigation then shifted to the "data interface problems" that are discussed in the following pages.

[43] *Id.* at 20.

### 1.   The Langford *interregnum*

The deadline for the City to file a renewed motion to terminate its consent decree subsequently was extended to April 14, 2008, to allow time to determine the impact of a transition of leadership in City governance.  Larry Langford — a former four-term Mayor of Fairfield, Alabama (1988-2002), member of the Jefferson County Commission (2002-2007), and future convicted felon — was elected Mayor of Birmingham during the October 9, 2007 municipal elections, and was sworn into office on November 13, 2007.[44]  The transition to the Langford administration marked the beginning of significant and costly setbacks for the City.  Many of the issues that subsequently arose were the result of Mayor Langford's lamentably unenlightened decision to fire the law firm that had represented the City in these cases since their inception more than three decades before,[45] and to replace it with attorneys from three

---

[44] Doc. no. 1422.  Langford received 26,230 of 52,510 votes cast in the election: 171 votes more than needed to avoid a run-off with his nearest challenger, Birmingham attorney Patrick Cooper.  After the votes were certified, Cooper filed suit, claiming that Langford, a former four-term Mayor of Fairfield who had signed only a six-month lease for a loft apartment in downtown Birmingham on June 4th, and who had only registered to vote in Birmingham on June 7, 2007, had failed to establish residency in the City as required by state law.  A State judge subsequently dismissed the suit, holding that residency was "a matter of intent."  *See*, *e.g.*, *Larry Langford*, http://www.bhamwiki.com; *Larry Langford*, http://en.wikipedia.org; Jay Reeves, *Suit Seeks to Disqualify Mayor of Birmingham*, The Decatur Daily, Nov. 15, 2007.

[45] *See* doc. no. 1431 (Dec. 28, 2007 Motion to Withdraw by Anne Yuengert of the Birmingham law firm then known as Bradley, Arant, Rose & White).

firms,[46] none of whom possessed sufficient knowledge of the multifaceted history of this extraordinarily old and complex institutional reform litigation to effectively represent the City in ongoing proceedings.

The Monitor reported on January 17, 2008, that the City was refusing to act cooperatively to report personnel actions to the Personnel Board, resulting in substantial discrepancies between the City's records and those of the Board.[47]  Those problems were intensified by the technical inability of the software programs running on the computer systems operated by the City and Personnel Board, respectively, to communicate data ("interface") with each other.  The Monitor's March 24, 2008 Special Report stated that:

> **It is clear to the Monitor that this issue cannot be resolved without the commitment of significant resources in the form of programming expertise and persons dedicated to data entry corrections**.  Even with the provision of sufficient skilled human resources, it may not be possible to resolve this issue within the 2008 calendar year.  **Immediate action is necessary to bring this problem under control and the Monitor urges the City and the Board to direct sufficient resources to resolving this issue**.  This may require the use of external contractors.[48]

---

[46] Only two of the three firms were located in the City of Birmingham.  *See* doc. no. 1428 (Dec. 10, 2007 Notice of Appearance of Brandy Murphy Lee, Lee Law Firm LLC, Birmingham); doc. no. 1433 (Notice of Appearance of Hycall Brooks, III, The Brooks Law Firm, Birmingham); doc. no. 1434 (Notice of Appearance of Charles I. Brooks, The Brooks Law Firm P.C., Birmingham); doc. no. 1435 (Notice of Appearance of Tiffany N. Johnson, Law Offices of Robert Simms Thompson P.C., Tuskegee, Ala.).

[47] *See* doc. no. 1438 (Monitor's Report November-December 2007).

[48] Doc. no. 1457 (Mar. 24, 2008 Special Report of the Monitor), at 4 (emphasis in original).

Accordingly, the court entered an order on March 31, 2008, extending the City's deadline to refile a motion to terminate its consent decree to June 13, 2008.[49]  The court emphasized that any such motion would need to be "supported by clear and convincing evidence of the City's commitment to work with the Personnel Board to resolve the issues raised in the Monitor's reports to the court."[50]

The City filed its renewed motion to terminate the remainder of its consent decree, and to have itself dismissed as a party to the litigation, on the June 13, 2008 deadline.[51]  Despite this court's prior admonition that the City would need to demonstrate by clear and convincing evidence that progress had been made toward resolution of all of the communication problems and data discrepancies between the City and Personnel Board, the Monitor reported on November 17, 2008 that the data interface problems and resulting backlog in processing personnel actions had reached "crisis proportions."[52]  As a result, the court extended the Monitor's duties to include reporting on the City of Birmingham,[53] and entered an order on November 25, 2008, setting a series of deadlines for the City to resolve the technical difficulties and reduce the backlog of personnel actions.  The court cautioned the City that, if it

---

[49] Doc. no. 1461.

[50] *Id.* at 2.

[51] Doc. no. 1486.

[52] Doc. no. 1569 (Monitor's Report October 2008), at 4.

[53] Doc. no. 1574.

missed *any* of its deadlines, the court would act immediately to appoint a receiver or outside services firm to assist with the City's compliance.[54]

The City failed to meet its deadline for resolving certain personnel actions by January 31, 2010.[55]  Accordingly, the City was ordered to show cause why it and its Personnel Director should not be held in contempt of court, and why a receiver or outside services firm should not be appointed to secure the City's compliance.[56]  In the meantime, Larry Langford had been arrested on a 101-count federal indictment charging him — along with investment banker William B. Blount and former Alabama Democratic Pary Chairman Al LaPierre — with conspiracy, bribery, fraud, money laundering, and filing false income-tax returns in connection with a long-running bribery scheme.  His public corruption trial ended on October 28, 2009, with convictions on 60 counts, and resulted in his automatic removal from office.  William A. Bell, Sr., was elected to serve the balance of Langford's term, and was sworn in on January 26, 2010.[57]

---

[54] Doc. no. 1575.

[55] *See* doc. no. 1672 (Monitor's Report January 2010), at 4.

[56] Doc. no. 1673 (Order for Show Cause Hearing).

[57] *See* doc. no. 1672, at 6.

27

## 2. Mayor Bell and the restoration of focus

Mayor Bell's election marked a positive turn in direction.[58]  The attorneys who had been retained by Larry Langford withdrew, and attorneys from the law firm of Burr & Forman, L.L.P., took their place.[59]  Even so, it still required more than an additional year of court supervision, and the retention of an outside technical consultant to serve as "Executive Project Manager," supervising teams of employees from the City and Personnel Board, in order to resolve the software interface discrepancies between the City's computerized employee data and the records maintained by the Personnel Board.[60]  Ultimately, however, after the City filed its *fourth* motion to terminate its consent decree on March 1, 2011,[61] and following a hearing at which no party objected, federal supervision of the City of Birmingham ceased on January 27, 2012:[62] *seven and a half years after the City first moved to*

---

[58] *See generally* doc. no. 1691 (Monitor's Report April and May 2010); doc. no. 1692 (Monitor's Report June 2010); doc. no. 1693 (Monitor's Report July 2010); doc. no. 1694 (Monitor's Report August 2010); doc. no. 1703 (Monitor's Report September-December 2010); doc. no. 1723 (Monitor's Report January 2012).

[59] *See* doc. no. 1679 (Notice of Appearance by Howard Walthall, Jr.); doc. no. 1680 (Notice of Appearance by Michael K.K. Choy); doc. no. 1690 (Motion to Withdraw by Brandy Murphy Lee), granted by text order on May 27, 2010.

[60] *See* doc. no. 1684 (order directing Steve Goldsby to preside over a meeting between the City and the Board as a representative of the Special Master); doc. no. 1723, at 3 (reporting that the interface problem was resolved on February 24, 2011).

[61] Doc. no. 1707.

[62] Doc. no. 1724 (Order Terminating City's Consent Decree and Terminating the City as a Party).

28

*terminate its decree*.

**F**.   ***Finally*, Jefferson County!**

During all of the years of litigation addressing the provisions of the consent decrees of the Personnel Board and City of Birmingham, defendant Jefferson County, Alabama managed to avoid intensive court scrutiny. The County's proposed consent decree was not presented to Judge Pointer until more than a year after the City and Board decrees. It was signed on December 28 and 29, 1982 by representatives of the United States and the Martin class of plaintiffs, on one side, and the Jefferson County Commission and Jefferson County Sheriff on the other.[63] Judge Pointer entered the decree on December 29, 1982.[64] No party actively pursued enforcement of the County's decree until sometime during the year 2006, when the Martin-Bryant parties began to gather evidence addressing the County's compliance with its consent decree. The motion that precipitated this opinion was filed in the following year.[65]

The County's consent decree differs from those of the City and Personnel Board in at least two respects. First, the County decree does not contain the race and gender

---

[63] *See* Plaintiff's Exhibit 13 (Jefferson County Consent Decree) (hereafter, "County decree"), at 1-2, and 31. The plaintiffs to the original action commenced by the Ensley Branch of the N.A.A.C.P. and several individual class representatives did not allege claims against Jefferson County.

[64] *Id*. at 31.

[65] *See supra* note 1.

preferences found in the original City and Board decrees.  Instead, its "major purposes" are characterized as ensuring that blacks and women are "considered for employment by the County on an equal basis with whites and males," and correcting for "the effects of any alleged prior discriminatory employment practices by the County against blacks and women."[66]  To those ends, the decree enjoins the County from "engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or prospective applicant [for employment] with, Jefferson County because of such individual's race, color or sex."[67]  The County also agreed in its decree "that all hiring, promotion, upgrading, training, job assignments, discharge or other disciplinary measures, compensation, or other terms and conditions or privileges of employment shall be maintained and conducted in a manner which does not unlawfully discriminate on the basis of race, color or sex."[68]  Further, the County's decree requires that it

> seek in good faith to achieve the employment of qualified blacks and females in job vacancies in the classified service of the County in numbers approximating their percentage representation among persons on the eligibility lists for such jobs as determined by the Jefferson County Personnel Board under nondiscriminatory recruitment and selection procedures set forth in its Consent Decree . . . and in job vacancies in laborer positions in the unclassified service in numbers approximating their

---

[66] County decree ¶ 5.

[67] Id. ¶ 1 (alteration supplied).

[68] Id.

percentage representation among qualified applicants for such jobs as determined by the County under the provisions of this Consent Decree.[69]

The second major respect in which the County's consent decree differs from those of the City and Personnel Board is that it has not been modified.

Now that the historical and procedural framework of the County's decree has been laid, the court moves on to discuss, in Part II, the standards that must be met by the Martin-Bryant parties in order to hold the County in civil contempt; and, in Part III, the standards that pertain to modification of a contempt decree.

## II. CIVIL CONTEMPT STANDARDS

A consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). Civil contempt sanctions are the primary means of compelling a party's compliance with the provisions of such a decree. The procedures for invoking such sanctions were outlined by the Eleventh Circuit in *Reynolds v. Roberts*, 207 F.3d 1288 (11th Cir. 2000) ("*Reynolds II* "), holding that

> consent decrees, like all injunctions, are to be enforced through the district court's civil contempt power — exercised after (1) the plaintiff moves the court to order the defendant to show cause why he should not be held in contempt for refusing to obey the decree's mandate, (2) the court grants the

---

[69] *Id.* ¶ 5.

motion, and (3) the defendant fails to present a lawful excuse for his alleged disobedience . . . .

*Id*. at 1297.  *See also*, *e.g.*, *Reynolds v. Roberts*, 251 F.3d 1350, 1358 (11th Cir. 2001) ("*Reynolds III* ") (reiterating a proposition first stated in *Thomason v. Russell Corp.*, 132 F.3d 632 (11th Cir. 1998), and *Reynolds II*:  *i.e.*, "there are proper procedures to be followed for the enforcement and litigation of issues related to consent decrees"); *Florida Association for Retarded Citizens, Inc. v. Bush*, 246 F.3d 1296, 1298 (11th Cir. 2001) (*per curiam*) (same); *Thomason*, 132 F.3d at 634 n.4  (observing that "the proper method of enforcing a consent decree is *not* a 'motion to enforce' or similar plea for the court to 'do something' about a violation of the decree," but a motion asking "the court to issue an order to show cause why [the defendant] should not be held in contempt and sanctioned for failing to abide by the Decree's mandate") (emphasis in original) (alteration supplied); *Wyatt v. Rogers*, 92 F.3d 1074, 1078 n.8 (11th Cir. 1996) ("Precedent dictates that a plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order move the court to issue an order requiring the defendant to show cause why he should not be held in contempt and sanctioned for his noncompliance.") (citation omitted); *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990) ("Every civil contempt proceeding is brought to enforce a court order that requires the defendant to act in some manner."); *Newman v. Alabama*,

683 F.2d 1312, 1318 (11th Cir. 1982) ("The plaintiffs, if they think [a defendant] is failing to take the action required by the consent decree and wish the court to intervene, have available a traditional equitable remedy. They can initiate contempt proceedings by moving the court to issue an order to show cause why the [defendant] should not be held in civil contempt.") (alterations supplied).

Civil contempt proceedings are both coercive and remedial in nature. To prevail on a motion for civil contempt, a plaintiff must demonstrate by clear and convincing evidence that a defendant violated a prior court order that was lawful, clear, and unambiguous, and that the alleged violator possessed the ability to comply with the order. *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). "Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor 'to produce evidence explaining his noncompliance' at a 'show cause' hearing." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)). The contemnor must show "either that he did not violate the court order or that he was excused from complying." *Mercer*, 908 F.2d at 768.

> This burden of production is not satisfied by "a mere assertion of inability." *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984). Rather, in this circuit, a party subject to a court's order demonstrates inability to comply only by showing that he has made "in good faith all reasonable efforts to comply." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976) (citing

*United States v. Ryan*, 402 U.S. 530, 534, 91 S. Ct. 1580, 1583, 29 L. Ed. 2d 85 (1971)).

*United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988). Despite that standard's

use of the subjective term "good faith," the inquiry is an objective one: that is,

> the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir. 1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. *Newman* [*v. Graddick*], 740 F.2d [1513,] 1524 [(11th Cir. 1984)].

*Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)

(alterations supplied).

Even so, the Eleventh Circuit has made it clear that a party's recent (*i.e.,* hurried,

eleventh-hour) compliance with the requirements of a consent decree in advance of

a contempt hearing does not excuse its past non-compliance. A party has no "license

to flout or wilfully to disobey a court order by violating the order and then complying

with the order before the contempt proceeding begins." *Mercer*, 908 F.2d at 769

n.10. If that occurs,

> the court still will have two means of coercing compliance or punishing the defendant. *First, the court may conclude that*, even though the defendant is in technical compliance at the time of the proceeding, *the defendant's prior conduct indicates that he will not continue to comply with the court's injunction*. In such a case, it may be appropriate to hold the defendant in

34

civil contempt and sanction him until he satisfies the court that he will indeed obey the injunction. *Second, if the court finds the defendant acted wilfully or maliciously in disregarding the injunction, then the court may cite the defendant for criminal contempt. See United States v. Hilburn*, 625 F.2d 1177, 1179 (5th Cir. 1980). In such a case, the court may fully vindicate its authority with a fine, imprisonment, or both. Thus, in no situation is the court left without authority to act when the defendant appears to be flouting judicial authority.

*Id.* (emphasis supplied). *See also Chairs v. Burgess*, 25 F. Supp. 2d 1333, 1338 (N.D. Ala. 1998) (holding that the defendant in a consent decree case could not "moot the issue [of contempt] by simply bringing itself into compliance by the time of the Show Cause Hearing") (alteration supplied).

"The district court has wide discretion to fashion an equitable remedy for contempt that is appropriate to the circumstances," bearing in mind that "[t]he purposes of civil contempt sanctions are 'to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987) (quoting *Local 28 of Sheet Metal Workers' International Association v. EEOC*, 478 U.S. 481, 443 (1986), and also citing *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976)) (alteration supplied).[70]

---

[70] It should be noted that there is a distinction between *coercion* and *punishment*, as the Eleventh Circuit observed in *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297 (11th Cir. 1991), holding that the sanctions imposed upon a showing of civil contempt should be sufficient "to coerce the contemnor to comply with the court's order, but may not be so excessive as to be punitive in nature." *Id.* at 1304 (citing *Matter of Trinity Industries, Inc.* 876 F.2d 1485, 1493 (11th Cir.

Thus, "'[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.  This may entail the doing of a variety of acts . . . .'" *Guardian Pools*, 828 F.2d at 1515 (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949)) (alteration supplied).  One such act is the appointment of a receiver.  *Dixon v. Barry*, 967 F. Supp. 535, 550 (D. D.C. 1997) (holding that the court's "equitable power includes the power to appoint a receiver") (citing *Morgan v. McDonough,* 540 F.2d 527, 533 (1st Cir. 1976).  *See also*, *e.g.*, *Bracco v. Lackner*, 462 F. Supp. 436, 455 (N.D. Cal. 1978); *Petitpren v. Taylor School District*, 304 N.W.2d 553, 557 (Mich. Ct. App. 1981)).

"The appointment of a person to carry out functions the court deems necessary to provide full and complete relief is not a novelty in American jurisprudence." *Wayne County Jail Inmates v. Lucas*, 216 N.W.2d 910, 913 (Mich. 1974) (*en banc*) (footnoted citations omitted) ("*Wayne I*"); *see also, e.g., Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 556 & n.2 (Mich. Ct. App. 1989) ("*Wayne II*") (same); *Morgan*, 540 F.2d at 533 ("A district court's power to fashion and effectuate desegregation decrees is broad and flexible, and the remedies may be 'administratively awkward, inconvenient, and even bizarre.'")

---

1989)).  *See also Mercer*, 908 F.2d at 768 n. 9 ("Of course, the sanctions may not be any greater or more onerous than is necessary to ensure compliance.").

(quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 28 (1971)); *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999) ("The court has the power, pursuant to its equity jurisdiction, to take broad remedial action to secure compliance with its orders, including the power to appoint a receiver.") (citing *Dixon*, 967 F. Supp. at 500); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 677 N.E.2d 127, 148 (Mass. 1997) ("Public officials who fail to abide by legal standards are not immune to these remedies. . . . A court with equity jurisdiction has the discretion to appoint a receiver to take over the main functions of public officials.") (citations omitted), *abrogated on other grounds by In re Birchall*, 913 N.E. 2d 799, 813 (Mass. 2009).

Receivers have been appointed "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons." *Dixon*, 967 F. Supp. at 550.

> The mechanisms at work in the creation of . . . a receivership of a public institution, are fairly clear. The political process has failed to produce an institution conforming to law and those subjected to the illegality, who are usually politically powerless (*cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, 58 S. Ct. 778, 783, 82 L. Ed. 1234 (1938)), turn to the courts for the vindication of their rights. Injunctive remedies are called for, but the judge lacks expertness in the particular field, and lacks time even when he chances to have the knowledge. Hence the appointment of adjunct officers who supply expert knowledge and sometimes implicitly encourage acceptance by the parties and the general public of the results of the judicial intervention.

*Perez v. Boston Housing Authority*, 400 N.E.2d 1231, 1250 n.29 (Mass. 1980).

Even so, the appointment of a receiver to act in the place of "elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances." *Morgan*, 540 F.2d at 535. "Essentially it is the remedy of last resort, and therefore, should be undertaken only when absolutely necessary." *Jerry M.*, 738 A.2d at 1213 (citing *LaShawn A., by Moore v. Kelly*, 144 F.3d 847, 854 (D.C. Cir. 1998)). *See also Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) ("Under federal law, appointing a 'receiver is an extraordinary equitable remedy,' which should be applied with caution.") (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)).

Because the imposition of a receivership is an equitable remedy, it is available only when there is no adequate legal remedy. *United States v. Bradley,* 644 F.3d 1213, 1310 (11th Cir. 2011). Thus, the primary consideration is "whether any other remedy is likely to be successful." *Dixon*, 967 F. Supp. at 550 (citing *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.Va. 1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."); *Newman*

*v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction."); *Bracco*, 462 F. Supp. at 456 (noting that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren*, 304 N.W.2d at 557 (finding a receiver appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence")).

Courts in the District of Columbia — the jurisdiction in which most of the reported receiverships have been imposed on public institutions — have identified six, non-exhaustive factors to consider when determining whether other remedies are inadequate, and whether the imposition of a receivership remains the only viable option for coercing compliance with court orders. These include:

> (1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and, (6) "whether a receiver can provide a quick and efficient remedy."

*Jerry M.*, 738 A.2d at 1213 (quoting *Dixon*, 967 F. Supp. at 550-51 (citing, in turn, *Judge Rotenberg Educational Center*, 677 N.E.2d at 148-49, and *Morgan*, 540 F.2d at 533 ("Remedial devices should be effective and relief prompt."))).

### III.  STANDARDS FOR MODIFICATION OF A CONSENT DECREE

The Martin-Bryant parties also have asked this court to modify some provisions of the County's consent decree.  The Supreme Court promulgated a two-pronged standard for determining when (and to what extent) an institutional-reform consent decree that "arguably relates to the vindication of a constitutional right" should be modified in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 n.7 (1992).  The first prong requires the party seeking modification to "establish that a significant change in facts or law warrants revision of the decree."  *Id.* at 383.  If the moving party satisfies that prerequisite, then the second prong requires the court to make modifications that are "suitably tailored" to address the new factual or legal environment.  *Id.  See also Ensley II*, 31 F.3d at 1563.

### A.  Significant Change in Facts or Law

The prerequisite for proof of a significant change in either the facts or legal circumstances upon which the consent decree was based "is interpreted flexibly, and different sorts of factual changes may qualify as changed circumstances permitting modification."  *Reynolds v. McInnes*, 338 F.3d 1221, 1226 (11th Cir. 2003) (citing *Ensley II*, 31 F.3d at 1563).  According to the Supreme Court, modification based on factual change may be warranted "when changed factual conditions make compliance with the decree substantially more onerous," or "when a decree proves to be

40

unworkable because of unforeseen obstacles," or "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384-85.

The Eleventh Circuit has also held that modification is warranted "when 'significant time has passed and the objectives of the original agreement have not been met' despite the defendants' efforts, or when a continuation of the decree would be inequitable." *Reynolds*, 338 F.3d at 1227 (citations omitted).

**B**.   **"Suitably Tailored" Modifications**

If significant factual or legal changes are established, the court must then "determine the appropriate scope of the changes, accepting only proposals that are 'suitably tailored' to address significant factual developments or conflicts between new legal standards and the requirements of the decree." *Ensley II*, 31 F.3d at 1563-64 (quoting *Rufo*, 502 U.S. at 393).  The court has broad discretion in making that determination, but it "may not modify a decree in a way that would 'violate the basic purpose of the decree,' and must under no circumstances 'create or perpetuate a constitutional violation.'"  *Id*. at 1564 (quoting *Rufo*, 502 U.S. at 391).

## IV.  THE COUNTY'S ADMISSIONS OF NONCOMPLIANCE

The County admitted that it has not complied with significant portions of its consent decree.  The admissions are set out in the following paragraphs of the County's post-trial brief:

56.  The County has not evaluated supervisory personnel, in part, on the basis of their compliance with their responsibilities as well as their cooperation with the Affirmative Action Officer as required by paragraph 31 of the Consent Decree.[71] . . .

57.  *Prior to June 29, 2004*, the County did not institute a formal affirmative recruitment program designed to inform African Americans and females of job opportunities with the County, as required by paragraph 16 of the Consent Decree.[72] . . .

---

[71] Paragraph 31 states (***Nota bene***: All quotations from Jefferson County's Dec. 29, 1982 Consent Decree have been copied from Plaintiff's Exhibit 13):

The County shall inform supervisory personnel that the County shall not discriminate against or harass any employee or potential employee on the basis of race or sex.  In addition, the County will instruct such personnel about their responsibilities as they relate to carrying out the provisions of this Decree. Supervisory personnel will be evaluated, in part, on the basis of their compliance with these instructions as well as their cooperation with the Affirmative Action Officer identified in paragraph 33 below.

[72] Paragraph 16 states:

Except for unclassified laborer positions over which the County has sole recruitment responsibility under this Decree, if the recruitment efforts of the Personnel Board pursuant to its Consent Decree fail to supply sufficient applicants for the County to meet the objectives of this Decree, the County shall institute an affirmative recruitment program designed to inform blacks and women of job opportunities with the County.  This recruitment obligation is intended to supplement but not duplicate the recruitment efforts of the Personnel Board, as required by the Consent Decree between plaintiffs and the Board.  The County's recruitment activities shall be directed specifically at attracting qualified black and female applicants for the jobs identified in paragraphs 7, 8, and 11, and in Appendices A and

42

58. *Prior to June 29, 2004*, the County did not consistently inform its employees of all opportunities for promotion or transfer, nor did it insure that all written announcements received from the Personnel Board for hiring, promotion and training opportunities with the County were made available to all of its employees reasonably in advance of any scheduled examinations or training for such positions and posted in conspicuous places, as required by paragraph 18 of the Consent Decree.[73] . . .

59. *Prior to February 1, 2005*, the County did not consistently instruct supervisory personnel regarding their responsibilities as they relate to carrying out the provisions of the Consent Decree, as required by paragraph 31 of the Consent Decree.[74] . . .

---

B of this Decree. The recruitment program may include but shall not be limited to maintaining contacts with area high schools, technical and vocational schools, colleges, and organizations which have traditionally expressed an interest in providing minority and female applicants, or which indicate such interest in the future, and informing them of employment opportunities with the County. In addition, where appropriate, advertising of employment opportunities may be placed with or in advertising media primarily directed to black and female audiences for the purpose of emphasizing to blacks and women the availability of employment opportunities with the County. Utilization of the above described recruitment sources in accordance with this paragraph shall constitute compliance by the County with the affirmative recruitment obligations required by this paragraph.

[73] Paragraph 18 states:

The County shall inform its employees of all opportunities for promotion or transfer. The County shall insure that all written announcements received from the Personnel Board for hiring, promotion and training opportunities with the County are made available to all of its employees reasonably in advance of any scheduled examinations or training for such positions. Such announcements shall be posted in conspicuous places so that reasonable notice is given to the County's employees of such employment opportunities. Notices of job announcements within a department in either permanent, part-time or temporary positions shall be posted separately and in conspicuous places from notices of job announcements in other departments.

[74] Paragraph 31 states:

The County shall inform supervisory personnel that the County shall not discriminate against or harass any employee or potential employee on the basis of race or sex. In addition, the County will instruct such personnel about their

43

60. *Prior to February 1, 2005*, the County did not maintain a complete record of all actions taken in pursuit of the duties in the Consent Decree, including correspondence relating to any complaints or investigations undertaken pursuant to the decree and any investigatory files, as required by paragraph 33(e) of the Consent Decree.[75] . . .

61. *Prior to June 29, 2004*, the County did not maintain a list of all organizations and schools which are contacted for recruitment purposes for classified positions, showing the date that any notice of job opportunity was mailed to them, the title of the job to be filled from that notice, and the date through which applications would be received for the job, as required by paragraph 51(a) of the Consent Decree.[76] . . .

62. *Prior to June 29, 2004*, the County failed to meet its own independent recruiting obligations under paragraphs 13[77] and 51(a)[78] of

---

responsibilities as they relate to carrying out the provisions of this Decree. Supervisory personnel will be evaluated, in part, on the basis of their compliance with these instructions as well as their cooperation with the Affirmative Action Officer identified in paragraph 33 below.

[75] Paragraph 33(e) requires the County to appoint an Affirmative Action Officer who is required, among other responsibilities, to "Maintain a complete record of all actions taken in pursuit of the duties prescribed herein, including all correspondence directed to or from the County with respect to any complaints or investigations undertaken pursuant to this Consent Decree and any investigatory files."

[76] Paragraph 51(a) states that the County's records shall include:

A list of all organizations and schools which are contacted for recruitment purposes, showing the date that any notice of job opportunity was mailed to them, the title of the job and number of positions within that job to be filled from that notice, and the date through which applications would be received for the job. A summary or compilation of all other recruitment efforts aimed at minorities and women shall also be maintained, together with the date and nature of the efforts and the names and job title of the County employees involved.

[77] Paragraph 13 states:

In [those departments and divisions identified in "Appendix A" to the County's decree, in which blacks and females have *not* been hired consistent with their expressed or potential interest in such employment], Jefferson County agrees that it will make a good faith recruitment effort, in accordance with its affirmative

44

the Consent Decree, which are not delegable to the Personnel Board. . . .

63.  *Prior to June 29, 2004*, the County did not consistently maintain all written applications and related records for all persons seeking employment with the County, including applications for transfer or promotions within or among departments for a period of at least five years, as required by paragraph 51(b) of the Consent Decree.[79] . . .

64.  *Prior to February 1, 2005*, the County did not consistently maintain records containing a statement by the appropriate County official, setting forth the reasons why any applicant was found not to be qualified for the position(s) applied for, as required by paragraph 51(b) of the Consent Decree.[80] . . .

65.  *Prior to October 2008*, the County did not consistently produce

---

recruitment obligations under this Decree, to secure the number of black and female applicants in entry level (open competitive) jobs in those departments and divisions that is at least equivalent to the degrees of representation of blacks and women in the civilian labor force of Jefferson County. The parties preserve the right to adjust these recruitment goals through agreement and subject to the approval of the Court, where it can be shown that a professional degree, license or certificate is required to perform the duties of any particular job or jobs and that blacks and/or women hold such degrees, licenses or certificates in percentage terms in the relevant labor market which are inconsistent with these goals. The relevant labor market for the jobs identified on Appendices A and B will be Jefferson County, unless the parties agree or the Court requires that for a particular job or jobs some other labor market be used that will better serve the purposes of this Decree. For purposes of this paragraph, entry level jobs are those listed in Appendices A and B. [alteration supplied]

[78] *See supra* note 77 for the text of Paragraph 51(a).

[79] Paragraph 51(b) states that the County's records shall include:

All written applications and related records for all persons seeking employment with the County, including applications for transfer or promotion within or among departments, for a period of at least five (5) years, which applications shall include identification by the County of the applicant by race and sex. Such records shall also contain a statement signed by the appropriate County official, setting forth the reasons why any applicant was found not to be qualified for the position(s) applied for.

[80] *See id.*

45

semi-annual reports containing a summary showing the total number of current employees by race and sex in each job classification for each department of the County in both the classified and unclassified service, as required by paragraph 52(a) of the Consent Decree.[81] . . .

66.   *Prior to October 2008*, the County did not consistently produce semi-annual reports containing a list of all probational appointments for permanent full-time positions, by job classification and department, during the six month reporting period, indicating the race and sex of the persons hired or promoted, as required by paragraph 52(b) of the Consent Decree.[82] . . .

67.   *Prior to October 2008*, the County did not consistently produce annual reports listing all persons, by job classification, department, race and sex, to whom positions had been offered with an indication thereon of whether or not the person was accepted, as required by paragraph 53(a) of the Consent Decree.[83] . . .

68.   *Prior to October 2008*, the County did not consistently produce annual reports listing all promotions to permanent full-time positions in the classified service, by job classification and department, during the twelve month reporting period indicating the race, sex, date of initial hire in the classified service and date of the promotion, as required by paragraph 53(b)

---

[81] Paragraph 52(a) requires the County to make a semi-annual report containing, among other items, "[a] summary showing the total number of current employees by race and sex in each job classification for each department of the County in both the classified and unclassified service" (alteration supplied).

[82] Paragraph 52(b) requires the County to make a semi-annual report containing, among other items, "[a] list of all probational appointments for permanent full-time positions, by job classification and department, during the six month reporting period indicating the race and sex of the persons hired or promoted" (alteration supplied).

[83] Paragraph 53(a) requires the County to make an annual report containing, among other items, "[a] list of persons, by job classification, department, race and sex, to whom positions have been offered with an indication thereon of whether or not the position was accepted" (alteration supplied).

of the Consent Decree.[84] . . .

69.  *Prior to October 2008*, the County did not consistently produce annual reports with a breakdown of the applicant flow for employment with the County which indicates by race and sex the number of applicants for each department and job classification in the classified and unclassified service, and the number of applicants hired, rejected and pending for each job classification and department, as required by paragraph 53(c) of the Consent Decree.[85] . . .

70.  *Prior to February 1, 2005*, with respect to all applicants who were certified for hire or promotion and who were not selected for the vacancy for which the applicant was certified, the County did not record in writing, signed by the appropriate County official, the reasons for the applicant not being selected for the vacancy, as required by paragraph 53(c) of the Consent Decree.[86] . . .

71.  *Prior to October 2008*, the County did not consistently produce annual summary reports of the recruiting activities conducted by the County for classified positions and the results of those activities, as required by paragraph 53(d) of the Consent Decree.[87] . . .

---

[84] Paragraph 53(b) requires the County to make an annual report containing, among other items, "[a] list of all promotions to permanent full-time positions in the classified service, by job classification and department, during the twelve month reporting period indicating the race, sex, date of initial hire in the classified service and date of the promotion" (alteration supplied).

[85] Paragraph 53(c) requires the County to make an annual report containing, among other items:

>     A breakdown of the applicant flow for employment with the County which indicates by race and sex the number of applicants for each department and job classification in the classified and unclassified service, and the number of applicants hired, rejected and pending for each job classification and department.  Applicant hires shall be separately identified as to Comprehensive Employment Training Act (CETA) positions.

[86] *See id.*

[87] Paragraph 53(d) requires the County to make an annual report containing, among other items, "[a] summary of the recruiting activities conducted by the County and the results of those activities" (alteration supplied).

Doc. no. 1772 (County's Post-Trial Brief) ¶¶ 56-71, at 14-19 (emphasis and alterations supplied).

## V.  THE COUNTY'S STIPULATIONS AS TO MODIFICATIONS

The County has stipulated to certain modifications of its consent decree.[88]  With regard to employee selection procedures, the County believes that there are 177 job classifications that the plaintiffs have identified as "problematic."[89]  The County has offered to hire by random selection in 165 of those 177 job classifications.

Addressing the remaining twelve jobs — *i.e.*, *Chief Accountant*, *Chief Security Officer*, *Environmental Biologist*, *Environmental Lab Compliance Administrator*, *HVAC/Refrigeration Technician*, *Sewer Construction/Maintenance Supervisor*, *Sewer Video Supervisor*, *Senior Maintenance Repair Worker*, *Waste Water Treatment Plant Shift Supervisor*, *Waste Water Treatment Plant Supervisor*, and *GIS Manager* — the County proposes that those job classifications should be further analyzed by the parties "for adverse impact"; *and*, to the extent that any adverse impact is detected, the County agrees to retain an "Industrial-Organizational psychologist"[90] to develop

---

[88] *See* doc. no. 1772 (County's Post-Trial Brief), at 56 ("The County does not dispute the Decree should be modified.").

[89] *Id.* at 58.  See Part VI(B)(6), *infra*, for further discussion of the 177 jobs.

[90] "Industrial and organizational psychology" (also known as "I-O psychology" or "work psychology") is the scientific study of employees, workplaces, and organizations.  I-O psychologists contribute to an organization's success by improving the performance, satisfaction, and well-being of its employees.  Such psychologists conduct research on employee behaviors and attitudes, and how these can be improved through hiring practices, training programs, feedback, and management

and validate selection procedures for these positions.[91]

Furthermore, to the extent additional job classifications are shown to have adverse impact because of the County's selection procedures, the County will either choose to hire via random selection or will agree to a schedule in the modified Decree for the hiring of an I/O psychologist to validate the selection procedures for those positions.[92]

In addition to consenting to the foregoing modifications of the consent decree provisions that pertain to the 177 so-called "Included Jobs," the County has stipulated as follows:

- The County will agree to the appointment of a Monitor who will work with a County hired I/O psychologist to ensure the County satisfies its selection procedure development obligations as they are determined by the Court and the Special Master.

- The County agrees to have all provisional, temporary or emergency appointments for the 177 jobs to be submitted, reviewed and approved by the Monitor, as requested by the Plaintiffs.

- The County agrees to have the use of independent contractors submitted, reviewed and approved by the Monitor, as requested by the Plaintiffs.

- The County agrees to have all requests to terminate or recertify certification lists for the 177 jobs to be submitted, reviewed and approved by the Monitor, as requested by Plaintiffs.

- The County agrees to retool the Affirmative Action Officer position

---

systems. *See*, *e.g.*, Gerald R. Ferris & M. Ronald Buckley, *Human Resources Management* 156-60, 162-64, 166-69, 173-76 (Englewood Cliffs, N.J.: Prentice-Hall 3d ed. 1996).

[91] Doc. no. 1772 (County's Post-Trial Brief), at 58-59.

[92] *Id*. at 59.

and have the Monitor review and approve improvements to the Affirmative Action Officer position, as requested by Plaintiffs.

•   The County agrees to work with the Monitor to improve its recruitment plan, anti-harassment policy, and discrimination complaint process as requested by Plaintiffs.

•   The County agrees not to terminate or request to recertify a certification list without having used an objective, job-related selection procedure to evaluate each certified applicant on that list as requested by Plaintiffs.

•   As to the remaining paragraphs in Plaintiffs' Prayer for Relief regarding provisional appointments/independent contractors, anti-nepotism policy, employees working outside of classification, anti-harassment policy, posting of vacancies, document retention, mandatory Consent Decree training, anti-nepotism policy training, harassment/discrimination policy training, diversity training, recruitment of females and African[-]Americans, and recordkeeping, [sic] and reporting obligations, the County will review its current policies and procedures with the Monitor to determine ways to improve the same. The County is willing to discuss with Plaintiffs and the Court further modifications to the Consent Decree regarding these areas.

Doc. no. 1772 (County's Post-Trial Brief), at 61-62 (alteration supplied).

## VI. DISCUSSION

The present posture of this case, if not unique, surely is unusual, in that Jefferson County has admitted that it willfully disobeyed significant requirements of its consent decree. The questions that remain to be resolved, then, are the extent of that

contumacious conduct, and, the appropriate remedy.[93]

The Martin-Bryant parties assert that a Receiver should be appointed to control all of the County's personnel functions.  In response, the County argues that the drastic remedy of a receivership is unwarranted, based upon the facts presented at trial and, particularly, the County's recent efforts at compliance.

## A.   The County's Irrelevant Arguments

The County repeatedly asserts three arguments in its post-trial briefing that have little bearing on this court's decision of what remedy to impose for the County's admitted contempt, and that confuse the actual issues before the court.  First, the County repeatedly compares itself to the Personnel Board of Jefferson County, over

---

[93] *See* doc. no. 1772 (County's Post-Trial Brief), at 2 ("[T]he County is willing to stipulate to specific violations of the decree alleged by Plaintiffs and to most of the relief sought by Plaintiffs in their Contempt Motion.  Thus, the question before the Court is what remedy it is going to impose for the County's non-compliance.") (alteration supplied); *id*. at 14-19 (detailing the County's stipulations as to violations of the decree); *id*. at 61-62 (setting forth the County's stipulations as to appropriate remedies for its contempt); *id*. at 62 ("While the County maintains it has made good faith efforts at compliance, particularly in the last four years, *it concedes it has not consistently abided by all aspects of the Decree*.") (emphasis supplied).  *See also* doc. no. 1798 (County's Response to Martin-Bryant Parties' Post-Trial Brief), at 1 ("The County does not dispute that Plaintiffs exercised the proper procedural vehicle in bringing the County's non-compliance with the Decree before this Court.  More importantly, the County also does not dispute that it has not complied fully with the Decree.  Indeed, as stated in multiple pleadings . . . and as reaffirmed by the Commissioners and County Manager during trial, the County is willing to stipulate to specific violations of the Decree alleged by Plaintiffs and to most of the relief sought by Plaintiffs in their Contempt motion.  Thus, *the pertinent question before the Court is what remedy to impose for the County's non-compliance*.") (emphasis supplied); *id*. at 4 ("The County accepts that it has not lived up to the bargain it agreed to in 1982 and accepts it will be faced with a finding of contempt and modifications of the Decree.").

which this court imposed a receivership in 2002.[94]  The County seems to believe that,

by arguing that its behavior is not "as bad" as was that of the Personnel Board, it can

be saved from the same fate that befell the Board.[95]  That is not necessarily the case.

While the court will apply the same factors in the present controversy as it applied

when deciding whether to impose a receivership over the Personnel Board, those

factors will be *independently* applied to the County's actions.  The Board's past

misfeasance and nonfeasance has no bearing on the receivership analysis for the

---

[94] *See* doc. nos. 934 & 935 (Memorandum Opinion and Order imposing receivership).

[95] *See* doc. no. 1772 (County's Post-Trial Brief), at 2 ("The County maintains that it is not the Personnel Board *circa* 2002 and this Court should not impose the severe and drastic remedy of a receiver . . . .") (emphasis in original); *id*. at 3 ("Since none of the factors previously relied on by the Court in placing a receiver over the Personnel Board weigh in favor of a similar finding for the County, this Court should not impose such a harsh and extreme remedy here.") (emphasis in original); *id*. at 66 ("In grave contrast to what this Court was facing in 2002 with the Personnel Board (including the threat of criminal sanctions), the application of these factors to the County and its current leadership demonstrates a the [sic] extraordinary remedy of a receiver is not necessary.") (alteration supplied); *id*. at 67 ("[T]he County has not repeatedly or cavalierly disregarded Court-imposed deadlines in contrast to previous incarnations of the Personnel Board.") (alteration supplied); *id*. at 71 (contrasting the County's production of documents during these proceedings to the Board's "repeated failures to provide required data and information to the parties"); *id*. at 73 n.8 ("The current situation is drastically different from what this Court was facing with the Personnel Board."); *id*. at 75 ("The contrast between this Commission and County Manager and the Personnel Board's leadership at the time it was placed under receivership is glaring."); *id*. at 76 ("Here, the evidence presented by the County, including its pre-trial stipulations and suggested relief, the change in government structure and the Commissioners and County Manager's testimony paint an **entirely** different picture than that this Court faced with the Personnel Board.") (emphasis in original); *id*. at 80 (contrasting the Board's wasteful patterns to the County's own, allegedly, more conservative use of resources. *See also* doc. no. 1772 (County's Response to Martin-Bryant Parties' Post-Trial Brief), at 219 ("Jefferson County in 2013, no matter its wayward history, is not the Personnel Board in 2002."); *id*. at 220 ("Since none of the factors previously relied on by the Court in placing a receiver over the Personnel Board weigh in favor of a similar finding for the County, this Court should not impose the remedy of last resort.") (emphasis in original).

County.  Indeed, it is possible for the court to find the County's conduct to not be as "bad" as was the Board's in 2002, but *still* conclude that a receivership should be imposed.

Second, the County repeatedly references its poor financial situation.[96] According to the County:

> When the current Commission came into office, the County was faced with a number of problems such as four billion dollars of debt that the County could not service financially, economic development issues due to stymied population growth, a consent decree with the Environmental Protection Agency and this Federal consent decree related to employment practices.[97]

It also is widely known that the County filed for Chapter 9 Bankruptcy protection on November 9, 2011.[98]  That proceeding still is pending.  Even so, the bankruptcy case did not prevent the hearing on the present motion of the Martin-Bryant parties from going forward,[99] and neither the County's bankruptcy nor its general financial condition will prevent this court from imposing whatever remedy it determines

---

[96] *See, e.g.,* doc. no. 1772 (County's Post-Trial Brief), at 2 (asserting that the court should not impose a receivership, in part, because of "the County's precarious financial situation").

[97] County's Proposed Fact No. 201 (alteration supplied).

[98] *See* County's Proposed Fact Nos. 222 ("On November 9, 2011, in the eleventh month of the new Commissioners' tenure and the second month of Mr. Petelos' service, the County filed Chapter 9 bankruptcy.") & 224 ("The County remains in bankruptcy with no general fund revenue sources.").

[99] *See* doc. no. 1725 (order holding that the automatic stay provisions of Title 11 of the United States Code do not apply to the portion of this litigation that concerns Jefferson County, including the Martin-Bryant parties' motion to hold the County in contempt of court for failure to comply with the terms of its consent decree).

appropriate for the purpose of correcting the County's contempt.[100]  As Judge Frank M. Johnson, Jr., once observed, "[t]he Constitution does not put a price on constitutional rights, in terms either of time or money.  The rights guaranteed by the Constitution are to be made effective in the present."[101]  Those observations hold true when one considers that the County has been under the obligations of its decree since 1982, *decades* before it began to suffer the financial problems that ultimately led to its 2011 bankruptcy filing.  If the County and its legal advisors had not squandered numerous opportunities to profit from observance of the errors of the Personnel Board's ways, and to voluntarily bring County government into compliance with the requirements of its decree during times of plenty, it would not have been necessary to plead for leniency during a time of depleted resources.[102]

Finally, the County offers evidence of the overall racial composition of its workforce in an effort to demonstrate its alleged recent progress toward decree compliance.  Specifically, the County points out that the number of African-

---

[100] The *only* relevance that evidence about the County's financial problems might have to *these* proceedings is as background information to explain why the County implemented the 2011 Administrative Leave Without Pay ("ALWOP") and the 2012 Reduction-In-Force ("RIF"), or as an indication that the current County leadership is faced with too many other problems to devote an appropriate amount of time and resources to consent decree compliance.

[101] Jack Bass, *Taming the Storm* 398 (1993) (quoting a written statement made by Judge Johnson during confirmation proceedings regarding his nomination to a position on the United States Court of Appeals for the Eleventh Circuit) (alteration supplied).

[102] *Cf. Proverbs* 6:6 ("Go to the ant, thou sluggard; consider her ways, and be wise . . . .") (King James).

Americans working for the County has grown in all but four job classifications since the decree was entered in 1982, and that the number of females has grown in all but two jobs. It also points out that the percentage of African-Americans in the County workforce as a whole has grown from 17 percent in 1982 to 38 percent today, and the percentage of females in the County workforce as a whole has grown from 32 to 40 percent. Those statistics are even greater for positions in the higher pay grades of 21 through 30.[103]

Even assuming that the statistics presented by the County are correct, the relative increase in the number and percentage of blacks and females in the County workforce does not demonstrate either the County's good faith, or its compliance with the requirements of its consent decree. While increasing the overall numbers of blacks and females employed by the County certainly is not a *bad* thing, the decree does not merely require the County to hire more blacks and females. *Instead*, *the decree prohibits discrimination of any kind on the basis of race or gender*,[104] *and it requires that blacks and females be considered for employment with the County on the same basis as whites and males*.[105] Achieving the goals set forth in the decree requires that *every* hiring decision for *every* job at the County be made *without regard to* race or

---

[103] *See* County's Proposed Fact Nos. 72-77.

[104] Consent Decree ¶ 1.

[105] *Id.* ¶ 5 (reciting the "major purposes" of the decree).

sex.  The decree sets its own benchmarks for evaluating whether those goals have

been met.  *Specifically*, paragraph 5 states that:

> The objectives of this Decree will be considered to be attained *in entry level jobs* when the percentage of qualified blacks and women employed by the County in each of the jobs identified in paragraphs 7, 8, and 11 and in Appendices A and B of this Decree approximates their respective percentages in the civilian labor force of Jefferson County . . . .  *For jobs that require a professional degree*, *license or certificate*, and where it can be shown that blacks and/or women hold such degrees, licenses or certificates in percentage terms which are lower than their respective percentage representations in the civilian labor force of Jefferson County, the parties agree that the attainment of the objectives of this Decree for such jobs shall be based upon the best available information as to the availability of qualified blacks and women for such jobs . . . .  If the County fails to meet these objectives in a particular job or jobs, it shall have the burden of demonstrating that it made a good faith effort to achieve such objectives, and that it otherwise complied with the affirmative recruitment and nondiscriminatory selection requirements for such positions as set forth in Part II of this Decree.[106]

Thus, the County's data about the overall composition of its workforce says

nothing about whether it has attained the decree's stated goals with regard to specific

positions, and that data has little relevance to the analysis of whether the County has

complied with the decree.  If anything, the County's repeated focus on the overall

employment numbers as an indication of its compliance with the decree demonstrates

a fundamental misunderstanding of the requirements of its decree.

---

[106] *Id.* (emphasis supplied).

**B**.   **Receivership Factors**

The court will begin its discussion of whether to appoint a receiver by addressing six questions.  *First*, have there been repeated failures to comply with court orders? *Second*, will further efforts to secure compliance only lead to confrontation and delay?  *Third*, is leadership available to turn the tide within a reasonable time? *Fourth*, has there been "bad faith" on the part of the County?  *Fifth*, are resources being wasted?  *Finally*, can a Receiver provide a quick and efficient remedy?  *See*, *e.g.*, *Morgan v. McDonough,* 540 F.2d 527, 533 (1st Cir. 1976); *Dixon v. Barry*, 967 F. Supp. 535, 550-51 (D. D.C. 1997); *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 677 N.E.2d 127, 148-49 (Mass. 1997).

The foregoing factors are non-exhaustive, and serve only as a starting point for the equitable analysis.

**1.**   **Have there been repeated failures to comply with court orders?**

The County's consent decree was entered on December 29, 1982, and the County openly admits that today, more than thirty years later, it *still* is not complying with all of the requirements of its decree.  If thirty years of failing to comply does not constitute "repeated failures," nothing does.

The County makes much of the assertion that it has not been under any "interim

57

deadlines" similar to the "schedule of deliverables" this court imposed upon the Personnel Board in 2000, requiring certain actions to be completed by specified dates.[107]   That is of no consequence.   Regardless of whether additional interim deadlines were imposed after the decree was entered, regardless of whatever else might be said by way of excuse, this glaring fact remains:  the County has repeatedly failed to comply with significant portions of its decree.[108]

Indeed, the number and breadth of the admitted violations set out in Part IV of this opinion, *supra*, speak loudly, as they represent between 22 and 26 years of stipulated failures to comply with provisions of the County's decree.   Despite acknowledging decades of contumacious conduct, the County asserts that it has more recently — *i.e.,* within the past seven years, or since the date on which the Martin-Bryant parties began to investigate the County's contempt and take steps to enforce its decree — "made efforts" and "taken steps" to bring itself into compliance with the decree.

These efforts include (1) creating a Human Resources ("HR") Department and discussing Decree compliance with the Director when she was hired;

---

[107] *See*, *e.g.*, doc. no. 708 (Order Extending 1981 Consent Decrees and 1995 Modification Orders of the City of Birmingham and Personnel Board of Jefferson County), at 6 *et seq*.

[108] The court notes that two of the provisions with regard to which the County has stipulated its non-compliance are paragraphs 52 and 53, which require the County to submit semi-annual and annual reports to the plaintiffs.  The County has acknowledged its failure to "consistently" satisfy those *interim* reporting requirements between 1982 and 2008.  Thus, the County has admitted to at least this "repeated" failure.

(2) retaining two Affirmative Action Officers charged with investigating employee complaints and training; (3) adopting formal anti-harassment and anti-nepotism policies; (4) conducting training on these policies and having over 2500 employees complete Employment of Relatives Forms; (5) training over 1600 employees specifically on the provisions of the Decree; (6) recruiting for positions at historically black colleges and universities; (7) consistently producing semi-annual and annual reports to Plaintiffs since October 2008; (8) producing monthly reports to the Commission President and now to the County Manager regarding Decree compliance and (9) distributing quarterly newsletters to employees instructing how to obtain a copy of the Decree and contact information for the Affirmative Action Officers.[109]

While the court does not question that the County has recently made *some* progress toward decree compliance, the Martin-Bryant parties have demonstrated that even the County's Johnny-come-lately efforts to atone for past sins have fallen short in many areas.[110]

    a.   **Human Resources Department**

It is undisputed:  that the County created a centralized Human Resources Department in 2004; that Demetrius Taylor, an African-American female, serves as Director of that Department; and that the County's consent decree was discussed with Ms. Taylor when she was selected for the position.[111]  It also is undisputed that many

---

[109] Doc. no. 1772 (County's Post-Trial Brief), at 68-69.

[110] Moreover, the fact that the County only recently began to make these efforts at compliance, and only under the threat of contempt sanctions, is relevant to other factors in the receivership analysis, particularly those that have to do with the inadequacy of other remedies.

[111] *See* County's Proposed Fact Nos. 109-110.

of the sub-department heads and other employees of the Department are African-American and/or female.[112]

This court does not question that centralization of all human resource functions under a single department was a responsible decision, or that, in theory, such centralization *should have* caused the County's human resource functions to operate more smoothly, and *should have* reduced the potential for improper outside influence. Despite the appeal of the *concept* of a centralized Human Resources Department, the Martin-Bryant parties have pointed out several ways in which the Department has failed to realize its theoretical potential.  For example, the Department has failed to generate all of the reports, and to make all of the comparisons, required by paragraphs 5, 13, 14, and 16 of the decree (or, if it has generated such reports and comparisons, Ms. Taylor was not aware of their existence).[113]

During Ms. Taylor's deposition in 2007, it became apparent that she did not understand certain concepts that are fundamental to consent decree compliance, including the distinction between a job *description* and a job *analysis*, and the concept of validating a structured interview.  She also erroneously testified that the

---

[112] *See* County's Proposed Fact Nos. 114-22.

[113] *See* Martin-Bryant parties' Proposed Fact Nos. 2.1.3 & 2.2.2 (regarding the comparisons required by paragraph 5 of the decree), 4.1.3 (regarding the comparisons required by paragraph 13 of the decree), 5.1.2 (regarding the comparisons required by paragraph 14 of the decree), 7.2.2 (regarding the comparisons required by paragraph 16 of the decree).

County had an affirmative action program.[114]

Mercy Ireri, who was placed in charge of administering the County's structured interview program, did not have any prior experience with test validation or structured interviews; and, during her deposition, her testimony revealed that she was not familiar with all provisions of the consent decree.[115]

The Martin-Bryant parties also provided several examples of the Human Resources Department either approving, or overlooking, the hiring of less qualified male or white applicants for certain positions over more qualified female or African-American applicants, including one egregious example of a Human Resources employee directing a supervisor to *change an applicant's interview score* so there would be justification for hiring a different applicant.[116]

These facts demonstrate that the Human Resources Department has not been as effective as it should have been in assisting the County in its compliance with the consent decree.

---

[114] *See* Martin-Bryant parties' Proposed Fact Nos. 32.1.3.1.1, 32.1.3.2, and 32.1.5.

[115] *See* Martin-Bryant parties' Proposed Fact Nos. 32.1.3.3 & 32.1.4.

[116] *See* Martin-Bryant parties' Proposed Fact No. 32.2. The Martin-Bryant parties also offer several examples of the Human Resources Department inappropriately or inadequately handling complaints of discrimination by County employees. *See* Martin-Bryant parties' Proposed Fact No. 33 and all subparts. The court does not feel it necessary to fully explore the details of each individual employee's complaint and determine whether the County's response to each was appropriate. There is no need for these contempt proceedings to be transformed into a series of mini-trials on employee discrimination claims, as ample other evidence exists demonstrating the County's contempt of its decree and the need for an effective remedy.

**b**.   **Affirmative Action Officers**

Paragraph 33 of the County's consent decree requires the appointment of an Affirmative Action Officer, who is to be assigned the following, far-reaching responsibilities:

(a)   Advise black and female employees of the terms of this decree;

(b)   Post his or her office hours and location and copies of this Decree in conspicuous places within each department or operational unit of the County;

(c)   Receive and investigate oral or written complaints of race and sex discrimination and conciliate such complaints when appropriate, and notwithstanding any other provisions of law, establish a written procedure which shall govern such complaints;

(d)   Meet periodically with department heads to assess their progress in meeting the objectives of this Decree;

(e)   Maintain a complete record of all actions taken in pursuit of the duties prescribed herein, including all correspondence directed to or from the County with respect to any complaints or investigations undertaken pursuant to this Consent Decree and any investigatory files.

(f)   If within any six month reporting period prescribed by paragraphs 37 and 39 below, the County determines that it is failing to meet any of the objectives contained in Part II, subpart A of this Decree, the County shall require the Affirmative Action Officer to review the future selection decisions of the appointing authority in the job(s) and Department(s) in which such objectives were not met in order to insure [*sic*] compliance with this Decree.  As part of this review the Affirmative Action Officer shall review the appointing authority's written justification for failure to select certified black or female applicants in the jobs for which the objectives of the Decree were not met, and shall submit his or her written comments

together with the appointing authority's written justification to the County Attorney.  Appointments may be made in the job(s) and Department(s) under review while such review is pending before the Affirmative Action Officer or the County Attorney, provided, however, that blacks or women who are found to have been improperly denied employment or consideration for employment during the period covered by the review shall be eligible for recertification and employment in a future vacancy in the jobs to which they were originally certified, with all rights, benefits and compensation that they would otherwise be entitled to under the provisions of paragraphs 1 and 2 of this Decree.

(g)   The Affirmative Action Officer shall report at least semiannually to the County Commissioners his findings with respect to any investigations undertaken pursuant to his above described responsibilities.

(h)   The Affirmative Action Officer referred to herein shall be appointed by the County within thirty (30) days after final approval of this Decree.  The County shall inform the plaintiffs of any changes in the identity of the Affirmative Action Officer.

Plaintiff's Exhibit 13 (Jefferson County Consent Decree) ¶ 33.

The County asserts that Kimberly Oden-Webster and Ben Sullen serve as the "Affirmative Action Officers" required by paragraph 33.  Mr. Sullen did not testify at trial, but Ms. Oden-Webster testified that her job duties include investigating employee complaints, conducting training on employment policies, and mediating disputes.[117]  An African-American female County employee named Malinda Parker testified that, when she had an employment-related complaint, she knew she should address it to Ms. Oden-Webster, although she thought Oden-Webster was a

---

[117] County's Proposed Fact No. 19.

63

"compliance officer," and not an "affirmative action officer." She knew the location of Ms. Oden-Webster's office, and she had no trouble reaching her for the purpose of lodging a complaint. She also believed that Ms. Oden-Webster seriously considered her complaint, and treated her in a respectful manner.[118]

Those facts demonstrate that the County has two employees who perform *some* of the duties required by paragraph 33 of its decree. Even so, it is questionable whether either Mr. Sullen or Ms. Oden-Webster should be considered "Affirmative Action Officers." And, it is clear that Mr. Sullen and Ms. Oden-Webster do not, either individually or jointly, perform *all* of the functions required by paragraph 33. Moreover, the decree does not authorize the appointment of *two* Affirmative Action Officers. Instead, it clearly contemplates a *single* Affirmative Action Officer.

Furthermore, neither Mr. Sullen nor Ms. Oden-Webster has the job title of "Affirmative Action Officer." Instead, Mr. Sullen's official title is "Personnel Analyst II," and Ms. Oden-Webster is classified as an "Employee Relations Officer." The County issued an Administrative Order on June 29, 2004, stating that the Employee Relations Officer would be designated as the County's Affirmative Action Officer; and it amended that order on March 25, 2008, to also designate the Personnel

---

[118] County's Proposed Fact Nos. 20-22.

64

Analyst II position as an Affirmative Action Officer.[119]  Even so, there is no indication that anyone was officially deemed the County's Affirmative Action Officer prior to 2004, although the County appears to claim that Ms. Oden-Webster has performed the duties of the Affirmative Action Officer since she was hired in 1993.[120]

Regardless of the official job title, and even assuming that Ms. Oden-Webster had the same duties in 1993 as she had in 2004, her position still did not fulfill all the requirements of paragraph 33 of the consent decree, and there is no indication that anyone else fulfilled those requirements.

Furthermore, it is undisputed that an Affirmative Action Officer was not appointed within thirty days of Judge Pointer's approval of the County's decree, as required by paragraph 33(h).  Instead, the County did not make any effort to appoint such an official until 2004 at the earliest, more than *two decades* after the decree was approved.

As of March 2009, when the first installment of the contempt trial began, neither Ms. Oden-Webster nor any other County employee was advising African-American and female employees of the terms of the consent decree, as required by paragraph

---

[119] Martin-Bryant parties' Proposed Fact Nos. 10.1.3, 10.1.5.

[120] If Ms. Oden-Webster had been performing the duties of the Affirmative Action Officer since 1993, she was unaware of it.  During her 2007 deposition, she testified that the County did not have an Affirmative Action Officer, and had not had one at any time since 1993.  Plaintiffs' Exhibit 1028 (Deposition of Kimberly Oden-Webster), at 110.  She reaffirmed that testimony during the first session of the trial.  March 2009 Trial Transcript, Vol. 1, at 78-79, 87.

33(a).[121]  Sometime in 2009, the County began providing all new employees with one to two hours of consent decree training.  The County also began conducting similar training with existing employees, but it only reached about half of the existing workforce before employee shortages in the Human Resources Department caused it to stop.[122]  The training consisted of a "Power Point®" presentation and an accompanying handout explaining certain portions of the decree.[123]  Although the training materials contained a link to a full copy of the decree on the County's *intranet* site and other information about where to find full copies of the decree, the materials themselves omitted any mention of several of the key provisions of the decree, including paragraph 1, which enjoins the County from engaging in discriminatory acts, and paragraph 5, which states that a "major purpose" of the decree is that of hiring qualified African-American and female applicants according to their percentage representation on certification lists prepared by the Personnel Board or in applicant pools.[124]

Moreover, testimony from managers of some County departments revealed that they lacked a basic understanding of many of the consent decree's provisions, despite

---

[121] *See* Martin-Bryant parties' Proposed Fact No. 10.2 and all subparts.

[122] December 2012 Trial Transcript, Vol. 6, at 82-85.

[123] *See* Defendant's Exhibit 152 (Power Point® Presentation); Defendant's Exhibit 153 (handout).

[124] *See* Martin-Bryant parties' Proposed Fact No. 10.3.2 and all subparts.

having attended the consent decree training.  For example, Jon Fancher, the Painter Superintendent, knew that the decree prevented discrimination, but he had never seen the full decree, he did not know that the position of Painter was subject to special requirements under the decree,[125] and he had hired a lower-ranking white male candidate over higher-ranking African-American and female candidates.[126]  Robby Bennett, a Wastewater Treatment Plant Manager, also attended consent decree training, but he had never seen or read the decree, and he did not know that the Waste Water Treatment Plant Operator position was subject to special requirements under the decree, even though he was in charge of hiring for that position.[127]  Similarly, William Corley, the Highway District Superintendent for the Roads and Transportation Department, testified that, despite attending consent decree training, he had never read the decree, never been instructed that the County had any obligation to increase the number of African-Americans and women in the workplace, and did not know that the Truck Driver position was subject to special requirements under the decree, even though he was in charge of hiring for that position.[128]

---

[125] *See* Consent Decree ¶¶ 12-16 and Exhibit A.

[126] *See* Martin-Bryant parties' Proposed Fact No. 9.2.3.1 and all subparts.

[127] *See* Martin-Bryant parties' Proposed Fact No. 9.2.3.2 and all subparts.  *See also* Consent Decree ¶¶ 12-16 and Exhibit A.

[128] *See* Martin-Bryant parties' Proposed Fact No. 9.2.3.3 and all subparts.  *See also* Consent Decree ¶¶ 12-16 and Exhibit A.

The County did adopt an Anti-Harassment Policy on March 25, 2008, but the policy was not drafted by either Ms. Oden-Webster or Mr. Sullen.[129] The County has not presented evidence of any *other* written procedures governing discrimination complaints *"established" by the Affirmative Action Officer*, as required by paragraph 33(c).

Ms. Oden-Webster testified during her 2007 deposition that she had met with *some,* but not all, department heads regarding their progress in meeting the objectives of the decree, as required by paragraph 33(d).[130] However, she clarified during her 2009 trial testimony that she did not discuss with the department heads their progress toward satisfying provisions of the decree that require comparisons of employees hired to certification lists or applicant pools.[131] All of the department heads and division managers in the General Services, Roads and Transportation, Information Technology, and Environmental Services departments testified during their depositions that they had never met with Ms. Oden-Webster regarding their respective departments' progress toward decree compliance.[132] The parties have pointed the court to no evidence establishing that, *after* March of 2009, Ms. Oden-

---

[129] *See* Martin-Bryant parties' Proposed Fact Nos. 10.5.3-10.5.4.

[130] Oden-Webster Deposition, at 125-26.

[131] March 2009 Trial Transcript, Vol. 1, at 112.

[132] *See* Martin-Bryant parties' Proposed Fact No. 10.6.4 and all subparts.

68

Webster, or any other county employee, satisfied the requirements of paragraph 33(d).

As discussed, the County has conceded that, prior to 2005, it did not satisfy paragraph 33(e), which requires the Affirmative Action Officer to maintain a complete record of all actions taken to comply with the decree. The evidence shows that paragraph 33(e) also was not fully satisfied *after* 2005. Ms. Oden-Webster testified in 2009 that she kept records of all employee complaints and training efforts, but she did not have any records regarding efforts to comply with other requirements of the decree.[133] The parties have not pointed the court to any evidence establishing that, *after* March of 2009, Ms. Oden-Webster, or any other County employee, satisfied the requirements of paragraph 33(e).

Ms. Oden-Webster testified during the abbreviated trial in March of 2009 that she was not aware of any of the requirements of paragraph 33(f) of the decree, and that she had never performed any of the tasks set forth in that paragraph. She also was not aware of anyone else performing those tasks.[134] The parties have not pointed the court to any evidence establishing that, *after* March of 2009, Ms. Oden-Webster, or any other County employee, satisfied the requirements of paragraph 33(f).

Finally, there is no evidence that Ms. Oden-Webster, or anyone else purporting

---

[133] March 2009 Trial Transcript, Vol. 1, at 112-13.

[134] *Id.* at 113-16.

69

to act as the Affirmative Action Officer, has ever made semi-annual reports to the County Commissioners, as required by paragraph 33(g). Ms. Oden-Webster testified during her 2007 deposition that she had never made any such reports, and there is no evidence that she started making those reports at any later date.

### c.    Anti-harassment and anti-nepotism policies and training

It is undisputed that the County adopted Anti-Nepotism and Anti-Harassment Policies on March 25, 2008, the same day this court ordered the County to show cause why it should not be held in contempt for failing to comply with the consent decree.[135]  The Anti-Nepotism Policy restricts the ability of "related persons" to work together,  but it does not restrict the employment or work of friends or other people in non-romantic, non-familial relationships.   The policy has only *prospective* application; it does not affect the employment relationships of "related persons" who already were working together on the date the policy was adopted.[136]

Prior to the institution of the Anti-Nepotism Policy, hires based on nepotism and "cronyism" were common at the County.[137]  The record also contains evidence of at least one egregious example of cronyism *after* the adoption of the Anti-Nepotism

---

[135] *See* Martin-Bryant parties' Proposed Fact Nos. 30.4.3 & 30.4.4.  *See also* doc. no. 1458 (show cause order).

[136] *See* Defendant's Exhibit 113 (Anti-Nepotism Policy).

[137] *See* Martin-Bryant parties' Proposed Fact No. 26 and all subparts.

70

Policy.  Specifically, the position of "Director of Tax Collections" became vacant in the Spring of 2007 due to the retirement of the previous Director.[138]  The Personnel Board's job description for that position defined its "Essential Functions" as follows:

> Directs the collection of current and/or delinquent ad valorem real and personal property taxes in Jefferson County; directs the collection and distribution of land redemption revenues, personal property taxes and the sale of property for non-payment of taxes.  Plans, organizes, directs, coordinates, and evaluates the work of 15 to 25 employees engaged in billing, collection, posting, and distribution of real and personal property taxes through supervising staff.  Designs and implements an activity schedule to coordinate the annual billing and collection of 300,000 tax accounts.  Plans and prepares the annual departmental operating budget of $1,000,000 to $1,500,000; monitors and controls expenditures.  Reviews and analyzes bank services, investment activities and land redemption process to ensure compliance with the Alabama Code; negotiates and executes bank contracts affecting the Tax Collector's Office including collateral or ledges to secure funds deposited; resolves tax problems with taxpayers.  Conducts feasibility studies and analyze[s] results to ensure efficiency or reduce expenditures.  Develops, revises, and implements office policies and procedures.  Assembles and prepares seasonal and management reports.  Acts as Tax Collector in his/her absence or as required.  Stays current on pertinent laws, regulations and generally accepted governmental accounting practices.[139]

The Personnel Board described the knowledge and skill sets necessary to perform the duties of the position as follows:

> Knowledge  of  the  principles,  practices  and  procedures  of  tax

---

[138] Martin-Bryant parties' Proposed Fact No. 25.1.1.7.

[139] Plaintiffs' Exhibit 758, at 1 (alteration supplied).

collection. Knowledge of all federal, state and local regulatory requirements applicable to Tax Collection. Knowledge of the funding process in a municipal environment as related to budgeting, cost accounting, financial planning and management. Knowledge of the laws concerning state and federal appeals and bankruptcy. Knowledge of generally accepted accounting procedures. Ability to plan, assign, and supervise assigned professional and nonprofessional personnel. Ability to communicate clearly and effectively, both orally and in writing. Ability to establish and maintain effective working relationships with employees and the general public. Ability to use modern office methods, techniques and equipment. Skill in using a computer.[140]

The "Compensable Qualifications" for the position were "[p]ossession of a Bachelor's Degree in Accounting, Business Administration, Management, Public Administration or *closely related field* and five years experience in finance, treasury operations, banking and investments, or taxes, including three years of related supervisory experience; *or any equivalent combination of training and experience*."[141]

The hiring decision for the Director of Tax Collection position was made by J.T. Smallwood, the Tax Collector, an elected official.

Malinda Parker, a black female, applied for the position when it came open during the Spring of 2007. Ms. Parker has a Bachelor's degree in Business Administration, a Master's degree in Public Administration, and 33 additional hours of advanced accounting courses. She had worked in the Birmingham division of the

---

[140] *Id.*

[141] *Id.* (alteration and emphasis supplied).

72

Jefferson County Tax Collector's Office for sixteen years.  In her most recent position, "Tax Agent," she was responsible for collecting delinquent personal property taxes in Jefferson County.[142]  Ms. Parker had worked closely with the previous Director of Tax Collection, and she was familiar with the day-to-day operations of the office.[143]  She also had additional managerial experience at Compass Bank and as a military officer prior to coming to work for the County.[144]  Ms. Parker was placed on the Personnel Board's certification list for the position, but she was not scheduled for an interview until June of 2008, after she contacted Mr. Smallwood's office to ask why she had not yet been scheduled.  Ms. Parker testified that the position remained vacant for an unusually long time before interviews were scheduled, compared to other positions she had observed during her employment with the County.[145]

In the meantime, John Michael DeLucia, a white male, had been provisionally appointed to the position by Mr. Smallwood.  Before that provisional appointment, Mr. DeLucia had served, since 2003, as Mr. Smallwood's Chief Deputy Tax Collector.  The chief deputy is not a merit system position; thus, the selection for that

---

[142] December 2012 Trial Transcript, Vol. 4, at 153-54.

[143] *Id.* at 163-64.

[144] *Id.* at 157-59.

[145] *Id.* at 155-57.

position was solely at Mr. Smallwood's discretion.[146]  Mr. DeLucia held a law degree from the Birmingham School of Law, and had been admitted to the Alabama State Bar on September 2, 2003.[147]  Ms. Parker testified that Mr. DeLucia did not have an accounting or business degree, but Mr. DeLucia's application for the Director of Tax Collection position stated that he received a Bachelor of Arts degree from the University of Alabama in Birmingham, and his major and minor areas of study were listed as "Sociology/Accounting major (still attending); History minor."[148]  It is unclear from the application in which field of study Mr. DeLucia actually obtained a degree, and in which field he was a "still attending" student.  He did list the following on his application as "training, licenses, special skills or qualifications": "Law License, Alabama State Bar; Served as Chief Deputy Tax Collector for 4+ years.  Property tax administration classes: Auburn University; Fed. Income Tax, Income Tax, Estate and Gift Tax, Statutory Rights of Redemption and Property Law."[149]  Mr. DeLucia's last employment position, before being appointed as Chief Deputy Tax Collector, was as a law clerk for Mr. Smallwood's father, the late Jefferson County Circuit Judge T.M. Smallwood.[150]  After the interview process, Mr.

---

[146] *Id.* at 159-62.

[147] *See* http://www.alabar.org/directory.

[148] Plaintiff's Exhibit 898, at HR 274839.

[149] *Id.* at HR 274840.

[150] December 2012 Trial Transcript, Vol. 4, at 168-70.

DeLucia was permanently selected as the Director of Tax Collection.[151]

Some of the rating factors designed by Mr. Smallwood to apply during the interview process for the Director of Tax Collection position appear to be designed to give preference to an applicant with a law license and/or legal background. An applicant would receive a minus or negative notation (-) (meaning that the applicant "does not meet job requirements") if she had a Bachelors degree in a business-related area; a check mark (x) (meaning "meets job requirements") if she had a Masters degree in a business-related area; and a plus notation (+) (meaning the applicant "exceeds job requirements") if she had a Doctorate degree in a business-related area.[152] Ms. Parker received an (x) for her Masters Degree in Public Administration,[153] but Mr. DeLucia received a (+) for his law degree.[154] For the rating factor "List any licenses or certifications that would relate to a government tax setting," an applicant would receive a (-) for none, an (x) for a Certified Public Accountant ("CPA") designation, and a (+) for a law license.[155] Ms. Parker received a (-) because she did not have a CPA or other certification,[156] but Mr. DeLucia

---

[151] *Id.* at 159.

[152] Plaintiffs' Exhibit 898, at HR 274861-62.

[153] *Id.* at HR 274863.

[154] *Id.* at HR 274835.

[155] *Id.* at HR 274861-62.

[156] *Id.* at HR 274863.

received a (+) for his law license.[157]  Significantly, however, the Personnel Board's job description for the position does not require *any* licenses, and it only requires a Bachelors degree and five years of experience, not any advanced degrees.[158]

Applicants also were asked to name the protected classes in employment law. They received a (-) if they did not know the answers, and a (+) if they identified race, age, religion, gender, and "creed" (notably omitting color, national origin, pregnancy, and disabilities).[159]  Ms. Parker received a (-) for that category because she only listed gender, age, disability, and "minorities" (thereby omitting religion and Mr. Smallwood's uninformed designation of "creed" as a protected category).[160]  Mr. DeLucia received a (+) because — *surprise !* — he identified the identical categories designated by the man for whom he had worked since 2003.[161]  Again, however, the Personnel Board's job description for the position does not make any reference to knowledge of employment law,[162] and there has been no explanation for why that rating factor might be relevant to the position of "Director of Tax Collections."  When

---

[157] *Id.* at HR 274835.

[158] *See* Plaintiffs' Exhibit 758.

[159] Plaintiffs' Exhibit 898, at HR 274861-62.

[160] *Id.* at HR 274863.  The court can discern no reasonable difference, for purposes of protection under anti-discrimination laws, between religion and creed.  The court also must note that Mr. Smallwood's list of acceptable answers is incomplete, as it omits the prohibition of discrimination on the basis of national origin.

[161] *Id.* at HR 274835-36.

[162] *See* Plaintiffs' Exhibit 758.

questioned about that rating factor during her trial testimony, Human Resources Director Demetrius Taylor acknowledged that she did not know why that rating factor had been included.[163]

Applicants for the position also were asked to identify the elements of a valid contract.  They received a (-) if they did not know the elements, and a (+) if they identified offer, acceptance, consideration, and "standing."[164]  Ms. Parker received a (-) for that factor because she did not identify any of those elements,[165] but Mr. DeLucia received a (+) for identifying all of the elements, even though Mr. Smallwood's interview notes indicate that Mr. DeLucia identified only standing, offer, and acceptance, but *not* consideration:   the *sine qua non* of a binding agreement![166]   Again, the Personnel Board's job description for the position of "Director of Tax Collections" does not make any reference to knowledge of contract law,[167] and there has been no explanation for why that rating factor might be relevant

---

[163] December 2012 Trial Transcript, Vol. 7, at 65-66.

[164] Plaintiffs' Exhibit 898, at HR 274861-62.  The court does not understand why "standing" was listed by Mr. Smallwood as one of the requisite elements of a valid contract.  An agent, principal, third-party beneficiary, or stranger to a contract might have to demonstrate "standing" in order to bring an action for either breach or to enforce the agreement, *see*, *e.g.*, *Williston on Contracts* §§ 35:41, 35:46, 37:28, 37:1, but "standing" in the sense that term normally is used in the law generally is not listed as an essential element of a valid contract.

[165] Plaintiffs' Exhibit 898, at HR 274863.

[166] *Id.* at HR 274835-36.

[167] *See* Plaintiffs' Exhibit 758.

to the position.

The Human Resources Department approved Mr. Smallwood's hiring of Mr. DeLucia as Director of Tax Collections after reviewing the entire structured interview packet.[168]  Even so, during her 2012 trial testimony, Ms. Taylor acknowledged the obvious:  the interview process appeared to be a "setup," designed to create questions that would elicit favorable responses from Mr. DeLucia and lead to his selection for the position.[169]

The County has provided training on both the Anti-Nepotism and Anti-Harassment Policies to all new hires since the adoption of those policies in 2008.[170] The training also is *available* to all existing County employees,[171] but there is no

---

[168] Martin-Bryant parties' Proposed Fact Nos. 25.1.1.19 and 25.1.1.20.

[169] December 2012 Trial Transcript, Vol. 7, at 67-68.  In addition to asserting that the interview process for Director of Tax Collection was designed to guarantee the position to Mr. Smallwood's pre-selected candidate, the Martin-Bryant parties also argue that Ms. Parker's failure to receive the position was the result of race and gender discrimination.  *See* Martin-Bryant parties' Proposed Fact No. 1.3.1.1 ("Ms. Parker, an African American woman, was denied a promotion to Director of Tax Collection because of her race and gender.").  They also assert that Ms. Parker's job duties later were diminished after her return from a pre-approved military leave of absence, that she was retaliated against for filing a discrimination complaint about the situation with her military leave, and that she was adversely affected by the Administrative Leave Without Pay program and the Reduction-in-Force because of the other discrimination she had already suffered.  *See* Martin-Bryant parties' Proposed Fact Nos. 1.3.1.4-1.3.1.7, 25.1.1.18.  There is no need to discuss those allegations of discrimination in this opinion, however.  As observed in note 117, *supra*, there is no need for these contempt proceedings to be transformed into a series of mini-trials on employee discrimination claims, as ample other evidence exists demonstrating the County's contempt of its decree and the need for an effective remedy.

[170] *See* County's Proposed Fact No. 41.

[171] *See* County's Proposed Fact No. 43.

indication that it is *mandatory*, and no data about how many employees have received the training.

### d.   Consent decree training

The court has already discussed the County's consent decree training in Part VI(B)(1)(b), *supra*.

### e.   Recruiting at historically black colleges and universities

Ms. Taylor testified that the County has, at least since 2009, conducted general recruiting at historically black colleges and universities like Alabama A&M University, Miles College, and Lawson State Community College. Those recruitment efforts include encouraging students to apply for both "classified positions" available through the merit-selection system administered by the Personnel Board and Jefferson County,[172] and "unclassified positions."[173]

---

[172] December 2012 Trial Transcript, Vol. 6, at 196-97. The Martin-Bryant parties assert that the County has not conducted any recruiting for classified positions. *See* Martin-Bryant parties' Proposed Fact No. 7.3.3 and all subparts. Most of the evidence they cite, however, relates to the County's activities before 2009. Ms. Taylor's testimony concerned the County's activities at the time of trial *in 2012*, and there is nothing to dispute that testimony.

As discussed in the text accompanying notes 19-22, *supra*, the Personnel Board is charged by Alabama law with the function of administering written tests and other job selection procedures that produce "registers" and "certificates" of persons considered eligible for employment or promotion to classified positions with the twenty-two governmental entities served by the Personnel Board.

[173] The Board's enabling legislation excludes such positions as elected officials, certain appointed officials and professionals, and — in the sense relevant to the statement in text — "common laborers" from merit positions in the classified service. *See* Acts No. 677 and 782, 1977 Acts of Alabama.

### f.    Production of semi-annual and annual reports

It is undisputed that, since October of 2008, the County has produced the semi-annual reports required by its consent decree.[174]   Even so, it also is undisputed that the County's reports are "not perfect."[175]   For example, the same individual might be identified as African-American on one report, but Hispanic, white, or unknown on another.   Or, one individual might be listed as both male and female on the same report, or as male on one report, but female on another.[176]

Landon Dowe, the individual hired by the County in 2008 to generate the semi-annual and annual reports required by the decree, was not aware of any of those inconsistencies when he gave trial testimony in 2012.[177]   For the most part, Mr. Dowe simply relied upon the information applicants provided in their application packets to create his reports.   He did check for "transpositions," or situations where an applicant might have erroneously identified his race in the blank reserved for identifying gender, or vice versa.   However, he did not check for situations where an applicant might have mistakenly been identified as being of two different genders or

---

[174] *See* County's Proposed Fact No. 48.   It also is undisputed that, *before* October of 2008, the County *did not* consistently produce the semi-annual and annual reports required by the decree. *See* doc. no. 1772 (County's Post-Trial Brief) ¶¶ 65-71.

[175] *See* County's Proposed Fact No. 49.

[176] *See* Martin-Bryant parties' Proposed Fact No. 15.2.2.1 and all subparts.

[177] *See* Martin-Bryant parties' Proposed Fact Nos. 15.2.3.2.1, 15.2.3.2.2, and 15.2.3.2.3.

races, or as being of one race or gender on one report, but of a different race or gender on another report.[178]  At the request of plaintiffs' counsel, the County did at some point begin to provide the data used to compile these reports in electronic form, and to provide Social Security numbers for all applicants.[179]  Even so, the County did not use Social Security numbers to check the accuracy of its reports.[180]  The Martin-Bryant parties' expert witness, Dr. Kathleen Lundquist, testified that, when such inconsistencies appeared on the reports, the data had to be excluded from the calculations of how many persons of each race and gender were hired for particular jobs.  In Dr. Lundquist's opinion, that reduced the sample size for each job analysis, and made the statistical analysis less likely to detect differences among race- or gender-based subgroups.[181]

Additionally, Dr. Lundquist identified approximately 200 situations in which individuals were listed on the "Persons Offered Positions Report" required by decree paragraph 53(a),[182] but not on the "Applicant Flow Report" required by paragraph

---

[178] December 2012 Trial Transcript, Vol. 6, at 124-27.

[179] *See* County's Proposed Fact No. 50.

[180] December 2012 Trial Transcript, Vol. 6, at 126-28.

[181] December 2012 Trial Transcript, Vol. 8, at 63-68.

[182] Paragraph 53(a) requires the County to make an annual report of "all persons, by job classification, department, race and sex, to whom positions have been offered with an indication thereon of whether or not the position was accepted."

81

53(c).[183]   Mr. Dowe explained that those inconsistencies could occur because the Applicant Flow Report reflects the persons who were selected by individual departments to fill a position, but the Persons Offered Positions Report reflects which individuals actually were extended a formal offer of employment by Human Resources.   Even after being selected by a department, an applicant could fail a pre-employment screening evaluation conducted by Human Resources and, consequently, not be extended a formal offer.   Mr. Dowe knew that the reports had been "out of sync," but he did not perform a consistency check on any of the reports until 2012.[184]

Dr. Lundquist testified that if individuals appeared as having received offers on the Persons Offered Positions Report, but did not also appear on the Applicant Flow Report, she excluded those persons from her adverse impact analysis, because she did not want to base the analysis on inconsistent or unreliable data.[185]

At some point, plaintiffs' counsel also informed Mr. Dowe that previous semi-

---

[183] December 2012 Trial Transcript, Vol. 8, at 69-74.   Paragraph 53(c) requires the County to annually provide

> [a] breakdown of the applicant flow for employment with the County which indicates by race and sex the number of applicants for each department and job classification in the classified and unclassified service, *and the number of applicants hired*, rejected and pending for each job classification and department.   Applicant hires shall be separately identified as to Comprehensive Employment Training Act (CETA) positions.   [Emphasis and alteration supplied.]

[184] December 2012 Trial Transcript, Vol. 6, at 135-37.

[185] December 2012 Trial Transcript, Vol. 8, at 72-74.

annual reports had included certified applicants with a status of "Pending," or "Included on Certification List," but that more recent semi-annual reports never updated those applicants' statuses. Mr. Dowe provided updated information for many of those individuals in October of 2012. He was not sure of the exact number of people for whom he had to update the information, but he was not surprised at plaintiffs' counsel's statement that it was approximately 10,000 individuals! Even after the updated information had been produced, there were numerous entries where an applicant's status still was listed as "Pending," although the County attempted to explain those entries wherever possible. Moreover, when he provided this updated information to plaintiffs' counsel, Mr. Dowe did not verify whether the information provided on the Applicant Flow Report was consistent with the information on the Persons Offered Positions Report.[186]

### g.   Monthly reports and quarterly newsletters

Until the County's 2012 reduction-in-force, the Human Resources Department sent out a quarterly newsletter to every County employee with an e-mail address, and also posted copies of the newsletters in various locations.[187] A copy of one of these newsletters was submitted as an attachment to Plaintiffs' Exhibit 3196. It contains

---

[186] *See* Martin-Bryant parties' Proposed Fact Nos. 15.2.6 and 15.2.7 and all subparts.
[187] December 2012 Trial Transcript, Vol. 6, at 193-94.

the following statement:

ATTENTION COUNTY EMPLOYEES

Please remember that the Jefferson County Commission is under a Consent Decree. The decree prohibits discrimination against blacks and females which is also contrary to the County's anti-harassment policy. Please contact your affirmative action officer, Kimberly R. Oden Webster[188] or Ben Sullen (325-5249), if you have concerns or issues regarding discrimination. You may also review the Consent Decree at your affirmative action officer's office located in the Main Courthouse Rm. A630.

*Jefferson County Commission follows all applicable local, state, and federal laws concerning equal employment opportunity without regard to race, color, creed, sex, religious beliefs, national origin, age, or disability. Further, Jefferson County Commission will not discriminate based on genetic or family medical history.*[189]

Demetrius Taylor also testified during the 2012 trial that the Human Resources Department had been generating a monthly report for a few years. At first, the monthly report was sent to the President of the County Commission, but since Tony Petelos was hired as County Manager in November of 2011, the reports have been sent to Mr. Petelos.[190] The monthly reports are approximately two to four pages long, and they "run the gamut" of all of the Human Resources Department's activities, including information about hires, terminations, employee complaints, benefits, and

---

[188] *Nota bene*: Ms. Oden-Webster's preferred spelling of her last name includes a hyphen.

[189] Plaintiffs' Exhibit 3196, at HR 308959 (emphasis in original).

[190] December 2012 Trial Transcript, Vol. 6, at 197-98; Vol. 7, at 29-30.

84

customer service calls.[191]  Notably, Mr. Petelos testified that he was "so busy" with other matters  that he did not read the monthly reports until the Spring of 2012, at the earliest.[192]

It is unclear which provisions of the decree the County thinks have been satisfied by the dissemination of quarterly newsletters and monthly reports.  It cannot seriously be contended that the newsletters satisfy the County's obligation to "inform supervisory personnel that the County shall not discriminate against or harass any employee or potential employee on the basis of race or sex" as required by paragraph 31, or the Affirmative Action Officer's obligation to "[a]dvise black and female employees of the terms of this decree" as required by paragraph 33(a).  Moreover, it cannot seriously be contended that the two-to-four-page monthly reports could satisfy the semi-annual or annual reporting requirements set forth in paragraphs 52 and 53, or any of the requirements of paragraph 33, because the monthly reports are not issued by the Affirmative Action Officer.  Thus, while there may be nothing *wrong* with the Human Resources Department's act of sending County employees a quarterly newsletter, or sending the County Manager a monthly report, the consent decree does not require either of those actions.  Therefore, those actions do not reflect

---

[191] *Id.*, Vol. 6, at 198.

[192] *Id.*, Vol. 7, at 139-41.

any progress on the County's part toward compliance with its decree.

**h.   Structured interview process**

The County also asserts that its implementation of a structured interview process is evidence of its recent efforts to comply with the decree.  But, even in making this argument, the County acknowledges that the process it devised was not adequate. Despite conceding that its structured interview process "had flaws," and that it "has not been validated as lawful under the Uniform Guidelines and/or controlling Federal law,"[193] the County weakly asserts that the process "*attempted* to add a layer of review and accountability to the County's hiring process."[194]  As discussed more fully below, however, those attempts were not successful.

Indeed, perhaps the best that can be said about the County's structured interview process — and this is all the County does say — is that it "improved the County's recordkeeping practices from 2005 forward by centralizing hiring documentation and requiring maintenance of documents required by paragraph 51(b)-(d) of the Decree."[195]

---

[193] County's Proposed Fact No. 158.

[194] Doc. no. 1172, at 69 (emphasis supplied).

[195] *Id.*  Paragraphs 51(b)-(d) of the consent decree require the County to maintain the following records:

> (b) All written applications and related records for all persons seeking employment with the County, including applications for transfer or promotion within or among departments, for a period of at least five (5) years, which applications shall

The most significant deficiency of the County's discussion of its structured interview process is that it overlooks just how woefully inferior the County's hiring system was *before* implementation of structured interviews in 2005.  The Martin-Bryant parties have set forth extensive evidence, most of it uncontested, demonstrating that, prior to 2005, "County managers had complete discretion over the interview and hiring procedure, which was not validated, resulting in inconsistent, arbitrary and biased selections that adversely impacted African-Americans and women," and that interviewers did not have any formal training.[196]  The County may have *attempted* to remedy those problems by implementing the structured interview process in 2005, but, while the process may have brought about *some* improvement

---

include identification by the County of the applicant by race and sex.  Such record shall also contain a statement signed by the appropriate County official, setting forth the reasons why any applicant was found not to be qualified for the position(s) applied for.

(c) With respect to any applicant who is certified for hire or promotion and who is not selected for the vacancy for which that applicant is certified, the County shall record in writing, signed by the appropriate County official, the reasons for the applicant's not being selected for that vacancy.  Also, the County shall record and maintain any other written records or comments on an applicant for certification in accordance with paragraph 32(e) above.

(d) All written communications between the County and applicants for employment, transfer and promotion.

[196] Doc. no. 1773 (Martin-Bryant parties' Post-Trial Brief), at 102.  *See also* Martin-Bryant parties' Proposed Fact Nos. 19-20 and all subparts.  The County even states, as one of its own proposed facts, that, prior to implementation of the Structured Interview Process, "the County utilized non-validated selection procedures that were manager-driven."  County's Proposed Fact No. 125.

in the County's recordkeeping procedures, and some centralization of the hiring process, the evidence as a whole overwhelmingly demonstrates that the process falls far short of satisfying the County's obligations under its consent decree.

The County's decision to implement a structured interview process in the first place was questionable. Shortly after Ms. Taylor was hired as Director of Human Resources in 2004, Charles S. Wagner, a former Assistant County Attorney, instructed her to learn about the City of Birmingham's structured interview program, *and to adopt a similar procedure for the County*. It is significant to note that Mr. Wagner gave such an instruction to Ms. Taylor *despite* his act of transmitting a twelve-page memorandum entitled "Critique of PMG's Structured Interview Test Development Procedure" to the other parties in these consolidated cases and the Special Master on November 21, 2002. That memorandum criticized the use of structured interviews as a selection device for the City of Birmingham.[197] Mr. Wagner stated that, in his opinion, structured interviews would be the "preferred methodology" only in "very limited cases," and that they had "extremely limited usefulness as a selection instrument."[198] Mr. Wagner further opined that structured interviews "have a high degree of subjectivity, are prone to rating errors and bias and

---

[197] December 2012 Trial Transcript, Vol. 7, at 30-32.
[198] Plaintiffs' Exhibit 3150, at 1.

have poorer reliability and validity than comparable written or job performance (work sample) tests."[199]  According to Mr. Wagner, a major flaw in the structured interview process is that "[t]wo different test developers may well come up with totally different decisions in the exact same situation."[200]  Thus, structured interviews would have "greater subjectivity, errors, and bias with lower reliability and poorer validity than the written test at a far higher cost for development and administration."[201]  Mr. Wagner's overall opinion was that such selection devices

> *would only be appropriate in relatively rare cases*, those in which objective measures of KSAO's[202] and tasks are sparse or non-existent.  Such cases might be in assessing decision making, team affiliation behaviors, interpersonal skills or management styles. [Structured interviews] might be more useful as a minor adjunct selection process to more robust and valid selection processes.  Job performance (work  sample) tests and written test[s] carefully written and analyzed have far better reliability and validity than [structured interviews].  [*Structured interviews*] *should not be considered as the primary selection instrument for the majority of positions at the* [*Jefferson County Personnel Board*].[203]

No rational explanation has been provided for why Mr. Wagner severely criticized the option of a structured interview process for the City of Birmingham in 2002, but then instructed Ms. Taylor to implement just such a process at the County only two

---

[199] *Id.*

[200] *Id.* (alteration supplied).

[201] *Id.* at 3.

[202] "KSAO" is an acronym standing for "knowledge, skills, abilities, and other characteristics."

[203] *Id.* at 11 (alterations and emphasis supplied).

years later.

When the structured interview process first was implemented, and for an unspecified time thereafter, the County used a procedure called "short-listing": a process that allowed hiring managers to narrow certification lists received from the Personnel Board by developing their own list of selection criteria. The managers who developed "short list" criteria were not provided any training or guidance about how to properly do so. Consequently, their criteria were *ad hoc*, arbitrarily developed, and not validated. Sometimes the short list selection criteria included considerations that were not required by the job description, and sometimes the criteria would vary among divisions or on different certification lists. The scoring system for short lists also failed to give particular weight to factors that represented an applicant's knowledge, skills, and abilities ("KSA's") over other factors.[204]   In practice, the managers developing short list criteria often did so only *after* reviewing the applications for a particular position, and subjectively evaluating the candidates' respective qualifications.[205]   That practice resulted in the obvious problem of short-list criteria being developed to justify the hire of a pre-selected candidate:   *not* because the criteria were related to, much less essential to, the performance of the duties of the

---

[204] *See* Martin-Bryant parties' Proposed Fact No. 21.1.1 and all subparts.

[205] Martin-Bryant parties' Proposed Fact No. 21.1.6.5.

job. The County apparently eventually recognized the problems with the short-listing process, because it repeatedly emphasized in its briefs that the process is no longer employed.[206]   It is unclear, however, exactly when the County ceased the practice.

Even without the obvious shortcomings of the irrational short-listing process, the structured interview process still is too problematic to satisfy the County's decree obligations.   There is no evidence that the County ever hired any professional job analysts or outside consultants to conduct defensible job analyses for any positions. Demetrius Taylor testified that a "thorough job analysis" is *not* conducted before developing the questions for any interview, although the Human Resources Department does review each question and answer, and each structured interview packet.[207]   In lieu of the job analysis, the interviewers simply review the job description provided by the Personnel Board and rely upon their own experience and the needs they perceive in developing the questions and rating factors.[208]   In Dr. Lundquist's opinion, the failure to conduct thorough job analyses is a major reason why the County's structured interview process cannot be validated.[209]

Moreover, some of the scales by which interviewers rated an applicant's

---

[206] *See, e.g.,* County's Proposed Fact No. 165.

[207] December 2012 Trial Transcript, Vol. 7, at 41.

[208] *See* Martin-Bryant parties' Proposed Fact No. 22.1 and all subparts.

[209] December 2012 Trial Transcript, Vol. 8, at 16.

responses to interview questions were vague and ambiguous, even though they had been approved by the Human Resources Department.[210]   Department managers conducting the interviews did not always understand what KSA's a particular interview question was designed to evaluate.[211]   Some interview questions called for a subjective, unquantifiable, or unverifiable response from the applicant.[212]   Some structured interview packets did not contain numerical values for each rating category, and the managers conducting interviews could not always explain how they arrived at the overall rating score assigned to each applicant.[213]   For some positions, the managers conducting the interviews could not even answer all the interview questions they were posing to applicants, and they could not always explain the ratings they had assigned to particular applicants.[214]   The numerical rating scales for some positions left gaps that did not encompass all possible candidate responses.  For example, an applicant might receive a (-) if he or she answered 69% of the answers "correctly," an (x) for 70-80% correct answers, and a (+) if 88-90% of the questions were answered correctly.  In such instances, there is no explanation of what score to give an applicant whose correct responses fell into the interstitial space between 80%

---

[210] Martin-Bryant parties' Proposed Fact No. 22.2.1.1.

[211] Martin-Bryant parties' Proposed Fact No. 22.2.3 and all subparts.

[212] Martin-Bryant parties' Proposed Fact No. 22.2.4 and all subparts.

[213] Martin-Bryant parties' Proposed Fact No. 22.2.5 and all subparts.

[214] Martin-Bryant parties' Proposed Fact No. 22.2.7 and all subparts.

and 88%, or were above 90%.[215]  Some of the rating scales contained outright errors, even though they had been approved by the Human Resources Department.  For example, the rating factors for one position sometimes were used for another position, and the "meets expectations" and "plus" ratings were switched on some of the forms.[216]

Because the structured interview questions were not based on a proper job analysis, the questions and rating factors were not always related to the knowledge, skills, and abilities that were necessary for performance of the duties of the job.[217] The interview questions for a position sometimes conflicted with the Personnel Board's job description for that position.[218]  The interviewers sometimes could not explain how they determined the weight assigned to particular questions, or what benchmarks they used to evaluate each applicant's responses.[219]  The questions and rating factors sometimes were based more on a particular applicant's years of experience than on the KSA's necessary for the job.[220]  The interview questions did

---

[215] Martin-Bryant parties' Proposed Fact No. 22.2.8 and all subparts.

[216] Martin-Bryant parties' Proposed Fact No. 22.2.9 and all subparts.

[217] One egregious example of the potential for abuse in the Structured Interview Process is the 2008 selection of John DeLucia for Director of Tax Collection in 2008, discussed in Part VI(B)(1)(c), *supra.*

[218] Martin Bryant parties' Proposed Fact No. 22.3.2 and all subparts.

[219] Martin-Bryant parties' Proposed Fact Nos. 22.3.3 and 22.3.4 and all subparts.

[220] Martin-Bryant parties' Proposed Fact No. 22.3.5 and all subparts.

not always match up to the rating factors that were supposedly being used to rate responses to those questions. Some interview packets did not have any rating factors, and some interview questions were not designed to produce sufficient information to apply the rating factors.[221] Different candidates for the same position were sometimes asked different questions by different interviewers, and different interviewers sometimes assigned different ratings to two candidates who gave the same response to the same question.[222] Finally, the Martin-Bryant parties produced evidence showing that the County (and particularly the Human Resources Department) failed to provide effective training or oversight for the development of structured interview materials, or for the implementation or execution of the interviews themselves.[223]

The County currently offers hiring managers the option to either conduct structured interviews, or to hire by random selection from the list of eligible candidates provided by the Personnel Board.[224] The County also has begun considering whether to convert the structured interview process into an entirely computer-based one, with no live interviewer actually in the room, and to videotape

---

[221] Martin-Bryant parties' Proposed Fact No. 22.4 and all subparts.

[222] Martin-Bryant parties' Proposed Fact Nos. 23.1.1-23.1.6 and all subparts.

[223] *See* Martin-Bryant parties' Proposed Fact No. 24 and all subparts.

[224] County's Proposed Fact No. 178. The County also asserts that its hiring of Tony Petelos as County Manager and sole appointing authority represents an effort to comply with the decree. The court will discuss the impact of Mr. Petelos' position on the receivership analysis in Part VI(B)(3)(b), *infra.*

the computer-based interviews.[225]

### i.   Other decree violations

It is disturbing to state, but nevertheless true, that the evidence of non-compliance discussed in the preceding sections barely scratches the surface of the County's failures over the course of the past thirty years.  Indeed, those matters represent only a small portion of the evidence presented during trial depicting the County's failure to comply with various provisions of its consent decree.  The Martin-Bryant parties' post-trial brief contains additional, extensive discussion of the County's failure to comply with paragraphs 1, 5, 9, 13, 14, 15, 16, 18, 31, 33, 51, 52, and 53 of the decree.[226]  The Martin-Bryant parties also have presented abundant evidence that the County's stipulations of non-compliance with the decree do not tell the entire story, and that the County's actual non-compliance is far more extensive — and more recent — than the County has stipulated.[227]  Some of that evidence is disputed,[228] but there is no need for the court to resolve all of the disputes, or to discuss the additional evidence in more detail, because the County's stipulations, along with the evidence of the County's non-compliance discussed in the preceding

---

[225] December 2012 Trial Transcript, Vol. 7, at 48-49.

[226] Doc. no. 1773, at 14-249.

[227] *See* doc. no. 1797 (Martin-Bryant parties' Response to County's Post-Trial Brief), at 37-52.

[228] *See* doc. no. 1772 (County's Response to Martin-Bryant Parties' Post-Trial Brief).

sections, are sufficient to demonstrate that the County has repeatedly failed to comply with its consent decree.

2.   **Will further efforts to secure compliance only lead to confrontation and delay?**

The County asserts that future efforts to secure its compliance with its consent decree will not lead to confrontation and delay because it has attempted to reach a settlement with plaintiffs, because the testimony of the County Commissioners and County Manager indicates that achieving decree compliance is important to them, and because it has stipulated to *some* violations of the decree and agreed to *some* of plaintiffs' proposed remedies.

The County's efforts to reach a settlement on the Martin-Bryant parties' motion for contempt do not have much relevancy to the question of whether the County is likely to cooperate with future efforts to secure compliance with its decree.  Those settlement negotiations indicate more of a desire to avoid the expenses of litigation and the dangers of a contempt finding, than the County's desire, or willingness, to comply with its decree.

The County's willingness to stipulate to a limited number of decree violations and proposed remedies also does not weigh heavily in its favor.  Those stipulations indicate the County's willingness to cooperate *up to a certain point*, but they do not

speak to whether the County is willing to cooperate past that point; and, thus, they do not indicate that the County is likely to cooperate with future efforts to secure compliance with the decree. Instead, the evidence has demonstrated that the County's contempt of its decree is much broader, and has been occurring for far longer, than the County's stipulations reflect. That evidence begs the question of why, if the County is so willing to cooperate, it did not stipulate to more extensive violations.

That leaves the testimony of the County Commissioners, all of whom began serving four-year terms on November 10, 2010, and the County Manger, who was hired in November of 2011. County Manager Tony Petelos testified during trial that he is "committed" to resolving the issue of the County's non-compliance with the decree, and he believes the County Commissioners and Human Resources staff are as well.[229] He stated that his goal is to work with the court, and with a Monitor and Industrial/Organizational Psychologist, if those persons are appointed by the court.[230] He also testified to his understanding that, if any directives from the court conflict with any directives from the Personnel Board, the court's directives would control.[231] County Commission President David Carrington testified that Mr. Petelos and the entire Commission are "absolutely committed" to complying with the consent

---

[229] December 2012 Trial Transcript, Vol. 7, at 129-30.

[230] *Id.* at 130.

[231] *Id.* at 114.

decree.[232]  He also testified that it is important for the County to "clean up the entire mess" it is in, including the County's non-compliance with the consent decree.[233] Commissioner George Bowman testified that he is committed to complying with the consent decree, ensuring the County complies with the decree, and allowing Mr. Petelos to take the steps necessary to bring the County into compliance with the decree.[234]  He also testified to his understanding that an order of this court "trumps all other laws, all other state laws, local laws, any county resolutions.  If it conflicts with an order of this Court, this Court's authority prevails."[235]  He also understood that this court's authority is superior to all rules and regulations of the Personnel Board.[236]  Commissioner Sandra Little-Brown testified that her level of commitment to the County's compliance with the decree is "very wide,"[237] and that she wants to be a "wheel" to facilitate the County's compliance.[238]  She "would embrace a monitor or anything that this Court puts in place to make sure" the County comes into compliance with the decree.[239]  Commissioner Joe Knight testified that he also is

---

[232] December 2012 Trial Transcript, Vol. 5, at 229.

[233] *Id.* at 235.

[234] December 2012 Trial Transcript, Vol. 8, at 248-49.

[235] *Id.* at 248.

[236] *Id.*

[237] December 2012 Trial Transcript, Vol. 5, at 133.

[238] *Id.* at 135.

[239] *Id.* at 136.

committed to complying with the decree,[240] and understands that the orders of this court supercede conflicting state or local laws.[241]  Finally, Commissioner Jimmie Stephens testified that he and the other Commissioners will work with either a Monitor or a Receiver, if one should be appointed, "to fix this situation that's gone on way too long."[242]  He is "100 percent" committed to ensuring that the County comes into compliance with the decree, and to allowing County Manager Tony Petelos to take whatever steps are necessary to bring the County into compliance.[243] Commissioner Stephens also understands that this court's orders would override any state law, local law, or Personnel Board Rule.[244]

The uniform testimony of the Commissioners is of limited value, because they only recently passed the halfway point of their initial four-year terms.  There is no way of knowing whether the individuals currently serving on the Commission will seek re-election, or if they do, whether they will be successful in attaining a majority of the votes cast within their respective Districts.  If different Commissioners are elected for the next term, there is no way of knowing whether those individuals will share their predecessors' professed commitment to comply with all requirements of

---

[240] December 2012 Trial Transcript, Vol. 9, at 47.

[241] *Id.* at 54-55.

[242] *Id.* at 19-20.

[243] *Id.* at 20-21.

[244] *Id.* at 18.

the County's consent decree.  The next group of Commissioners could have more in common with those of the past — some of whom still are serving federal prison sentences on various corruption charges — than those of the present.

That said, there is no reason to question *current*, *subjective* desire of the Commissioners and Mr. Petelos to comply with the County's decree.  There also is no reason to question their understanding, *at the time of trial*, of the consent decree's supremacy over state or local law — *although the record clearly reflects that the Commissioners did not have such an understanding when they implemented the 2011 Administrative Leave Without Pay process* ("ALWOP"), *and the 2012 Reduction-in-Force* ("RIF").[245]  Even so, the court does not see any evidence that future efforts to achieve compliance with the consent decree will result in *confrontation* with *the current* Commissioners or *the present* County Manager.

Nevertheless, and despite the subjective good intentions of the Commissioners and County Manager, there is substantial evidence that future efforts to secure

---

[245] Commissioner Carrington testified that the ALWOP was implemented, in part, to comply with a state law requiring the County to maintain a balanced budget and a federal law requiring the County to have enough money to pay its workers before requiring them to work.  December 2012 Trial Transcript, Vol. 5, at 212-13.  He did not recall having any discussions with anyone about whether the County's consent decree obligations overrode its obligations under state and local law when deciding to implement the ALWOP and the RIF.  It was his understanding that as long as the ALWOP and RIF were conducted in accordance with Personnel Board rules, they also would satisfy the requirements of the consent decree.  *Id.* at 246-48.  Commissioner Little-Brown did not recall giving any consideration to the supremacy of the consent decree when deciding to implement the ALWOP and the RIF.  *Id.* at 177-78.

compliance with the decree in the absence of a receivership will only lead to delay. As discussed in Part VI(B)(1), *supra*, the County's recent efforts to comply with the decree have failed to produce the required results. Moreover, as discussed more fully in the following section, the evidence indicates that, despite the professed eagerness of the present Commissioners and County Manager, there will not be any more substantial progress toward compliance with the decree in the coming decade than there has been in the last, unless the court intervenes.

**3**.   **Is leadership available to turn the tide within a reasonable time?**

The County asserts that its current Commissioners are able to provide sufficient leadership to "turn the tide" toward decree compliance.

**a.   The current County Commissioners**

In addition to the current Commissioners' expressions of their desire and intent to bring the County into compliance with its consent decree, the County offers some evidence of more concrete actions taken by the Commissioners that allegedly reflect their commitment to compliance. For example, Commissioner Sandra Little-Brown met with the County's attorneys, the County Manager, the other Commissioners, and the Department Heads under her supervision to discuss compliance with the decree. When employees complained to her about unfair treatment, she made herself available to them, and told them to document the problems and report to the Human

Resources Department.[246]

David Carrington has read the decree several times, and has discussed it with the other Commissioners and Demetrius Taylor.[247]  When Mr. Carrington was elected, he asked to be assigned to the Human Resources Department, Environmental Services, and the County Attorney's office, because he viewed those departments as being of "crucial importance" to the County.[248]

That evidence is minimal, however, when compared to the other evidence that the current Commissioners have failed to fully appreciate the requirements of the decree, and the extent of the County's non-compliance.   The Commissioners approved the County's stipulation to certain items of non-compliance with the decree, but the evidence indicates that the extent of the County's non-compliance actually is much broader and more recent than the County has admitted.[249]  During her December 2012 trial testimony, Commissioner Little-Brown did not have any understanding of the decree's provisions beyond a general requirement to be fair in employment decisions, and she could not explain why the County was not in compliance with the decree.[250]  Commissioner Little-Brown also fully supported the Structured Interview

---

[246] December 2012 Trial Transcript, Vol. 5, at 130-31.

[247] *Id.* at 199-200.

[248] *Id.* at 205.

[249] See Part VI(B)(1), *supra*.

[250] December 2012 Trial Transcript, Vol. 5, at 145-50.

Process when it first was instituted, and she thought that any flaws in the process could be remedied by videotaping the interviews until she learned that the County had stipulated that the process was not validated under the Uniform Guidelines.[251] Commissioner Carrington's trial testimony revealed that he did not fully understand all of the reporting requirements of the decree, and he did not have a complete basis for determining whether the County was complying with those requirements.[252]

The most striking evidence of the Commissioners' failure to fully appreciate the requirements of the decree relates to the implementation of the ALWOP process in 2011, and the RIF during the following year. In June or July of 2011, faced with revenue shortfalls, and concerned that the County would violate a state law requiring it to pass a balanced budget, the Commissioners decided that the most efficacious way to quickly bring the County's budgeted expenditures into line with projected revenues was by slashing its payroll.[253] The County considered several methods for achieving those reductions, including: the elimination of some personal service contracts; reduction of salaries, wages, and hours worked each week; and, reduction of workweeks.[254] The option to make an across-the-board reduction of the number

---

[251] *Id.* at 160-66.

[252] December 2012 Trial Transcript, Vol. 6, at 24-30.

[253] December 2012 Trial Transcript, Vol. 5, at 210-213.

[254] December 2012 Trial Transcript, Vol. 9, at 8.

of hours in each employee's workweek was rejected because the Commissioners believed it would cause more employees to resign their employment positions.[255] Instead, the Commissioners decided to place certain employees on administrative leave without pay for a period of up to one year, hoping that, by the end of that year, new legislation would have been enacted by the Alabama Legislature that would permit the County to generate more tax revenues for its General Fund and, thereby, to cover payroll costs.[256]

Commissioners Knight, Stephens, and Carrington uniformly testified that they did not recall any discussion of the consent decree during the process of deciding to implement the ALWOP.[257]  That process was supposed to be conducted according to seniority within job classifications at the County, with employees having the least seniority within a classification being the first to be placed on administrative leave without pay:  in accounting terms, the last in should have been the first out.[258]  The Commission identified a dollar amount that each County department head had to cut from his or her budget.  Each department head then had to identify those job classifications within their department that were necessary for the department to

---

[255] *See* County's Proposed Fact No. 209; Martin-Bryant parties' Proposed Fact No. 31.7.3 and all subparts.

[256] *See* County's Proposed Fact Nos. 208, 210.

[257] Martin-Bryant parties' Proposed Fact No. 31.7.1 and all subparts.

[258] December 2012 Trial Transcript, Vol. 6, at 213-14.

104

function.  Once those "necessary" job classifications had been identified, the Human

Resources Department identified, by reverse seniority, the employees in the "non-

necessary" classifications who would be placed on administrative leave without

pay.[259]  Thus, ostensibly, the ALWOP process was designed to identify *positions*, not

*individuals*, and to thereby ensure that all decisions regarding the persons to be placed

on leave would be made without regard to race or gender.  In practice, however, as

long as a department head knew all of the employees in his department, he still could

select those individuals he desired to protect from being placed on leave without pay

by simply identifying the positions occupied by those favored employees as

"necessary."[260]  On at least one occasion, Commissioner Knight intervened in the

ALWOP process to bring back some employees in the Storm Water Management

division who had been placed on administrative leave without pay.  Commissioner

Knight acknowledged that his intervention was not in accordance with the rules for

conducting the ALWOP.[261]  After Tony Petelos was hired as County Manager, and

following a conference by him with the Human Resources Department and counsel,

he made the decision to reinstate some employees in the Purchasing Department who

had been placed on administrative leave without pay.  Although Mr. Petelos did not

---

[259] Martin-Bryant parties' Proposed Fact No. 25.3.1 and all subparts.

[260] *See* Martin-Bryant parties' Proposed Fact No. 25.3.2 and all subparts.

[261] December 2012 Trial Transcript, Vol. 9, at 51-52.

testify in detail about the basis of that decision, he did state that it was because of a problem with the way the individuals had been placed on ALWOP.[262]

It is undisputed that the 2011 ALWOP resulted in adverse impact against African-Americans and women in some positions.[263]   After learning of that adverse impact, however, Commission President Carrington did not take any steps, or even discuss taking any steps, to mitigate the effect of the ALWOP on African-Americans and women.  He also did not consider whether the adverse impact of the ALWOP had any effect on the County's obligations under its consent decree.[264]   None of the other Commissioners raised any concerns that the ALWOP may have violated the consent decree.[265]

The one-year period for the ALWOP expired in June of 2012, and the Commissioners had to consider a more permanent solution to the County's budget shortfalls, because the state legislature failed to enact legislation that would enable

---

[262] *Id*. at 118-20.  The Martin-Bryant parties rely upon a newspaper article to assert that the problem with how those individuals were placed on ALWOP was that Commissioner Stephens had improperly intervened in the ALWOP decision.  *See* Martin-Bryant parties' Proposed Fact No. 25.4.1 and all subparts.  However, there is no actual testimony or other evidence to establish that Commissioner Stephens had any such involvement.  During his trial testimony, Commissioner Stephens could not explain what was meant by the article.  *See* December 2012 Trial Transcript, Vol. 9, at 33-37.

[263] *See* Martin-Bryant parties' Proposed Fact Nos. 1.2.4, 25.3.4 and all subparts; County's Proposed Fact No. 220.

[264] Martin-Bryant parties' Proposed Fact No. 31.8.4.

[265] Martin-Bryant parties' Proposed Fact No. 31.8.4.1.

the County to increase the tax revenues flowing into its General Fund.[266]   The Commissioners ultimately decided to implement a permanent reduction-in-force.  In contrast to the ALWOP, seniority for the RIF was determined based upon an employee's time in service within a certain job classification throughout the entire merit system, not just the period of time the person had been employed by the County.[267]  RIF decisions were supposed to be made only with regard to a person's seniority within their position, not on an individual basis.[268]

Despite the fact that the ALWOP had resulted in adverse impact based on race and gender, Commissioner Carrington could not recall anyone raising a concern over whether the RIF also would result in adverse impact.[269]  He did, however, remember considering whether the RIF would comply with paragraph 2 of the consent decree.[270]

---

[266] *See* County's Proposed Fact Nos. 225-26.

[267] County's Proposed Fact No. 229.

[268] County's Proposed Fact No. 234.

[269] December 2012 Trial Transcript, Vol. 5, at 283.

[270] *Id.* at 284.  Paragraph 2 provides that:

> Nothing herein shall be interpreted as requiring the County to hire unnecessary personnel, or to hire, transfer, or promote a person who is not qualified, or to hire, transfer or promote a less qualified person, in preference to a person who is better qualified based upon the results of a job related selection procedure. Nothing herein shall prohibit the County from discharging, disciplining or demoting employees for just cause in accordance with applicable law, nor shall it preclude the County from engaging in layoffs or rollbacks of employees pursuant to State law, provided however that any such actions are taken and executed without regard to race or sex.

Commissioners Knight, Bowman, and Carrington all testified that they did not recall any separate discussions, prior to implementing the RIF, regarding the question of whether the County should require, as an alternative solution, that all employees uniformly work a reduced number of hours each week.[271]   After the RIF was completed, the County did not request an analysis of whether it had an adverse impact on African-Americans or women.[272]  Even without the benefit of such an analysis, the County has stipulated that the RIF resulted in adverse impact in certain departments. Mr. Petelos testified that there was no way to know beforehand whether the RIF would result in adverse impact,[273] but Commissioner Carrington testified that he should have known that the RIF would result in adverse impact because the ALWOP had resulted in adverse impact.[274]

### b.   County Manager

The County also points to the hiring of Tony Petelos as County Manager in November of 2011 as evidence that the County has leadership in place to turn the tide toward decree compliance within a reasonable period of time.

Legislation authorizing Jefferson County to employ a County Manager was first

---

[271] December 2012 Trial Transcript, Vol. 8, at 269-71 (Bowman); Vol. 9, at 64 (Knight); Vol. 5, at 278 (Carrington).

[272] County's Proposed Fact No. 228.

[273] County's Proposed Fact No. 239.

[274] Trial Transcript, Vol. 5, at 290.

enacted by the Alabama Legislature during the 2009 Regular Session, but the language of that enabling Act was precatory, providing only that "[t]he Jefferson County Commission, by a four-fifths vote, *may employ* a county manager to serve as the chief executive officer of the county . . . ." Ala. Act 2009-662, § 2 (alteration and emphasis supplied). The former County Commission did not exercise that authority. When the County was forced into the largest governmental bankruptcy up to that point in history, however, the Alabama Legislature amended Act 2009-662 to make the employment of a County Manager *mandatory*:   *i.e.*, "The Jefferson County Commission, by a four-fifths vote, *shall employ* an at-will county manager to serve as the chief executive officer of the county . . . ." Ala. Act 2011-69, § 2 (emphasis supplied). The statute stated that the person thus selected

> *shall be* the chief executive officer of Jefferson County and, as such, shall carry out the following duties and responsibilities established by the county commission, *including the following*:
>
> (1)  To act as the primary administrative advisor to the county commission on all matters relating to the efficient and economical administration of county government.
>
> (2)  To act as the executive agent of the county commission in overseeing the implementation of authorized projects and programs, assuring appropriate coordination of departmental operations, and resolving interdepartmental problems and disputes.
>
> (3)  To serve as the appointing authority for and exercise direct oversight of all department heads and their agencies and departments

including all county employees thereof, except for (*i*) elected officials, (*ii*) non-merit system employees, and (*iii*) the county attorneys and their staff. The county manager shall have the full authority to select, appoint, evaluate, terminate, and retain department heads, agency heads, and county employees for which the county manager is the appointing authority, in consultation with the whole commission, except that the selection or termination of a department head made by the county manager may be vetoed by four members of the commission at a meeting of the county commission, provided that the veto is made within 30 business days following the county manager's selection or termination decision, otherwise the county manager's decision shall become final.  Notwithstanding the foregoing, the county commission by a vote of four commissioners, may terminate the employment of a department head.

(4)  To directly manage all county functions and operations except those that are assigned to the county attorneys or committed by general law to elected officers of the county.

(5)  Conduct research and make studies and investigation which could result in greater economy and efficiency in county government; approve, on the basis of management principles, such organizational changes as proposed by departments; recommend to the county commission the creation, dissolution, merger, or modification of organization elements or work programs as deemed necessary for the efficient and economical operation of county government; and recommend to the county commission policies and adopt procedures for the orderly conduct of the county's administrative affairs.

(6)  Cause the planning process for both the operating and capital budgets to be compatible with approved county policies and long range plans; review and evaluate the budget estimates of all departments and submit a recommended annual budget to the county commission in a timely manner; exercise continuous review of revenues and expenditures throughout the year to insure budgetary control and implement any necessary fiscal controls; keep the county commission fully advised as to the financial condition and needs of the county; and review and give a recommendation as to all supplemental appropriations and budget transfers

110

which require county commission approval.

(7)   Conduct comprehensive management reviews and analyses of programs, projects, and departments, and report his or her findings and recommendations to the county commission.

(8)   Subject to budget approval, organize, staff, and administer and carry out the responsibilities of the office of county manager.  The county manager may hire a non-merit system confidential secretary to assist the county manager with administrative duties and responsibilities.  In addition, with the approval of a majority of the county commission, the county manager may hire a maximum of two at-will, non-merit system deputy county managers to assist the county manager in the performance of his or her duties and responsibilities under this act and an at-will non-merit system chief financial officer to assist the county manager with the financial management of the county, all of whom shall report to the county manager, who shall be their respective appointing authority.  The commission may, by resolution, set forth additional duties and responsibilities for either the deputy county managers or the chief financial officer.  Any position created by this subsection is authorized to participate in any benefit plan offered to full-time county employees.

(9)   Attend meetings of the county commission other than when he or she is absent due to illness, scheduled vacation, or another legally permissible reason and discuss any matter before the commission, but shall not vote.  During the temporary absence of the county manager, a deputy county manager, should one be appointed, shall attend all commission meetings in lieu of the county manager.

(10) Supervise the performance of all contracts made by any person for work done for the county and supervise and regulate all purchases of materials and supplies for the county within the limitations and under the rules as may be imposed by the county commission, and to make purchases and contracts for the county in amounts not exceeding the formal sealed bid limit set by Alabama law or resolution of the county commission.

(11) Perform such other duties as the county commission may direct

and keep the county commission advised of any and all matters which may be pertinent to the discharge of its responsibilities.

Ala. Act No. 2011-69, § 7 (emphasis supplied).

As required by the foregoing statute, the County Commission formally established the position of County Manager on September 27, 2011, appointed Tony Petelos to fill the position, set his salary at $224,000 a year, and stated that he would be required to "perform the duties and responsibilities set forth in section 7, Alabama Act 2011-69[, *supra*], and such other duties and responsibilities as may be assigned by majority vote of the Jefferson County Commission."   Defendant's Ex. 146 (Resolution recorded in County Minute Book 162, at 216), at Bates # HR 217118 (alteration supplied).

The hiring of a County Manager represented a shift in the form of County government, from one in which the Commissioners serve as an executive body to one in which they sit more in a legislative capacity, formulating policies for execution by the County Manager.   Prior to the enactment of Alabama Act No. 2011-69, the individual Commissioners were responsible for actually supervising the day-to-day functions of the various Departments of County government, including each Commissioner serving as the appointing authority for the departments under his or her supervision.   Now, Mr. Petelos, as County Manager, acts as the Chief Executive

112

Officer of the County and, according to his job description, "directly manage[s] all County functions and operations except those that are assigned to the County attorneys or committed by general law to elected officers of the County."[275]   The County Manager's executive functions include serving as the sole appointing authority for all County employees in all departments, other than elected officials, non-merit system employees, and the County Attorney's office.[276]   Removing the ultimate authority over employment decisions from the hands of five elected officials and placing it in the hands of one appointed executive who, *theoretically*, will be more free from political influences and the pressures exerted by interest groups was a significant step in the direction of improving the County's ability to make consistent, unbiased, employment decisions based upon merit, as opposed to cronyism (*e.g.*, partiality to friends and family, regardless of qualifications).[277]

Moreover, the record of Mr. Petelos' professional background supports the conclusion that the Commissioners reasonably could have believed that choosing him for the position of County Manager would be a positive step toward bringing the

---

[275] County's Proposed Fact Nos. 87, 92 (alteration supplied).

[276] County's Proposed Fact Nos. 88-90.

[277] *Cf.*, *e.g.*, V.O. Key, Jr., *Southern Politics in State and Nation* 51 (1949) (describing former Alabama Governor Bibb Graves as a man who "impressed local politicians over the state as a practical man who could and would do business with them to meet the immediate practical problems of governing with mutually beneficial results.  With the friends produced by favors and the expectation of favors, he bound to himself an essentially personal following.").

County into compliance with its decree.  Mr. Petelos previously had served in the Alabama legislature, as the Mayor of Hoover, Alabama (a large municipality within Jefferson County), and as the Commissioner of the Alabama Department of Human Resources ("DHR") from 1997 to 2004.[278]   During Mr. Petelos' tenure as DHR Commissioner, the Department was under a federal consent decree, and was facing charges of contempt in the United States District Court for the Middle District of Alabama for violation of that decree.  A court-appointed Monitor was in place in the DHR case, and Mr. Petelos worked closely and cooperatively with the Monitor. Three or four years after Mr. Petelos resigned the position of DHR Commissioner, the Department's consent decree was lifted.[279]

Despite Mr. Petelos' qualifications and his professed commitment to compliance with the County's federal decree, plaintiffs assert that his leadership does not indicate that the County will be able to turn the tide toward decree compliance within a reasonable period of time.  The record supports that assertion.

During the December 2012 trial, Mr. Petelos testified that he had never instructed his staff to cease violating the consent decree, or to fulfill the County's obligations under the decree.[280]  Mr. Petelos read the decree shortly after taking office

[278] County's Proposed Fact Nos. 82-84, 93.

[279] County's Proposed Fact Nos. 94-106.

[280] December 2012 Trial Transcript, Vol. 7, at 169-70.

114

in November of 2011,[281] but it was nearly a year (August of 2012 at the earliest) before he learned which provisions the Martin-Bryant parties contended the County had violated.[282]  Mr. Petelos attempted to rationalize his omission of any meaningful attention to the County's responsibilities under its federal decree by testifying that he was "overwhelmed" during his first months in office, given his new position and the County's bankruptcy filing shortly after he arrived.[283]  He acknowledged that he did not focus on the consent decree during his first year in office because he was "too busy" with other issues.[284]  Mr. Petelos was not in office when the ALWOP process was implemented, but he was there for the RIF.  He told his staff that the RIF should be implemented "correctly," and "according to the rules."  While, in his mind, those amorphous, imprecise instructions allegedly implied compliance with the County's decree, he could not recall whether he had specifically instructed anyone that the RIF should be conducted in accordance with the consent decree.[285]  He also did not recall any conversations, prior to implementation of the RIF, about whether it might violate the consent decree.[286]  As already discussed, it is undisputed that the RIF resulted in

---

[281] *Id.* at 132.

[282] *Id.* at 134-37, 166-69.

[283] *Id.* at 139-40.

[284] *Id.* at 140-41.

[285] *Id.* at 147-51.

[286] December 2012 Trial Transcript, Vol. 7, at 138.

adverse impact against African-Americans and females in certain departments.

On the whole, therefore, the evidence reflects that *the current* Commissioners and *the present* County Manager espouse a generalized, subjective desire to move the County forward, toward compliance with the decree, but there is no evidentiary basis for concluding that such a goal occupies a high place on any of their personal agendas, or that any of those persons have the requisite knowledge, skills, abilities, determination, or perseverance necessary to accomplish that end within a reasonable period of time. Correcting thirty years of contumacious conduct, and bringing the County into compliance with all the requirements of a lengthy and complex consent decree, will take a significant investment of time and resources, and overseeing the County's compliance will likely require the devoted, full-time attention of one or more persons for many more years. There is no quick fix for systemic problems that have perversely persisted for decades.

Moreover, Jefferson County is riddled with other problems — not the least of which is the largest governmental bankruptcy in national history — that demand the attention of its legislative and executive leaders. While Mr. Petelos *now* may be, as he says, able to pay *more attention* to decree compliance, there is no reason to expect that he, or any other members of his staff, will be able to devote *full attention* to its requirements. As well-intentioned and qualified as Mr. Petelos may be, rectifying the

116

depth and breadth of the County's contempt will require more time and ability than he can devote to the task. Furthermore, it bears repeating that the current Commissioners are elected officials in the middle of their first terms, and there is no guarantee that all, much less a stable majority, will remain in place for the amount of time that will be necessary to bring the County into belated compliance.

### 4. Has there been "bad faith" on the part of the County?

A distinct line must be drawn between the current Commissioners and their predecessors. During the period from 1998 to 2008, five members or former members of the Jefferson County Commission committed crimes involving their "service" in office for which they were later convicted in federal court.[287] Four of the gang of five were sentenced to lengthy terms of imprisonment: *i.e.*, Jeff Germany to 43 months; Jewel C. "Chris" McNair to 60 months;[288] Gary White to 120 months;[289]

---

[287] In addition to the five persons named in the two sentences following this marginal note, Gregory John Katopodis, a *former member* of the Jefferson County Commission, was convicted in federal court for stealing money that the County, among others, donated to a charity he organized and managed, *ostensibly* for the purpose of assisting underprivileged children. *See United States v. Katopodis*, 428 F. App'x 902 (11th Cir. 2011) (convictions for mail and wire fraud). Even though Mr. Katopodis committed those crimes between 2001 and 2008, he was not counted in the tally of convicted former Commissioners because he left office in 1990.

[288] *See United States v. McNair*, CR-05-PT-61-S and CR-05-S-543-S (N.D. Ala.) (convictions for conspiracy and for having accepted bribes while in office from contractors in exchange for steering county sewer reclamation work to them); *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010).

[289] *See United States v. White*, CR-07-CO-448-W (N.D. Ala.) (convictions for having accepted bribes while in office from contractors in exchange for steering county business to them); *United States v. White*, 663 F.3d 1207, 1209 (11th Cir. 2011).

and Larry Langford to 180 months.[290]  Only Mary Buckelew escaped incarceration, but she was sentenced to 36 months of probationary supervision by a United States Probation Officer.[291]  For such reasons, the Eleventh Circuit suggested that the Commissioners who served Alabama's most populous county prior to the present officeholders provided an example of the definition of "kleptocracy":  a term describing a "government characterized by rampant greed and corruption."  *United States v. White*, 663 F.3d 1207, 1209 (11th Cir. 2011) (Carnes, J.) (citations omitted). For such reasons, this court is naturally suspicious of whether those previous Commissioners attempted, in good faith, to advance the purposes of the consent decree within those Departments of County government over which each exercised control.[292]

On the other hand, the *current* Commissioners and *present* County Manager do not appear to have *intentionally* directed any actions for the purpose of subverting the consent decree, and the weight of the evidence indicates that they possess a generalized, subjective intent to bring the County into compliance with its decree.

---

[290] *See United States v. Langford*, CR-08-CO-245-W (N.D. Ala.) (convictions for bribery, conspiracy, money laundering, mail fraud, wire fraud, and tax fraud); *United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011).

[291] *See United States v. Buckelew*, CR-08-J-357-S (N.D. Ala.) (conviction for obstructing an official proceeding).

[292] *See, e.g., United States v. White*, 663 F.3d 1207, 1210 (11th Cir. 2011) ("Jefferson County consists of five districts, each represented by an elected commissioner who serves as the head of a county department.").

The County's outside, retained attorneys also assert that the following actions constitute evidence of the incumbents' good faith:

> (1) the implementation of the County Manager and hiring of Mr. Petelos; (2) the creation of a HR Department that has centralized County record-keeping and reporting functions and added a layer of accountability to hiring decisions; (3) the creation and implementation in good faith of the Structured Interview Process that, while admittedly flawed, was an improvement over unfettered hiring by department heads; [and] (4) performing Consent Decree-specific training and providing additional mechanisms to inform all employees of the Decree.[293]

Several points must be made in response. First, even good faith efforts to achieve compliance will not be sufficient to avoid the imposition of a receivership if, as has been the case with Jefferson County, those efforts have consistently fallen short of attaining the objectives required by the decree.

Second, the County's focus on the *recent* good faith efforts of its *current* officials ignores certain actions and inactions on the part of *past* County officials *and* the County Attorney's office that cannot be characterized so favorably. More than two decades passed, and a motion for contempt had to be filed, before the County began to take *any* of the actions that it now relies upon as evidence of its good faith efforts. During those decades, the County virtually ignored the decree. In October of 2000, the County even stated to this court, through the voice of Assistant County

---

[293] Doc. no. 1772 (County's Post-Trial Brief), at 79 (alteration supplied).

Attorney Charles S. Wagner, that the County's goal in the litigation had "always been to more or less keep a low profile, *almost a stealthy profile, if you will*."[294]

Third, from 2000 through 2004, the County consistently evaded its reporting requirements under the decree by asserting, through the County Attorney's office, that those requirements had been satisfied by reports submitted by the Personnel Board.[295]

Finally, this court entered an order on August 1, 2008, excoriating the County Attorney's "egregious abuse of the discovery requirements of the Federal Rules of Civil Procedure," and requiring the County to pay the Martin-Bryant parties' fees and expenses incurred in pursuing discovery from the County,[296] as well as ordering County Attorney Edwin A. Strickland and Assistant County Attorneys Charles S. Wagner and Theodore A. Lawson to show cause why sanctions should not be imposed upon them individually.[297]   The County moved to reconsider the sanctions

---

[294] Martin-Bryant parties' Proposed Fact No. 30.1.3 (emphasis supplied).  The adjective "stealthy," and its root noun, "stealth," are pejorative terms that generally connote furtive, surreptitious, and hidden acts or movements.  *See, e.g., Webster's Third New International Dictionary* 2232 (defining *stealth* as, *e.g.,* "the act or action of going or passing furtively, secretly, or imperceptibly") (2002).

[295] *See* Martin-Bryant parties' Proposed Fact No. 30.1 and all subparts.

[296] *See* doc. no. 1514 (Order entered Aug. 1, 2008, and requiring Jefferson County to pay the fees and expenses of counsel for the Martin-Bryant parties as a sanction for discovery abuses).  For more detail about the extent of the County's discovery abuses, see the Martin-Bryant parties' motion for sanctions (doc. no. 1494) and the Martin-Bryant parties' Proposed Fact No. 31.5.3 and all subparts.

[297] *See* doc. no. 1514 (Order entered Aug. 1, 2008), at 2-3 ("Further, the in-house attorneys from the Jefferson County Attorney's Office who represented Jefferson County during the period in which counsel repeatedly failed to comply with the Martin-Bryant parties' discovery requests —

order on August 15, 2008,[298] but this court has not ruled upon that motion, and the sanctions order remains under advisement, pending the outcome of the present contempt proceedings.[299]

In summary, even though there is little evidence of recent bad faith on the part of *the current* Commissioners or *the present* County Manager, there have been bad faith efforts to avoid enforcement of the decree in the past.  And, of course, the County's admitted failure to comply with the requirements of its decree for more than three decades certainly does not provide a strong basis for believing that its assertions of a present good faith intent to comply with the decree will continue into an indefinite future.

5.   **Are resources being wasted?**

The County asserts "[t]here is no evidence that the County's conduct with

---

*i.e.*, Charles S. Wagner, Theodore A. Lawson, II, and the aforesaid attorneys' ultimate supervisor, Jefferson County Attorney Edwin A. Strickland — each are ORDERED to show cause, in writing, on or before August 15, 2008, why the fees and expenses incurred by the Martin-Bryant parties in pursuing discovery from Jefferson County should not be imposed upon them individually, *not to be satisfied out of County funds*.") (emphasis in original).

[298] *See* doc. no. 1528 (Jefferson County Motion for Reconsideration of August 1, 2008 Sanction Order [Doc. 1514]), filed Aug. 15, 2008.

[299] *See, e.g.*, doc. no. 1561 (Order entered Nov. 7, 2008, and providing in pertinent part that the motion of Edwin A. Strickland to withdraw as counsel of record due to his retirement from employment as the Attorney for Jefferson County "will be held in abeyance until such time as the court decides whether sanctions should be imposed upon Mr. Strickland in his individual capacity for contributing to Jefferson County's repeated failure to respond to discovery requests submitted by the Martin-Bryant parties").

121

respect to the Decree has been a huge waste of the taxpayer's [*sic*] resources."[300] After more than thirty years of admitted failures to comply with the decree, that is a ludicrous assertion.  It must be remembered that Edwin A. ("Andy") Strickland, who served as Jefferson County's Attorney from 1975 through October of 2008, was the highest paid public official in the State of Alabama.  Toward the end of his tenure, his annual salary approached $400,000.[301]   Yet, Mr. Strickland never bothered to personally appear on behalf of his client at any of the monthly status conferences held in this case during the years after supervision of these consolidated cases was transferred to the undersigned.  Further, the evidence is crystal clear that neither he, nor the Assistant County Attorneys he assigned to this case, took any effective steps to bring the County into compliance with the requirements of its consent decree. Given those facts, together with the incredible, staggering breadth of official corruption perpetrated on Mr. Strickland's watch — criminal conduct that resulted in the largest governmental bankruptcy in national history, and the imprisonment of five members or former members of the County Commission, six County Department heads or supervisors,[302] and thirteen contractors connected with the sewer repair and

---

[300] Doc. no. 1772 (County's Post-Trial Brief), at 80 (alterations supplied).

[301] Mr. Strickland's successor, Jeff Sewell, whose services were involuntarily terminated by the Jefferson County Commission earlier this year, was drawing an annual salary of $393,000.

[302] The County Department heads and supervisors convicted of criminal acts in connection with the sewer repair and renovation projects were:

renovation projects,[303] and the farcical financial arrangements for that program[304]

1. **Jack Swann**, Director of the Jefferson County Environmental Services Department, was convicted of one count of Conspiracy to Commit Bribery, six counts of Bribery, and eleven counts of Honest Services Mail Fraud, and sentenced to 102 months, concurrent.  *See* CR 05-CO-544-S (N.D. Ala.).

2. **Harry Chandler**, Assistant Director of the Jefferson County Environmental Services Department, was convicted of one count of Conspiracy to Commit Bribery, and sentenced to 24 months of probationary supervision.  *See* CR 05-PT-61-S (N.D. Ala.).

3. **Ronald Wilson**, Chief Civil Engineer of the Jefferson County Environmental Services Department, was convicted of one count of Conspiracy to Commit Bribery, one count of Bribery, and one count of Mail Fraud, and sentenced to 13 months, concurrent.  *See* CR 05-CO-545-S (N.D. Ala.) and CR 06-CO-84-S (N.D. Ala.).

4. **Clarence Barber**, Construction and Maintenance Supervisor for the Jefferson County Environmental Services Department, was convicted of one court of Conspiracy to Commit Bribery and sentenced to 5 months of imprisonment.  *See* CR 05-P-542-S (N.D. Ala.).

5. **Larry Creel**, Maintenance Supervisor for the Jefferson County Environmental Services Department, was convicted of one count of Bribery and sentenced to 12 months probation.  *See* CR 05-PT-61-S (N.D. Ala.).

6. **Donald R. Ellis**, Engineer for the Jefferson County Environmental Services Department and Chairman of the Product Review Board, was convicted of one count of Bribery and sentenced to 36 months probation.  *See* CR 05-B-203-S (N.D. Ala.).

7. **Civil Engineering and Design Services, Inc**., a corporation formed by Ronald Wilson while he was employed by Jefferson County as Chief Civil Engineer of the Environmental Services Department, was convicted of one count of Mail Fraud and sentenced to 12 months probation and fined $80,000.00.  *See* CR 06-C0-84-S (N.D. Ala.).

[303] The contractors convicted of criminal conduct in connection with the sewer repair and renovation projects included:

1. **Grady R. (Roland) Pugh**, Chairman of the Board and 70 percent owner of Roland Pugh Construction Co., Inc., was convicted of one count of Conspiracy to Commit Bribery and sentenced to 45 months.  *See* CR 05-PT-61-S (N.D. Ala.).

2. **Grady R. Pugh, Jr**., CEO and 10 percent owner of Roland Pugh Construction Co., Inc., was convicted of two counts of Conspiracy to Commit Bribery, and sentenced to 5 months.  *See* CR 05-PT-61-S (N.D. Ala.).

3. **Joseph E. (Eddie) Yessick**, President and 10 percent owner of Roland Pugh Construction Co., Inc., was convicted of three counts of Conspiracy to Commit Bribery, four counts of Bribery, and eleven counts of Honest Services Mail Fraud, and sentenced to 24 months, concurrent.  *See* CR 05-PT-61-S, CR 05-P-542-S and CR 05-CO-544-S (N.D. Ala.).

4. **Roland Pugh Construction Co., Inc.**, was convicted of three counts of Conspiracy to Commit Bribery, nine counts of Bribery, and eleven counts of Mail Fraud, and sentenced to 60 months probation and fined $19,400,000. *See* CR 05-PT-61-S, CR 05-P-542-S, CR 05-CO-544-S and CR 05-CO-545-S (N.D. Ala.).

5. **Bobby J. Rast**, President and 41.5 percent owner of Rast Construction, Inc., was convicted of two counts of Conspiracy to Commit Bribery and eight counts of Bribery, and sentenced to 51 months, concurrent. *See* CR 05-PT-61-S and CR 05-CO-544-S (N.D. Ala.).

6. **Daniel B. (Danny) Rast**, Executive Vice President and 41.5 percent owner of Rast Construction, Inc., was convicted of one count of Conspiracy to Commit Bribery and three counts of Bribery, and sentenced to 41 months, concurrent. *See* CR 05-PT-61-S (N.D. Ala).

7. **Rast Construction, Inc**., was convicted of two counts of Conspiracy to Commit Bribery and ten counts of Bribery, and sentenced to 60 months probation, concurrent, and fined $1,702,500. *See* CR 05-PT-61-S and CR 05-CO-544-S (N.D. Ala).

8. **Sohan P. Singh**, President of US Infrastructure, Inc., was convicted of two counts of Conspiracy to Commit Bribery, thirteen counts of Bribery, and one count of Obstruction of Justice, and sentenced to 78 months, concurrent. *See* CR 05-S-543-S (N.D. Ala.).

9. **Edward T. Key, Jr.**, Vice President of US Infrastructure, Inc., was convicted of two counts of Conspiracy to Commit Bribery, fourteen counts of Bribery, and one count of Obstruction of Justice, and sentenced to 60 months, concurrent. *See* CR 05-S-543-S (N.D. Ala.).

10. **US Infrastructure, Inc**., was convicted of two counts of Conspiracy to Commit Bribery, thirteen counts of Bribery, and one count of Obstruction of Justice, and sentenced to 60 months probation and fined $6,750,000. *See* CR 05-S-543-S (N.D. Ala.).

11. **Floyd W. (Pat) Dougherty**, President and fifty percent owner of F.W. Engineering & Associates, Inc., was convicted of two counts of Conspiracy to Commit Bribery and two counts of Bribery, and sentenced to 51 months, concurrent. *See* CR 05-PT-61-S and CR 05-CO-544-S (N.D. Ala.).

12. **F.W. Engineering & Associates, Inc**., was convicted of two counts of Conspiracy to Commit Bribery and two counts of Bribery, and sentenced to 60 months probation and fined $3,830,760. *See* CR 05-PT-61-S and CR 05-CO-544-2 (N.D. Ala.).

13. **William H. Dawson**, Owner of Dawson Engineering, was convicted of one count of Conspiracy to Commit Bribery and sentenced to 4 months. *See CR* 05-PT-61-S (N.D. Ala.).

[304] The persons indicted with former Jefferson County Commissioner and Birmingham Mayor Larry Langford for the sewer bond issues included:

1. **William Blount**, Chairman and Owner of Blount Parrish & Co., Inc., an investment banking firm, was convicted of one count of Conspiracy to Commit Bribery, Mail Fraud, and Wire Fraud, and one Count of Aiding and Abetting, and sentenced to 52 months, concurrent. *See* CR 08-CO-245-W (N.D. Ala.); and,

— it is clear that Jefferson County did not receive adequate value as consideration for the aggregate amounts paid to its former County Attorney and his subordinates as salaries.[305]

---

**2.  Albert LaPierre**, the former Executive Director of the Alabama Democratic party and a lobbyist registered in the State of Alabama, was convicted of one count of Conspiracy to Commit Bribery, Mail Fraud, and Wire Fraud, and one count of Tax Fraud, and sentenced to 48 months, concurrent.  *See* CR 08-CO-245-W (N.D. Ala.).

[305] A minute portion of the massive corruption was described in the Eleventh Circuit's opinion affirming the conviction of County Commissioner Gary White, *United States v. White*, 663 F.3d 1207 (11th Cir. 2011):

> In 1996 Jefferson County and the United States Environmental Protection Agency entered into a consent decree, settling a Clean Water Act lawsuit over untreated waste being released into the county's rivers and streams.  The consent decree required the county to fix its sewer system, which was a mess.  The cost of doing so was approximately $3 billion.
>
> The county hired engineering firms to design the necessary repair-and-renovation projects.  The Environmental Services Department supervised the process of hiring those engineering firms.  *The design contracts were let on a no-bid basis, so typically either a commissioner or staff member selected the firm that would receive the contract*.  The staff then determined the scope of the work under the contract and negotiated pricing with the contractor.  After the staff and the engineering firm agreed on the contract's terms, it would go to the director of the Environmental Services Department for approval and then to the county commissioner in charge of the department.  If the commissioner approved the contract, it then went to the environmental services committee, which consisted of that commissioner and two others.  They would decide whether to send the contract to the full commission, consisting of the three of them and the two other commissioners, for final approval.
>
> The sewer system reconstruction project was lucrative for U.S. Infrastructure, an engineering firm owned by Sohan Singh.  From 1996 to 2005, Singh's company and Jefferson County entered into approximately $50 million worth of contracts involving the sewer system work.  Each contract required the county to pay U.S. Infrastructure for its expenses in performing the work plus a professional fee.
>
> In getting contracts with Jefferson County, U.S. Infrastructure had a competitive advantage — bribes that Singh and others paid.  Singh and Edward Key,

*Have County resources been wasted since 1982, when the consent decree was entered?*  The question is rhetorical.  Clearly, "resources" have been wasted, even when that term is limited to money.  The word is larger than that, however.  It also encompasses *human resources*, and there is no way to quantify the "value" of the adverse impact of the County's perverse and persistent failure to comply with federal employment standards upon the lives and employment opportunities of untold numbers of African-American and female employees and applicants for employment with the County.

Even the monetary costs associated with many of the County's more recent efforts at achieving compliance with its decree have been a waste of taxpayer resources, insofar as those efforts have been incomplete, ineffective, or both.  The County weakly asserts that its efforts to develop a structured interview process have not been a waste, because the process "was done in good faith and has, in fact, brought *some benefit* to the County."[306]   The fact, if it be a fact, that the structured interview process was developed "in good faith" is not relevant to a determination of

who was a U.S. Infrastructure vice president, began bribing the county's officials in 1999 in exchange for contracts.  *See United States v. U.S. Infrastructre, Inc.*, 576 F.3d 1195, 1202-03 (11th Cir. 2009).  One of the officials who was bribed was Chris McNair, a former commissioner in charge of the Environmental Services Department.  *Id*. at 1203-06.

*White*, 663 F.3d at 1210-11 (emphasis supplied, footnote omitted).

[306] Doc. no. 1772 (County's Post-Trial Brief), at 81 (emphasis supplied).

126

whether it was a waste of taxpayers' resources.

Further, it cannot reasonably be stated that "some benefit" to the County (presumably, the contention that the structured interview process is better than the manager-driven hiring system that was in place before, and that the process has somewhat improved the County's recordkeeping) is worth the cost of developing a grossly flawed process. There is no evidence of the precise amount of money the County spent when developing that process, but the financial costs must have been high, not to mention the *human* resources that have been devoted to the effort. For all that time and money, the County created a process that has not been, and cannot be, validated under federal guidelines. If the process cannot be validated, the court sees no way that the County can continue to adhere to it and hope to be released from its decree. There also is no indication that the County's only idea for improving the process — videotaping the interviews — would positively effect validity, and the cost of videotaping likely would *far exceed* the $75,000 amount the County has budgeted to purchase video equipment, because Ms. Taylor acknowledged during trial that she had not considered the need for Human Resources employees to review each video.[307] In short, the structured interview process is a paradigmatic example of waste.

In addition, the County has paid the salaries of Human Resources personnel who

---

[307] *See* Martin-Bryant parties' Proposed Fact No. 31.4 and all subparts.

have failed to effectively carry out their responsibilities under the decree. It also paid the salary of Charles S. Wagner, the Assistant County Attorney who advised Ms. Taylor to implement the County's structured interview process, despite his scathing criticism of the use of such a procedure in the City of Birmingham.

Finally, the County points to its efforts to reach a settlement of the contempt issue prior to trial as evidence that it has not wasted taxpayer resources. According to the County, "for the greater part of the past year, [it] has attempted to take significant measures — requesting mediation and status conferences, seeking in-person meetings with Plaintiffs' counsel and voluntarily making concessions and stipulations — in an attempt to **save** resources."[308]   The implication of those statements, of course, is that the trial itself was a waste.[309]  The court does not agree with that assessment. While the trial no doubt resulted in costs to the County in terms of time and legal fees, those costs were not wasteful. As a result of the testimony and other evidence presented at trial, the court learned that the extent of the County's non-compliance with the requirements of its decree was far greater than reflected in the County's pre-trial stipulations. The court also had the opportunity to ask questions

---

[308] Doc. no. 1772 (County's Post-Trial Brief), at 81 (alteration supplied, emphasis in original).

[309] *See id.* ("This included making concessions and stipulations in hopes of using the time allocated for the hearing to resolve outstanding issues instead of having 'mini-trials' of individual complaints and hearing testimony about particular jobs and practices that were no longer relevant given the concessions and stipulations.").

and observe the demeanor and credibility of the witnesses for both sides.

### 6. Can a Receiver provide a quick and efficient remedy?

The County asserts that "[s]tripping the authority from the relevant decision-makers who want to bring the County into compliance with the Decree and placing it with a receiver is not a reasonable solution under the incredibly unique circumstances facing all aspects of the County, not just those in the HR Department."[310]  Stated differently, the County contends that a receiver over the HR Department would have to understand not just the consent decree, but also the County's bankruptcy, its budget issues, and the influence of the Alabama Legislature over the powers and prerogatives of County government.  According to the County, it "could take months — if not years — to fully understand and appreciate" those issues, resulting in "a delay in the development and implementation of non-discriminatory selection procedures and [an] increase [in] the risk of even greater inefficiencies."[311]  The County argues that the "disruption caused by the appointment of a receiver could be devastating," and it pleads that "[t]he elected officials and other County employees who understand and recognize the actual, realistic complexities

---

[310] *Id.* at 82 (alteration supplied).

[311] *Id.* (alterations supplied).

facing the County should be given the opportunity to do what they have stipulated to in writing and stated in open court with respect to the decree."[312]

The court does not dispute the County's characterization of the situation at hand as a complex one, and recognizes that bringing the County into compliance with its consent decree will require diverse skill sets and a substantial investment of time and resources, both human and monetary. There can be no "quick" or "efficient" remedy for thirty years of contempt, especially when the process of remedying the contempt is complicated by other problems of the County's own making. That does not mean, however, that an outside receiver cannot provide a *more efficient* or *expeditious* remedy than maintenance of the status quo or implementation of any of the remedies suggested by the County.

The overwhelming weight of the evidence of record indicates that the County cannot be expected to quickly begin complying with the decree, if left to its own devices. The County has had thirty years to achieve compliance, but it still has fallen far short. It has known of the plaintiffs' intent to enforce the decree since at least 2006, and even though it increased its *efforts* to comply with the decree since that time, the actual *results* of those efforts have been minimal. The Human Resources Department has not proven itself capable of developing and implementing procedures

---

[312] *Id.* at 82-83 (alteration supplied).

that will satisfy the decree, and the current Commissioners and County Manager also have not produced convincing evidence of progress. Thus, even if it did take an outside receiver months, or even years, to fully grasp all of the intertwining issues facing the County, there is every indication that the receivership still would provide a quicker and more efficient remedy than trusting the County to come into compliance on its own.

Moreover, most of the specific remedies proposed by the County are likely to *never* bring about complete decree compliance, even if the County did diligently implement them. The most profound example is the County's proposal to hire by lottery in 165 of 177 job classifications. The County touts that proposal as an "agreed" remedy, as though plaintiffs have agreed to it. But plaintiffs never asked for a remedy similar to the County's proposal, and they have not agreed to the County's proposal. Instead, the Prayer for Relief in plaintiffs' motion to hold the County in contempt and to modify the decree reads as follows:

> To redress the County's violations of its Decree, the Martin-Bryant parties respectfully request that this Court enter such further orders as are necessary to compel the County to comply with the purposes of its Decree and to bring its employment practices in line with Federal law. That relief may include, *but is not limited to*, the following:
>
> A. The County must develop lawful selection procedures for included jobs according to a detailed schedule. Each of the Included Jobs shall be placed on a schedule, pursuant to which the County will be

required to develop and implement a selection procedure that either (i) lacks adverse impact, or (ii) has been validated in accordance with the Uniform Guidelines. The schedule will provide for interim deliverables to the parties to the Decree, and periods for comment and objection. As to any particular job, satisfaction of the test development obligations shall occur either when the parties to the Decree agree that the obligations may be terminated or the County proves that the device either (i) lacks adverse impact or (ii) meets the Uniform Guidelines and cannot be replaced with an equally valid selection procedure that produces less adverse impact.

B. Until the County demonstrates that it has the technical skills and resources to develop lawful selection procedures, the County will be required to retain outside experts to enable it to comply with its selection procedure development obligations.

C. For each Included Job, *until lawful selection procedures are in place*, the County will fill appointments by lottery from those certified as eligible (for the classified service) or meeting bona fide minimum qualifications (for the unclassified service).

D. The Court shall enjoin the County from using any job selection procedure other than random selection from the relevant certification list for each Included Job unless either: (a) the parties to the Decree agree that a method may be used; or (b) the County proves that the method (i) lacks adverse impact, or (ii) is job-related, consistent with business necessity, and produces less adverse impact than any equally job-related alternative method.

. . . .

H. The Court shall enjoin the County from using independent contractors for positions equivalent to those constituting Included Jobs.

. . . .

N. The Court shall appoint a Monitor. For each Included Job, until the County satisfies its selection procedure development obligations, each

132

proposed employment or promotional decision, including a full record of the basis for that decision, will be submitted to the Monitor and the parties to the Decree, with a period during which those parties may object, after which the Monitor shall either approve or deny the proposed appointment. In the event of any objection, it shall be the County's burden to justify the appointment.

O.   All provisional, temporary or emergency appointments for Included Jobs must also be submitted, along with a complete justification, for review by the parties to the Decree and approval by the Monitor.

. . . .

Q.   All requests to terminate or recertify certification lists for Included Jobs must also be submitted, along with a complete justification, for review by the parties to the Decree and approval by the Monitor.

. . . .

AA.      In addition to the recordkeeping requirements contained in the County's decree, the County will be required to do the following:

(1)   Maintain detailed written records pertaining to every Included Job, completely documenting the selection procedure used to fill the vacancy and the steps taken to contact and evaluate every person eligible for appointment to that position;

(2)   Maintain detailed written records of its reasons for hiring or promoting persons to Included Jobs, including a written explanation as to why others were not hired or promoted.  The County shall be required to maintain any documentation considered in making those determinations;

(3)   For each provisional, temporary or emergency appointment made by the County to Included Jobs, maintain a written record of the complete selection procedure used to make any such appointment, including identification of all persons eligible for such

appointment, contacted for such appointment, and the reasons for selecting the particular person given such appointment and for rejecting others.  Also, the County shall maintain a written record to explain the circumstances under which a provisional appointment has been requested . . . .[313]

Doc. no. 1413 (Martin/Bryant Parties' Motion to Hold Defendant Jefferson County in Civil Contempt and Modify Jefferson County Consent Decree), at 12-19 (emphasis supplied).

Thus, it is clear that the Martin-Bryant parties only asked that hiring be conducted by lottery *until lawful selection procedures could be developed for* "*Included Jobs*."  They did not suggest random hiring as a *permanent* solution.[314]

Moreover, the County's understanding of what is meant by the term "Included Jobs" appears to be different from that of the Martin-Bryant parties.  In their motion, the Martin-Bryant parties defined "Included Jobs" as

*those for which there is a need for development of lawful selection*

---

[313] The Martin-Bryant parties originally asked for the appointment of a Monitor, not a Receiver.  They explain that change in their response to the County's post-trial brief:

The relief necessary to compel the County to comply with the Consent Decree after 30 years of noncompliance is more extensive and considerably more complicated than what was outlined in the Martin-Bryant parties' Contempt Motion, largely because discovery and trial have demonstrated a far wider pattern of violations and contempt than were apparent in 2007.

Doc. no. 1797 (Martin-Bryant parties' Response to County's Post-Trial Brief), at 10 (MBR 12.3) (alteration supplied).

[314] *Id*. at 162 (MBR 286.2.2).

> *procedures*.   Unless agreed upon by the parties, the list would be
> determined on the basis of evidence concerning incumbency data, selection
> procedure results, qualified labor pool data, and whether the County
> violated its Decree obligations in a way that may have affected
> appointments to those jobs.[315]

In their response to the County's post-trial brief, the Martin-Bryant parties state that
they intentionally did not provide a specific list of "Included Jobs" when they filed
the contempt motion, "because the parties did not [then] possess evidence sufficient
to identify the classifications where relief would be required, and because the
determination of the scope of relief could not fully be assessed until after the receipt
of all the evidence at trial."[316]  At some point during the course of pre-trial settlement
negotiations, however, the Martin-Bryant parties generated a list of 177 jobs and
presented them to the County as jobs that were viewed as "problematic" in some
sense that has not been fully explained in the record.[317]  The County first referenced
that list of 177 jobs in its pre-trial brief, stating that it was "the County's
understanding that the 'Included Jobs' referenced by Plaintiffs are the 177 job

---

[315] Doc. no. 1413, at 13 n.2 (emphasis supplied).

[316] Doc. no. 1797 (Martin-Bryant parties' Response to County's Post-Trial Brief), at 161
(MBR 286.2.1) (alteration supplied).

[317] *See id.* at 162 (MBR 286.3.1) ("The list of 177 job classifications identified by the County
was developed in the process of settlement negotiations, which were explicitly identified as subject
to Federal Rule of Civil Procedure 408.").

135

classifications found in Exhibit A to this brief."[318]  The County offered the following

explanation for how it came to that understanding:

> Plaintiffs assert in the Contempt Motion that the "Included Jobs" are
> "those for which there is a need for development of lawful selection
> procedures.  Unless agreed upon by the parties, the list would be
> determined on the basis of evidence concerning incumbency data, selection
> procedure results, qualified labor pool data, and whether the County
> violated its Decree obligations in a way that may have affected
> appointments to those jobs." (Doc. no. 1413, n.2).  However, when asked
> by the County how the Plaintiffs made a determination with regard to which
> jobs to include on the list of 177, Plaintiffs could offer no statistical or
> empirical basis for including any of the jobs, and offered only that the 177
> jobs were the ones that plaintiffs determined were problematic.  Based on
> the utter lack of empirical justification for certain positions to be included
> on this list, the County maintains that adverse impact must be established
> for the 12 positions at issue before the County is required to validate its
> selections procedures with regard to those jobs.[319]

The Martin-Bryant parties refuted the County's understanding in their response to the

County's post-trial brief, stating that "[a]t no time have the Martin-Bryant parties

suggested that *the list of 177 job classifications was intended to represent or replace*

the Included Jobs *as defined in the Contempt Motion*."[320]  Based upon the foregoing,

it cannot be said that the County's proposal to hire at random in 165 of 177 job

positions is an "agreed" remedy; instead, it is merely a proposal by the County, and

---

[318] Doc. no. 1750 (County's Pre-Trial Brief), at 25.  The brief actually does not contain an "Exhibit A."  Even so, the list of 177 jobs was submitted at trial as Defendant's Exhibit 162.

[319] Doc. no. 1750 (County's Pre-Trial Brief) at 25 n.11.

[320] Doc. no. 1797 (Martin-Bryant parties' Response to County's Post-Trial Brief), at 162 (MBR 286.3) (alteration and emphasis supplied).

it is flawed for the reasons discussed below.

First, the list of 177 jobs represents only a fraction of the approximately 800 job classifications at the County.[321]  Without more of an explanation of how the list of 177 positions was compiled, and without any evidence about the validity of the selection procedures for the remaining hundreds of job classifications, a remedy that only addresses 177 jobs appears incomplete.  It would be better, as the Martin-Bryant parties have suggested, to fashion a remedy that addressed *all* job classifications for which there was a need for the development of lawful selection procedures (*i.e.,* the "Included Jobs").

Further, the County has never explained how it selected the twelve positions for which it has offered to evaluate adverse impact, and to develop validated selection procedures if adverse impact is found.[322]  Mr. Petelos testified that the County Attorney's Office worked with the department heads to identify those twelve

---

[321] *See* December 2012 Trial Transcript, Vol. 6, at 228 (testimony of HR Director Demetrius Taylor that there are "over 800, maybe" job classifications at Jefferson County); December 2012 Trial Transcript, Vol. 8, at 257 (Commissioner Bowman) ("It is my understanding that we have more than 177 different jobs at the County . . . .").

[322] The Martin-Bryant parties point out that the trial testimony of Ms. Taylor and some of the Commissioners indicated that the County was agreeing to develop validated selection procedures for all of the twelve positions, not just ones for which adverse impact is found.  *See* doc. no. 1797 (Martin-Bryant parties' Response to County's Post-Trial Brief), at 163 (MBR 286.4.3).  However, a review of the County's pre-trial and post-trial briefs reveals that the County intends to develop validated selection procedures only for those positions in which adverse impact is found.

positions, but he did not explain what criteria were used.[323]  Commissioner Carrington also testified that the twelve positions were selected based on the advice of counsel. He stated that those positions had been deemed "questionable," an adjective that might, or might not, be synonymous with "adverse impact."[324]  Commissioner Bowman testified that the twelve positions were ones for which the County did not have validated selection procedures, but he did not know whether the other 165 positions had validated selection procedures.[325]  Commissioner Knight testified that the twelve positions were selected after a survey was conducted among department heads to determine the positions in which hiring was most likely to occur in the near future.[326]  Curiously, the twelve positions do *not* include those which were previously identified *by the County's own expert* as having adverse impact on the basis of race or gender.  Instead, for those positions identified by the County's expert as having adverse impact on the basis of either race or gender, the County has proposed to hire by random selection.[327]

---

[323] December 2012 Trial Transcript, Vol. 7, at 115.

[324] December 2012 Trial Transcript, Vol. 6, at 9-10, 33-42.

[325] December 2012 Trial Transcript, Vol. 8, at 255-59.

[326] December 2012 Trial Transcript, Vol. 9, at 45-46, 56-57.  It is worth noting that seven of the twelve positions have never had an African-American incumbent or hire since the decree was entered, and six of the twelve have never had a female.  *See* Martin-Bryant parties' Proposed Fact No. 31.3.4 and all subparts.

[327] *See* December 2012 Trial Transcript, Vol. 7, at 115-17; doc. no. 1750 (County's pre-trial brief), at 4.

Hiring by random selection from the Personnel Board's certification lists is not an effective *permanent* solution in the large number of jobs for which the County proposes to use that technique.  Dr. Lundquist, the Martin-Bryant parties' expert, testified that random selection is not a viable selection tool for all positions.  If any job required additional criteria beyond those covered by the Personnel Board's certification process, random hiring would not account for those criteria.  Dr. Lundquist also testified that it would take years for one person to determine which jobs had additional requirements beyond what was covered by the Personnel Board's analysis, and to develop valid selection procedures for those positions.[328]  That is not a feasible solution, and certainly not a "quick" or "efficient" one.

The court can speculate why the idea of random selection might be appealing to the County.  It is the easiest method, and presumably the least costly, because it requires only a drawing of names from a hat.[329]  It also has the appearance of being

---

[328] December 2012 Trial Transcript, Vol. 8, at 47-50.

[329] Ms. Taylor described the random selection process as follows:

[W]e would assign a number starting with maybe double zero's and go down the list. And then we would put numbers in a hat, a container, and allow maybe the department head or a department representative who's requesting the position and an H.R. person and maybe a third person to witness the pull.  They would pull the first number.  And whatever number that is, that corresponding name on the cert list would be the first person called for the position.

December 2012 Trial Transcript, Vol. 6, at 169-70 (alteration supplied).

a race- and gender-neutral process, unless one of the people involved in the drawing finds a way to manipulate the results. But the County cannot get by with the easy way after thirty years of contempt. The requirements of the decree demand a more complete remedy. The County has offered no evidence — and the court sees none — that random selection, even if it is a race- and gender-blind process, would help "*correct for the effects of* any alleged prior discriminatory employment practices by the County against blacks and women," which is one of the "major purposes" of the decree.[330] There also is no indication that random selection will help the County meet any of the more specific benchmarks in the decree, such as employing blacks and women in numbers approximating their representation on certification lists or among qualified applicants,[331] or securing a number of black and female applicants in certain departments that is equivalent to the degree of representation of blacks and women in the civilian labor force of Jefferson County.[332] White applicants could be randomly selected for every available position within the County and, even though those selections might not be the result of discrimination, the benchmarks in the decree still would never be met. Furthermore, the development of lawful, validated procedures for the selection of candidates from the certification lists received from the Personnel

---

[330] Consent Decree ¶ 5 (emphasis supplied).

[331] *Id.* ¶¶ 5, 9.

[332] *Id.* ¶ 13.

140

Board will help ensure that the County will be able to operate in the future in a non-discriminatory manner.  That is an important consideration if the County ever hopes to have its decree lifted.  *See Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 247 (1991) (holding that a consent decree can be terminated when "the purposes of the litigation as incorporated in the decree . . . have . . . been fully achieved," and when the evidence shows that it is "unlikely that [the defendant] would return to its former ways" following the termination of judicial supervision) (quoting *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248 (1968)) (alteration supplied).

Finally, even if the County's proposal to develop valid selection procedures for only twelve or fewer jobs (depending on the number of jobs for which adverse impact was demonstrated) were an acceptable remedy, it would not produce a "quick" or "efficient" result.  Commissioner Carrington acknowledged that the process of having an Industrial and Organizational Psychologist validate selection procedures for even just the twelve positions identified by the County would be a long-term project, lasting months.[333]  The court's assessment is that the process would take even longer than predicted by Commissioner Carrington — more like years than months.

---

[333] December 2012 Trial Transcript, Vol. 6, at 13-14.

In short, the County's proposal to hire at random in 177 jobs is not likely to effect the goal of causing the County to come into compliance with its decree, and the appointment of a Monitor to oversee the County's proposed procedures will not likely improve their effectiveness. An ineffective remedy cannot be an efficient one, and any time and resources invested in implementing the County's proposals would be a waste of the taxpayers' resources. Similarly, it would be inefficient to allow the current County leaders more time to attempt to comply with the decree on their own when they have proven themselves incapable of doing so during the two years they have held the reins of power.

The court is not deluded that an outside receiver will have an easy time immersing himself or herself in the County's problems, or that the appointment of a receiver will cause the County to comply with its decree within weeks, months, or just a year or so. Even so, any extra time an outside receiver will have to spend familiarizing himself or herself with the County's unique situation will be worth it, in light of the vast amount of time the County already has spent in contempt of its decree. Receivership will not be a "quick" remedy, but the court expects that it will, nonetheless, be the *most expeditious*, *most effective*, and, in the end, *the least expensive* way to cause the County to come into compliance with its decree.

142

# VII.  CONCLUSIONS AND ORDERS

HURRY UP PLEASE ITS TIME
If you don't like it you can get on with it, I said.
Others can pick and choose if you can't.

T.S. Eliot, *The Waste Land*, § II, lines 152-54 (1922).[334]

This litigation should not have lasted so long.  "Federal court supervision of local government has always been intended as a temporary measure and should not extend beyond the time required to remedy the effects of past intentional discrimination." *Ensley II*, 31 F.3d at 1574-75 (citations and internal quotation marks omitted).[335]

Over the course of the past thirty-nine years this litigation has become the American equivalent of the case of *Jarndyce vs. Jarndyce* that Charles Dickens depicted in his novel, *Bleak House*, as having long-ago "passed into a joke" within the English legal profession, because innumerable children had been born into it; innumerable young people had married into it; innumerable old people had died out of it; and, in the course of time, the case had become so complicated that no man alive

---

[334] There are several layers of meaning to Eliot's use of the exhortation "HURRY UP PLEASE ITS [*sic*] TIME," the traditional call of an English pub-keeper when it is time to close and for patrons to leave.  The phrase hints at the transitory nature of modern life.  It suggests the traditional call to judgment.  Eliot also may have been admonishing readers to change the way in which society works.  It is the latter two senses in which the quotation is used here.  Of course, the lines also possess rather obvious allusions to the present posture of this case.

[335] *See also, e.g., Bd. of Educ. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 248 (1991); *Milliken v. Bradley*, 433 U.S. 267, 280–82 (1977); *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 424, 1245 n. 5 (1976) (Kennedy, J., concurring).

knew what it meant. It just droned on and on. This litigation is not fictional, however, and its longevity is no joking matter. Instead, the age of these cases has become — as Judge Edward E. Carnes observed in *Ensley II*, addressing the consent decree of the Personnel Board of Jefferson County — "*a badge of shame — a monument to* [the various defendants'] *past and present failure to treat all* [employees and applicants for employment] *in a fair and non-discriminatory manner*." *Id*. at 1577-78 (alterations and emphasis supplied).[336]

Jefferson County's admitted violations of express and unambiguous provisions of its December 29, 1982 consent decree — standing alone, and without even taking into account the numerous, additional violations detailed in the Martin-Bryant parties' proposed findings of fact and conclusions of law — establish a thirty-year pattern of intentional, willful disobedience of this court's orders. Clearly, the Martin-Bryant parties' motion to hold Jefferson County in civil contempt, and to modify some provisions of its decree, is due to be, and it hereby is, GRANTED.

Accordingly, it is **ORDERED**, **ADJUDGED**, and **DECREED** that defendant

---

[336] It should be noted that Judge Carnes' scathing condemnation was published on August 25, 1994, *nearly nineteen years ago*; and, at a point in time when the parties' consent decrees had been pending only about twelve years. Judge Carnes also remarked sarcastically that this litigation "already [is] older than the average college student," and January of each year marks yet another "birthday, if such a thing were cause for celebration." *Birmingham Fire Fighters Association 117 v. Jefferson County*, 280 F.3d 1289, 1295, 1290 (11th Cir. 2002) (Carnes, J.) (alteration supplied).

Jefferson County, Alabama is adjudged to be in contempt for failing to comply with the requirements of the consent decree entered on December 29, 1982.

While the imposition of a receivership is, under normal circumstances, a remedy of last resort, it is fully justified in the present circumstances. This court finds that no other remedy would be adequate to correct the effects of three decades of blatantly contumacious conduct, and that the extraordinary remedy of appointing a Receiver over the County's Department of Human Resources — who will be answerable to no one but this court — is warranted in light of all of the factors addressed in this opinion. Therefore, the parties are ORDERED to confer regarding, among other topics, but not limited to, the following subjects:  prospective candidates for the position of Receiver; the extent of the Receiver's duties; the powers to be conferred upon the Receiver to select, hire, promote, demote, discipline, or fire employees; the Receiver's compensation; the Receiver's support staff and personnel; office space for the Receiver and his or her support personnel; the authority of the Receiver to select, retain, and compensate outside consultants to assisting in devising valid, non-discriminatory, selection procedures that either have no adverse impact on the basis of race or gender, or that — despite having disparate impact on the basis of race or

gender — are "job related" as the term is used in Title VII jurisprudence.[337]

The parties are further directed to file a joint report of their conference, supported by the resumes of any prospective candidates for the position of Receiver, on or before Friday, September 20, 2013.[338]  The parties also are requested to send a proposed order to be entered when a Receiver is formally appointed, in Word Perfect format, to the chambers of the undersigned at smith_chambers@alnd.uscourts.gov, on or before Wednesday, September 25, 2013.

The parties are further ORDERED to confer regarding what modifications should be made to the County's consent decree in light of the evidence presented at trial and the findings made in this opinion.  The parties must file a joint report of their conference on or before Friday, September 20, 2013.  The parties also must submit a Word Perfect copy of all proposed modifications to the consent decree to the chambers of the undersigned, at smith_chambers@alnd.uscourts.gov, on or before

---

[337] Of course, if the selection procedure is to be justified on the basis of its "job relatedness," despite having some adverse impact on the basis of race or gender, the County's Receiver and/or outside consultant will be required to demonstrate that he or she searched for selection procedures that were equally job related, and which produced less adverse impact.

[338] Ultimately, the parties will be ordered to confer regarding the creation of a detailed plan for revision of the County's selection procedures, as well as any other actions that must be taken in order to correct the County's contempt, and to submit a joint report in a format similar to that employed in the December 18, 2000 "Order Extending 1981 Consent Decrees and 1995 Modification Orders for the City of Birmingham and the Jefferson County Personnel Board."  *See* doc. no. 708. Even so, the specific line-items and deadlines specified in such a document will be dependent upon and largely influenced by the person appointed to serve as Receiver.  For that reason, the present Order contains no specific requirements for the preparation of such a report.  Even so, this marginal note is provided to alert counsel to the court's intentions, and to inform their ongoing discussions.

Wednesday, September 25, 2013.

Finally, counsel for all parties are directed to appear for a status conference commencing at 9:30 o'clock a.m. on Thursday, September 26, 2013, in Courtroom 5B of the Hugo L. Black United States Courthouse in Birmingham, Alabama. Counsel are further advised that, with the exception of the months of November and December of each year, this court presently contemplates that status conferences will be conducted on the final Thursday of each month thereafter.

**DONE** and **ORDERED** this 20th day of August, 2013.

United States District Judge

147